Amy P. Lally (SBN 198555)
alally@sidley.com
Ellyce R. Cooper (SBN 204453)
ecooper@sidley.com
SIDLEY AUSTIN LLP
1999 Avenue of the Stars, 17th Floor
Los Angeles, CA 90067
Telephone: +1 310 595-9500
Facsimile: +1 310 595-9501

Mark Rosenbaum (SBN 59940)
mrosenbaum@publiccounsel.org
Judy London (SBN 149431)
jlondon@publiccounsel.org
Talia Inlender (SBN 253796)
tinlender@publiccounsel.org
Alisa Hartz (SBN 285141)
ahartz@publiccounsel.org
Lucero Chavez (SBN 273531)
lchavez@publiccounsel.org
Elizabeth Hadaway (SBN 308800)
ehadaway@publiccounsel.org
Malhar Shah (SBN 318588)
mshah@publiccounsel.org
Deena Tumeh (SBN 318573)
dtumeh@publiccounsel.org
PUBLIC COUNSEL
610 S. Ardmore Avenue
Los Angeles, CA 90005
Telephone: +1 213 385-2977
Facsimile: +1 213 385-9089

*Attorneys for Plaintiffs*
*Additional counsel on next page*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| Ms. J.P., Ms. J.O., Ms. R.M., on behalf of themselves and all other similarly situated, Plaintiffs, v. | Case No. 2:18-cv-06081 **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| --- | --- |

233895133

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15

JEFFERSON B. SESSIONS III,
ATTORNEY GENERAL OF THE
UNITED STATES; KIRSTJEN
NIELSEN, SECRETARY OF
HOMELAND SECURITY; U.S.
DEPARTMENT OF HOMELAND
SECURITY, AND ITS SUBORDINATE
ENTITIES; U.S. IMMIGRATION AND
CUSTOMS ENFORCEMENT; U.S.
CUSTOMS AND BORDER
PROTECTION; ALEX M. AZAR II,
SECRETARY OF HEALTH AND
HUMAN SERVICES; U.S.
DEPARTMENT OF HEALTH AND
HUMAN SERVICES; SCOTT LLOYD,
DIRECTOR OF THE OFFICE OF
REFUGEE RESETTLEMENT; OFFICE
OF REFUGEE RESETTLEMENT;
DAVID MARIN, LOS ANGELES FIELD
OFFICE DIRECTOR, U.S.
IMMIGRATION AND CUSTOMS
ENFORCEMENT; LISA VON
NORDHEIM, WARDEN, JAMES A.
MUSICK FACILITY; MARC J. MOORE,
SEATTLE FIELD OFFICE DIRECTOR,
U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT; LOWELL CLARK,
WARDEN, TACOMA NORTHWEST
DETENTION CENTER,

16            Defendants.

17

18   Carter G. Phillips*                    Mark E. Haddad (SBN 205945)
19   cphillips@sidley.com                   markhadd@usc.edu
     Jennifer J. Clark*                     Part-time Lecturer in Law
20   jennifer.clark@sidley.com              USC Gould School of Law**
21   SIDLEY AUSTIN LLP                      University of Southern California
     1501 K Street, N.W.                    699 Exposition Blvd.
22   Washington, D.C. 20005                 Los Angeles, CA 90089
23   Telephone: +1 202 736-8000             Telephone: +1 213 675-5957
     Facsimile: +1 202 736-8711
24

25   Michael Andolina*                      Luis Cortes Romero (SBN 310852)
26   mandolina@sidley.com                   lcortes@ia-lc.com
     Timothy Payne*                         Alma L. David (SBN 257676)
27   tpayne@sidley.com                      adavid@ia-lc.com
                                            IMMIGRANT ADVOCACY &
28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Kevin Fee*
kfee@sidley.com
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
Telephone: +1 312 853-7000
Facsimile: +1 312 853-7036

Sean A. Commons (SBN 217603)
scommons@sidley.com
Bridget S. Johnsen (SBN 210778)
bjohnsen@sidley.com
SIDLEY AUSTIN LLP
555 West Fifth Street
Los Angeles, CA 90013
Telephone: +1 213 896-6000
Facsimile: +1 213 896-6600

LITIGATION CENTER, PLLC
19309 68th Avenue South, Suite R-102
Kent, WA 98032
Telephone: +1 253 872-4730
Facsimile: +1 253 237-1591

*Application for admission pro hac vice to be submitted

** Institution listed for identification purposes only

# INTRODUCTION

1.      This complaint challenges the federal government's infliction of enormous emotional trauma on immigrant families through its extraordinary, deliberate, and needless policy of separating parents from their children without a showing of that the parents are unfit, and then holding the parents and children each in separate detention with no access to one another.  This family separation policy inflicts severe harm on Plaintiffs and their children and violates their Fifth Amendment rights to due process and equal protection.  To remedy these constitutional violations and address the severe harm from trauma the government has inflicted, Plaintiffs and their children are entitled to appropriate screening and trauma-informed and family-centered mental-health services under conditions conducive to effective treatment.

2.      Leading trauma experts agree that forcible separation of children from their parents is a traumatic event that can have both immediate and long-term psychological consequences if left unaddressed by professional care.  As one expert explains, "[s]eparation of a child from his/her mother would be a traumatic event for both the child/adolescent and for the mother and father, causing … [p]anic and terror, frightening dreams, flashbacks, dissociation (blanking out and lack of awareness), depersonalization (sense of unreality and separation from oneself), withdrawal into intense grief and depression, an ongoing sense of fear and terror."[1]  Acute psychological distress from separation not only produces mental symptoms such as anxiety and depression but also has serious consequences for the physical health of parent and child as well as for child development.

3.      The circumstances of separation under the government's policy— including the lack of information on the children's whereabouts, the inability of parents and children to communicate with each other, their detention in crowded facilities with poor food and round-the-clock lighting, the extended nature of the

---

[1] Declaration of Marti Loring, ¶ 8.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

separation, and the lack of procedures for and information about reunification, all coupled with the stressors and trauma that initially led the families to flee their homes and that they may have experienced on their journey—further exacerbates the trauma and distress inflicted on the families.  According to trauma experts, "[w]hen the separation is sudden and frightening, when it is initiated by adults unknown to the child, when the parent has no opportunity to prepare the child, when it is done forcefully, and when there is no or minimal contact between the child and parent after and during the separation, then the distress will be greater and the effects significantly more damaging to the child."[2]

4.      Plaintiffs in this case are three mothers who have been separated from their minor children under the family separation policy and have been held in detention by the federal government.  Each Plaintiff came to the United States with a child under the age of 18, fleeing from persecution in her native country, and seeking asylum here as permitted under the laws of the United States.  They have been detained separately from their children.  Plaintiffs bring this action on behalf of all similarly situated parents.

5.      Defendants are each charged with faithfully executing the laws of the United States.  Nonetheless, Defendants have adopted their family separation policy with the deliberate objective of defying these laws and deterring families from Central America from seeking asylum.  The policy is a component of Defendants' racially-motivated effort to stem immigration from non-European countries.

6.      Defendants implemented their cruel policy in a chaotic manner.  They subjected parents already fleeing violence and persecution in their home countries to one of the most brutal traumas: forced separation from their children.  Parents and children were torn away from each other with little explanation.  Guards mocked children and parents for their tears.  Parents received little or no information about

---

[2] Declaration of Kenneth Berrick, John Sprinson & Kevin Campbell, ¶ 16 (hereinafter "Berrick Decl.").

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

their children's whereabouts or well-being, and no explanation as to when or whether they would ever see their children again.

7.     The harms inflicted by the family separation policy were avoidable.  In the past, the federal government found alternatives to family separation, including the release of parents and children.  In those rare cases where release on recognizance is insufficient, there are a variety of effective programs to ensure attendance at court hearings and other proceedings.  For instance, under the Family Case Management Program, the government released asylum-seeking parents and children together.  In this program, which costs far less than detention, immigrants appeared for their removal hearings over 99% of the time.

8.     Defendants' policy of family separation during detention was thus a new and gratuitous injury inflicted solely to terrify immigrant parents and children, deter other refugees from seeking asylum, and extract political concessions.  Executive Order No. 13841, which summarily and prospectively terminates the family separation policy, confirms that the policy of separating parents and children was never required by law.

9.     Indeed, on June 26, 2018, the United States District Court for the Southern District of California enjoined the federal government's unjustifiable policy, finding a likelihood that the policy violates the Constitution.  *See Ms. L v. U.S. Immigration & Customs Enf't*, 18-cv-0428, 2018 WL 3129486 (S.D. Cal. June 26, 2018).  The court recognized that the putative class of migrant parents was likely to succeed on the due process challenge because the federal government was separating children from their parents without any finding that the parents were unfit or presented a danger to their children.  *Id.* at *7.  Additionally, the court found that the government's policy "was implemented without any effective system or procedure for (1) tracking the children after they were separated from their parents, (2) enabling communication between the parents and their children after separation, and (3) reuniting the parents and their children after the parents are returned to immigration

custody following completion of their criminal sentence." *Id.*  As a result, the court ordered the government to reunify all class member parents with their children under five years old by July 10, 2018, and with all their children by July 26, 2018.  *Id.* at *12.

10.   Despite indicating on July 5, 2018 that it would comply with the court-imposed deadlines,[3] the federal government sought clarification and/or relief from these deadlines later the same day.  *See Ms. L v. U.S. Immigration & Customs Enf't*, No. 18-cv-428, ECF No. 86 (S.D. Cal. July 5, 2018).  As of July 9, 2018, Defendants had reunited only four of the approximately 100 children under the age of five who have been separated from their parents.[4]  On July 10, 2018, the district court issued a number of rulings related to the reunification process and stated that "[w]ith these rulings, the Court anticipates the Government will be reuniting fifty-nine (59) Class Members with their children by the end of the day today," *i.e.*, July 10, 2018, in addition to the four parents and children already reunified.[5]

11.   Defendants have also contended that they require relief from the *Flores* Settlement sufficient to detain asylum-seeking parents and children indefinitely in substandard unlicensed detention centers.  On July 9, 2018, the District Court for the Central District of California rejected this argument entirely.  *See Flores v. Sessions*, No. CV 85-4544-DMG, ECF No. 455 (C.D. Cal. July 9, 2018).  The Court found that Defendants' arguments turned on "a tortured interpretation of the *Flores* Agreement" that would render key provisions "meaningless," and that "[a]bsolutely nothing [in the *Ms. L* order or the *Flores* Settlement] prevents Defendants from reconsidering their current blanket policy of family detention and reinstating prosecutorial discretion."

[3] *See* Merrit Kennedy, *Trump Administration Says It Will Comply with Family Reunification Deadlines*, NPR (July 5, 2018) (reporting statements of Defendant Alex M. Azar II), https://www.npr.org/2018/07/05/626216102/trump-administration-says-it-will-comply-with-family-reunification-deadlines.

[4] *See Ms. L v. U.S. Immigration & Customs Enf't*, No. 18-cv-428, ECF No. 101 (S.D. Cal. July 10, 2018).

[5] *Id.*

*Id.* at 5. Indeed, the Court concluded that "it is apparent that Defendants' Application is a cynical attempt … to shift responsibility to the Judiciary for over 20 years of Congressional inaction and ill-considered Executive action that have led to the current stalemate." *Id.* at 7. As a result, the Court denied the application as "procedurally improper and wholly without merit." *Id.*

12.     These decisions make clear that Defendants' efforts to avoid their legal responsibilities are unacceptable. Plaintiffs have been harmed by Defendants' unconstitutional family separation policy and have further suffered from Defendants' failure to prepare for that policy shift. Defendants must remedy this crisis of their own making. What is needed is for the government to act promptly and to remedy the significant harms that it has caused by reunifying the separated families and providing immediate and appropriate mental-health services under conditions conducive to effective treatment as required under the Constitution and the *Flores* Settlement.

13.     Plaintiffs and their children are entitled to these services for three separate reasons. First, under the Due Process Clause, the government has an obligation to provide adequate medical care, including mental-health services, to individuals that it detains against their will. *See, e.g.*, *Wakefield v. Thompson*, 177 F.3d 1160, 1164 (9th Cir. 1999); *Gibson v. Cty. of Washoe, Nev.*, 290 F.3d 1175, 1188 (9th Cir. 2002), *overruled on other grounds by Castro v. Cty. of Los Angeles*, 833 F.3d 1060 (en banc) (9th Cir. 2016).

14.     Second, the egregious and gratuitous family separation policy has directly caused Plaintiffs' injuries that only appropriate mental-health services can remedy, and thus, Defendants have an obligation to provide those services. *See, e.g.*, *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 (9th Cir. 2006) (citing, *inter alia*, *DeShaney v. Winnebago Cty. Dep't of Soc. Serv.*, 489 U.S. 189, 197 (1989)).

15.     Third, under the *Flores* Settlement, the government must provide noncitizen children detained in immigration custody with "[a]ppropriate routine medical and dental care" and "appropriate mental health interventions when

necessary." *Flores* Settlement, Ex. 1, ¶ 2.  In these circumstances, where the government has inflicted trauma through family separation, those services must include appropriate mental-health screenings and any services deemed necessary by medical professionals, including family counseling, under conditions conducive to effective treatment.

**Plaintiff Ms. J.P.[6]**

16.    Plaintiff Ms. J. P. ("Ms. P") is the 37-year-old mother of 16-year-old L.P. Ms. P is currently being detained in the custody of U.S. Immigration and Customs Enforcement ("ICE") at the James A. Musick Facility in Irvine, California.  Her daughter, L.P., is currently being held at Casa Phoenix, a Southwest Key Programs, Inc., facility in Phoenix, Arizona.

17.    Ms. P entered the United States with her daughter near San Luis, Arizona, on or around May 17, 2018, after having fled Guatemala in fear for her life. Ms. P sought to escape death threats from a former partner who had sexually abused and beaten Ms. P.  Ms. P and L.P. were detained by U.S. Customs and Border Protection ("CBP") officers shortly after crossing the border.  Ms. P's native language, Q'eqchi', is a Mayan dialect that is rarely spoken in the United States.  She cannot speak or understand English, and understands very little Spanish.  As a result, Ms. P was not able communicate with the CBP officers who detained her and L.P.

18.    Upon their detention, CBP officials placed Ms. P and L.P. in a cold, windowless room alongside approximately 150 other detainees.  There were no beds, showers, or private toilets, and the lights were on 24 hours a day.  The room was too crowded to allow them to lie down, and they were provided only nylon blankets.  Ms. P and L.P. were fed nothing but lukewarm soup for days, and the only water available was from the bathroom tap.  L.P. recalls witnessing other children forcibly taken from

[6] *See* Declaration of J.P. ("J.P. Decl."); Declaration of Alejandra Acuña ("Acuña Decl."); Declaration of Chandra Allen ("Allen Decl."); Declaration of Lucero Chavez re. L.P. ("Chavez L.P. Decl.").

their parents' arms, and seeing a mother being physically restrained by guards as her son was taken away.  Guards at the facility taunted mothers, saying:  "If you're such a good mother why would you bring your child here."

