1   Amy P. Lally (SBN 198555)
    alally@sidley.com
2   Ellyce R. Cooper (SBN 204453)
    ecooper@sidley.com
3   SIDLEY AUSTIN LLP
    1999 Avenue of the Stars, 17th Floor
4   Los Angeles, CA 90067
    Telephone: +1 310 595-9500
5   Facsimile: +1 310 595-9501

6
    Mark Rosenbaum (SBN 59940)
7   mrosenbaum@publiccounsel.org
    Judy London (SBN 149431)
8   jlondon@publiccounsel.org
    Talia Inlender (SBN 253796)
9   tinlender@publiccounsel.org
    Alisa Hartz (SBN 285141)
10  ahartz@publiccounsel.org
    Lucero Chavez (SBN 273531)
11  lchavez@publiccounsel.org
    Elizabeth Hadaway (SBN 308800)
12  ehadaway@publiccounsel.org
    Malhar Shah (SBN 318588)
13  mshah@publiccounsel.org
    Deena Tumeh (SBN 318573)
14  dtumeh@publiccounsel.org
    PUBLIC COUNSEL
15  610 S. Ardmore Avenue
    Los Angeles, CA 90005
16  Telephone: +1 213 385-2977
    Facsimile: +1 213 385-9089
17

18
19  *Attorneys for Plaintiffs*
    *Additional Counsel on next page*
20

21
22                 **UNITED STATES DISTRICT COURT**

23                 **CENTRAL DISTRICT OF CALIFORNIA**

24  | MS. J.P., MS. J.O., AND MS. R.M., on behalf of themselves and all others similiarly situated, | Case No. 2:18-cv-06081 |
    |---|---|
25  | | **NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |
    |                              Plaintiffs, | |
26  | |
    |                              v. | |
27  | |
    | JEFFERSON B. SESSIONS III, ATTORNEY GENERAL OF THE | |
28

| | |
|---|---|
| 1 | UNITED STATES; KIRSTJEN |
| 2 | NIELSEN, SECRETARY OF HOMELAND SECURITY; U.S. DEPARTMENT OF HOMELAND |
| 3 | SECURITY, AND ITS SUBORDINATE ENTITIES; U.S. IMMIGRATION AND |
| 4 | CUSTOMS ENFORCEMENT; U.S. CUSTOMS AND BORDER |
| 5 | PROTECTION; ALEX M. AZAR II, SECRETARY OF HEALTH AND |
| 6 | HUMAN SERVICES; U.S. DEPARTMENT OF HEALTH AND |
| 7 | HUMAN SERVICES; SCOTT LLOYD, DIRECTOR OF THE OFFICE OF |
| 8 | REFUGEE RESETTLEMENT; OFFICE OF REFUGEE RESETTLEMENT; |
| 9 | DAVID MARIN, LOS ANGELES FIELD OFFICE DIRECTOR, U.S. |
| 10 | IMMIGRATION AND CUSTOMS ENFORCEMENT; LISA VON |
| 11 | NORDHEIM, WARDEN, JAMES A. MUSICK FACILITY; MARC J. MOORE, |
| 12 | SEATTLE FIELD OFFICE DIRECTOR, U.S. IMMIGRATION AND CUSTOMS |
| 13 | ENFORCEMENT; LOWELL CLARK, WARDEN, TACOMA NORTHWEST |
| 14 | DETENTION CENTER, |

Date: October 29, 2018

Time: 8:30 a.m.

Judge:  Hon. John A. Kronstadt

Courtroom:  10B

Defendants.

Carter G. Phillips*
cphillips@sidley.com
Jennifer J. Clark*
jennifer.clark@sidley.com
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Telephone: +1 202 736-8000
Facsimile: +1 202 736-8711

Mark E. Haddad (SBN 205945)
markhadd@usc.edu
Part-time Lecturer in Law
USC Gould School of Law**
University of Southern California
699 Exposition Blvd.
Los Angeles, CA 90089
Telephone: +1 213 675-5957

Michael Andolina*
mandolina@sidley.com
Timothy Payne*
tpayne@sidley.com
Kevin Fee*
kfee@sidley.com
SIDLEY AUSTIN LLP

Luis Cortes Romero (SBN 310852)
lcortes@ia-lc.com
Alma L. David (SBN 257676)
adavid@ia-lc.com
IMMIGRANT ADVOCACY &
LITIGATION CENTER, PLLC
19309 68th Avenue South, Suite R-102

2

One South Dearborn                        Kent, WA 98032
Chicago, IL 60603                         Telephone: +1 253 872-4730
Telephone: +1 312 853-7000                Facsimile: +1 253 237-1591
Facsimile: +1 312 853-7036

Sean A. Commons (SBN 217603)
scommons@sidley.com
Bridget S. Johnsen (SBN 210778)
bjohnsen@sidley.com
SIDLEY AUSTIN LLP
555 West Fifth Street
Los Angeles, CA 90013
Telephone: +1 213 896-6000
Facsimile: +1 213 896-6600

*Application for admission pro hac vice to be submitted

** Institution listed for identification purposes only

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT
THEREOF

**TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD**:

PLEASE TAKE NOTICE that on October 29, 2018, at 8:30 a.m. or as soon thereafter as may be heard in Courtroom 10B of the above-entitled court, located at 350 West 1st Street, Los Angeles, California 90012, plaintiffs Ms. J.P., Ms. J.O., and Ms. R.M., (collectively "Plaintiffs") will and hereby do move this Court for entry of a preliminary injunction requiring Defendants to provide meaningful access to mental health care screening and treatment to Plaintiffs and members of the proposed class. Plaintiffs seek, in particular, meaningful access to:

- mental health screening for all Plaintiffs and class members to identify those who require further treatment as a result of the trauma inflicted on them, which must be performed by persons trained to recognize the signs and symptoms of such trauma, within fourteen (14) days of the entry of the Court's injunction;

- subsequent mental health screening for all Plaintiffs and class members to identify those who require further treatment as a result of the trauma inflicted on them, which must be performed by persons trained to recognize the signs and symptoms of such trauma, within fourteen (14) days of the reunification of the Plaintiff or class member with his/her child(ren) if such reunification takes place after the screening ordered as referenced above;

- mental health care treatment, for those Plaintiffs and class members whose screenings indicate that such treatment is needed, which must:

    o be provided in a safe environment that will not reinforce trauma;

    o be provided on a family basis to all members of the reunified family together;

    o be provided in a culturally competent manner by mental health clinicians trained in evidence-based trauma-informed interventions; and

    o be provided for a period of time sufficient to treat the trauma inflicted; and

- such other relief as is permitted by law.

This motion is made pursuant to Federal Rule of Civil Procedure 65 on the grounds that 1) Plaintiffs and class members are likely to prevail on their substantive due process claim under the Fifth Amendment and obtain an order directing the government to provide them with effective mental health screening and treatment, 2) Plaintiffs and class members will likely suffer irreparable harm absent preliminary

1

relief, 3) the balance of equities favors entry of an injunction, and 4) an injunction is in the public interest.

This motion is based upon this Notice of Motion; the supporting Memorandum of Points and Authorities; the supporting declarations; all documents and pleadings on file in this action; and on such other oral and documentary evidence as may be presented at the hearing on this motion.