19.     Ms. P and L.P. were not told if or when they would be released.  L.P. was questioned without her mother and given papers to sign in English, which she does not speak or read.  On or around May 20, 2018, officers came in and took L.P. away from Ms. P.  L.P. fainted in terror when she realized what was happening, causing injury to her mouth that left her face swollen for several days.  This cut was not treated until L.P. was moved to Southwest Key Programs.  Ms. P was not told or able to understand why her daughter was being taken, where she was going, or when—or if— she would see her daughter again.

20.     On June 1, 2018, with the assistance of a fellow detainee, Ms. P submitted a request to ICE seeking information on her daughter's whereabouts.  Ms. P can neither read nor write, and was not able to understand the written response that she received several days later, which, in any event, contained only her daughter's location and not a telephone number or other way to reach her daughter.  Ms. P had no contact with her daughter until June 22, 2018, when, after 30 hours of advocacy by her attorney, she was allowed to speak with L.P. by phone.  Until then, Ms. P feared that she would never see or speak to her daughter again.  She still fears that she faces certain death if she is forced to return to Guatemala, and remains worried that she will be deported and separated from her daughter.  Ms. P believes that she has been to court, but does not understand the purpose or substance of the court hearings that she attended.

21.     L.P. says that she has felt isolated during this period.  She has been kept hundreds of miles from her mother, and her only regular contact is with a counselor whom she sees once a week but who tells her not to cry even though L.P. feels crying helps her cope with the situation.  She feels depressed, hopeless, and confused by her detention and separation.  She cannot speak about her mother or the experience of

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

separation without crying.  She dreams of her mother and prays to be reunited with her.  According to according to a family member, L.P. "[i]s suffering without her mother."  Declaration of C.I., ¶ 3.

22.     Based on the preliminary evaluation of a licensed clinical social worker, Chandra Allen, L.P shows signs of depression, anxiety, adjustment to trauma, and traumatic grief.  L.P.'s constant uncertainty as to her situation and whether she will be reunited with her mother could lead to dissociative detachment and anxiety.

23.     Ms. P reports almost always having upsetting thoughts about being separated from her daughter, and repeatedly experiences bad dreams or nightmares.  She has significant difficulty sleeping and concentrating since L.P. was taken from her, and reports crying four times a day.  Based on the preliminary evaluation of a licensed clinical social worker, Alejandra Acuña, Ms. P is displaying symptoms of post-traumatic stress disorder ("PTSD"), depression, and anxiety as a result of being separated from L.P.  Ms. P has not reported having access to mental-health treatment.

**Plaintiff Ms. J.O.[7]**

24.     Plaintiff Ms. J.O. ("Ms. O") is the mother of 16-year-old T.B. Ms. O and her daughter fled their native Honduras in fear for their lives after gangs killed her husband in 2015 and beat her teenage son.  Ms. O and T.B. entered the United States near Granjeno, Texas, on or around May 17, 2018.  Rather than continuing into the interior, Ms. O and her daughter waited along a dirt road for a patrol car to arrive and flagged one down the next day.  They claimed fear of returning to Honduras and hoped to live with her sister in the United States.

25.     Ms. O and T.B. were processed separately and kept apart at the detention center that Ms. O called "La Hielera"—the icebox—because of the cold temperature inside.  While there, Ms. O was moved to "La Perrera," the doghouse, section of the facility where the holding cells resemble dog kennels.  During this transfer, Ms. O saw

---

[7] *See* Declaration of J.O. ("J.O. Decl."); Declaration of Lucero Chavez re. T.B. ("Chavez T.B. Decl.").

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

a young child taken from his mother, and the guards told the parents that a new law permitted them to take away their children permanently.  This statement terrified the parents, including Ms. O who feared she would be separated from T.B. forever.

26.     Ms. O was kept in a holding cell with over 50 other women.  There were no beds or pillows, and the lights were kept on 24 hours per day.  Ms. O was provided a piece of bread and a juice box for food.  From her cell, she could see T.B. in a similar chain-link cell with other children, some no more than five years old.  Because there were no adults in the cell, the older children were forced to care for the younger ones.  T.B., for instance, braided the younger girls' hair to provide them with some comfort.  During her time at La Hielera, Ms. O was moved from cell to cell.  But each cell was overcrowded, and at no time was she placed with her daughter.  Ms. O was not provided clean clothes or permitted to shower for the five days that she was in the facility.  She slept little, if at all, due to the cold temperature, 24-hour-a-day lighting, and her and others' constant crying.

27.     Ms. O spoke to T.B. once more in the facility, when they passed each other on the way to the restroom.  T.B. urged Ms. O not to sign deportation papers, fearing that Ms. O would be returned to Honduras without her.

28.     Ms. O's time in La Hielera separated from T.B. was traumatizing.  She lost track of which day it was, and the constant exposure to crying parents and children left her shaken.

29.     On or about May 21, 2018, Ms. O was taken with more than 50 other detainees to court for criminal proceedings.  Ms. O was told that she was to be charged with illegal entry in violation of 8 U.S.C. § 1325(a)(1).  Like the 35 people before her, she pleaded guilty, though she was not able to meet with an attorney before the proceedings and she did not understand the consequences of her plea.

30.     After these proceedings, CBP explained that Ms. O would be transferred to another facility without her daughter.  On or about May 21, 2018, Ms. O was moved to the SeaTac Federal Prison in SeaTac, Washington, and subsequently

9

1   transferred to the Northwest Detention Center in Tacoma, Washington.  On July 12,

2   2018, Ms. O was released on bond.

3       31.     Ms. O has not seen her daughter since approximately May 21, 2018 when

4   Ms. O was moved to SeaTac.  For nine days thereafter, Ms. O was unable to obtain

5   any information regarding her daughter, despite multiple pleas to immigration

6   officials.  Ms. O did not learn of T.B.'s whereabouts until May 30, 2018.  She learned

7   from her sister that T.B. is currently being detained in Southwest Key Programs,

8   Inc.—Casa Antigua in San Benito, Texas. Ms. O has since spoken with her daughter

9   only three times for less than five minutes per call.  Ms. O has attempted to call a

10  social worker to set up further calls, but the social worker has not answered the phone.

11      32.     To date, Ms. O has not received any mental-health or counseling services

12  from the government to address the trauma she has experienced due to the separation

13  from her daughter.

14  **Plaintiff Ms. R.M.[8]**

15      33.     Plaintiff Ms. R. M. ("Ms. M") and her 15-year-old daughter, S.Q., fled El

16  Salvador to get away from Ms. M's husband, a former military officer, who had

17  severely beaten her and threatened her life, and in fear of gangs who have threatened

18  S.Q.  On or around May 18, 2018, Ms. M and S.Q. entered the United States near

19  Hidalgo, Texas.  Ms. M and her daughter waited under a tree and flagged down a

20  patrol car.  They claimed fear of returning to their country of origin.

21      34.     Ms. M and her daughter were immediately taken to a facility and

22  separated for questioning.  Ms. M was unable to concentrate on the officials'

23  questions until she saw where her daughter was taken.  Once she located her daughter

24  and turned her attention to the officials, they began yelling at her that she would be

25  deported without her daughter and punished for bringing S.Q. from El Salvador.  Ms.

26  M. started crying, and one official told her:  "You can thank Trump."  The officials

27  ───────────────

28  [8] *See* Declaration of R.M. ("R.M. Decl."); Declaration of Lucero Chavez re. S.Q. ("Chavez S.Q.. Decl.").

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1  pressured her to sign deportation papers by threatening that she would go to jail if she

2  did not sign them.  Ms. M refused for fear of being deported without her daughter.

3  The officials laughed at her.  The questioning ended only when Ms. M reiterated that

4  she feared returning to El Salvador.

5       35.  After this questioning, Ms. M was taken to La Perrera and placed into a

6  cage with 40 or 50 other women.  They sat shoulder to shoulder on the floor.  They

7  were not provided beds, mats, pillows, or blankets.  There was only one toilet in the

8  cell, and it was in the open without walls or a door.  Women would stand to create a

9  human wall to provide the person using the toilet a small measure of privacy.

10       36.  Ms. M and the women in her cell were provided a soggy piece of bread, a

11  frozen piece of ham, and a juice box for sustenance twice a day.  The guards would

12  also open the cell door and throw crackers on the floor.  When the hungry women

13  scrambled to pick them up, the guards would laugh.  One time when Ms. M was

14  standing close to the door, she reached out her hand for a cracker.  Instead of handing

15  her the cracker, the guard asked, "do you want five-star treatment," and then threw the

16  cracker on the floor, saying "there is your room service."

17       37.  Ms. M was also not permitted to brush her teeth for four days, and she

18  was not given a change of clothes.

19       38.  From her cage, Ms. M could see her daughter in a different cage with

20  other children.  She was not permitted to speak with her, but she could see her

21  continuously crying.

22       39.  On or about May 21, 2018, Ms. M was taken with over 50 detainees

23  before a judge for criminal proceedings.  Ms. M was told that she was being charged

24  with illegal entry into the United States pursuant to 8 U.S.C. § 1325(a)(1).  She was

25  placed in shackles and handcuffs, and before the proceedings began, a man stood up

26  and advised the detainees to plead guilty in order to receive a lower sentence.  Ms. M

27  and the 25 people before her pleaded guilty because she thought that she had to do so.

28  She did not understand the consequences of her plea.

40.     Following these proceedings, Ms. M was placed on a bus and transferred to Laredo, Texas.  Ms. M and the other women cried out, asking for their children.  One guard yelled, "stop asking about your kids!"  Ms. M began crying uncontrollably once she realized that she was going to be separated from her daughter.  For three days, she slept no more than one hour per night.  She could not eat and she could not talk to anyone.  No official told her where her daughter was or even whether she was safe, though she learned from her mother on May 25, 2018, that her daughter was in San Benito, Texas at Southwest Key Programs, Inc.—Casa Antigua.

41.     Eventually, Ms. M was transferred to the SeaTac Federal Prison in SeaTac, Washington.  She was later moved to the Northwest Detention Center in Tacoma, Washington.  On July 12, 2018, Ms. M was released on bond.

42.     On or about June 22, 2018, Ms. M was finally able to speak with her daughter for about one minute.  S.Q was crying uncontrollably and could not speak.  Ms. M has tried to set up additional calls through S.Q.'s social worker, but the social worker does not answer the phone.

43.     Ms. M believes that her daughter has suffered significantly due to their separation and detention and that she will need trauma-based counseling as a result.  To date, Ms. M has not received any mental-health services from the government to address the trauma she has experienced due to the separation from her daughter.

44.     Ms. M's mother—S.T.—is a permanent legal resident in the United States and has lived here since 1989.  *See* Declaration of S.T.  Based on her conversations with her daughter and granddaughter, she believes that their separation has been traumatic for them.  Additionally, she is "ready, willing, and able to take care of, and provide a home for[,] both R.M. and S.Q. at any time, and [is] committed to doing what [she] can to have R.M. released and to support her while she is in the United States."  *Id.* ¶ 15.

---

12
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**Defendants**

45.    Defendant Jefferson B. Sessions is the Attorney General of the United States.  In this capacity, Defendant Sessions is responsible for setting policy related to the enforcement of immigration laws in the United States, including the policy of family separation.

46.    Defendant Kirstjen Nielsen is the Secretary of the Department of Homeland Security.  In this capacity, Defendant Nielsen is responsible for the administration of immigration laws in the United States.  Defendant Nielsen has ultimate responsibility for each of the agencies within DHS, and for all DHS policies and procedures.

47.    Defendant U.S. Department of Homeland Security ("DHS") is responsible for enforcing the immigration laws of the United States.

48.    Defendant U.S. Immigration and Customs Enforcement ("ICE") is the agency of DHS responsible for administering immigration laws in the United States, including overseeing immigration detention.

49.    Defendant U.S. Customs and Border Protection ("CBP") is an agency of DHS responsible for the processing and detaining of noncitizens who are apprehended near the United States border.

50.    Defendant Alex M. Azar II is the Secretary of Health and Human Services.  In this capacity, Defendant Azar is responsible for the detention of unaccompanied non-citizen children.  Defendant Azar has ultimate responsibility for each of the agencies within HHS, and for all HHS policies and procedures.

51.    Defendant U.S. Department of Health and Human Services ("HHS") is responsible for the detention of unaccompanied non-citizen children.

52.    Defendant Scott Lloyd is the Director of the Office of Refugee Resettlement.  In this capacity, Defendant Lloyd is responsible for the detention of unaccompanied non-citizen children, and has ultimate responsibility for all ORR policies and procedures.

53.     Defendant Office of Refugee Resettlement ("ORR") is the agency of HHS responsible for detaining unaccompanied non-citizen children.

54.     Defendant David Marin is the Los Angeles Field Office Director for ICE. In this capacity, Defendant Marin is responsible for the detention of J.P.

55.     Defendant Lisa Von Nordheim is the warden at the James A. Musick Facility.  In this capacity, Defendant Von Nordheim is responsible for the detention of J.P.

56.     Defendant Marc J. Moore is the Seattle Field Office Director for ICE.  In this capacity, Defendant Moore has been responsible for the detention of J.O. and R.M.

57.     Defendant Lowell Clark is the warden at the Tacoma Northwest Detention Center.  In this capacity, Defendant Clark has been responsible for the detention of J.O. and R.M.

## JURISDICTION AND VENUE

58.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1346, and 2241 because this action arises under the Constitution and laws of the United States.

59.     Sovereign immunity does not bar claims against federal officials seeking solely to prevent future violations of federal law (rather than monetary relief).  *See, e.g.*, *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 697-99 & nn.18-19 (1949); *Shields v. Utah Idaho Cent. R.R. Co.*, 305 U.S. 177, 183-84 (1938); 5 U.S.C. § 702.

60.     Venue is proper in the Central District of California under 28 U.S.C. §§ 84(c) and 1391(e)(1) because at least one plaintiff resides in this judicial district and each defendant is an agency of the United States or an officer of the United States sued in his or her official capacity.

61.     The Court has authority to provide declaratory relief under 28 U.S.C. §§ 2201-2202.

14

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## STATUTORY AND LEGAL FRAMEWORK

### U.S. Law Permits Families to Seek Asylum upon Arrival

62.     The laws of the United States permit non-citizens on American soil to seek asylum regardless of how, or where, or with whom they arrive at the border. Specifically, these laws establish that "[a]ny alien" who arrives in the United States, "whether or not at a designated port of arrival" may apply for asylum "irrespective of such alien's status." 8 U.S.C. § 1158.

63.     Statutes that govern the process for seeking asylum in the United States have their roots in the refugee crisis that followed World War II.  They incorporate concepts from international law (*see, e.g.*, 8 U.S.C. § 101(a)(42) (incorporating the definition of "refugee" from the United Nations Convention Relating to the Status of Refugees)), and provide a process for individuals who fear persecution in their native countries to seek protection in the United States (*see, e.g.*, Refugee Act of 1980, Pub. L. No. 96-212 § 201(b), 94 Stat. 102 (1980)).

64.     The United States does not limit the right to seek asylum to those who cross into the country at a port of entry.  Those apprehended for the first time crossing into the United States outside a port of entry may be subject to expedited removal, a process under which an individual may be removed from the United States without a full hearing before an immigration judge.  *See* 8 U.S.C. § 1225(b)(1)(A)(i).  But there are safeguards to protect those seeking asylum in that context.  If an individual "indicates either an intention to apply for asylum . . . or a fear of persecution," immigration officers must refer the individual "for an interview by an asylum officer" to evaluate whether the individual has a credible fear of persecution if returned to their country.  8 U.S.C. § 1225(b)(1)(A)(ii).