DATED: July 18, 2018

*/s/ Amy P. Lally*

2

1
2

# **TABLE OF CONTENTS**

3  INTRODUCTION ............................................................................................... 1

4  FACTUAL BACKGROUND ............................................................................... 2

5       **A.**    Plaintiffs and the Proposed Class. .................................. 2

6       **B.**    The Government Implemented the Family Separation Policy. ...... 2

7       **C.**    The Government's Family Separation Policy Is Found Likely
          Unconstitutional and Enjoined ...................................................... 3

8
9       **D.**    The Government's Family Separation Policy Inflicts Trauma and
          Increased Risk of Lifelong Health Problems on Plaintiffs, Class
10           Members, and Their Children. ....................................................... 5

11      **E.**    Plaintiffs, Class Members, and Their Children Require Trauma-
          Informed Family Mental Health Screenings and Services to
12           Recover From the Trauma Inflicted by the Government ..............10

13      **F.**    Mental Health Care Services Provided by the Government Are Not
          Effective Or Sufficient. ................................................................12

14 LEGAL STANDARD..........................................................................................13

15 ARGUMENT.......................................................................................................14

16   **I.**    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS. .........14

17      **A.**    The Government's Detention of Class Members Created a Special
          Relationship Requiring It to Provide Effective Mental Health
18           Treatment During and Following Detention.................................14

19      **B.**    The Government Must Provide Effective Mental Health Care to
          Plaintiffs and Class Members to Remedy the Injury That It Caused
20           ..................................................................................................16

21      **C.**    The Government Has Failed To Provide Adequate Mental Health
          Screenings and Treatment ............................................................21

22
23   **II.**   PLAINTIFFS WILL SUFFER IRREPARABLE HARM IF THE
       INJUNCTION IS NOT GRANTED ......................................................21

24   **III.**  THE BALANCE OF HARDSHIPS FAVORS THE INJUNCTION ......23

25   **IV.**  THE PUBLIC INTEREST FAVORS THE INJUNCTION ...................24

26 CONCLUSION ...................................................................................................25

27
28

# TABLE OF AUTHORITIES

**Cases**                                                                                              **Page(s)**

*All. for the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011)............................................................................13

*Cook v. California*,
  No. 1:16-CV-00674-LJO-SAB, 2016 WL 4161114 (E.D. Cal. Aug. 5,
  2016) ...................................................................................................................16

*Cty. of Sacramento v. Lewis*,
  523 U.S. 833 (1998)....................................................................................17, 18

*DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*,
  489 U.S. 189 (1989)............................................................................................14

*Doe v. Kelly*,
  878 F.3d 710 (9th Cir. 2017)........................................................................3, 14

*Estelle v. Gamble*,
  429 U.S. 97 (1976)..............................................................................................14

*Garcia v. Google, Inc.*,
  786 F.3d 733 (9th Cir. 2015) (en banc) ............................................................13

*Gibson v. Cty. of Washoe*,
  290 F.3d 1175 (9th Cir. 2002), *overruled on other grounds by Castro
  v. Cty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016) (en banc) ..............14, 15, 21

*Estate of Gonzales v. Hickman*,
  No. ED CV 05-00660 MMM, 2006 WL 4959780 (C.D. Cal. Jan. 30,
  2006) ...................................................................................................................16

*Gordon v. Cty. of Orange*,
  888 F.3d 1118 (9th Cir. 2018)...........................................................................20

*Halet v. Wend Inv. Co.*,
  672 F.2d 1305 (9th Cir. 1982)...........................................................................19

*Haskins v. Stanton*,
  794 F.2d 1273 (7th Cir. 1986)...........................................................................24

*Henry A. v. Willden*,
    678 F.3d 991 (9th Cir. 2012) ............................................................. 14, 17, 18, 19

*Hernandez v. Sessions*,
    872 F.3d 976 (9th Cir. 2017) .................................................................. 22, 23, 24

*Kennedy v. City of Ridgefield*,
    439 F.3d 1055 (9th Cir. 2006) ...................................................................... 14, 16

*Leiva-Perez v. Holder*,
    640 F.3d 962 (9th Cir. 2011) ............................................................................... 19

*M.R. v. Dreyfus*,
    697 F.3d 706 (9th Cir. 2012) ............................................................................... 24

*Melendres v. Arpaio*,
    695 F.3d 990 (9th Cir. 2012) ............................................................................... 24

*Ms. L. v. U.S. Immigration & Customs Enf't*,
    Case No. 3:18-cv-00428-DMS-MDD (S.D. Cal.) .................................. 4, 5, 13, 18

*Norsworthy v. Beard*,
    87 F. Supp. 3d 1164 (N.D. Cal. 2015) ................................................................ 25

*Patel v. Kent Sch. Dist.*,
    648 F.3d 965 (9th Cir. 2011) ............................................................................... 19

*Penilla v. City of Huntington Park*,
    115 F.3d 707 (9th Cir. 1997) (*per curiam*) ........................................................ 16

*Pimentel v. Dreyfus*,
    670 F.3d 1096 (9th Cir. 2012) ............................................................................ 13

*Porter v. Osborn*,
    546 F.3d 1131 (9th Cir. 2008) ............................................................................ 17

*Rodriguez v. Robbins*,
    715 F.3d 1127 (9th Cir. 2013) ............................................................................ 23

*Sierra Forest Legacy v. Rey*,
    577 F.3d 1015 (9th Cir. 2009) ............................................................................ 13

*United States v. Raines*,
    362 U.S. 17 (1960) ............................................................................................... 24

iii

*Wakefield v. Thompson*,
  177 F. 3d 1160 (9th Cir. 1999)....................................................................... 14, 15, 16

**Constitutional Provisions**

Fifth Amendment....................................................................................................14

Eighth Amendment .................................................................................................15

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT
THEREOF

## INTRODUCTION

Every parent who has lost sight of a child for even a short time knows that family separation may cause severe stress to parent and child alike.  They also know that separation can become traumatic where it is forcible, sudden, or prolonged, and where loved ones cannot contact one another while separated.  Yet the government, including Defendants, deliberately, needlessly, and unconstitutionally separated thousands of children from their parents, refused to allow parents and children to communicate, failed to provide information about the well-being of separated family members, and kept separated family members in intolerable suspense by refusing to explain when or even *if* families would *ever* be reunified.

Even if the government somehow failed fully to anticipate the trauma that its actions would cause, the reactions of the separated family members immediately informed the government that it was inflicting severe harm.  Media reports and personal accounts of the separations are replete with vivid descriptions of obviously terrified children and desperate parents.  Compl., Dkt. No. 1 ("Compl.") ¶¶ 107, 130, 132-33.  The experience of the putative class representatives in this case and their families likewise shows the obvious nature of the harm inflicted by the government.  Plaintiff Ms. J.P.'s daughter fainted in terror when she realized she was about to be separated from her mother, and after nearly two months of separation feels depressed and cannot speak about her mother without crying.  *Id.* ¶¶ 19, 21.  Plaintiff Ms. O's and Ms. M's daughters have suffered excessive worry, dysphoric mood, crying spells, sleep and appetite disturbances, and fear of the unknown.  *Id.* ¶ 145.

The government's misconduct inflicted devastating psychological trauma on both parents and children the government chose to tear apart.  This trauma is being multiplied each day that these families remain separated and its effects will not evaporate once families are reunited; instead, it risks causing long-lasting damage to the physical and mental health of parents and children alike, including anxiety, depression, and post-traumatic stress disorder ("PTSD").  Plaintiffs, and the group of

parents whom they seek to represent in this action, need immediate mental health screenings, and if appropriate, family mental health treatment designed to alleviate such trauma to reduce the risk of such long-term consequences to both parent and child.

The government has compounded the harm caused by its callous and unconstitutional family separation program by failing to provide adequate mental health care. This failure violates the government's constitutional obligations in two independent ways. First, the government must provide adequate health care, including mental health care, to persons it detains. Second, having inflicted grievous harm on thousands of people by its misconduct, which has already been found likely to violate due process, the government is promptly required to remedy the damage it has caused and prevent further damage by providing effective trauma-focused family therapy. This motion seeks an order from the Court requiring the government to live up to its constitutional obligations by providing effective treatment in an appropriate setting to address the harm inflicted by its unconstitutional family separation policy.

## FACTUAL BACKGROUND

### A.   Plaintiffs and the Proposed Class.

Plaintiffs in this case are three mothers who were separated from their minor children under the government's family separation policy.[1] They seek to represent the following nationwide class:

> All adult parents nationwide who (1) were, are, or will be detained in immigration custody by the Department of Homeland Security, (2) have a minor child who has been, is, or will be separated from them by DHS and detained in DHS or ORR [Office of Refugee Resettlement] custody or foster care, absent a demonstration in a hearing that the parent is unfit or presents a danger to the child.

### B.   The Government Implemented the Family Separation Policy.

On May 7, 2018, Defendant Attorney General Jeff Sessions announced a "zero-tolerance" policy of forced family separation to deter migrants from crossing the

---

[1] Compl. ¶ 4.