65.     If an asylum officer concludes that there is a "significant possibility" the individual can prove eligibility for asylum, the asylum seeker receives a positive credible fear determination and is placed into regular removal proceedings.  During those regular removal proceedings, the putative refugee may submit an asylum

application, obtain a hearing before an immigration judge, and appeal an adverse decision through the Board of Immigration Appeals and the federal courts.  8 U.S.C. § 1225 (b)(1)(B)(ii); 8 C.F.R. § 235.6(a)(1)(ii), (iii).

66.    An asylum seeker may also be placed directly into regular removal proceedings with issuance of a Notice to Appear for a future hearing date.  *See* 8 U.S.C. §§ 1225(b)(2), 1229(a)(1), 1229a.

67.    No law requires the detention of asylum seekers throughout this process, and no law requires the prolonged separation of families either.

## The *Flores* Settlement Sets Standards for Housing and Providing Services to Detained Children

68.    When the government detains children, it must comply with the *Flores* Settlement, regardless of whether the children arrive unaccompanied or with their families.  *Flores v. Lynch*, 828 F.3d 898 (9th Cir. 2016).

69.    The *Flores* Settlement requires the government to "place each detained minor in the least restrictive setting appropriate to the minor's age and special needs."  Settlement ¶ 11.  Children should generally be released within five days to one of the following recipients, in order of preference:  a parent, a legal guardian, an adult relative, an adult designated by a parent or legal guardian, or, if no such individuals are available, a licensed program willing to accept legal custody.  *Id.* ¶¶ 12, 14.  In the event of an "emergency" or an "influx" of minors into the country, the government is required to place minors "as expeditiously as possible."  *Id.* ¶ 12.C.  The *Flores* court found that up to 20 days may be as expeditious as possible for the government under extenuating circumstances, a time frame that has been widely reported in the press.

70.    The government must "make and record the prompt and continuous efforts on its part toward family reunification and the release of the minor," and "[s]uch efforts at family reunification shall continue so long as the minor is in [the government's] custody."  Settlement ¶ 18.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

71.     When the government transfers a detained minor to any person or entity other than a parent, guardian, adult relative, or a parent or guardian's designee, such person or entity is required to be "licensed by an appropriate State agency to provide residential, group, or foster care services for dependent children."  Settlement ¶ 6. Any such licensed person or entity to which the government transfers a minor is required to meet certain additional standards, as described in Exhibit 1 of the *Flores* Settlement.

72.     Among other services, licensed programs must provide "appropriate mental health interventions when necessary," "identification of the minor's special needs including any specific problem(s) which require immediate intervention," "[a]t least one (1) individual counseling session per week conducted by trained social work staff," "[g]roup counseling," and "[v]isitation and contact with family members (regardless of their immigration status)."  Settlement, Exhibit 1.

73.     The government is required by the *Flores* Settlement to "treat minors with dignity, respect, and special concern for their particular vulnerability." Settlement, Exhibit 2.  The government is further required to "hold minors in a facility that is safe and sanitary and that is consistent with . . . the particular vulnerability of minors."  *Id.*  Any such facility in which minors are held by the government following arrest must provide for "contact with family members who were arrested with the minor."  *Id.*[9]

---

[9] On June 21, 2018, the government requested relief from the *Flores* Settlement so as to permit it to detain minors who are arrested with their parents indefinitely through the pendency of their immigration proceedings, in facilities unlicensed by any state authority.  *Flores v. Sessions*, No. 85-cv-04544, Dkt. 435 (C.D. Cal. Jun. 21, 2018). The Court rejected this request as "procedurally improper and wholly without merit." *Flores v. Sessions*, No. CV 85-4544, ECF No. 455, at 7 (C.D. Cal. July 9, 2018).

## THE NEEDLESS AND INHERENTLY CRUEL POLICY OF FAMILY SEPARATION INFLICTED IRREPARABLE HARM

### The Family Separation Policy Was Unnecessary

74.     Defendants have falsely claimed that the family separation policy was required by existing law. [10]  Their position is belied by the June 20, 2018 Executive Order ending the policy on a prospective basis.  It is also belied by the practice of prior administrations[11] and the undeniable existence of effective alternatives.

75.     Several alternatives to detention would allow asylum seekers and their families to remain together.  For example, in recent years community supported models have proven particularly effective and economical.  For many migrants, release on recognizance is sufficient to ensure that they attend court hearings and other proceedings. [12]

76.     In other cases, case management programs have proven effective. Indeed, the American Academy of Pediatrics ("AAP") endorses community-based case management as an alternative solution to detention.[13]  Beginning on January 21, 2016, the Family Case Management Program ("FCMP") was offered as an "alternative to detention . . . that use[d] qualified case managers to promote participant compliance with their immigration obligations."[14] The program used a wrap-around services

[10] Linda Qiu, *Fact-Checking the Trump Administration's Case for Child Separation at the Border*, N.Y. TIMES (June 19, 2018), https://www.nytimes.com/2018/06/19/us/fact-check-trump-child-separation.html.

[11] *Id.*

[12] *See, e.g.*, *Report of the DHS Advisory Committee on Family Residential Centers*, DHS (Sept. 30, 2016), https://www.ice.gov/sites/default/files/documents /Report/2016/ACFRC-sc-16093.pdf ("For many families, release on recognizance with information about rights and responsibilities and referrals to legal services and psycho-social supports is sufficient to ensure compliance with immigration proceedings.").

[13] Julie M. Linton et al., *Detention of Immigrant Children*, THE AMERICAN ACADEMY OF PEDIATRICS (March 2017), http://pediatrics.aappublications.org/content/early/ 2017/03/09/peds.2017-0483.

[14] *Fact Sheet: Stakeholder Referrals to the ICE/ERO Family Case Management Program*, U.S. I.C.E, *available at* http://www.ilw.com/immigrationdaily/ news/2016,0111-ICE.pdf.

18

model for immigrant families whom ICE recommended for placement after determining they were "non-dangerous" and "low-flight-risk families."[15]  The cost was reported to be $36 per family each day compared to $319 per bed per day in a family detention center.[16]

77.    The FCMP was designed, but not limited, to serve victims of domestic violence or sexual abuse, pregnant women, nursing mothers, and families with physical and/or mental illness. The FCMP operated in five cities across the United States: Baltimore, Chicago, Los Angeles, Miami, and New York.  The program allowed families for whom detention in ICE centers or more traditional alternative programs would exacerbate their trauma or illness to exit detention into the community while they moved through their immigration proceedings. The program facilitated access to holistic community-based services tailored to each family's needs, including:[17]

- Orientation and education for participants about their legal rights and responsibilities;
- Individualized family service plans;
- Assistance in accessing low-cost or pro bono legal assistance for housing, education, and—as most relevant here—mental health providers (if needed);
- Assistance with transportation logistics;

---

[15] *Id.*; *see also* Loiselle, Mary F., *GEO Care's New Family Case Management Program*," GEO World, at 3 (2016), *available at* https://www.geogroup.com/userfiles/1de79aa6-2ff2-4615-a997-7869142237bd.pdf.

[16] Elise Foley & Jennifer Bendery, *This Alternative to Detaining Immigrant Families Works.  Trump Just Won't Use It.*, HUFFINGTON POST (June 22, 2018), *available at* https://www.huffingtonpost.com/entry/trump-family-detention-alternative_us_5b2d4731e4b0321a01d1002e.

[17] *Fact Sheet: Stakeholder Referrals to the ICE/ERO Family Case Management Program*, U.S. I.C.E, *available at* http://www.ilw.com/immigrationdaily/news/2016, 0111-ICE.pdf; Loiselle, Mary F., *GEO Care's New Family Case Management Program*," GEO World, at 3 (2016), *available at* https://www.geogroup.com/userfiles/1de79aa6-2ff2-4615-a997-7869142237bd.pdf.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

- Tracking and monitoring of immigration obligations; and
- Safe repatriation and reintegration planning (where applicable).

The FCMP was launched on January 21, 2016, and proved within its first year of operation to be a more effective alternative to other more restrictive alternatives traditionally utilized.  It was a step forward in procuring dignity for immigrant families, and it satisfied ICE's primary goal of ensuring compliance with participants' immigration obligations—99% for ICE check-ins and appointments, and 100% for attendance at court hearings.[18]

78.    Despite its success in terms of the government's stated compliance priorities, the program was closed in June 2017.

**"Zero Tolerance" Family Separation Policy Rationalized as Deterrent**

79.    On May 7, 2018, Attorney General Jeff Sessions announced a "zero-tolerance" policy of forced family separation to deter migrants from crossing the southern border of the United States.  Sessions said, "If you cross this border unlawfully, then we will prosecute you.  It's that simple. . . .  If you are smuggling a child, then we will prosecute you and that child will be separated from you. . . ."[19]

80.    The family separation policy was by no means limited to "smugglers." In the first month of the policy, nearly 3,000 children were separated from their parents while crossing the border.[20]  Some children were as young as 18 months old,

---

[18] *U.S. Immigration and Customs Enforcement's Award of the Family Case Management Program Contract (Redacted).* DHS Office of Inspector General, at 5 (OIG-18-22) (Nov. 30, 2017).

[19] *Attorney General Sessions Delivers Remarks Discussing the Immigration Enforcement Actions of the Trump Administration*, DOJ Justice News (May 7, 2018), https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-discussing-immigration-enforcement-actions.

[20] Caitlin Dickerson, *Trump Administration in Chaotic Scramble to Reunify Migrant Families*, N.Y. TIMES (July 5, 2018), https://www.nytimes.com/2018/07/05/us/migrant-children-chaos-family-separation.html.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

and more than 100 children were younger than four years old.[21]  These children have been sent to shelters and other temporary housing, overseen by the U.S. Department of Health and Human Services ("HHS"), across the United States.  The children are often housed hundreds of miles away from their parents.  There are an estimated 100 shelters in 17 states, including Arizona, California, Connecticut, Florida, Illinois, Kansas, Maryland, Massachusetts, Michigan, New Jersey, New York, Oregon, Pennsylvania, South Carolina, Texas, Virginia, and Washington.[22]  Of course, separation of a mere mile between a child and parent is a terrifying situation for both when there is no certainty of where the parent or child is being kept and no guarantee that the two ever will be reunited.

81.    Defendants have mischaracterized family separation as necessary to enforce the law.  But DHS expressly contemplated using family separation to deter migration from Central America into the United States at least a year before the "zero tolerance" policy was adopted.[23]  In March 2017, then-DHS Secretary John Kelly confirmed that family separation was under consideration as a means to deter migration across the southern border.  After experts and members of Congress strongly opposed the idea, DHS Secretary Kelly testified in April 2017 that DHS would not "routinely" separate children from their families at the border, except under extenuating circumstances.[24]  Nevertheless, non-profit organizations observed a trend

---

[21] Caitlin Dickerson, *Hundreds of Immigrant Children Have Been Taken From Parents at U.S. Border*, N.Y. TIMES (Apr. 20, 2018), https://www.nytimes.com/2018/04/20/us/immigrant-children-separation-ice.html.

[22] Sarah Almukhtar et al., *Where Migrant Children Are Being Held Across the U.S.*, N.Y. TIMES (June 21, 2018), https://www.nytimes.com/interactive/2018/06/21/us/where-are-the-border-children.html.

[23] Daniella Diaz, *Kelly: DHS is considering separating undocumented children from their parents at the border*, CNN (March 6, 2017), https://www.cnn.com/2017/03/06/politics/john-kelly-separating-children-from-parents-immigration-border/index.html.

[24] *See, e.g.*, Stein, Fernando et al., *AAP Statement Opposing Separation of Mothers and Children at the Border*, AMERICAN ACADEMY OF PEDIATRICS (March 4, 2017), *available at* https://www.aap.org/en-us/about-the-aap/aap-press-room/Pages/immigrantmotherschildrenseparation.aspx; *Letter to Secretary Kelly Opposing Plan to Separate Migrant Families at the Border*, ALIANZA AMERICAS ET

1  of family separation at the border with Mexico and complained to DHS and urged it to

2  clarify its policies.

3      82.    On May 11, 2018, now-White House Chief of Staff Kelly confirmed that

4  the policy was put in place to deter other migrants, specifically Central Americans,

5  from coming to the United States.  In his words, "a big name of the game is

6  deterrence."[25]

7              **Separated Families Held Hostage to Exact Political Concessions**

8      83.    As the horrors of family separation reached the media, President Trump

9  insisted that he would not change the policy unless lawmakers agreed to his

10 immigration reform demands.[26]  He asserted that if lawmakers had passed the

11 aggressive anti-immigration legislation he wanted, the policy would be unnecessary.[27]

12 He urged Congress to crack down on asylum seekers, reduce visas, and spend $25

13 billion on a border wall.[28]

14     84.    President Trump also contended that the solution to the emerging

15 humanitarian crisis that he had created was for Democrats to give in to his political

16

---

17 AL. (March 22, 2017), *available at* https://www.womensrefugeecommission.org/
18 rights/gbv/resources/1460-family-separation-sign-on-letter; Testimony before
   Congress in the Senate Homeland Security and Governmental Affairs Committee
19 hearing titled, "Improving Border Security and Public Safety" (April 5, 2017); *Kelly
   says DHS won't separate families at the border*, CNN (March 29, 2017)
20 http://www.cnn.com/2017/03/29/politics/border-families-separation-kelly/index.html.

21 [25] *Transcript: White House Chief of Staff John Kelly's Interview with NPR*, NPR (May
   11, 2018), https://www.npr.org/2018/05/11/610116389/transcript-white-house-chief-
22 of-staff-john-kellys-interview-with-npr.

23 [26] Michael Scherer & Josh Dawsey, *Trump cites as a negotiating tool his policy of
   separating immigrant children from their parents*, WASH. POST (June 15, 2018),
24 https://www.washingtonpost.com/amphtml/politics/trump-cites-as-a-negotiating-tool-
   his-policy-of-separating-immigrant-children-from-their-parents/2018/06/15/ade82b80-
   70b3-11e8-bf86-
25 a2351b5ece99_story.html?utm_term=.8d0d24db87ef&__twitter_impression=true&no
   redirect=on.

26 [27] Michael D. Shear et al., *G.O.P. Moves to End Trump's Family Separation Policy,
   but Can't Agree How*, N.Y. TIMES (June 19, 2018), https://www.nytimes.com/
27 2018/06/19/us/politics/trump-immigration-children-separated-families.html.

28 [28] *Id.*

---

22

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

demands.[29]  On June 15, 2018, he tweeted, "The Democrats are forcing the breakup of families at the Border with their horrible and cruel legislative agenda.  Any Immigration Bill MUST HAVE full funding for the Wall, end Catch & Release, Visa Lottery and Chain, and go to Merit Based Immigration.  Go for it!  WIN!"[30]

85.    Despite his administration's previous characterization of the family separation policy as a means to deter future immigration, President Trump also advanced the fiction that existing federal law already compelled family separation.  On June 19, 2018, he said, "[W]e have to get the Democrats to go ahead and work with us.  Because as a result of Democrat-supported loopholes in our federal laws, most illegal immigrant families and minors from Central America who arrive unlawfully at the border cannot be detained together or removed together, only released.  These are crippling loopholes that cause family separation, which we don't want."[31]

86.    As children and parents suffered the consequences of being torn apart with no certainty that they would ever see each other again, President Trump used their suffering as a bargaining chip in his political negotiations to advance his broader anti-immigrant agenda.