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT THEREOF

southern border, announcing "If you cross this border unlawfully, then we will prosecute you.  It's that simple. . . .  If you are smuggling a child, then we will prosecute you and that child will be separated from you. . . ."[2] But the policy was not limited to "smugglers."  Rather, ordinary immigrant families – many of whom are seeking asylum – bore its brunt.  In the first month of the policy, nearly 3,000 children were separated from their parents while crossing the border.[3]  Some children were as young as 18 months old, and more than 100 were younger than four years old.[4]

The government mischaracterized family separation as necessary to enforce the law.  But DHS expressly contemplated using family separation to deter migration from Central America into the United States at least a year before the "zero tolerance" policy was adopted.[5]  In March 2017, then-DHS Secretary Kelly confirmed that family separation was under consideration as a means to deter migration across the southern border.  On May 11, 2018, White House Chief of Staff John Kelly confirmed that the family separation policy was put in place to deter other migrants, specifically Central Americans, from coming the United States.  In his words, "a big name of the game is deterrence."[6]

## C. The Government's Family Separation Policy Is Found Likely Unconstitutional and Enjoined.

The government's policy of separating families was met with widespread

[2] *Attorney General Sessions Delivers Remarks Discussing the Immigration Enforcement Actions of the Trump Administration*, DOJ Justice News (May 7, 2018), https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-discussing-immigration-enforcement-actions.
[3] Caitlin Dickerson, *Trump Administration in Chaotic Scramble to Reunify Migrant Families*, N.Y. TIMES (July 5, 2018), https://www.nytimes.com/2018/07/05/us/migrant-children-chaos-family-separation.html.
[4] Caitlin Dickerson, *Hundreds of Immigrant Children Have Been Taken From Parents at U.S. Border*, N.Y. TIMES (Apr. 20, 2018), https://www.nytimes.com/2018/04/20/us/immigrant-children-separation-ice.html.
[5] Daniella Diaz, *Kelly: DHS is considering separating undocumented children from their parents at the border*, CNN (March 6, 2017), https://www.cnn.com/2017/03/06/politics/john-kelly-separating-children-from-parents-immigration-border/index.html.
[6] *Transcript: White House Chief of Staff John Kelly's Interview with NPR*, NPR (May 11, 2018), https://www.npr.org/2018/05/11/610116389/transcript-white-house-chief-of-staff-john-kellys-interview-with-npr (last visited July 12, 2018).

condemnation and, unsurprisingly, litigation.  One of the cases challenging the policy was filed by a refugee known as "Ms. L." in the Southern District of California, and is pending before Judge Dana Sabraw.  *Ms. L. v. U.S. Immigration & Customs Enf't*, Case No. 3:18-cv-00428-DMS-MDD (S.D. Cal.) ("Ms. L. Case").  On June 26, 2018, Judge Sabraw preliminarily certified a class of parents who enter the United States who were, are or will be detained in immigration custody, and who have a minor child who is or will be separated from them absent a determination that the parent is unfit or endangers the child.  *Ms. L. Case*, Dkt. No. 82 at 17.  That same day, he entered a preliminary injunction that included the following provisions, among others:

- Defendants . . . are preliminarily enjoined from detaining Class Members in DHS custody without and apart from their minor children, absent a determination that the parent is unfit or presents a danger to the child . . . .

- Defendants must reunify all Class Members with their minor children who are under the age of five (5) within fourteen (14) days of the entry of this Order; and . . . Defendants must reunify all Class Members with their minor children age five (5) and over within thirty (30) days of the entry of this Order.

- Defendants . . . are preliminarily enjoined from removing any Class Members without their child . . . .

*Ms. L. Case*, Dkt. No. 83 at 22-24.

In support of this injunction, Judge Sabraw found that the *Ms. L. Case* plaintiffs had submitted evidence demonstrating that they were likely to succeed in showing that the government's family separation practice violates due process and "shocks the conscience."  *Id.* at 12.  Judge Sabraw found that the government implemented this practice "without any effective system or procedure for (1) tracking the children after they were separated from their parents, (2) enabling communication between the parents and their children after separation, and (3) reuniting the parents and children after the parents are returned to immigration custody following completion of their criminal sentence."  *Id.* at 14.  Noting that the government routinely catalogs, stores,

4

and returns *property* seized from detainees upon their release, Judge Sabraw found that the government's failure to do the same with respect to *children* "cannot satisfy the requirements of due process." *Id.* at 14-15. Going further, Judge Sabraw found that the government improperly placed the onus on parents to "search for their children and make application for reunification;" he found that placing that burden on parents "is backwards" because "the Government has an affirmative obligation to track and promptly reunify these family members." *Id.* at 16-17. In summary, Judge Sabraw found that the government's practice of separating families, as implemented, "is likely to be so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience . . . interferes with rights implicit in the concept of ordered liberty, . . . and is so brutal and offensive that it [does] not comport with traditional ideas of fair play and decency." *Id.* at 17 (citations and quotation marks omitted).

Judge Sabraw also found that the plaintiffs were likely to suffer irreparable harm because they were likely deprived of their constitutional rights. *Id.* Judge Sabraw further found that the balance of equities and public interest favored the plaintiffs, because they had established a likelihood that the government's policy was unconstitutional, because the injunction would not interfere with the government's ability to enforce criminal and immigration laws, and to exercise discretion in matters of release and detention consistent with law, and because the injunction would protect the interest of parents in the care, custody, and control of their children, which is perhaps the oldest of the fundamental liberty interests recognized by the Supreme Court. *Id.* at 20-21 (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)).

### D. The Government's Family Separation Policy Inflicts Trauma and Increased Risk of Lifelong Health Problems on Plaintiffs, Class Members, and Their Children.

The government's policy of separating families has caused harm to separated families. The consensus among trauma experts is that tearing children from their parents inflicts severe complex trauma on parents and children alike. As Senior Vice Dean and Professor of Mental Health at University of Southern California Dr.

1    Marleen Wong explains, trauma is the body's neurobiological stress response to

2    experiencing or witnessing an event involving life-threatening circumstances or threat

3    of serious injury that causes him or her to feel intense fear, helplessness, or horror.[7]

4    Complex trauma describes multiple, repeated, persistent, or prolonged exposure to

5    trauma such that the body's stress response impacts the development and functioning

6    of the brain.[8]  Left untreated, such trauma causes immediate and long-lasting physical

7    and psychological harm, especially in children, whose developing bodies and brains

8    are ill equipped to cope with traumatic stress.[9]

9         Upon separation, children experience acute psychological distress.  According

10   to Founder and Chief Executive Officer of Seneca Family of Agencies Kenneth

11   Berrick, founder of the Center for Family Finding and Youth Connectedness Kevin

12   Campbell, and Clinical Director of Seneca Family of Agencies Dr. John Sprinson,

13   such trauma may be particularly severe when the separation is sudden or forcible.[10]

14   During the moment of separation, a child can experience "severe neurobiological

15   stress causing the child to feel intense fear, helplessness, or horror."[11]  "Immediate

16   reactions include obvious emotional suffering in the form of inconsolable crying,

17   desperate efforts to pursue or search for the parent and anger."[12]  Instructor of

18   Psychiatry at the Harvard Medical School and Massachusetts General Hospital Dr.

19   Jose Hidalgo notes these effects may be exacerbated by the additional trauma caused

20

---

21   [7] Declaration of Marleen Wong, Dkt. No. 1-16 ("Wong Decl.") ¶ 12.  Each
     Declaration cited herein also was attached to the Complaint.  Plaintiffs have
22   referenced the document number for those attachments to the Complaint as well as
     refiled the Declarations relied upon in this Motion per L.R. 7.5(b).
23   [8] Id.
     [9] Declaration of Kenneth Berrick, et al., Dkt. No. 1-2 ("Berrick Decl.") ¶ 15;
24   Declaration of Dylan Gee, Dkt. No. 1-13 ("Gee Decl.") ¶¶ 5, 8, 9; Declaration of Jose
     Hidalgo, Dkt. No. 1-14 ("Hidalgo Decl.") ¶ 13; Declaration of Bruce D. Perry, Dkt.
25   No. 1-15 ("Perry Decl.") ¶ 21; Wong Decl.  ¶ 24 ("Prolonged exposure to such stress
     has a debilitating effect on children even after the particular traumatic event is over.").
26   [10] Berrick Decl. ¶ 9 ("When the separation is sudden, unpredictable, or in a strange
     environment with no other familiar adult figures present then the response is likely to
27   be extreme."); Hidalgo Decl. ¶¶ 9, 13; Wong Decl. ¶¶ 19, 23.
     [11] Wong Decl. ¶ 23.
28   [12] Berrick Decl. ¶ 10.