**Family Separation is Motivated by Racial Animus**

87.    The family separation policy was adopted as part of an anti-immigration agenda that is motivated by racial animus.  On the first day of his presidential campaign, then-Candidate Trump categorically labeled Mexican immigrants as criminals and rapists: "When Mexico sends its people, they're not sending their

---

[29] Linda Qiu, *Fact-Checking the Trump Administration's Case for Child Separation at the Border*, N.Y. TIMES (June 19, 2018), https://www.nytimes.com/2018/06/19/us/fact-check-trump-child-separation.html.

[30] Donald J. Trump (@realDonaldTrump), TWITTER (June 15, 2018), https://twitter.com/realDonaldTrump/status/1007671131841671169.

[31] *Remarks by President Trump at the National Federation of Independent Businesses 75th Anniversary Celebration*, WHITE HOUSE (June 19, 2018), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-national-federation-independent-businesses-75th-anniversary-celebration/.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

best. … They're sending people that have lots of problems, and they're bringing those problems with [them].  They're bringing drugs. They're bringing crime. They're rapists. And some, I assume, are good people."[32]

88.    Three years later, when Chief of Staff Kelly discussed the family separation policy, he echoed similar sentiments about the categorical undesirability of migrants from Central America.  "[T]hey're also not people that would easily assimilate into the United States into our modern society.  They're overwhelmingly rural people in the countries they come from—fourth, fifth, sixth grade educations are kind of the norm.  They don't speak English, obviously that's a big thing.  They don't speak English.  They don't integrate well, they don't have skills."[33]

89.    The Trump Administration has consistently demonstrated a pattern of pursuing immigration policies motivated by racial animus toward non-European immigrants.  For example, in or around June 2017, in a meeting with Secretary of State Rex Tillerson and then-DHS Secretary Kelly, President Trump reportedly said of the 15,000 Haitians admitted to the United States, they "all have AIDS."[34]  At this same meeting, the President, after learning that 40,000 people had entered the United States from Nigeria, reportedly stated that they would never "go back to their huts" in Africa.[35]

90.    On or about January 11, 2018, several lawmakers gathered with the President in the Oval Office of the White House to discuss a bipartisan immigration

---

[32] *Donald Trump Announces a Presidential Bid*, WASH. POST (June 16, 2015), https://www.washingtonpost.com/news/post-politics/wp/2015/06/16/full-text-donald-trump-announces-a-presidential-bid/?utm_term=.0b727c71c4c8.

[33] *Transcript: White House Chief of Staff John Kelly's Interview with NPR,* NPR (May 11, 2018), https://www.npr.org/2018/05/11/610116389/transcript-white-house-chief-of-staff-john-kellys-interview-with-npr.

[34] Michael D. Shear & Julie Hirschfeld Davis, *Stoking Fears, Trump Defied Bureaucracy to Advance Immigration Agenda*, N.Y. TIMES (Dec. 23, 2017), https://nyti.ms/2DEQLyv.

[35] *Id.*

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

proposal.  President Trump grew frustrated when the conversation turned to protections for foreign nationals from certain Central American and African countries.  "Why," the President asked, "are we having all these people from shithole countries come here?"[36]  President Trump asked, "Why do we need more Haitians?"  He insisted that lawmakers "[t]ake them out" of any potential immigration deal.[37]  Instead, he expressed a preference for immigrants from countries like Norway, which is overwhelmingly white, or from Asian countries, which he felt would help the United States economically.[38]

91.    Senator Dick Durbin, who was present at the January 11, 2018, meeting in the Oval Office, characterized the President's "shithole" comments as "clearly racial," "hate-filled," and "vile."[39]  Senator Durbin reportedly warned the President that exclusion of immigrants based on those grounds would be "an obvious racial decision."[40]

92.    Similarly vile sentiments motivate the Trump Administration's policies on family separation.  Not only are these policies being used to attempt to deter asylum seekers and other migrants from certain countries, they are also dehumanizing

---

[36] Josh Dawsey, *Trump Derides Protections for Immigrants from "Shithole" Countries*, WASH. POST (Jan 12, 2018), https://www.washingtonpost.com/politics/trump-attacks-protections-for-immigrants-from-shithole-countries-in-oval-office-meeting/2018/01/11/bfc0725c-f711-11e7-91af-31ac729add94_story.html?utm_term=.06cbc70bfaec.

[37] *Id.*

[38] *Id.* Despite the President's openness to the financial benefits of Asian immigrants, his Administration has targeted Asian refugees for deportation.  Agnes Constante, *As Cambodian deportations resume, community looks for ways to cope*, NBC NEWS (April 20, 2018), https://www.nbcnews.com/news/asian-america/deportation-cambodian-refugees-u-s-devastates-community-n867096.

[39] Carl Hulse, *Inside the Oval Office Immigration Meeting that Left a Senator Stunned*, N.Y. TIMES (Jan. 19, 2018), https://nyti.ms/2DiqhlM.

[40] *Id.*

25

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

and inhumane.  In fact, President Trump explicitly stated on May 16, 2018, "These aren't people.  These are animals."[41]

93.     On June 18, 2018, he again asserted that migrant parents crossing the border with their children "could be murderers and thieves and so much else."[42]  He also argued that his political opponents "don't care about crime and want illegal immigrants, no matter how bad they may be, to pour into and infest our Country, like MS-13."[43]  He refers to migrants, including asylum seekers, as people who "invade our Country" and who should not receive the process due to them under United States and international law: "When somebody comes in, we must immediately, with no Judges or Court Cases, bring them back from where they came."[44]

94.     These categorical insults expose the racial animus motivating recent policies.  Other explanations have proven false and pretextual.  DHS Secretary Nielsen argued that the policy was necessary due to a marked increase in the number of adults arriving at the border with children and fraudulently claiming to be a family unit.  In the last five months, however, less than one percent of families apprehended at the border fraudulently claimed to be a family unit.[45]  President Trump has also claimed that 80 percent of migrants who are released never show up for their

[41] Julie H. Davis, *Trump Calls Some Unauthorized Immigrants 'Animals' in Rant*, N.Y. TIMES (May 16, 2018), https://www.nytimes.com/2018/05/16/us/politics/trump-undocumented-immigrants-animals.html.

[42] Philip Rucker et al., *Trump defiant as crisis grows over family separation at the border*, WASH. POST (June 19, 2018), https://www.washingtonpost.com/politics/trump-defiant-as-crisis-grows-over-family-separation-at-the-border/2018/06/18/210c78ca-730f-11e8-805c-4b67019fcfe4_story.html?utm_term=.1d4d5ae8f8b7.

[43] Donald Trump (@realDonaldTrump), TWITTER (June 18, 2018), https://twitter.com/realdonaldtrump/status/1009071403918864385 (emphasis added).

[44] John Bacon, *Trump wants to send undocumented immigrants back without hearings: What we know now*, USA TODAY (June 24, 2018), https://www.usatoday.com/story/news/nation/2018/06/24/immigrant-children-trump-warns-undocumented-immigrants-invade-us/728949002/.

[45] Linda Qiu, *Fact-Checking the Trump Administration's Case for Child Separation at the Border*, N.Y. TIMES (June 19, 2018), https://www.nytimes.com/2018/06/19/us/fact-check-trump-child-separation.html.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

immigration hearings and disappear into the country.  Federal data, however, reveals that most do appear at their court hearings.[46]

95.     Research also suggests that deterrence policies have little effect on reducing illegal immigration.[47]  Indeed, even a forced-separation policy would not deter many Central American migrants from traveling to the United States because they are asylum seekers whose lives are in danger; the alternative of staying in their own countries is even worse.[48]  Many migrants simply have no choice but to escape the violence of their home countries.

**Family Separation Is Exposed As Needless Cruelty**

96.     As news about the family separation policy spread, it shocked the public conscience.  Thousands of people across the country protested the cruel and inhumane policy of forcible separation.[49]  Major health organizations, political figures, and the business community voiced their outrage and opposition.

97.     America's medical and public health communities broadly decried the practice of separating families.[50]  The American Academy of Pediatrics said that the "[s]eparation of a parent or primary caregiver from his or her children should never

---

[46] Noah Bierman, et al., *Trump orders end to his family separation policy at the border, but relief could be temporary*, N.Y. TIMES (June 20, 2018), http://www.latimes.com/politics/la-na-pol-trump-immigration-20180620-story.html.

[47] Anna Oltman, *Does separating families at the border discourage immigration? Here's what the research says*, WASH. POST (May 31, 2018), https://www.washingtonpost.com/news/monkey-cage/wp/2018/05/31/does-separating-families-at-the-border-discourage-immigration-heres-what-the-research-says/?utm_term=.58063f1056b9.

[48] Julie Turkewitz & Jose A. Del Real, *Why Are Parents Bringing Their Children on Treacherous Treks to the U.S. Border?*, N.Y. TIMES (June 22, 2018), https://www.nytimes.com/2018/06/22/us/immigration-border-children.html.

[49] Tim Argango & Kalya Cockrel, *Marches Across the U.S. Protest Separation of Migrant Families*, N.Y. TIMES (June 14, 2018), https://www.nytimes.com/2018/06/14/us/protest-marches-family-separation.html.

[50] Melissa Healy, *'Children must not be abused for political purposes': What health groups say about family separation*, L.A. TIMES (June 20, 2018), http://www.latimes.com/science/sciencenow/la-sci-sn-family-separation-medical-groups-20180620-story.html.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

occur, unless there are concerns for safety of the child at the hand of parent."[51]  The

American Academy of Child and Adolescent Psychiatry stated that "[s]eparating these

children from their families in times of stress creates unnecessary and high-risk

trauma at the very time they need care and support the most."[52]  The National

Academies of Sciences, Engineering and Medicine said that "[p]arents' impact on

their children's well-being may never be greater than during the earliest years of life,

when a child's brain is developing rapidly and when nearly all of her or his

experiences are shaped by parents and the family environment."[53]

98.     In an open letter to Attorney General Sessions and Secretary Nielsen, the

Attorneys General in 21 states called for the Trump Administration to end the zero-

tolerance policy.[54]  The Attorneys General called the policy "inhumane" and "contrary

to American values," and characterized the policy as raising serious due process and

equal protection concerns.  The letter concluded, "Put simply, the deliberate

separation of children and their parents who seek lawful asylum in America is wrong."

---

[51] Julie M. Linton et al., *Detention of Immigrant Children*, THE AMERICAN ACADEMY
OF PEDIATRICS (March 2017), http://pediatrics.aappublications.org/content/early/
2017/03/09/peds.2017-0483; *U.S. Rights Chief: Migrant Family Separations
"Unconscionable,"* CBS NEWS (June 18, 2018) (Dr. Colleen A. Kraft, President of the
American Academy of Pediatrics, say that separating children from their parents by
force is a "form of child abuse"), https://www.cbsnews.com/news/trump-policy-
migrant-family-separation-parents-children-unconscionable-un-says/.

[52] Karen Wagner, *President's Statement on Separating Children from Families*,
American Academy of Child & Adolescent Psychiatry (May 11, 2018),
https://www.aacap.org/AACAP/Press/Press_Releases/2018/Statement-on-Separating-
Children-from-Families.aspx.

[53] *Statement on Harmful Consequences of Separating Families at the U.S. Border*,
The National Academies of Sciences, Engineering, Medicine (June 20, 2018),
http://www8.nationalacademies.org/onpinews/newsitem.aspx?RecordID=06202018.

[54] Hector H. Balderas, *Open Letter to the Honorable Jeff Sessions and the Honorable
Kirstjen Nielsen*, STATE OF NEW MEXICO OFFICE OF THE ATTORNEY GENERAL (June
19, 2018), https://ag.ny.gov/sites/default/files/ag_ltr_to_ag_sessions_sec._nielsen
_re_family_separation_6.19.181.pdf (joined by the Attorney Generals of California,
Connecticut, Delaware, District of Columbia, Hawaii, Illinois, Iowa, Maine,
Maryland, Massachusetts, Minnesota, New Jersey, New York, North Carolina,
Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, and Washington).

99.     All four living former first ladies also joined the chorus of critics.[55] Laura Bush compared the situation to Japanese Internment.[56]  She called the policy "cruel" and "immoral," and noted that such treatment inflicts serious trauma.[57] Michelle Obama and Hillary Clinton both supported Mrs. Bush's article; Secretary Clinton called the situation a "humanitarian crisis" and noted that "every human being with a sense of compassion and decency, should be outraged."[58]  Rosalynn Carter called the policy "disgraceful and a shame to our country."[59]

100.     Several airlines also condemned the separation policy and said that they would not allow the federal government to use their flights to transport separated children.  American Airlines said that it has "no desire to be associated with separating families, or worse, to profit from it."[60]  Southwest Airlines asked that "anyone" involved with the separation policy not fly with them.[61]

101.     The U.S. Chamber of Commerce and the Business Roundtable also condemned forcibly separating children from their parents.  The Business Roundtable called it "cruel and contrary to American values," and the U.S. Chamber of Commerce's top official said that "this is not who we are, and it must end now."[62]

---

[55] Stephanie Ebbs, *All 5 first ladies speak out against family-separation immigration policy*, ABC NEWS (June 18, 2018), https://abcnews.go.com/Politics/ladies-speak-family-separation-immigration-policy/story?id=55986862.

[56] Laura Bush, *Laura Bush: Separating children from their parents at the border 'breaks my heart'*, WASH. POST (June 17, 2018), https://www.washingtonpost.com/opinions/laura-bush-separating-children-from-their-parents-at-the-border-breaks-my-heart/2018/06/17/f2df517a-7287-11e8-9780-b1dd6a09b549_story.html?noredirect=on&utm_term=.d43b5a479ab6.

[57] *Id.*

[58] Stephanie Ebbs, *All 5 first ladies speak out against family-separation immigration policy*, ABC NEWS (June 18, 2018), https://abcnews.go.com/Politics/ladies-speak-family-separation-immigration-policy/story?id=55986862.

[59] *Id.*

[60] Richard Fausset, *Airlines Ask Government Not to Use Their Flights to Carry Children Separated at the Border*, N.Y. TIMES (June 20, 2018), https://www.nytimes.com/2018/06/20/us/airlines-transport-immigrant-children.html.

[61] *Id.*

[62] Michael D. Shear et al., *G.O.P. Moves to End Trump's Family Separation Policy, but Can't Agree How*, N.Y. TIMES (June 19, 2018),

102.    Governors from at least eight states announced that they would withhold or recall National Guard troops from efforts to secure the border in response to the separation policy.[63]   North Carolina Governor Roy Cooper said that the "cruel policy of tearing children away from their parents requires a strong response" and that he was pulling his state's troops from the border.[64]   Massachusetts Governor Charlie Baker called the policy "cruel and inhumane."[65]

103.    Republican Senator Orrin G. Hatch (UT) said that the separation policy was "not American."[66]   Senator Rob Portman (OH) said that policy runs "counter to our values."[67]

104.    In addition, 75 former United States Attorneys also called on Sessions to end the family separation policy.  The open letter stated that Attorney General Sessions' "Zero Tolerance policy has resulted in the unnecessary trauma and suffering of innocent children."  The letter went on to say that "[u]nder [the] policy, families and children are greeted with unexpected cruelty at the doorstep of the United States, instead of with relief or asylum in the greatest country in the world."[68]

### "Tender Age" Facilities

105.    Conditions in detention centers are especially poor for younger children, particularly those of "tender age," defined as 12 years old or younger.  As of July 5,

https://www.nytimes.com/2018/06/19/us/politics/trump-immigration-children-separated-families.html.