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT
THEREOF

when witnessing a parent's reaction to separation.[13]

In the immediate aftermath of separation, children are likely to continue to suffer from "extraordinary stress and pain."[14]  They may show signs of regression, reverting to crying and bed-wetting, or suffer the loss of other important developmental milestones.[15]  Separated children are also likely to exhibit a variety of negative behaviors from aggressiveness to withdrawal.[16]

The longer the parent and child are separated, the greater the harm the child will experience.[17]  Decades of public health research demonstrate that the child-parent bond is a crucial factor in healthy child development.[18]  The absence of interaction between parent and child "acts as a 'double whammy' for healthy development: not only does the brain not receive the positive stimulation it needs, but the body's stress response is activated, flooding the developing brain with potentially harmful stress hormones."[19]  Moreover, separation disrupts and severely damages the relationship

---

[13] Hidalgo Decl. ¶ 9.

[14] Declaration of Luis H. Zayas, Dkt. No. 1-17 ("Zavas Decl.") ¶ 11; *see also* Gee Decl. ¶ 5 ("The immediate psychological consequences of exposure to traumatic events involving caregivers include, but are not limited to, anxiety, distress, despair, and terror for both the child and the parent."); Perry Decl. ¶ 21; Wong Decl. ¶ 20.

[15] Sady Doyle, *Child Trauma Can't Be Undone With an Executive Order*, Elle Magazine (June 21, 2018), https://www.elle.com/culture/career-politics/a21748590/child-trauma-cant-be-undone-with-an-executive-order/ (last visited July 12, 2018); *see also* Berrick Decl. ¶ 10.

[16] Berrick Decl. ¶ 10; Wong Decl. ¶¶ 18, 20.

[17] Hidalgo Decl. ¶ 12; Jessica Henderson Daniel, PhD, *Statement of APA President Regarding Executive Order Rescinding Immigrant Family Separation Policy*, Am. Psychological Ass'n (June 20, 2018), http://www.apa.org/news/press/releases/2018/06/family-separation-policy.aspx (last visited July 12, 2018).

[18] Karen Dineed Wagner, MD, PhD, *President's Statement on Separating Children From Families*, Amer. Acad. of Child and Adolescent Psychiatry (May 11, 2018), https://www.aacap.org/App_Themes/AACAP/Docs/press/2018/Statement-on-Separating-Children-and-Families.pdf (last visited July 12, 2018) ("Parental support is an essential and proven protective factor that substantially reduces risk for adverse health and developmental outcomes for children."); *Separating Parents and Children at US Border is Inhumane and Sets the Stage for a Public Health Crisis*, Am. Public Health Ass'n (June 15, 2018), https://www.apha.org/news-and-media/news-releases/apha-news-releases/2018/parent-child-separation (last visited July 12, 2018).

[19] *Serve and Return*, Harvard University Center on the Developing Child, https://developingchild.harvard.edu/science/key-concepts/serve-and-return/ (last visited July 11, 2018); *see also* Berrick Decl. ¶ 14

7

1    between a child and their parent.[20]

2            Assistant Professor of Psychology at Yale University Dr. Dylan Gee writes,

3    "[f]or a child who has been separated from their parent at the border, their body and

4    brain are being shaped to anticipate danger and prepare for the worst."[21]  As detailed

5    by substantial research conducted by Adjunct Professor in the Department of

6    Psychiatry and Behavioral Sciences at the Feinberg School of Medicine at

7    Northwestern University, Dr. Bruce Perry, stress hormones induce a state of

8    hypervigilance that alters a child's cognition and emotion and causes chronic

9    problems with how that child responds to stress over a lifetime.[22]  Such alterations

10   increase the risk of "psychological and physical health problems," including

11   "fundamental changes in brain function," which may "manifest[] as a loss of capacity

12   to regulate intense emotions, to cope with future stress and to regulate fear reactions to

13   reminders of traumatic events," and may cause "other effects such as depression,

14   substance abuse, problems forming relationships, and other behavioral problems."[23]

15           Parents experience psychological trauma due to forcible separation from their

16   children.[24]  In adults, such trauma "is associated with elevated risk for psychiatric

17   [20] Berrick Decl. ¶¶ 10, 11.

18   [21] Dylan Gee, *I study kids who were separated from their parents.  The trauma could
     change their brains forever*, VOX (June 20, 2018), https://www.vox.com/first-
     person/2018/6/20/17482698/tender-age-family-separation-border-immigrants-children

19   (last visited July 12, 2018).

20   [22] *Id.*; *see also* Perry Decl. ¶¶ 4, 13 ("[T]rauma, neglect, and maltreatment during
     childhood have profound effects on physical, social, emotional, behavioral, and
     cognitive development."); ¶ 21 ("[T]raumatic stress alters the developing brain.  It can

21   increase risk for a host of emotional and behavioral problems, including antisocial
     behavior, attention problems, acting out, aggressive or violent behaviors, lack of trust,

22   and other counterproductive coping mechanisms."); Berrick Decl. ¶¶ 12, 16; Gee
     Decl. ¶¶ 5, 8.

23   [23] Hidalgo Decl. ¶ 13; Gee, *supra* n.21 ("A child whose brain is constantly scanning
     the environment for danger will undoubtedly have difficulty paying attention in class

24   or interacting with peers on the playground. . . .  In the long run, the cascade of
     consequences places individuals who have experienced early trauma at risk for

25   academic or occupational failure, substance abuse, and health problems such as heart
     disease and diabetes."); Doyle, *supra* n. 15 ("'Long-term, these individuals who have

26   traumatic reactions are at heightened risk of virtually every medical problem,' says
     Dr. Judith Cohen, Medical Director of the Center for Traumatic Stress.  'Neurologic to

27   cardiac to pulmonary to reproductive problems . . . just go down the body and
     virtually every part is affected.'").

28   [24] Hidalgo Decl. ¶ 14; Gee Decl. ¶ 6.

disorders including [PTSD] and can induce physiological changes, including but not limited to dysregulated stress responding, amygdala hyperactivity, and deficits in prefrontal cortex control of the amygdala, which are associated with difficulty regulating fear."[25] The trauma may also manifest in physical and mental symptoms of anxiety, depression, suicidal ideation, loss of appetite, and loss of sleep.[26]

PTSD can escalate into more severe mental health and social problems, including (i) intrusive recollections of the traumatic event, (ii) dissociative states lasting several days in which persons feel detached from their bodies or the world around them, (iii) auditory pseudo-hallucinations and paranoid ideation, (iv) an increased likelihood of engaging in aggressive, reckless, or self-destructive behavior, and (v) an increased risk of suicidal ideation and suicide attempts.[27]  PTSD has functional consequences, including high levels of social, occupational, and physical disability, high levels of medical utilization, and impaired functioning across social, interpersonal, educational, physical, health, and occupational domains.[28]

Plaintiffs and class members here have already suffered such trauma and consequent injury.  Plaintiff Ms. P. "is displaying symptoms of [PTSD] . . . as a result of her separation from her daughter" and is also "displaying symptoms of both depression and anxiety."[29]  If left untreated, these symptoms "could escalate into a diagnosis of PTSD, Dissociative Disorder, and Major Depressive Disorder."[30]  There have also been credible reports that a parent forcibly separated from his child under the zero-tolerance policy was driven to suicide.[31]  According to press reports, Marco

---

[25] Gee Decl. ¶ 6 (citations omitted).
[26] Berrick Decl. ¶ 19.
[27] Declaration of Alejandra Acuna, Dkt. No. 1-4 ("Acuna Decl.") ¶ 11.
[28] *Id.*
[29] Acuna Decl. ¶¶ 7-8.
[30] *Id.* ¶ 11.
[31] *See* Nick Miroff, *A Family Was Separated At the Border, and This Distraught Father Took His Own Life*, WASH. POST (June 9, 2018), https://www.washingtonpost.com/world/national-security/a-family-was-separated-at-the-border-and-this-distraught-father-took-his-own-life/2018/06/08/24e40b70-6b5d-11e8-9e38-24e693b38637_story.html?utm_term=.f3c12fb7157d (last visited July 12, 2018).