[63] Matthew Haag & Jess Bidgood, *Governors Refuse to Send National Guard to Border, Citing Child Separation Practice*, N.Y. TIMES (June 19, 2018), https://www.nytimes.com/2018/06/19/us/national-guard-trump-children-immigration.html.

[64] *Id.*

[65] *Id.*

[66] *Id.*

[67] *Id.*

[68] *Bipartisan Group of Former United States Attorneys Call on Sessions to End Family Separation*, MEDIUM (June 18, 2018), https://medium.com/@formerusattorneys/bipartisan-group-of-former-united-states-attorneys-call-on-sessions-to-end-child-detention-e129ae0df0cf.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

reportedly more than 100 children under age five were separated from their parents at the border.[69]  Homeland Security officials were unable to "provide information about the age cutoff below which they would decline to take a child."[70]

106.   These "tender age" children are being sent to their own shelters, three of which were family detention centers that were hurriedly updated to care for younger children who were separated from their parents.[71]  A fourth facility is planned for Houston to "house up to 240 children in a warehouse previously used for people displaced by Hurricane Harvey."[72]

107.   Lawyers and health care professionals who have visited the "tender age" shelters "described play rooms of crying preschool-age children in crisis."[73]  Elizabeth Frankel, associate director of the Young Center for Immigrant Children's Rights, said that her colleagues have been given the responsibility for caring for a number of infants.[74]  She described children in crisis, crying uncontrollably, having panic attacks, not sleeping, wetting the bed, and regressing to the point that they can no longer talk.[75]

---

[69] Caitlin Dickerson, *Trump Administration in Chaotic Scramble to Reunify Migrant Families*, N.Y. TIMES (July 5, 2018), https://www.nytimes.com/2018/07/05/us/migrant-children-chaos-family-separation.html.

[70] Julie Hirschfeld Davis, *Separated at the Border From Their Parents:  In Six Weeks, 1,995 Children*, N.Y. TIMES (June 15, 2018), https://www.nytimes.com/2018/06/15/us/politics/trump-immigration-separation-border.html.

[71] Caitlin Dickerson and Manny Fernandez, *What's Behind the 'Tender Age' Shelters Opening for Young Migrants*, N.Y. TIMES (June 20, 2018), https://www.nytimes.com/2018/06/20/us/tender-age-shelters-family-separation-immigration.html.

[72] Garance Burke and Martha Mendoza, *Toddlers Separated from Parents at the Border Are Being Detained in 'Tender Age' Shelters*, TIME (June 20, 2018), http://time.com/5316764/toddler-immigrants-tender-age-shelters/.

[73] *Id.*

[74] Caitlin Dickerson and Manny Fernandez, *What's Behind the 'Tender Age' Shelters Opening for Young Migrants*, N.Y. TIMES (June 20, 2018), https://www.nytimes.com/2018/06/20/us/tender-age-shelters-family-separation-immigration.html.

[75] *Id.*

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1   Other children are too young to speak, and therefore staff members have been unable
2   to determine where or who their parents are.[76]

3       108.   The government has not provided for a comprehensive and independent
4   investigation by qualified mental-health professionals into the circumstances under
5   which Plaintiffs and other asylum-seeking parents were separated from their children
6   or into the effects of that separation on the families.  Absent relief from this Court,
7   Plaintiffs, even if eventually reunited with their children, will have no way adequately
8   to determine and respond to the harms inflicted by the separation policy.

9   **President Trump Issues An Executive Order To Halt Prospective Application Of**
10  **Family Separation Policy**

11      109.   Faced with national revulsion at family separation and legislative refusal
12  to accede to his political demands as the price of ending the policy, President Trump
13  abruptly changed course.

14      110.   On June 20, 2018, President Trump issued an executive order entitled
15  "Affording Congress an Opportunity to Address Family Separation" ("Executive
16  Order").[77]  The Executive Order continued the policy of initiating criminal
17  proceedings for all who cross the border illegally and called for indefinite detention of
18  families, including children covered by the *Flores* Settlement, in camps and makeshift
19  detention centers.[78]

20      111.   President Trump's Executive Order did not and could not end the trauma
21  of family separation.  Most families still have not been reunited.  Parents still do not
22  know where their children are and, like Plaintiffs, are not able to care for them or even
23  speak with them.  Traumatized children remain in deplorable detention conditions.
24  Some may be lost in the system.  Detention centers "are often unable to locate the

---

25  [76] *Id.*

26  [77] Executive Order, *Affording Congress an Opportunity to Address Family Separation*,
27  WHITE HOUSE (June 20, 2018), https://www.whitehouse.gov/presidential-
    actions/affording-congress-opportunity-address-family-separation/.

28  [78] *Id.*

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

parent of separated children because the children arrive without proper records."[79]
Once a child arrives at a detention center, "there is no firm process in place to
determine whether they have been separated from someone who was legitimately their
parent, or for reuniting parents and children who had been mistakenly separated."[80]

112.   Critically, the Executive Order failed to provide any remediation for the
trauma and devastation unnecessarily inflicted by the government on the children and
parents whom it separated.  To mitigate the negative effects of the trauma suffered,
separated families must be immediately reunited and provided with access to mental
health screenings, and to appropriate and effective intensive trauma treatment services
outside of the traumatizing environment of the current detention environment.[81]
Without these remedies, the deleterious impact of forcible separation is debilitating
and causes life-long harm.[82]

### A System in Utter Chaos and Confusion: Difficulties in Reunification

113.   Because the Executive Order was a surprise to many, further chaos
ensued.  Agencies carrying out the policy received no advanced notice about the major
changes.  And one official who works for ICE said that an internal email about the
Executive Order arrived "literally at the same time that it was breaking on CNN."[83]

---

[79] Caitlin Dickerson, *Hundreds of Immigrant Children Have Been Taken From Parents at U.S. Border*, N.Y. TIMES (Apr. 20, 2018), https://www.nytimes.com/2018/04/20/us/immigrant-children-separation-ice.html.

[80] *Id.*

[81] Declaration of Dylan Gee ("Gee Decl."), ¶ 17 ("Following reunification, children and parents require immediate, intensive clinical intervention to support healing following trauma exposure."); Declaration of Luis H. Zayas ("Zayas Decl."), ¶ 12 ("The psychological wounds of detention and family separation will last a lifetime. It will take social work, psychiatric, psychological and counseling services to start and see through the repairs.").

[82] Declaration of Marleen Wong ("Wong Decl."), ¶ 25 ("Without such trauma treatment programs, the effect of the forcible separation on these children will be debilitating and will cause them life-long harm.").

[83] Caitlin Dickerson, *On Family Separation, Federal Workers Often Agonized Over Enforcement*, N.Y. TIMES (June 23, 2018),

Such an abrupt change of course has left federal agencies scrambling with little guidance on how to proceed.[84]

114.   Notably, the Executive Order failed to mention what would happen to the nearly 3,000 children who had been separated from their parents.  There is no reliable plan in place yet to reunite families.  On the day the Executive Order was issued, a spokesman for HHS initially said that the government would not try to reunite separated families, but later backtracked, saying that "it is still very early, and we are awaiting further guidance on the matter."[85]  Anthony Enriquez, director of the unaccompanied minors program for Catholic Charities, explained, "There is no system whatsoever to track these family separations, no efforts systemically to reunite these families.  There is no supervisor, there is no database saying, 'child here, parent there,' so they can come back together."[86]  While HHS insists that it "is working with relevant agency partners to foster communications and work towards reuniting every minor and every parent or guardian via well-established reunification processes," very few details have been released about how HHS will go about reuniting families and what the timeline is for reunification.[87]

115.   Indeed, even after the Executive Order was signed, many parents had still not spoken with their children and did not know where they were being held.  Parents report repeatedly calling the government-established hotline number, but nobody

https://www.nytimes.com/2018/06/23/us/migrant-children-federal-agency-border.html.

[84] Michelle Goldberg, *They Really Don't Care About Migrant Families*, N.Y. TIMES (June 21, 2018), https://www.nytimes.com/2018/06/21/opinion/trump-family-separation-melania-jacket.html.

[85] Charlie Savage, *Explaining Trump's Executive Order on Family Separation*, N.Y. TIMES (June 20, 2018), https://www.nytimes.com/2018/06/20/us/politics/family-separation-executive-order.html.

[86] Liz Robbins, *Hundreds of Separated Children Have Quietly Been Sent to New York*, N.Y. TIMES (June 20, 2018), https://www.nytimes.com/2018/06/20/nyregion/children-separated-border-new-york.html.

[87] *Fact Sheet: Zero-Tolerance Prosecution and Family Reunification*, DEPT. OF HOMELAND SECURITY (June 23, 2018), https://www.dhs.gov/news/2018/06/23/fact-sheet-zero-tolerance-prosecution-and-family-reunification.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

answers or no information is provided.  Compounding the difficulties, detained parents do not have a phone number where agencies may call them back.[88]  As a result, parents and children have no idea if and when they will see each other again. One separated parent said, "I feel like I am going to die.  I feel powerless."[89]

116.   Out of pure desperation, some parents have agreed to give up their asylum claims in the hopes of seeing their children again.  Knowing how desperate separated parents are, the government has taken advantage of their fears and vulnerability by encouraging parents to sign voluntary deportation orders in exchange for the return of their children.  One Honduran detainee agreed to abandon his asylum case and signed voluntary deportation forms in the hopes of seeing his 6-year-old daughter again.[90]

## THE FEDERAL COURTS ENJOIN SIGNIFICANT ASPECTS OF THE FAMILY SEPARATION POLICY AND REJECT ATTEMPTS TO ALTER THE *FLORES* SETTLEMENT

117.   Faced with the government's inhumane and cruel policy, migrant parents separated from their children have turned to the federal courts.  In a number of these cases, the courts have already acted by requiring the government to conform its actions to the Constitution, statutes passed by Congress, and its own policies.

### *Ms. L v. U.S. Immigration & Customs Enforcement* (S.D. Cal.)

118.   For example, on June 26, 2018, the District Court for the Southern District of California in a nationwide class action granted a preliminary injunction,

---

[88] Jennifer Jett & Mihir Zaveri, *More Than 500 Migrant Children Reunited with Adults, Government Says*, N.Y. TIMES (June 24, 2018), https://www.nytimes.com/2018/06/24/us/migrant-children-reunited.html.

[89] Jack Healy, *Migrant Parents Wait and Hope for Their Children: 'I Feel Like I'm Going to Die'*, N.Y. TIMES (June 21, 2018), https://www.nytimes.com/2018/06/21/us/immigrant-children-separating-families.html.

[90] Jay Root & Shannon Najmabadi, *Kids in exchange for deportation: Detained migrants say they were told they could get kids back on way out of U.S.*, TEXAS TRIBUNE (June 24, 2018), https://www.texastribune.org/2018/06/24/kids-exchange-deportation-migrants-claim-they-were-promised-they-could/.

prohibiting the government from (1) separately detaining migrant parents and their children, (2) detaining minor children if their parents are released from custody, and (3) removing any migrant parent from the United States without their child—absent voluntary waiver by the parents or a finding of unfitness. *See Ms. L*, 2018 WL 3129486, at *11-12. Additionally, the Court ordered the government to reunite detained parents with the children under the age of five by July 10, 2018, and to reunite detained parents with their other children by July 26, 2018. *Id.* at *12; *see also Souza v. Sessions*, No. 18-cv-4412, ECF No. 23 (N.D. Ill. June 28, 2018) (ordering government to release child to custody of parent).

119. In providing this relief, the Court had to find first that the parents were likely to succeed on their Fifth Amendment challenge to the family separation policy. The parents argued that "the Government's practice of separating class members from their children, and failing to reunite those parents who have been separated, without a determination that the parent is unfit or presents a danger to the child violates the parents' substantive due process rights to family integrity." *Ms. L*, 2018 WL 3129486, at *6.

120. The Court agreed with the parents for several reasons. First, the Court found that, even when the Executive Branch "is acting within its powers to detain individuals lawfully entering the United States and to apprehend individuals illegally entering the country," "the right to family integrity still applies." *Id.* at *7. Second, it recognized that "asylum seekers [like the plaintiffs] may be fleeing persecution and are entitled to careful consideration by government officials. Particularly so if they have a credible fear of persecution." *Id.* To that end, Congress has "plainly stated [the nation's] intent to treat refugees with an ordered process, and benevolence, by codifying principles of asylum." *Id.* But, in its view, "[t]he Government's treatment of [migrant parents] does not meet this standard, and it is unlikely to pass constitutional muster." *Id.* Third, the Court highlighted that "the practice of separating these families was implemented without any effective system or procedure for (1) tracking the children

after they were separated from their parents, (2) enabling communication between the parents and their children after separation, and (3) reuniting the parents and children after the parents are returned to immigration custody following completion of their criminal sentence." *Id.* In the Court's words, "[t]his is a startling reality," particularly given that the government routinely tracks detained individuals' personal *property* with efficiency and accuracy. *Id.* The Court concluded these practices, taken together, "shock the conscience" and are likely inconsistent with due process.

121. The Court also found that "the Ninth Circuit has repeatedly found" that "separation of a parent from his or her child" "constitutes irreparable harm." *Id.* at *9 (citing *Leiva-Perez v. Holder*, 640 F.3d 962, 969-70 (9th Cir. 2011); *Washington v. Trump*, 847 F.3d 1151, 1169 (9th Cir. 2017)). The Court also determined that the injuries inflicted by the family separation policy "deserve[] special mention," noting that "the separations at issue have been agonizing for parents who have endured them." *Id.* In particular, the Court noted that declarations submitted by class representatives in the case and press reports of the trauma caused by the policy, including reports that government officials ripped one mother's crying 18-month-old son from her and that one parent committed suicide as a result of being separated from his three-year-old son. The Court further noted that press reports and declarations submitted by class representatives demonstrate that these separations have inflicted a "highly destabilizing, traumatic experience that has long term consequences on child well-being, safety, and development." *Id.* at *9-10.

122. Finally, the Court concluded that the balance of equities and the public interest favored injunctive relief. Specifically, the Court found that stopping the needless separation of parents from children would not "have a negative impact on the[] [government's] ability to enforce the criminal and immigration laws." *Id.* at *10. It also found that "[t]he public interest in upholding and protecting th[e] [right to family integrity and association] would be served by issuance of the requested injunction." *Id.* at *11.