9

Antonio Muñoz and his family were taken into custody and sought asylum. His child was forcibly taken from his arms, and then Mr. Muñoz was placed in a cell. After he struggled to break free of his cage, the Border Patrol transported him to a local jail and placed him in a padded cell. The next morning, he was found dead apparently as a suicide.

**E.    Plaintiffs, Class Members, and Their Children Require Trauma-Informed Family Mental Health Screenings and Services to Recover From the Trauma Inflicted by the Government.**

If the separated families are to recover from the trauma caused by the government's separation, they require mental health screening and services that meet several criteria. Most importantly, the treatment must be evidence-based and trauma-informed, meaning that it must be designed especially to alleviate the psychological and neurobiological consequences of forcible separation.[32] Such treatments exist and have been shown to be effective across cultural backgrounds.[33] Some have been successfully adapted for immigrant populations.[34] These mental-health services often take the form of trauma-focused cognitive behavioral therapy.[35]

For these services to be effective, several conditions must be met. First, **the families must be reunified** quickly. The longer the separation, the more pervasive and intense the trauma becomes.[36] "The effects of trauma on separated children are [already] significant, long-lasting, and difficult to mitigate."[37] Prolonging the separation increases the trauma and thus requires more intense mental-health services.

Second, all reunited parents and children **must be immediately screened** "to identify those whose anxiety is toxic and detrimental to themselves and their families, as well as those whose anxiety has grown into trauma with its accompanying

---

[32] *See, e.g.*, Perry Decl. ¶ 22; Hidalgo Decl. ¶¶ 17-20.
[33] *See* Gee Decl. ¶ 10.
[34] *Id.*
[35] *Id.*
[36] *See id.*; Hidalgo Decl. ¶ 12.
[37] *Id.* ¶ 13.

10

symptoms,"[38] so that treatment plans can be developed for them.  This screening process is essential because "[t]he longer [appropriate] interventions are delayed, the greater the negative cumulative effect the acute neurophysiological, neuroendocrine, and neuropsychological response will have on these children and their parents."[39]  For these screenings to be effective given the special trauma inflicted upon the families, they must be conducted according to trauma-informed procedures and by appropriately trained trauma-informed professionals.[40]  Such screenings must also be repeated following family reunification to determine whether the process of reunification revealed trauma not previously evident.

Third, mental-health services must be offered to those requiring them in an **environment that does not continue or prolong the trauma**.  Treatment for trauma requires the restoration of a sense of safety and it is much easier to achieve this goal when the person receiving the service is in an environment of *actual safety.*[41]  When an individual must remain vigilant for threats and is preoccupied with uncertain and unknown possible outcomes they are less likely to, or are much slower to, develop a trusting alliance and an emotionally resonant connection with a therapist.[42]  The detention centers in which Plaintiffs, class members, and their children were or are held are not suitable locations to provide such therapy:  "[f]or a child and an adult to remain in a setting he/she associates with the traumatic separation (even after reunification with the mother or father) . . . will cause additional and profound anticipation of further traumatic events[.] The mother and father who also experienced traumatic separation from their child would need to be placed in a safe family setting with their child(ren) to avoid an increase in such trauma symptoms as persistent negative thoughts and expectations about oneself, one's world, and others."[43]

[38] Declaration of Marti T. Loring, Dkt. No. 1-1 ("Loring Decl.") ¶ 11; Hidalgo Decl. ¶¶ 17-20.
[39] Perry Decl. ¶ 22.
[40] *See* Gee Decl. ¶ 18.
[41] Berrick Decl. ¶ 27.
[42] *Id.*
[43] Loring Decl. ¶ 10.

11

Fourth, counseling services must be **provided to the family as a whole**, meaning that "the adult caregivers must be a part of the trauma intervention provided to these children."[44]  This approach is necessary not only to assist the child in "reestablishing [his or her] ability to effectively regulate himself [or herself]," but also "to treat [the parent's] own primary trauma and to effectively support their traumatized child."[45]  Indeed, "[d]ecades of research demonstrates that the most significant protective factor for vulnerable children facing adversity are bonds to those that love them."[46]

Fifth, these services must "be delivered in a **culturally competent manner and linguistically sensitive manner and by mental health clinicians trained in evidence-based trauma-informed interventions**."[47]  The trauma caused by family separation is acute, and the migrant families are diverse.  For the trauma to be appropriately mitigated, the mental-health services must be tailored to address the specific individuals harmed and their symptoms.

Sixth, mental-health services must be provided for **a sufficient period of time** in order to effectively mitigate the harm the government has caused, including after the families' ultimate release from detention.

### F.   Mental Health Care Services Provided by the Government Are Not Effective Or Sufficient.

The mental health services actually offered by the government in detention facilities are sporadic to nonexistent.  Family detention centers operated by the Office of Refugee Resettlement ("ORR") do not routinely provide mental health services at all.[48]  As to centers where minors reside, ORR provides general case management personnel and mental health follow-up services, but does not provide trauma-informed mental health care services for minors at such centers.[49]  In fact, some "clinicians" at

---

[44] Perry Decl. ¶ 23.
[45] *Id.* ¶¶ 23-24; *see also* Hidalgo Decl. ¶ 25.
[46] Hidalgo Decl. ¶ 31.
[47] Gee Decl. ¶ 18 (emphasis added).
[48] Declaration of Alfonso Mercado, Dkt. No. 1-20 ("Mercado Decl.") ¶ 4.
[49] *Id.*

12

such centers are *not* licensed mental health professionals.[50]  None of the Plaintiffs have been offered any mental health care screenings or services by the government.

Facilities with a law-enforcement purpose do not provide the conditions needed for trauma-informed therapy to be effective.  Far from providing an environment that makes patients feel safe and reduces their toxic stress levels, conditions in law-enforcement detention facilities "are highly stressful and do not provide children with sufficient opportunities for positive, social-emotional supports."[51]  Just as importantly, because Plaintiffs, class members, and their children experienced trauma while in detention at the hands of those in control of the detention environment, "children and parents would not be likely to feel safe in such facilities and are likely to be re-traumatized by the conditions."[52]

## LEGAL STANDARD

Plaintiffs are entitled to preliminary injunctive relief if they show: (1) likely success on the merits; (2) likely irreparable harm absent preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public's interest. *Pimentel v. Dreyfus*, 670 F.3d 1096, 1105–06 (9th Cir. 2012); *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1021-23 (9th Cir. 2009).  Plaintiffs seeking a mandatory injunction must show that the law and facts clearly favor their position.  *See Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc).  Under the Ninth Circuit's "sliding scale" approach, a stronger showing of one element may offset a weaker showing of another, as long as plaintiffs "establish that irreparable harm is likely." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). "While Plaintiffs carry the burden of demonstrating likelihood of success, they are not required to prove their case in full at the preliminary injunction stage but only such portions that enable them to obtain the injunctive relief they seek." *Ms. L. Case*, Dkt. No. 83 at 11, (citing *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)).

---

[50] *Id.*
[51] Hidalgo Decl. ¶ 24.
[52] *Id.*

13

**ARGUMENT**

**I.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.**

Plaintiffs and the Class are likely to prevail on their substantive due process claim under the Fifth Amendment and obtain an order directing the government to provide them with effective mental health screening and treatment on two separate and independent grounds.  First, the government is required to provide effective mental health care services to all persons it detains, both during detention and for a reasonable period thereafter. *See Wakefield v. Thompson*, 177 F. 3d 1160, 1164-65 (9th Cir. 1999).  To date, it has provided no such services to Plaintiffs and class members, in violation of its clearly established constitutional obligations.