### *Damus v. Nielsen* (D.D.C.)

123.   On July 2, 2018, the District Court for the District of Columbia entered a preliminary injunction requiring the government to follow its 2009 Directive, "Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture," issued by Immigration and Customs Enforcement.  *See Damus v. Nielsen*, 2018 WL 3232515, at *2 (D.D.C. July 2, 2018).  This ICE Directive mandates that "'[e]ach alien's eligibility for parole should be considered and analyzed on its own merits and based on the facts of the individual alien's case,' and that if an asylum-seeker establishes his identity and that he presents neither a flight risk nor a danger to the public, '[ICE] should, absent additional factors ... parole the alien on the basis that his or her continued detention is not in the public interest.'"  *Id.*  The plaintiffs in *Damus*—a provisional class covering asylum seekers in five ICE Field Offices who have been found to have a credible fear of persecution or torture and who are being detained by ICE after having been denied parole—showed that when the ICE Directive was in force, more than 90 percent of asylum seekers were *granted* parole, while 92 to 100 percent of similar individuals were *denied* parole between February and September 2017.  *Id.* at *15.

124.   The Court concluded that, on the basis of these statistics and declarations from class members, the plaintiffs were likely to succeed on their Administrative Procedure Act claim because it appears that the government is no longer following its own directives.  *Id.* at *16-17.  The Court also found that plaintiffs sufficiently showed they would suffer irreparable harm absent an injunction given that "detention pursuant to an unlawful departure from agency procedure cannot be remediated after the fact."  *Id.* at *17.  Finally, the Court determined that the balance of harms and the public interest would be served by the injunction because the plaintiffs were asking only for the government to follow its own procedures.

### *Flores v. Sessions* (C.D. Cal.)

125.   On July 9, 2018, the District Court for the Central District of California denied the government's efforts to modify the *Flores* Settlement.  *Flores v. Sessions*,

38

No. CV 85-4544, ECF No. 455 (C.D. Cal. July 9, 2018).  The *Flores* Settlement is a consent agreement between a class including all immigrant children held by the government and the government, which "sets out nationwide policy for the detention, release, and treatment of minors in the custody of [the federal government]."  *Flores v. Lynch*, 828 F.3d 898, 901 (9th Cir. 2016). The government asked for two specific exemptions:  (1) permission to detain children indefinitely with their parents in ICE custody, and  (2) permission to detain children in facilities that do not meet the agreement's state licensure requirement.  *Flores*, ECF No. 455, at 1.

126.   The Court first found that Defendants' *ex parte* application was procedurally improper because it was a "thinly veiled motion for reconsideration" of previous motion asking for similar relief.  *Id.*  Second, the Court concluded that the government failed to satisfy Rule 60's requirements for altering a settlement agreement, given that the current so-called difficulties, to the extent they exist, were foreseeable. *Id.* at 2.  To that end, the Court also determined that Defendants had not shown that the *Flores* Settlement bore any responsibility for the uptick in family border crossings, that families routinely fail to appear at required proceedings, or that the *Ms. L* injunction prevents the government from meeting its obligations.  Rather, in the Court's view, "[i]t is apparent that Defendants' Application [was] a cynical attempt … to shift responsibility to the Judiciary for over 20 years of Congressional inaction and ill-considered Executive action that have led to the current stalemate." *Id.* at 7.  The Court therefore denied the application as "procedurally improper and wholly without merit." *Id.*

## THE FAMILY SEPARATION POLICY HAS INFLICTED SIGNIFICANT TRAUMA ON MIGRANT PARENTS AND THEIR CHILDREN

127.   The family separation policy has caused traumatic harm to separated families.  The consensus among leading experts on trauma is that tearing children from their parents inflicts severe complex trauma on both parents and children alike

39

that might never be fully remedied.[91]  As Senior Vice Dean and Professor of Mental Health at University of Southern California Dr. Marleen Wong explains, trauma is the body's neurobiological stress response to experiencing or witnessing an event involving life-threatening circumstances or threat of serious injury that causes him or her to feel intense fear, helplessness, or horror.[92]  Complex trauma describes multiple, repeated, persistent, or prolonged exposure to trauma such that the body's stress response impacts the development and functioning of the brain.[93]  Left untreated, such trauma causes immediate and long-lasting physical and psychological harm, especially in children, whose still-developing bodies and brains are ill-equipped to cope with traumatic stress. [94]

**Trauma Experienced by Parents**

128.   Parents experience trauma due to forcible separation from their children.[95]  Psychologists and other mental-health professionals, including Drs. Gee, Hidalgo, Sprinson, Loring, and Zayas, Messrs. Berrick and Campbell, and Professor Wong, expect that parents who experience their children being taken away from them will likely suffer acute psychological distress that manifests in physical and mental symptoms of anxiety, depression, suicidal ideation, loss of appetite, and/or loss of sleep.[96]  After all, "[s]eparation of a child from his/her mother would be a traumatic

[91] Declaration of Kenneth Berrick, John Sprinson & Kevin Campbell ("Berrick Decl."), ¶¶ 10, 12; Gee Decl. ¶ 5; Declaration of Jose Hidalgo ("Hidalgo Decl."), ¶¶ 12, 13; Declaration of Bruce Perry ("Perry Decl."), ¶ 21; Declaration of Marleen Wong ("Wong Decl."), ¶ 23; Declaration of Luis Zayas ("Zayas Decl."), ¶¶ 12, 14.

[92] Wong Decl. ¶ 12.

[93] *Id.*

[94] Berrick Decl. ¶ 15; Gee Decl. ¶¶ 5, 8, 9; Hidalgo Decl. ¶ 12; Perry Decl. ¶ 21; Wong Decl.  ¶ 24 ("Prolonged exposure to such stress has a debilitating effect on children even after the particular traumatic event is over.").

[95] *See, e.g.*, Hidalgo Decl. ¶ 14; Gee Decl. ¶ 6; Berrick Decl. ¶¶ 17, 19; Declaration of Marti T. Loring ("Loring Decl."), ¶ 8; Wong Decl. ¶ 23; Zayas Decl. ¶ 8.

[96] Gee Decl. ¶ 6 ("Forcible family separation can also have devastating psychological and neurobiological consequences for parents, [which are] likely to be exacerbated when parents are not provided with information about their child's location or condition, or when parents do not have access to information in their native language."); Hidalgo Decl. ¶ 14 ("This level of stress related to the separation can take

event for both the child/adolescent and for the mother and father, causing … [p]anic and terror, frightening dreams, flashbacks, dissociation (blanking out and lack of awareness), depersonalization (sense of unreality and separation from oneself), withdrawal into intense grief and depression, an ongoing sense of fear and terror."[97]

129.   "The traumatic nature of separation from the child is likely to be exacerbated when parents are not provided with information about their child's location or condition, or when parents do not have access to information in their native language …."[98]

130.   Indeed, there has been at least one credible report that a parent forcibly separated from his child under the zero-tolerance policy was driven to suicide.[99] According to press reports, Marco Antonio Muñoz and his family were taken into custody and sought asylum.  His child was forcibly taken from his arms, and then Mr. Muñoz was placed in a chain-link detention cell.  After he struggled to break free of his cage, the Border Patrol transported him to a local jail and placed him in a padded cell. The next morning, he was found dead at his own hand.

a toll on parents and may cause physical and mental health symptoms such as loss of sleep, loss of appetite, headaches, anxiety, depression, and suicidal ideation."); Berrick Decl. ¶¶ 17, 19 ("Parents also experience psychological distress and trauma due to separation and detention [and] may includ[e] anxiety, depression, suicidal ideations, and loss of appetite."); Loring Decl. ¶ 8 ("Separation of a child from his/her mother would be a traumatic event for both the child/adolescent and for the mother and father, causing … [p]anic and terror, frightening dreams, flashbacks, dissociation (blanking out and lack of awareness), depersonalization (sense of unreality and separation from oneself), withdrawal into intense grief and depression, an ongoing sense of fear and terror."); Wong Decl. ¶ 23 ("Forcible separation of familes inflicts severe trauma on children and parents."); Zayas Decl. ¶ 8 ("The separation of parents from their children—the very children they sought to protect and save by requesting asylum in the United States—creates emotional stresses on parents beyond that which they have already suffered.").

[97] Loring Decl. ¶ 8.

[98] Gee Decl. ¶ 6; *see also* Hidalgo Decl. ¶ 26 ("Ongoing separation and the uncertainty of not knowing where separated loved ones are is likely to be re-traumatizing for separated children and parents.").

[99] *See* Nick Miroff, *A Family Was Separated At the Border, and This Distraught Father Took His Own Life*, WASH. POST (June 9, 2018), https://www.washingtonpost.com/world/national-security/a-family-was-separated-at-the-border-and-this-distraught-father-took-his-own-life/2018/06/08/24e40b70-6b5d-11e8-9e38-24e693b38637_story.html?utm_term=.f3c12fb7157d.

41

131.   Parents, like their children, must also cope with the events that prompted their migration in the first place, as well as the stressors and trauma experienced on the way. [100]   As with their children, such experiences are only compounded by subsequent detention and separation from their families.[101]

**Trauma Experienced by Children**

132.   Recent media reports offer but a hint at the on-going suffering caused by forced family separation on children.  Recently, an audio recording from inside a CBP facility captured the voices of ten Central American children separated from their parents.  The children, as young as four, can be heard crying out desperately for their parents.  They repeatedly scream "Mami" and "Papa," many crying so hard it sounds like they can barely breathe.  Above the heart wrenching weeping and crying is the voice of a Border Patrol agent who jokes: "Well, we have an orchestra here.  What's missing is a conductor."[102]

133.   A pediatrician visiting the Texas detention facility known as "the Ursula" reported seeing somewhere between 20 and 30 ten-year-old boys caged in by a chain link fence crying and sobbing for their mothers—some of them reaching out through the fence as they screamed.  Their mothers, who were in identical cages about 50 feet away, could only look on, unable to help or console them.[103]

134.   Upon separation, children experience acute psychological distress.[104] Indeed, "[f]or children younger than seven or eight years of age, separation from parents is even worse than the concept of death, as at young ages children see death as

---

[100] *See, e.g.*, Gee Decl. ¶ 7; Zayas Decl. ¶ 8.

[101] *See, e.g.*, Gee Decl. ¶ 7; Zayas Decl. ¶ 8.

[102] Ginger Thompson, *Listen to Children Who've Just Been Separated From Their Parents at the Border*, PROPUBLICA (June 18, 2018), https://www.propublica.org/article/children-separated-from-parents-border-patrol-cbp-trump-immigration-policy.

[103] Sady Doyle, *Child Trauma Can't Be Undone With an Executive Order*, ELLE MAGAZINE (June 21, 2018), https://www.elle.com/culture/career-politics/a21748590/child-trauma-cant-be-undone-with-an-executive-order/.

[104] Hidalgo Decl. ¶ 9.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

something that can be reversible and is not universal."[105]  According to founder and Chief Executive Office of Seneca Family of Agencies Kenneth Berrick, founder of the Center for Family Finding and Youth Connectedness Kevin Campbell, and Clinical Director of Seneca Family of Agencies Dr. John Sprinson, such trauma may be particularly severe when the separation is sudden or forcible.[106]  During the moment of separation, a child can experience "severe neurobiological stress causing the child to feel intense fear, helplessness, or horror."[107]  "Immediate reactions include obvious emotional suffering in the form of inconsolable crying, desperate efforts to pursue or search for the parent and anger."[108]  Instructor of Psychiatry at the Harvard Medical School and Massachusetts General Hospital Dr. Jose Hidalgo notes these effects may be exacerbated by the additional trauma caused when witnessing a parent's reaction to separation.[109]

135.   In the immediate aftermath of separation, children are likely to continue to suffer from "extraordinary stress and pain."[110]  They may show signs of regression, reverting to crying and bed-wetting, or suffer the loss of other important developmental milestones.[111]  Separated children are also likely to exhibit a variety of negative behaviors from aggressiveness to withdrawal.[112]

---

[105] Declaration of Victor Carrion ("Carrion Decl.") ¶ 5.

[106] Berrick Decl. ¶ 9 ("When the separation is sudden, unpredictable, or in a strange environment with no other familiar adult figures present then the response is likely to be extreme."); *see* Hidalgo Decl. ¶ 9; Wong Decl. ¶ 22.

[107] Wong Decl. ¶ 23.

[108] Berrick Decl. ¶ 10.

[109] Hidalgo Decl. ¶ 9.

[110] Zayas Decl. ¶ 11; *see also* Gee Decl. ¶ 5 ("The immediate psychological consequences of exposure to traumatic events involving caregivers include, but are not limited to, anxiety, distress, despair, and terror for both the child and the parent."); Perry Decl. ¶ 21; Wong Decl. ¶ 22.

[111] Doyle, *supra* note 103; *see also* Berrick Decl. ¶ 10.

[112] Berrick Decl. ¶ 10; Wong Decl. ¶¶ 18, 22.

43

136.   The longer the parent and child are separated, the greater the harms the child experiences.[113]  Decades of public health research demonstrate that the child-parent bond is a crucial factor in healthy child development.[114]  The absence of interaction between parent and child "acts as a 'double whammy' for healthy development: not only does the brain not receive the positive stimulation it needs, but the body's stress response is activated, flooding the developing brain with potentially harmful stress hormones."[115]  Moreover, separation disrupts and severely damages the relationship between a child and their parent.[116]

137.   Assistant Professor of Psychology at Yale University Dr. Dylan Gee writes that "For a child who has been separated from their parent at the border, their body and brain are being shaped to anticipate danger and prepare for the worst."[117]  As detailed by substantial research conducted by Adjunct Professor in the Department of Psychiatry and Behavioral Sciences at the Feinberg School of Medicine at Northwestern University Dr. Bruce Perry, stress hormones induce a state of

---

[113] Hidalgo Decl. ¶ 12; Jessica Henderson Daniel, PhD, *Statement of APA President Regarding Executive Order Rescinding Immigrant Family Separation Policy*, AM. PSYCHOLOGICAL ASS'N (June 20, 2018), http://www.apa.org/news/ press/releases/2018/06/family-separation-policy.aspx.

[114] Karen Dineed Wagner, MD, PhD, *President's Statement on Separating Children From Families*, AMER. ACAD. OF CHILD AND ADOLESCENT PSYCHIATRY, https://www.aacap.org/AACAP/ Press/Press_Releases/2018/Statement-on-Separating-Children-from-Families.aspx ("Parental support is an essential and proven protective factor that substantially reduces risk for adverse health and developmental outcomes for children."); "Separating Parents and Children at US Border is Inhumane and Sets the Stage for a Public Health Crisis," AM. PUBLIC HEALTH ASS'N (June 15, 2018), https://www.apha.org/news-and-media/news-releases/apha-news-releases/2018/parent-child-separation ("Decades of public health research have shown that family structure, stability and environment are key social determinants of a child's and a community's health.").

[115] *Serve and Return*, HARVARD UNIVERSITY CENTER ON THE DEVELOPING CHILD, https://developingchild.harvard.edu/science/key-concepts/serve-and-return/ (last visited June 24, 2018); *see also* Berrick Decl. ¶ 15

[116] Berrick Decl. ¶¶ 11, 12.

[117] Dylan Gee, *I study kids who were separated from their parents.  The trauma could change their brains forever*, VOX (June 20, 2018), https://www.vox.com/first-person/2018/6/20/17482698/tender-age-family-separation-border-immigrants-children.