Second, the government's separation of Plaintiffs and class members from their children, which has already been found likely to violate due process and shock the conscience, directly and foreseeably injured Plaintiffs and class members, and the government is obligated to remedy the injuries and risk of future injuries that its violations caused.  *See Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1062 (9th Cir. 2006) ("this circuit has held state officials liable . . . for their roles in creating or exposing individuals to danger they otherwise would not have faced.")

**A.     The Government's Detention of Class Members Created a Special Relationship Requiring It to Provide Effective Mental Health Treatment During and Following Detention.**

Detained persons have a due process right requiring the government to provide adequate medical care. *Henry A. v. Willden*, 678 F.3d 991, 1000 (9th Cir. 2012); *see also Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 199–200 (1989)). The reason for this right is clear: while the government restricts a person's ability to provide for his or her own medical care, it must bear the responsibility of providing it.  *See Wakefield*, 177 F.3d at 1164.

The government held or is holding Plaintiffs and class members in detention. Accordingly, it is required to provide adequate medical care including mental health services. *DeShaney,* 489 U.S. at 199–200; *see also, e.g., Doe v. Kelly*, 878 F.3d 710,

14

722–23 (9th Cir. 2017) ("There is no question that detainees are entitled to 'adequate medical care'" as a component of their due process rights); *Gibson v. Cty. of Washoe*, 290 F.3d 1175, 1188 (9th Cir. 2002), *overruled on other grounds by Castro v. Cty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016) (en banc) ("With regard to medical needs, the due process clause imposes, at a minimum, the same duty the Eighth Amendment imposes: 'persons in custody ha[ve] the established right to not have officials remain deliberately indifferent to their serious medical needs.' This duty to provide medical care encompasses detainees' psychiatric needs.") (citation omitted).  "In order to comply with their duty not to engage in acts evidencing deliberate indifference to inmates' medical and psychiatric needs, jails must provide medical staff who are 'competent to deal with prisoners' problems.'" *Gibson*, 290 F.3d at 1187 (quoting *Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982)).

Here, Plaintiffs and class members have suffered serious psychological trauma as a result of the government's conduct, and as such they need immediate psychological screening and appropriate mental health care by appropriately-trained therapists to prevent further trauma and injury. *See supra* at 5-11.  To be effective, such care must be provided to reunited families in an environment that does not continue or prolong the trauma.  *See supra* at 11-12.  Especially while class members remain in the government's custody, effective care must be provided by the government.

Moreover, the government's obligation to continue to provide effective, trauma-focused mental health care to Plaintiffs and class members remains in force for a period following their release.  The Ninth Circuit has recognized that as "a matter of common sense," a prisoner's ability to secure medication is "not necessarily restored the instant he walks through the prison gates and into the civilian world." *Wakefield*, 177 F.3d at 1164.  Instead, the court found that "it may take a number of days, or possibly even weeks, for a recently released prisoner to find a doctor, schedule an examination, obtain a diagnosis, and have a prescription filled."  Accordingly, the

Ninth Circuit held that to comply with its due process obligations, a government releasing a prisoner "who is receiving and continues to require medication" must provide the prisoner "with a supply sufficient to ensure that he has that medication available during the period of time reasonably necessary to permit him to consult a doctor and obtain a new supply." *Id.*; *see also Cook v. California*, No. 1:16-CV-00674-LJO-SAB, 2016 WL 4161114, at *5 (E.D. Cal. Aug. 5, 2016) (a three-month period following confinement could plausibly fall within the transitional period outlined in *Wakefield*).

Similarly here, the government's responsibility to provide effective psychological care extends beyond the period of confinement. Many Plaintiffs and class members will be unable to immediately obtain effective mental health care upon release from detention. As many Plaintiffs and class members have never lived in the United States, they are unlikely to know how to navigate the process of identifying an appropriate mental health care provider. These difficulties are compounded by the fact that certain Plaintiffs and many class members do not speak English or Spanish, but instead speak languages that are not widely spoken in the United States. Thus, the length of time the government's obligation to provide effective mental health care will continue after the release of Plaintiffs and class members in this case is not yet known, but what is clear is that Plaintiffs have a right to trauma-appropriate mental health care for a reasonable period after their confinement has ended.

**B.    The Government Must Provide Effective Mental Health Care to Plaintiffs and Class Members to Remedy the Injury That It Caused.**

The government is responsible for remedying the injuries that it caused to Plaintiffs and class members under the "state-created danger" doctrine. That doctrine applies where "the state action 'affirmatively place[s] the plaintiff in a position of danger,' that is, where state action creates or exposes an individual to a danger which he or she would not have otherwise faced." *Kennedy*, 439 F.3d at 1061 (quoting

*DeShaney*, 489 U.S. at 197).[53]   The Ninth Circuit has adopted a three-part test to determine whether this doctrine applies: "(1) whether any affirmative actions of the official placed the individual in danger he otherwise would not have faced; (2) whether the danger was known or obvious; (3) whether the officer acted with deliberate indifference to that danger." *Henry A.*, 678 F.3d at 1002.   In this case, Plaintiffs will succeed in demonstrating that each of these prongs is met.

**The Government Put Plaintiffs and Class Members in Danger.**   The government's actions satisfy the first prong of the *Henry A.* test because it affirmatively decided to separate Plaintiffs and class members from their children, directly inflicting trauma and injury on Plaintiffs and class members and exposing them to additional risk of future serious health problems that they would not face but for the government's actions, including PTSD, anxiety, depression, suicidal ideation, loss of appetite, and loss of sleep.  *See supra* at 5-10.

Neither Plaintiffs, class members, nor their children would have experienced this trauma, or the consequential risk of lifelong physical and mental illness, but for the government's decision to separate Plaintiffs and class members from their children.   The government gratuitously exacerbated that injury by effecting that separation suddenly, using force, and without providing information about loved ones' well-being or whereabouts, and with little or no communication between separated family members.   These deliberate actions by the government have injured Plaintiffs and class members, and the government is responsible for remedying that injury.

Notably, the government's actions that injured Plaintiffs and class members

---

[53] The state-created danger doctrine is not limited to circumstances in which the government bears *sole* responsibility for a particular risk – it applies in instances where a government official exposes an individual to *additional* risk. *Penilla v. City of Huntington Park*, 115 F.3d 707 (9th Cir. 1997) (*per curiam*) (doctrine applicable against police officers who, after finding a man in need of medical care, cancelled a request for paramedics and locked him inside his house); *see also Estate of Gonzales v. Hickman*, No. ED CV 05-00660 MMM (RCx), 2006 WL 4959780, at *13 (C.D. Cal. Jan. 30, 2006) ("The name of the doctrine . . . is something of a misnomer. Liability is not restricted to situations where the state actors *create* a danger; rather state actors who act affirmatively to *increase* an existing risk of danger . . . .") (citations omitted).

have already been found likely to violate substantive due process.  The Ninth Circuit has held that executive action violates substantive due process when it "shocks the conscience."  *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008); *see generally Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846–47 (1998) (collecting cases). That standard is "not subject to a rigid list of established elements."  *Ms. L. Case*, Dkt. No. 83 at 12 (citing *Lewis*, 523 U.S. at 850).  Instead, "an investigation into substantive due process involves an appraisal of the circumstances rather than a formalistic examination of fixed elements."  *Id.* (citation omitted).

Here, it is abundantly clear that the government's gratuitous and unnecessary separation of children from their parents meets this standard.  As Judge Sabraw recently found in the *Ms. L. Case*, the totality of the government's conduct is likely to be found to "shock[] the conscience," including the government's separation of children from their parents without an individualized determination that the parents were unfit or presented a danger to their children (*Ms. L. Case*, Dkt. No. 83 at 12-13, 17); its separation of parents who presented themselves at a point of entry and thus *committed no crime* from their children (*id.* at 13); and its implementation of the family separation policy "without any effective system or procedure for (1) tracking the children after they were separated from their parents, (2) enabling communication between the parents and their children after separation, and (3) reuniting the parents and children after the parents are returned to immigration custody following completion of their criminal sentence" (*id.* at 14).