44

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

hypervigilance that alters a child's cognition and emotion and causes chronic problems with how that child responds to stress over a lifetime.[118]  Such alterations increase the risk of "psychological and physical health problems," including "fundamental changes in brain function," which may "manifest[] as a loss of capacity to regulate intense emotions, to cope with future stress and to regulate fear reactions to reminders of traumatic events," and may in turn cause "other effects such as depression, substance abuse, problems forming relationships, and other behavioral problems."[119]

138.   Separation is not the only source of trauma migrant children will face upon arrival at the border.  After separation, children are likely to be held in detention centers, where even a short length of stay is known to cause traumatic effects.[120] According to Dr. Luis Zayas, Dean of Steve Hicks School of Social Work and Professor of Psychiatry at Dell Medical School at the University of Texas, Austin,

---

[118] *Id.*; *see also* Perry Decl. ¶ 13 ("[T]rauma, neglect, and maltreatment during childhood have profound effects on physical, social, emotional, behavioral, and cognitive development.  Some of the most important consequences of developmental adversity are the result of abnormal development and functioning of the brain's stress response systems."); ¶ 21 ("[T]raumatic stress alters the developing brain.  It can increase risk for a host of emotional and behavioral problems, including antisocial behavior, attention problems, acting out, aggressive or violent behaviors, lack of trust, and other counterproductive coping mechanisms."); Berrick Decl. ¶¶ 13, 16; Gee Decl. ¶¶ 5, 8.

[119] Hidalgo Decl. ¶ 13; Gee, *supra* note 117 ("A child whose brain is constantly scanning the environment for danger will undoubtedly have difficulty paying attention in class or interacting with peers on the playground.  Some children will internalize their feelings and appear numb; others will respond by acting out.  In the long run, the cascade of consequences places individuals who have experienced early trauma at risk for academic or occupational failure, substance abuse, and health problems such as heart disease and diabetes."); Doyle, *supra* note 103, ("'Long-term, these individuals who have traumatic reactions are at heightened risk of virtually every  medical problem,' says Dr. Judith Cohen, Medical Director of the Center for Traumatic Stress. 'Neurologic to cardiac to pulmonary to reproductive problems . . . just go down the body and virtually every part is affected.'").

[120] Council on Community Pediatrics, *Policy Statement—Detention of Immigrant Children*, AMERICAN ACADEMY OF PEDIATRICS (March 2017), http://pediatrics.aappublications.org/content/early/2017/03/09/peds.2017-0483; *see also* Zayas Decl. ¶¶ 11, 15.

---

45

both "[s]cience and clinical practice show that [] children being held in detention with or without their parents are undergoing extraordinary stress and pain."[121]

139.   Reports concerning unaccompanied immigrant children detained in the United States found high rates of mental health disorders like anxiety, depression, posttraumatic stress disorder, and suicidal ideation, as well other behavioral problems that do not necessarily disappear upon release.[122]   Experts concur that any period of detention, even if brief, can cause psychological trauma and induce long term mental and medical health risks in children.[123]   According to the American Academy of Pediatrics, "there is no evidence indicating that any time in detention is safe for children."[124]

140.   Indeed, separation and detention are likely to be only some of many traumatic experiences already suffered by a migrant child.  The families arriving daily at this nation's borders are likely to be fleeing endemic levels of crime, violence, and victimization in their home countries.[125]   They are likely to have been victims of violence, both in their homes and communities.[126]   On top of that, migrant children and their families are likely to have endured a harrowing journey across thousands of miles without adequate food, water, or protection.[127]   To be suddenly separated from

---

[121] Zayas Decl. ¶ 11.

[122] Council on Community Pediatrics, *supra* note 120.

[123] Zayas Decl. ¶¶ 11, 15-19.

[124] Council on Community Pediatrics, *supra* note 120.

[125] Adriana Beltrán, *Fleeing Violence in Central America*, WOLA: COMMENTARY (Feb. 21, 2017), https://www.wola.org/analysis/people-leaving-central-americas-northern-triangle/ ("In [] Guatemala and Honduras, homicide levels have decreased overall, but both remain among the world's most violent countries not at war."); ("Extortion is widespread, with small businesses, the public transportation sector, and poor neighborhoods being the most heavily hit. . . .  Failure to pay can result in harassment, violence, or death."); *id.* ("Honduras and Guatemala are some of the most dangerous countries to be a woman, with female homicide rates among the highest in the world.").

[126] *Id.*

[127] *NAPNAP Statement Opposing the Border Separation of Children and Parents*, NAT'L ASS'N OF PEDIATRIC NURSE PRACTITIONERS (June 11, 2018),

one or both parents compounds trauma upon trauma.[128]  Exposure to multiple traumatic events results in even higher risks for the multitude of mental and medical problems described above.[129]

### Plaintiffs and Their Children Forcibly Separated By the Government Are Subject to Severe, Ongoing Trauma

141.   Plaintiffs and their children have experienced and continue to experience severe, complex trauma as a result of their forced separation.  This trauma is evident in the emotional response to this separation that each has displayed.

142.   Ms. P, Ms. O, and Ms. M have exhibited symptoms of trauma.  "For example, both J.O. and R.M. cried unconsolably after they realized that their children were being taken away."[130]  "Both R.M. and J.O. reported feeling a sense of anguish and fear that they would not see [their] daughter[s] again."[131]  According to Dr. Hidalgo, the "level of stress related to the separation can take a toll on parents and may cause physical and mental health symptoms such as loss of sleep, loss of appetite, headaches, anxiety, depression, and suicidal ideation."[132] Ms. O and Ms. M have experienced distress and symptoms such as losing sense of time, inability to eat, and sleeplessness.[133]

143.   Likewise, Ms. P "reports that she was terrified by the fact of separation and thought that she would never see her daughter again."[134] As a result, she has

---

https://www.napnap.org/napnap-statement-opposing-border-separation-children-and-parents.

[128] Tammy Bean, PhD, et al., *Comparing Psychological Distress, Traumatic Stress Reactions, and Experiences of Unaccompanied Refugee Minors with Experiences of Adolescents Accompanied by Parents*, 195 J. NERVOUS MENTAL DISEASE, 288, 288 (2007); *see also* Hidalgo Decl. ¶ 9; Zayas Decl. ¶ 8; Declaration of Carolyn Murphy ("Murphy Decl."), ¶ 5.

[129] Gee, *supra* note 117.

[130] Hidalgo Decl. ¶ 14.

[131] *Id.*

[132] *Id.*

[133] *See generally* J.O. Decl.; R.M. Decl.

[134] Acuña Decl. ¶ 6.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

"upsetting thoughts or images about being separated from her daughter 'almost always,'" "feel[s] upset when she thinks or hears about events that have transpired 'almost always,'" "and reports crying four times a day."[135]  Ms. P has difficulty sleeping, and has "trouble concentrating 'almost always.'"[136]

144.   These symptoms due to family separation are compounded by the presence of other traumatized parents in confinement and by the traumatic events that caused them to migrate in the first place.  For instance, R.M. has reported that "she saw other parents 'wailing and crying until they could cry no more.'"[137]  J.P. has similarly reported that "[s]he worries what will happen to her next," in part, because "when she sees women leave the detention center, she does not know where they go and what happens to them."[138]  Further, Dr. Hidalgo notes that "[m]any of the parents"—including the Plaintiffs—"have previously experienced other traumas and have fled their home countries seeking sanctuary from violence," and that for "parents who have a prior history of trauma and losses, the forcible separation from their children can lead to higher rates of posttraumatic stress disorders, depression, anxiety, suicidal behavior, among other impacts."[139]

145.   Plaintiffs' children have also experienced identifiable trauma.  For instance, L.P. recalls having "a hard time thinking of anything but her mother" and "spen[t] most of the time crying" until she could speak with her mother.[140]  When she attempts not to cry, she experiences nosebleeds and headaches.[141]  The harm is made worse because other children in the facility are also distressed.  As she has "tearfully reported," "it can sometime be hard to fall asleep as she can hear the younger children

---

[135] *Id.* ¶ 7.
[136] *Id.*
[137] Hidalgo Decl. ¶ 14.
[138] Acuña Decl. ¶ 8.
[139] Hidalgo Decl. ¶ 15.
[140] Allen Decl. ¶ 12.
[141] *Id.*

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

[as young as two years old] crying for their mothers."[142]  "S.Q. and T.B. each [have] reported symptoms including excessive worry, dysphoric mood, crying spells, sleep and appetite disturbances, and fear of the unknown" "stemming from family separation."[143]  Other children who have been separated from their parents "ha[ve] significantly regressed to the point that [they] are now non-verbal, soil themselves, and have communication and socializing problems."[144]

146.   Further, in what appears to be a willful disregard for the trauma they have and continue to endure, immigration officers responsible for carrying out the detentions have treated each of the Plaintiffs with remarkable cruelty.  Ms. P and her daughter were held in deplorable conditions for three days before their forced separation.[145]  Officers made no efforts to help Ms. P communicate with her daughter until counsel became involved, despite her obvious distress.[146]  In an act particularly symbolic of the subhuman way that detainees are treated, a CBP officer threw crackers on the floor to force Ms. M pick them up, rather than simply handing them to her.[147]  These actions inevitably and purposely exacerbate the trauma for the Plaintiffs.

147.   To date, Plaintiffs have not received trauma-informed mental-health screenings or services to address the harms suffered.

## TO REMEDY TRAUMA INFLICTED BY ITS CRUEL POLICY, THE GOVERNMENT MUST OFFER SEPARATED FAMILIES COMPREHENSIVE MENTAL-HEALTH SERVICES PROVIDED UNDER APPROPRIATE CONDITIONS

148.   Defendants have an obligation to provide adequate medical care, including mental-health services, to individuals that they detain against their will and

---

[142] *Id.* ¶ 14.

[143] Declaration of Alfonso Mercado ("Mercado Decl.") ¶ 7.

[144] *Id.* ¶ 8.

[145] Chavez L.P. Decl. ¶¶ 10-12.

[146] J.P. Decl. ¶ 21.

[147] R.M. Decl. ¶ 11.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

to remedy the harms caused by their unconstitutional actions.  If the separated families are to recover from the trauma imposed by Defendants' actions, these mental-health services cannot be provided in the same slipshod manner as the government implemented its initial trauma-inducing policy.  Instead, they must be provided under conditions conducive to effective treatment.

149.   Most importantly, the treatment must be evidence-based and trauma-informed, meaning that it must be designed especially to alleviate the psychological and neurobiological consequences of forcible separation.[148]  Such treatments exist and have been shown to be effective across cultural backgrounds.[149]  Some have been successfully adapted for immigrant populations.[150]  These mental-health services often take the form of trauma-focused cognitive behavioral therapy.[151]

150.   For these services to be effective, several conditions must be met.

151.   First, the families must be reunified in short order consistent with the *Ms. L* injunction.  The longer the separation, the more pervasive and intense the trauma becomes.[152]  "The effects of trauma on separated children are [already] significant, long-lasting, and difficult to mitigate."[153]  Prolonging the separation understandably increases the trauma and thus requires more intense mental-health services.

152.   Second, all parents and children must be immediately screened "to identify those whose anxiety is toxic and detrimental to themselves and their families, as well as those whose anxiety has grown into trauma with its accompanying

---

[148] *See, e.g.*, Perry Decl. ¶ 22; Hidalgo Decl. ¶ 21; Gee Decl. ¶ 10.

[149] *See* Gee Decl. ¶ 10; Hidalgo Decl. ¶ 18.

[150] *See* Gee Decl. ¶ 10.

[151] *See, e.g.*, *id.*

[152] *See id.* ("Longer durations of trauma exposure are consistently associated with poorer outcomes."); Hidalgo Decl. ¶ 12; Carrion Decl. ¶ 13 ([reuniting the families] is necessary to prevent further damage as it will restore the children's primary support system and prevent the accretion of yet more stress from the continuation of the traumatic separation to their allostatic loads").

[153] Hidalgo Decl. ¶ 13.

50

symptoms,"[154] so that treatment plans can be developed for them. "Screening is a 'wide-net' process, the first step in the assessment and treatment process,"[155] and it is essential because "[t]he longer [appropriate] interventions are delayed, the greater the negative cumulative effect the acute neurophysiological, neuroendocrine, and neuropsychological response will have on these children and their parents."[156] Such screenings must also be repeated following family reunification to determine whether the process of reunification revealed trauma not previously evident. For these screenings to be effective given the special trauma inflicted upon the families, they must be conducted according to trauma-informed procedures and by appropriately trained trauma-informed professionals.[157] Specifically, they must meet several conditions: to start, a tool must show "*efficacy* (*i.e.*, reliability, validity, and accuracy in identifying individuals with trauma) and *effectiveness* (*i.e.*, generalizability to the real-world that adults and children inhabit)."[158] A tool must also show "*sensitivity* (*i.e.*, number of individuals correctly identified, that is true positives) and *specificity* (*i.e.*, eliminating those who do not demonstrate a problem, that is true negatives)."[159]

153. Third, to the extent that professionals conducting the screening find that the families are experiencing or have experienced trauma due to Defendants' policy, appropriate mental-health services must be offered in an appropriate environment. While each family's ultimate treatment must be tailored to its particular

---

[154] Loring Decl. ¶ 11; *see* Hidalgo Decl. ¶ 16; Zayas Decl. ¶¶ 20-21; Mercado Decl. ¶ 9.
[155] Zayas Decl. ¶ 21.
[156] Perry Decl. ¶ 22.
[157] *See* Gee Decl. ¶ 18 ("All mental health assessment and treatment provided to plaintiffs and all similarly situated parents and children be delivered in a culturally competent and linguistically sensitive manner and by mental health clinicians trained in evidence-based trauma-informed interventions."); Zayas Decl. ¶ 28.
[158] Zayas Decl. ¶ 21.
[159] *Id.*

circumstances, extensive research suggests that several baseline factors will be common for all affected families.

154.   One, counseling services are most effective in such situations when provided at the family level, meaning that "the adult caregivers must be a part of the trauma intervention provided to these children."[160] "Appropriate treatment for trauma caused by separation should consist of family therapy" because the trauma touched "all family members" and their relationships with each other, and thus family therapy "is necessary to address family pain."[161] Put another way, this approach is necessary not only to assist the child in "reestablishing [his or her] ability to effectively regulate himself [or herself]," but also "to treat [the parent's] own primary trauma and to effectively support their traumatized child."[162]  Indeed, "[d]ecades of research demonstrates that the most significant protective factor for vulnerable children facing adversity are bonds to those that love them."[163]

155.   Two, these services must "be delivered in a culturally competent and linguistically sensitive manner and by mental health clinicians trained in evidence-based trauma-informed interventions."[164]  The trauma caused by family separation is acute, and the migrant families are diverse.  For the trauma to be appropriately

---

[160] Perry Decl. ¶ 23; *see* Allen Decl. ¶ 22.

[161] Acuña Decl. ¶ 12.

[162] Perry Decl. ¶¶ 23-24; *see also* Hidalgo Decl. ¶ 25; Murphy Decl. ¶ 9 ("family or parental involvement is often critical in providing treatment to children and young people, both to obtain collateral historical information and because the entire family 'system' may have been traumatized and need treatment both in support of the minor child and to prevent a re-traumatization effect when the child is reunited with family members whose own trauma has not been addressed.").

[163] Hidalgo Decl. ¶ 31.