Here, the government's conduct vis-à-vis Plaintiffs and class members is the same conduct found likely by Judge Sabraw to "shock the conscience" and thus violate due process.  This Court should accordingly find that Plaintiffs and class members are likely to prevail in showing that the government violated their substantive due process rights and that that violation injured them.

**The Government Knew That Separating Children From Parents Would Cause Injury.** As to the second prong of the *Henry A.* test, the danger that forced

18

separation of children from their parents would cause psychological and physical harm was known and obvious to Defendants. As set forth in the prior section, the danger of family separation is well-understood in the medical and psychological communities.  In fact, in a recent report, the government stated that "[s]tudies have found that both private and government-run residential institutions for children, or places such as orphanages and psychiatric wards that do not offer a family-based setting, cannot replicate the emotional companionship and attention found in family environments that are prerequisites to healthy cognitive development."[54]

Courts themselves have frequently recognized that separating children from their parents is harmful to both.  *See, e.g.*, *Leiva-Perez v. Holder*, 640 F.3d 962, 969-70 (9th Cir. 2011) ("separation from family members" identified as a factor in irreparable harm analysis); *Halet v. Wend Inv. Co.*, 672 F.2d 1305, 1311 (9th Cir. 1982) ("Family life, in particular the right of family members to live together, is part of the fundamental right of privacy" and noting that "[a] fundamental right is even more clearly involved" when it involves the right of children to live with their parents.").

The facts of this case establish that Defendants were aware of the harm that would be caused to Plaintiffs, class members, and their children by ripping apart families and failing to reunify them.  Ms. P.'s daughter fainted in terror when she realized she was about to be separated from her mother. Compl. ¶ 19.  After nearly two months of separation from her mother, she feels depressed, hopeless, confused, and cannot speak about her mother or the experience of separation without crying, something witnessed by a counselor in her facility. *Id.* ¶ 21. Plaintiff Ms. O's and Ms. M's daughters have suffered excessive worry, dysphoric mood, crying spells, sleep and appetite disturbances, and fear of the unknown.  *Id.* ¶ 145.

**The Government Inflicted Injury With Deliberate Indifference.**  To satisfy

---

[54] *Child Institutionalization and Human Trafficking*, U.S. DEP'T OF STATE (June 28, 2018), https://www.state.gov/documents/organization/283784.pdf (last visited July 12, 2018)

19

the third *Henry A.* factor, "[t]he state actor must 'recognize[] [an] unreasonable risk and actually intend[] to expose the plaintiff to such risks without regard to the consequences to the plaintiff.'" *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 974 (9th Cir. 2011). In evaluating whether a government official acted with deliberate indifference in the context of a due process claim, the Ninth Circuit recently held that "the proper standard of review for such claims is one of objective indifference, not subjective indifference." *Gordon v. Cty. of Orange*, 888 F.3d 1118, 1120–24 (9th Cir. 2018). That is, a plaintiff must show that the government official took a harmful action notwithstanding that "a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious." *Id.* at 1125.

Here, reasonable officials in the Defendants' positions would have appreciated the high risk that ripping the Plaintiffs and class members from their small children would inflict psychological trauma and consequent harm.  As set forth above, experts, courts, and the government all have recognized that separating children from their parents inflicts trauma and imposes a high degree of risk that the separated family members will suffer psychological and physiological consequences for years to come. *See supra* at 5-10.  Even if reasonable officials could somehow fail to anticipate what every human being would intuit, viz., that tearing families apart would impose a high risk of trauma, the heart-rending reactions of separated families (including at least one suicide) would put those officials on immediate notice of the harm they were inflicting.  In addition, there are a number of measures available that the government could have taken to avoid the harm caused here.  For example, the government could have kept families together by using community-based case management, such as the arbitrarily terminated Family Case Management Program. Compl. ¶¶ 7, 76-78. Particularly in light of these alternatives, a reasonable government official would have appreciated that tearing families apart imposed a high risk of harm. Due Process requires the government to remedy its wanton violation.

## C.   The Government Has Failed To Provide Adequate Mental Health Screenings and Treatment.

The government has completely failed to provide effective, trauma-focused mental health care screenings and treatment to Plaintiffs and class members, which is a further violation of their constitutional rights.

The government has not staffed the detention facilities with therapists trained in recovery from traumatic experiences,[55] and has not offered any family-based, trauma-informed treatment.  In fact, some "clinicians" who purportedly provide mental health services at centers where minors reside are *not* licensed mental health professionals.[56] Even as to children separated from their parents, who are at the greatest risk of suffering lifelong mental and physical harm as a result of the stress inflicted on them, the government does not provide specialized trauma-informed mental health care services, and does not routinely provide *any* mental health services at family detention centers operated by the Office of Refugee Resettlement.[57]  The government has thus fallen far short of the constitutional standard of providing "medical staff who are competent to deal with prisoners' problems." *Gibson,* 290 F.3d at 1187.  The government has also wholly abdicated its constitutional responsibilities to Plaintiffs and class members who have been released from detention by providing absolutely no mental health care screenings or services to any class members following their release. The government's failure to provide these mental health services constitutes a second Constitutional violation.

## II.   PLAINTIFFS WILL SUFFER IRREPARABLE HARM IF THE INJUNCTION IS NOT GRANTED.

The government needlessly and gratuitously traumatized vulnerable families seeking asylum by separating them in violation of their constitutional rights.  The government compounded that trauma and constitutional violation by failing to provide Plaintiffs and class members the trauma-focused therapy that is their constitutional

---

[55] Mercado Decl. ¶ 4.
[56] *Id.*
[57] *Id.*

21

1   due as detainees and as persons injured by the government's violations of their rights.

2   The government's failure to provide effective therapy itself violates the constitutional

3   rights of Plaintiffs and class members, and thus constitutes irreparable harm. Worse,

4   however, the government's failure to provide such treatment risks subjecting Plaintiffs

5   and class members to a lifetime of psychological and physical problems, intangible

6   injuries that cannot be remedied by monetary damages alone.

7   "It is well established that the deprivation of constitutional rights

8   unquestionably constitutes irreparable injury." *Hernandez v. Sessions*, 872 F.3d 976,

9   994 (9th Cir. 2017) (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir.

10   2012)). As set forth above at 14-20, the government's ongoing failure to provide

11   effective, trauma-focused therapy to Plaintiffs and class members violates its

12   constitutional obligations to them, both as persons who were or are detained by the

13   government, and as persons injured by the government's unconstitutional policy of

14   separating parents from their children. This violation alone constitutes irreparable

15   injury.

16   Without the injunctive relief sought by this motion, Plaintiffs and class

17   members also are likely to suffer lifelong intangible injuries, which also constitute

18   irreparable harm. In *Arizona Dream Act Coalition v. Brewer*, the Ninth Circuit

19   explained that "[i]rreparable harm is traditionally defined as harm for which there is

20   no adequate legal remedy, such as an award of damages." 757 F.3d 1053, 1068 (9th

21   Cir. 2014). In that case, which challenged Arizona's policy of refusing to issue

22   driver's licenses to beneficiaries of the Deferred Action for Childhood Arrivals

23   program, the Ninth Circuit held that Arizona's policy caused the plaintiffs to suffer

24   irreparable harm because the plaintiffs' inability to obtain driver's licenses "limit[ed]

25   their professional opportunities" and "diminished their opportunity to pursue their

26   chosen professions." *Id.* It found that "[t]he irreparable nature of Plaintiffs' injury is

27   heightened by Plaintiffs' young age and fragile socioeconomic position. Setbacks

28   early in their careers are likely to haunt Plaintiffs for the rest of their lives." *Id.* It

noted that "[n]o award of damages can compensate Plaintiffs[] for the myriad personal and professional harms caused by their inability to obtain driver's licenses. Thus, Plaintiffs are likely to suffer irreparable harm in the absence of an injunction." *Id.*

Here, the harm caused by the government's failure to provide effective mental health care and screenings to Plaintiffs and class members are more profound than the harm in *Arizona Dream Act Coalition*. Absent such therapy, Plaintiffs and class members risk a lifetime of mental health conditions including PTSD, depression, and anxiety, which have consequences including an increased risk of suicide and professional and social difficulties. *See supra* at 5-10. All of these conditions, if realized, will diminish Plaintiffs' and class members' professional opportunities and life prospects in myriad ways. Accordingly, the government's failure to provide the constitutionally-required screenings and treatment constitutes irreparable harm under the standard set forth in *Arizona Dream Act Coalition*. This is precisely the type of harm that warrants the injunctive relief requested here. *See Hernandez*, 872 F.3d at 999 (noting that injunction is appropriate where maintenance of "the status quo . . . is exactly what will inflict the irreparable injury") (citation omitted).

## III.   THE BALANCE OF HARDSHIPS FAVORS THE INJUNCTION.

The government needlessly traumatized Plaintiffs by forcibly separating them from their children and continuing to keep them apart. Beginning to appropriately treat that trauma is in the public interest and outweighs any purported injury the government may assert. As explained above (at 14-20), the Due Process Clause requires that Plaintiffs be provided with trauma-focused mental health services. These mental health services are plainly in the interests of Plaintiffs and class members, as they are the sole means by which the harm inflicted by the government might be mitigated.

On the other hand, ordering the government to provide treatment does no harm because it simply requires the government to live up to its constitutional and legal obligations. *See Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) (citing

*Zepeda v. I.N.S.*, 753 F.2d 719, 727 (9th Cir. 1983) ("[T]he INS cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations.")); *Haskins v. Stanton*, 794 F.2d 1273, 1277 (7th Cir. 1986) (where an injunction seeks to require defendants to comply with existing law, the injunction imposes no burden but "merely seeks to prevent the defendants from shirking their responsibilities").[58]  The balance of hardships favors the injunction.

## IV.   <u>THE PUBLIC INTEREST FAVORS THE INJUNCTION.</u>

The requested injunction serves the interest of the general public by ensuring that the government complies with its constitutional obligations.  This alone is sufficient to justify entry of the requested injunction.  *See Hernandez*, 872 F.3d at 996 ("public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution."). *Melendres*, 695 F.3d at 1002 ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights." (internal quotation omitted)); *see also United States v. Raines*, 362 U.S. 17, 27 (1960) ("[T]here is the highest public interest in the due observance of all the constitutional guarantees.").

The injunction also serves the public interest by reducing "the indirect hardship to . . . friends and family members" of the Plaintiffs and class members.  *Hernandez*, 872 F.3d at 996.  Without effective, trauma-focused screening and treatment, the psychological and physical health conditions that Plaintiffs and class members may suffer will place heavy burdens on their friends and family members, both as a result of the care to Plaintiffs and class members that friends and family members may be required to provide directly or pay for, and as a result of the diminution in the ability of Plaintiffs and class members to act as breadwinners and caretakers.

---

[58] In the event the government claims that providing appropriate mental health care creates a financial burden, the Ninth Circuit has repeatedly rejected such arguments. *See, e.g., Hernandez*, 872 F.3d at 996 ("Faced with such a conflict between financial concerns and preventable human suffering, we have little difficulty concluding that the balance of hardships tips decidedly in plaintiffs' favor." (internal quotation marks omitted)); *see also M.R. v. Dreyfus*, 697 F.3d 706, 737-38 (9th Cir. 2012).

Finally, allowing the suffering of Plaintiffs and class members to continue untreated is contrary to the public interest. *See Norsworthy v. Beard*, 87 F. Supp. 3d 1164, 1194 (N.D. Cal. 2015) ("[t]here is no public interest in [Plaintiff]'s continued suffering during the pendency of this litigation"). The public interest favors the injunctive relief requested in this motion.

## CONCLUSION

Plaintiffs and class members are entitled to mental health care screenings and effective family treatment to address and remediate the effects of the trauma that the government wantonly and knowingly inflicted on them under its unconstitutional policy of separating parents from their children. The government has wholly failed to provide such treatment, violating its constitutional obligations to care for persons it detains and on whom it has inflicted injury. The balance of harms and public interest favor requiring the government to live up to its obligations. The Court should enter an injunction requiring the government to provide meaningful access to:

- mental health screening for all Plaintiffs and class members to identify those who require further treatment as a result of the trauma inflicted on them, which must be performed by persons trained to recognize the signs and symptoms of such trauma, within fourteen (14) days of the entry of the Court's injunction;

- subsequent mental health screening for all Plaintiffs and class members to identify those who require further treatment as a result of the trauma inflicted on them, which must be performed by persons trained to recognize the signs and symptoms of such trauma, within fourteen (14) days of the reunification of the Plaintiff or class member with his/her child(ren) if such reunification takes place after the screening ordered as referenced above;

- mental health care treatment, for those Plaintiffs and class members whose screenings indicate that such treatment is needed, which must:

  - be provided in a safe environment that will not reinforce trauma;

  - be provided on a family basis to all members of the reunified family together;

  - be provided in a culturally competent manner by mental health clinicians trained in evidence-based trauma-informed interventions; and

  - be provided for a period of time sufficient to treat the trauma inflicted; and

- such other relief as is permitted by law.

25

1

2      Dated:  July 18, 2018                          Respectfully Submitted,

3      MARK ROSENBAUM (SBN 59940)          /s/ Amy P. Lally
       mrosenbaum@publiccounsel.org               Amy P. Lally (SBN 198555)
4      Judy London (SBN 149431)                   alally@sidley.com
                                                  Ellyce R. Cooper (SBN 204453)
5      jlondon@publiccounsel.org                  ecooper@sidley.com
       Talia Inlender (SBN 253796)                SIDLEY AUSTIN LLP
6      tinlender@publiccounsel.org                1999 Avenue of the Stars, 17th Floor
       Alisa Hartz (SBN 285141)                   Los Angeles, CA 90067
7      ahartz@publiccounsel.org                   Telephone: +1 310 595-9662
                                                  Facsimile: +1 310 595-9501
8      Lucero Chavez (SBN 273531)
       lchavez@publiccounsel.org
9      Elizabeth Hadaway (SBN 308800)             Carter G. Phillips*
       ehadaway@publiccounsel.org                 cphillips@sidley.com
10     Malhar Shah (SBN 318588)                   Jennifer J. Clark*
                                                  jennifer.clark@sidley.com
11     mshah@publiccounsel.org                    SIDLEY AUSTIN LLP
       Deena Tumeh (SBN 318573)                   1501 K Street, N.W.
12     dtumeh@publiccounsel.org                   Washington, D.C. 20005
       PUBLIC COUNSEL                             Telephone: +1 202 736-8270
13     610 S. Ardmore Avenue                      Facsimile: +1 202 736-8711
14     Los Angeles, CA 90005
       Telephone: +1 213 385-2977                 Michael Andolina*
15     Facsimile: +1 213 385-9089                 mandolina@sidley.com
                                                  Timothy Payne*
16     Mark E. Haddad (SBN 205945)                tpayne@sidley.com
                                                  Kevin Fee*
17     markhadd@usc.edu                           kfee@sidley.com
       Part-time Lecturer in Law, USC Gould       SIDLEY AUSTIN LLP
18     School of Law**                            One South Dearborn
       University of Southern California          Chicago, IL 60603
19     699 Exposition Blvd.                       Telephone: +1 312 853-7000
       Los Angeles, CA 90089                      Facsimile: +1 312 853-7036
20     Telephone: +1 213 675-5957
                                                  Sean A. Commons (SBN 217603)
21     Luis Cortes Romero (SBN 310852)            scommons@sidley.com
       lcores@ia-lc.com                           Bridget S. Johnsen (SBN 210778)
22     Alma L. David (SBN 257676)                 bjohnsen@sidley.com
       adavid@ia-lc.com                           SIDLEY AUSTIN LLP
23     Immigrant Advocacy & Litigation            555 West Fifth Street
       Center, PLLC                               Los Angeles, CA 90013
24     19309 68th Ave South R-102                 Telephone: +1 213 896-6000
       Kent, WA 98032                             Facsimile: +1 213 896-6600
25     Telephone: +1 253 872-4730
       Facsimile: +1 253 237-1591

26

27     *Application for admission pro hac vice to be submitted

28     ** Institution listed for identification purposes only

                                        26