[164] Gee Decl. ¶ 31; *see* Allen Decl. ¶ 22; Zayas Decl. ¶ 28 ("all screenings, assessments, and treatments [must] be culturally, linguistically, and developmentally appropriate, and scientifically tested"); Hidalgo Decl. ¶ 18 ("[s]creenings and evaluations should be conducted by culturally and linguistic competent providers").

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

mitigated, the mental-health services must be tailored to address the specific individuals harmed and their symptoms.

156.   Three, these services must be provided in an environment that does not continue or prolong the trauma.  "[T]herapeutic work while in a setting or circumstance where there is continuing distress, threat, uncertainty and unpredictability can undermine, or even make impossible, meaningful therapeutic progress."[165] In addition, "[f]or a child and an adult to remain in a setting he/she associates with the traumatic separation (even after reunification with the mother or father), … will cause additional and profound anticipation of further traumatic events: The mother and father who also experienced traumatic separation from their child would need to be placed in a safe family setting with their child(ren) to avoid an increase in such trauma symptoms as persistent negative thoughts and expectations about oneself, one's world, and others."[166]

157.   An environment like the detention centers where class members are currently housed can prevent and even undermine trauma intervention.[167]  AAP has stated that "continuing to maintain the 'zero tolerance' policy will put more children in detention facilities, an environment [that] is no place for a child, even if they are accompanied by their families."[168]  AAP explained, "Studies of detained immigrants have shown that children and parents may suffer negative physical and emotional symptoms from detention, including anxiety, depression and posttraumatic stress disorder.  Conditions in U.S. detention facilities, which include forcing children to sleep on cement floors, open toilets, constant light exposure, insufficient food and

---

[165] Perry Decl. ¶ 22.

[166] Loring Decl. ¶ 10.

[167] Hidalgo Decl. ¶ 24 ("Facilities with a law enforcement orientation do not have the training or expertise to manage the complex needs of trauma survivors.").

[168] Colleen Kraft, *AAP Statement on Executive Order of Family Separation*, AMERICAN ACADEMY OF PEDIATRICS (June 20, 2018), https://www.aap.org/en-us/about-the-aap/aap-press-room/pages/AAP-Statement-on-Executive-Order-on-Family-Separation.aspx.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

water, no bathing facilities, and extremely cold temperatures, are traumatizing for children.  No child should ever have to endure these conditions."[169]

158.   Data from Texas Health and Human Services Commission and the Department of Family and Protective Services shows that numerous of the centers where children are being sent pursuant to this policy "have been cited by state child care facility regulators for dozens of violations in recent years," some of which have been for serious issues.[170]

159.   Such centers have also been the subject of "fire-code violations, lawsuits claiming abuse, and complaints from employees alleging wrongful termination and unpaid wages."[171]

160.   At family detention centers, former detainees have reported a dozen or more people sharing a single cell, guards ordering that toddlers not be allowed to crawl, and toys barred from living quarters.[172]  A 2014 evaluation of children at family detention centers found that "children regressed to bed wetting.  A 9-year-old-girl sought to return to breast feeding.  Children clung to their mothers legs, fearful of letting them out of sight.  Many had night terrors, were depressed or acted out."[173]

---

[169] *Id.*

[170] Manny Fernandez, *Inside the Former Walmart That Is Now A Shelter for Almost 1,500 Migrant Children*, N.Y. TIMES (June 14, 2018), https://www.nytimes.com/2018/06/14/us/family-separation-migrant-children-detention.html.

[171] Manny Fernandez and Katie Benner, *The Billion-Dollar Business of Operating Shelters for Migrant Children*, N.Y. TIMES (June 21, 2018), https://www.nytimes.com/2018/06/21/us/migrant-shelters-border-crossing.html.

[172] Sonia Nazario, *There's a Better, Cheaper Way to Handle Immigration*, N.Y. TIMES (June 22, 2018), https://www.nytimes.com/2018/06/22/opinion/children-detention-trump-executive-order.html.

[173] *Id.*

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

161.   Guards at family detention centers have been accused of sexual assault, abusive treatment, and neglect.[174]

162.   In any event, the government has an obligation to provide the families it has traumatized access to conditions that will not exacerbate the trauma already inflicted and that will allow for effective treatment.

163.   Finally, given that Defendants' actions have caused this trauma, mental-health services must be provided for a sufficient period of time, including after release.

## CLASS ALLEGATIONS

164.    Plaintiffs bring this action under Federal Rule of Civil Procedure 23(b)(2) on behalf of themselves and a nationwide class of all other persons similarly situated.

165.   Plaintiffs seek to represent the following nationwide class:

> All adult parents nationwide who (1) were, are, or will be detained in immigration custody by the Department of Homeland Security, (2) have a minor child who has been, is, or will be separated from them by DHS and detained in DHS or ORR custody or foster care, absent a demonstration in a hearing that the parent is unfit or presents a danger to the child.

166.   The proposed class is so numerous that joinder of all members is impractical, satisfying Federal Rule of Civil Procedure 23(a)(1).  According to Defendants, nearly 3,000 children have been separated from their parents under the Trump Administration's immigration policy.  Nearly all of these children's parents remain in DHS's custody.

---

[174] *Id.*; Manny Fernandez and Katie Benner, *The Billion-Dollar Business of Operating Shelters for Migrant Children*, N.Y. TIMES (June 21, 2018), https://www.nytimes.com/2018/06/21/us/migrant-shelters-border-crossing.html.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

167.   The proposed class meets the commonality requirements of Federal Rule of Civil Procedure 23(a)(2) for several reasons.  First, the proposed class members have all been subject to the government's family separation policy and, as a result, have had their children forcibly taken from their care, triggering the harms alleged. Second, other factual questions are common to the proposed class, including whether and to what extent the government has developed an appropriate policy for mitigating the harms inflicted by the family separation policy.  Third, multiple questions of law are common to the proposed class, namely whether Defendants' actions have violated their substantive due process rights and their rights to equal protection of the law.

168.   The proposed class meets the typicality requirements of Federal Rule of Civil Procedure 23(a)(3).  Ms. P, Ms. O, and Ms. M have all have been forcibly separated from their children without a finding of unfitness or that they present a danger to their children, and they have not been provided with appropriate mental-health screening or offered appropriate trauma-informed intervention.  Additionally, Plaintiffs assert the same rights under the Fifth Amendment.

169.   The proposed class meets the adequacy requirements of Federal Rule of Civil Procedure 23(a)(4).  Ms. P, Ms. O, and Ms. M assert the same claims and seek the same relief as the other members of the class, namely an order that they be provided appropriate mental-health screening and any appropriate trauma-informed intervention in an appropriate environment.  The named plaintiffs will defend the rights of all proposed class members fairly and adequately. Further, the proposed class is represented by Sidley Austin LLP and Public Counsel.  Counsel have extensive experience litigating class action suits and other complex cases in federal court, including civil rights suits on behalf of noncitizens.

170.   The members of the proposed class are readily ascertainable through Defendants' records.

171.   Finally, the proposed class satisfies Federal Rule of Civil Procedure 23(b)(2).  Defendants have acted or refused to act on grounds that apply generally to

56

the class by forcibly separating the migrant parents from their children under a common policy and failing to provide adequate medical care for detained individuals and to remedy the harms inflicted.  As a result, the declaratory and injunctive relief sought by the proposed class will be appropriate with respect to the class as a whole.

## CLAIMS FOR RELIEF

### FIRST CLAIM

### Violation of Substantive Due Process

172.   Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs.

173.   The Due Process Clause of the Fifth Amendment to the U.S. Constitution provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.

174.   The Due Process Clause applies to all persons on United States soil and thus applies to Plaintiffs and their children.  *Zadvydas v. Davis*, 533 U.S. 678 (2001).

175.   The guarantee against the deprivation of liberty without due process bars the government from infringing on certain fundamental liberty interests.  The continued separation and confinement of Plaintiffs and their children violates those rights in several respects.

176.   Plaintiffs and their children have a liberty interest under the Due Process Clause in remaining together as a family and a right to be protected against the government's arbitrary destruction of the integrity of their families.  *See, e.g.*, *Santosky v. Kramer*, 455 U.S. 745 (1982); *Moore v. E. Cleveland*, 431 U.S. 494 (1977); *Meyer v. Nebraska*, 262 U.S. 390 (1923).  Under the Fifth Amendment, Plaintiffs also have "the right … to make decisions concerning the care, custody, and control of their children."  *Fields v. Palmdale Sch. Dist.*, 427 F.3d  1197, 1204 (9th Cir. 2005) (citing *Troxel v. Granville*, 430 U.S. 57, 66 (2000) (plurality op.)).  The continued separation of Plaintiffs from their children, without any determination that Plaintiffs were unfit or present a danger to their children, plainly violates these rights.

57

177.   Plaintiffs' separation and the resulting trauma occurred while Plaintiffs and their children were in the custody of the United States Department of Homeland Security and the Department of Health and Human Services.  Once Defendants detained Plaintiffs and their children, the Defendants incurred a duty not to gratuitously inflict emotional and psychological harm and a duty to provide for their safety and general well-being.  *See DeShaney v. Winnebago Cty. Dept. of Soc. Servs.*, 489 U.S. 189 (1989).

178.   By forcibly separating Plaintiffs from their children and keeping them apart, Defendants have inflicted and will continue to inflict upon Plaintiffs extraordinary harm that they would not have otherwise have faced.  During Plaintiffs' confinement and since the time Defendants arbitrarily separated Plaintiffs from their children, Plaintiffs have not received the intensive family mental-health screenings and services that they need on an ongoing basis—including for a period following their release from detention—as a result of Defendants' intentional infliction of emotional and psychological harm.

179.   The separation of Plaintiffs from their children and their continued detention is arbitrary and shocks the conscience.  Defendants forcibly separated Plaintiffs from their children without explanation or basis in fact, which deliberately induced severe trauma to both parent and child.  Defendants did so despite clear warnings, including from numerous professionals and organizations such as the American Academy of Pediatrics, that their actions were tantamount to child abuse and could result in long-term adverse mental health consequences.

180.   Defendants intentionally took these actions pursuant to a policy of detention and family separation that lacked any legitimate basis.  Subjecting parents and their minor children to the cruel practice of separating families for the purposes of deterring other legitimate asylum seekers, and to use their profound suffering as a political bargaining chip, clearly violates due process.

181.   Plaintiffs and their children have suffered and will continue to suffer irreparable injury from the arbitrary and cruel separation of their families and their unnecessary continued detention.

## SECOND CLAIM

### Violation of the Equal Protection Guarantee of the Due Process Clause of the Fifth Amendment

182.   Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs.

183.   The Fifth Amendment contains an implicit guarantee of equal protection that invalidates any official action that in part reflects a racially discriminatory intent or purpose. Classifications based on race or national origin receive exacting scrutiny, and even facially neutral policies and practices will be held unconstitutional when they reflect a pattern unexplainable on grounds other than race. *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977).

184.   Defendants' decisions to forcibly separate families and to isolate children in detention facilities separate from their parents, are unconstitutional because they were motivated, at least in part, by intentional discrimination based on race, ethnicity, and/or national origin and, in particular, reflect bias against immigrants perceived to come from non-white, non-European countries.

185.   Plaintiffs have suffered and continue to suffer irreparable injury resulting from the separation and continued detention of asylum-seeking parents and children, and the denial of adequate, remedial, family medical and mental-health services in a setting conducive to effective treatment.

## **PRAYER FOR RELIEF**

Plaintiffs ask this Court to grant the following relief:

1.   Certify a class of all adult parents nationwide who (1) were, are, or will be detained in immigration custody by the Department of Homeland Security, and (2)

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

have a minor child who has been, is, or will be separated from them by DHS and detained in DHS or ORR custody or foster care, absent a demonstration in a hearing that the parent is unfit or presents a danger to the child;

2.      Name Ms. O, Ms. P., and Ms. M. as representatives of the class, and appoint Plaintiffs' counsel as class counsel;

3.      Order Defendants to provide mental-health screenings of Plaintiffs and their children immediately as well as after reunification in order to assess their need for subsequent trauma-informed remedial medical and mental-health services to address the trauma of separation and child detention;

4.      Order Defendants to offer appropriate trauma-informed remedial medical and mental-health services appropriate to address the trauma of separation and detention to Plaintiffs and to Plaintiffs' children and under conditions conducive to effective treatment;

5.      Order Defendants to permit class counsel or their agents entry into government facilities in which class members are detained to evaluate whether the mental-health screenings and services are being provided and whether they are appropriate;

6.      Require Defendants to pay reasonable attorneys' fees and costs pursuant to 28 U.S.C. § 2412, and on any other basis justified under law; and

7.      Grant any other and further relief that this Court may deem fit and proper.

Dated:  July 12, 2018                         Respectfully Submitted,


Mark Rosenbaum (CABN 59940)              /s/ Amy P. Lally
mrosenbaum@publiccounsel.org             Amy P. Lally (CABN 198555)
Judy London (SBN 149431)                 alally@sidley.com
jlondon@publiccounsel.org                Ellyce R. Cooper (CABN 204453)
Talia Inlender (SBN 253796)              ecooper@sidley.com
tinlender@publiccounsel.org              SIDLEY AUSTIN LLP
                                         1999 Avenue of the Stars, 17th Floor

Alisa Hartz (SBN 285141)
ahartz@publiccounsel.org
Lucero Chavez (SBN 273531)
lchavez@publiccounsel.org
Elizabeth Hadaway (SBN 308800)
ehadaway@publiccounsel.org
Malhar Shah (SBN 318588)
mshah@publiccounsel.org
Deena Tumeh (SBN 318573)
dtumeh@publiccounsel.org
PUBLIC COUNSEL
610 S. Ardmore Avenue
Los Angeles, CA 90005
Telephone: +1 213 385-2977
Facsimile: +1 213 385-9089

Mark E. Haddad (SBN 205945)
markhadd@usc.edu
Part-time Lecturer in Law, USC Gould
School of Law**
University of Southern California
699 Exposition Blvd.
Los Angeles, CA 90089
Telephone: +1 213 675-5957


Luis Cortes Romero (SBN 310852)
lcortes@ia-lc.com
Alma L. David (SBN 257676)
adavid@ia-lc.com
Immigrant Advocacy & Litigation
Center, PLLC
19309 68th Ave South R-102
Kent, WA 98032
Telephone: +1 253 872-4730
Facsimile: +1 253 237-1591

Los Angeles, CA 90067
Telephone: +1 310 595-9662
Facsimile: +1 310 595-9501

Carter G. Phillips*
cphillips@sidley.com
Jennifer J. Clark*
jennifer.clark@sidley.com
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Telephone: +1 202 736-8270
Facsimile: +1 202 736-8711

Michael Andolina*
mandolina@sidley.com
Timothy Payne*
tpayne@sidley.com
Kevin Fee*
kfee@sidley.com
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
Telephone: +1 312 853-7000
Facsimile: +1 312 853-7036

Sean A. Commons (SBN 217603)
scommons@sidley.com
Bridget S. Johnsen (SBN 210778)
bjohnsen@sidley.com
SIDLEY AUSTIN LLP
555 West Fifth Street
Los Angeles, CA 90013
Telephone: +1 213 896-6000
Facsimile: +1 213 896-6600

*Application for admission pro hac vice to be submitted

** Institution listed for identification purposes only

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF