**DECLARATION OF DR. JOSE HIDALGO**

I, Dr. Jose Hidalgo, M.D., make the following declaration based on my personal knowledge and declare under the penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.      I am a Board-Certified Psychiatrist at Massachusetts General Hospital in Boston, Massachusetts, where I specialize in trauma and mental health crisis services, with a particular focus on survivors of trauma and forensic psychiatry.  I have over eighteen years of experience providing direct psychiatric services to people suffering a wide range of mental health problems including trauma survivors and detained immigrant children and adults who have experienced trauma and its effects.  I am also a psychiatrist at the Suffolk House of Corrections. In addition to my clinical practice, I am an Instructor of Psychiatry at the Harvard Medical School and Massachusetts General Hospital, where I teach psychiatry residents and fellows in training. In previous years, I have held appointments as a Clinical Fellow in Medicine, a Clinical Fellow in Psychiatry.  From 2006 to 2014, I was the Medical Director of the Latin American Health Institute ("LHI").  I have also served on trauma-focused professional committees and lectured and presented on trauma, child trauma, collaborative resilience and trauma interventions for migrant children, complex trauma and trauma-informed care, human trafficking and trauma, building self-sustaining programs for children and forensic topics.

2.      I received an M.D. from the New York University School of Medicine.  I completed a Medical Internship at Massachusetts General Hospital, a General Psychiatry Residency at Boston University Medical Care, a Fellowship in Traumatic Stress Studies at the Trauma Center at the Boston University Medical Center, and a Forensic Psychiatry Fellowship at Massachusetts General Hospital.

3.      Attached hereto as Exhibit A is my Curriculum Vitae, including a list of my publications.

4.      I have worked extensively on how to provide trauma-informed care to detained unaccompanied immigrant children.  From 2008 to 2011, I led a $1.8 million dollar grant, PATHS to Resilience, that specifically involved detained unaccompanied migrant children, and

that aimed to develop a capacity-building program to promote trauma-informed services for these children while in U.S. custody within the Division of Unaccompanied Children Services ("DUCS"), part of the Office of Refugee and Resettlement ("ORR"). The program successfully blended a resilience-based intervention (an intervention that uses play and collaborative games) alongside a conventional clinical intervention, Trauma Systems Therapy, and was disseminated to 16 facilities across the United States. A mixed-method evaluation of the program revealed significant improvement of morale in the staff and reduction of restraints rates and behavioral incidents in the youth. In addition, I led Project REACH, a program funded by the Department of Justice to develop a national technical assistance program to address the mental health needs of victims of human trafficking.

5.　　I have previously served as an expert witness in over 60 civil and criminal matters relating to trauma and its effects, emotional harm, standards of care, aid in sentencing, and criminal responsibility.

6.　　My declaration is based on my expertise in trauma and its effects, as well as my extensive training and experience working with adults and children who have experienced trauma and, in particular, with unaccompanied detained children and trauma survivors.  I have met with two of the plaintiffs in this action, J.O., and R.M., both of whom were separated from their children after entering the United States in May 2018 and who are currently being detained in by immigration authorities in Washington State.

7.　　My declaration is based on these meetings as well as on a review of case notes for Plaintiffs and their minor children.  I understand that Plaintiffs in this action are the class of parents who have been separated from their children under the administration's separation policy.

**Separating Children from Their Parents Severely Harms Children's Health**

8.　　Decades of research demonstrates that the most significant protective factor for vulnerable children facing adversity is attachment to a caring adult, and ideally a parent.

9.　　Separating a child from her parent is a traumatic event that can cause severe harm to the child, which may be particularly severe when separation is forcible and sudden.

Depending on the parent's reaction as the separation is happening, a child may be further traumatized upon seeing a parent's helplessness, crying, shaking, or futilely pleading with a guard.

10.   The mental health effects of separating a child from her parents are numerous.

11.   Many children have also already experienced trauma, including violence from war, gangs, or a caregiver, famine, natural disasters, or economic instability.  Research has clearly shown that exposure to multiple traumas increases a child's risk of severe psychological and physical symptoms.

12.   The longer the parent and child are separated, the greater the harm the child experiences.

13.   The effects of trauma children are significant, long-lasting, and difficult to mitigate.  The sudden and forcible separation of children from their parents rises to the level of traumatic stress. Children's brains are not fully developed and require the support of a caring adult, ideally their parents, to help them cope with overwhelming emotional distress.  Separated children are therefore at elevated risks of psychological and physical health problems because their brains are still in the process of developing and they have been separated from the bonds that can help mitigate effects of trauma. Exposure to overwhelming stress can lead to fundamental changes in brain function, for example a diminished ability of cortical areas of the brain to modulate emotional areas of the brain, such as the amygdala and fear circuits.  This is manifested as a loss of capacity to regulate intense emotions, to cope with future stress and to regulate fear reactions to reminders of traumatic events.  These changes can in turn lead to other effects such as depression, substance abuse, problems forming relationships, and other behavioral problems.

**Parents who have been separated from their children are also at risk of traumatic stress and other mental health impacts**

14.   For parents, the sudden and forcible separation from their children could represent a traumatic event leading to acute and severe psychological distress. For example, both J.O. and R.M. cried unconsolably after they realized that their children were being taken away.  They also

EXPERT DECLARATION OF JOSE HIDALGO

recounted witnessing other parents in a similar state of distress.  R.M. stated she saw other parents "wailing and crying until they could cry no more."  Both R.M. and J.O. reported feeling a sense of anguish and fear that they would not see her daughter's again.  This level of stress related to the separation can take a toll on parents and may cause physical and mental health symptoms such as loss of sleep, loss of appetite, headaches, anxiety, depression, and suicidal ideation.

15.    Many of the parents have previously experienced other traumas and have fled their home countries seeking sanctuary from violence.  For example, J.O.'s husband was murdered and feared for her life, and J.O. fled her home country due to threats to her life.  As indicated earlier cumulative trauma can lead to more severe and complex physical and mental health impacts. Thus, parents who have a prior history of trauma and losses, the forcible separation from their children can lead to higher rates of posttraumatic stress disorders, depression, anxiety, suicidal behavior, among other impacts.

**16.    Traumatized children and parents must receive appropriate screening for traumatic stress and other mental health impacts**

17.    Every child has a unique mental health profile and set of personal experiences, background, and needs.  All parents and children who have been separated should be screened for medical and mental health impacts.  Screenings and evaluations within detention centers may be of limited value as parents and children will likely not feel safe enough to disclose their feelings within a system that caused their traumatic separation.  R.O. for example stated that officers at the holding facility mocked her and told her that she was going to lose her child. For separated parents and children, the immigration detention facilities will likely continue to represent an ongoing threat of separation. Ideally, Parents and children should be reunited and released from detention centers in order for them to be properly evaluated and offered treatment if needed.

18.    Screenings and evaluations should be conducted by culturally and linguistic competent providers. The parents and children who are identified as having concerning symptoms should undergo a thorough psychosocial evaluation and treatment planning by

1   licensed clinicians who have experience in trauma and child trauma and who are capable of

2   providing culturally and linguistic appropriate services.

3          19.     Without having access to a facility and the children inside, it is not possible to

4   prescribe a fully appropriate treatment plan that will begin to address the extensive trauma these

5   children have experienced. Trained clinicians need immediate access to observe conditions and

6   assess the children's mental state. The more time that elapses, the harder it will be to effectively

7   mitigate the harm to children.

8          20.     Separated children and their parents should be screened for acute mental health

9   symptoms such as anxiety, depression, suicidal ideation, exacerbation of any pre-existing

10  conditions, and any changes of behavior such as social withdrawal or acting out behavior. It is

11  particularly important to conduct screenings after reunification, since many parents and children

12  may feel unsafe during detention to reveal the degree of their suffering.  To the extent that some

13  parents or children remain detained, it is also important to conduct screenings as soon as possible

14  in order to identify those that need the most support.

15  **Children and parents showing symptoms of trauma must receive immediate mental health**

16  **services in a therapeutically appropriate environment**

17         21.     Separated children need to be reunited with their parents as soon as it is feasible to

18  do so, in order to limit the damage being done by the forced separation. Separated children also

19  need immediate, trauma-informed interventions to begin to mitigate the harms caused by forced

20  separation from their parent(s).  Effective treatment programs recognize that both environment

21  and quality of relationships are essential components.  There is a general consensus about some

22  of the components that must be included in a program to address trauma, including (1) safety

23  and stabilization, this relates to the provision of a safe environment, e.g., free of ongoing trauma;

24  the provision for basic needs and assistance with skills and resources to mitigate the aftermath of

25  emotional harm; and the (2) development of quality relationships.

26         22.     ***Safety and Stabilization***: A safe environment is necessary in order to help

27  someone begin to overcome trauma. The first order of business in creating a safe environment is

28  to stop the infliction of trauma, i.e., stop the forced separation of children from their parents, and

1  reunite those that have been separated as soon as possible.  Any talk of treatment while

2  separation continues would be meaningless, as it is nearly impossible to heal from trauma while

3  the traumatic experiences continues to be perpetrated.

4        23.    Immigrant children separated from their parents and detained separately from their

5  parents are unlikely to benefit from a trauma intervention plan implemented in a DHS detention

6  facility that does not provide a supportive environment and lacks the important features

7  described above.  As mentioned above, continued separation from their parents would render

8  any treatment designed to address this harm ineffective as long as the separation continues.

9        24.    Furthermore, facilities with a law enforcement orientation do not have the training

10  or expertise to manage the complex needs of trauma survivors.  (Prior to initiating my work for

11  the Office of Refugee and Resettlement I visited a number of such facilities.  The stress on the

12  part of the staff and residents was quite palpable). The conditions are highly stressful and do not

13  provide children with sufficient opportunities for positive, social-emotional supports. Moreover,

14  having experienced trauma while in detention and having been traumatized by those in control of

15  the detention environment, children and parents would not be likely to feel safe in such facilities

16  and are likely to be re-traumatized by the conditions.

17        25.    Parents are necessary partners in their children's therapeutic program, particularly

18  when the trauma is caused by separation from the parent.  One of the most heart wrenching

19  impacts of the forced separation of migrant children from their parents is the disruption of the

20  parent child bond.  As indicated earlier, the most important factor in mitigating the impact of

21  trauma is a healthy bond between a child and a caring adult, especially a parent.  It is common in

22  clinical practice to include parents in the treatment of their children for mental health concerns.

23  In the case of separated children and families, including the parents in any treatment intervention

24  would be a necessary condition, since part of the goal of any therapeutic intervention would be

25  to restore the trust in the parent child bond.

26        26.    Safety for separated families would also include providing accurate information

27  about the whereabouts of separated children; the means of keeping consistent contact with

28  separated children; accurate information about process of reunification; and access to

appropriate advocacy and social supports.  Ongoing separation combined with the uncertainty of not knowing where separated loved ones are is likely to be re-traumatizing for separated children and parents. The process of re-unification should be transparent and implemented as soon as possible, in order to limit the harm caused by the separation.

27.     As indicated earlier, exposure to repeated and severe trauma can have long lasting effects on children's brains and development, e.g. loss of a sense of safety, the capacity to regulate emotions, the ability to put words before actions or words to feelings, and loss of trust and ability to form healthy bonds.  Specific skills and resources are required to mitigate these emotional and behavioral impacts in order to help those afflicted by trauma restore a sense of internal safety and improve emotional regulation.

28.     There are specific psychosocial interventions designed to mitigate these impacts, such as Trauma Systems Therapy. These interventions focus on helping the child and those caring for her to create a sense of safety and to improve her capacity to regulate emotions and to cope with stress – restore proper brain function.  For this intervention to work, however, a child needs a safe external environment – to be out of a traumatizing environment.

29.     Trauma recovery for these deeply affected populations, such as the parents and children in this case, requires that mental health services provided to these traumatized children must also be culturally sensitive and responsive to the unique needs of each child.

30.     Accepted primary care professional standards also reflect a similar safety-based approach to care in which these children are eased into therapeutic empowering relationships with clinicians who understand the profound effects of trauma on behavior. To the extent possible, internal and family medicine specialists caring for these children should actively communicate information and coordinate goals with their patients' mental health professional. A general familiarity with the stages of trauma recovery and overarching principles (such as safety and stabilization, avoidance of retraumatization, and long-term recovery support) are important.

31.     ***Quality of Relationships***: Decades of research demonstrates that the most significant protective factor for vulnerable children facing adversity are bonds to those that love them.  Tearing apart those bonds is extremely harmful.  There is no doubt that parents play an important role in child's trauma recovery and having a loving parent present will provide an extremely significant support for a child.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on July 11, 2018, in Suffolk County, Massachusetts.


Dr. Jose Hidalgo

9

**Exhibit A**

**CURRICULUM VITAE**

**Date Prepared:**     January 2016

**Name:**              Jose Hidalgo, MD

**Office Address:**    Massachusetts General Hospital
                       Law and Psychiatry Service
                       Department of Psychiatry
                       One Bowdoin Square, 9th Floor
                       15 New Chardon Street
                       Boston, MA  02114-2927

**Work Phone:**        617-724-8658,  cell: 617-413-1552
**Work E-Mail:**       jhidalgo@mgh.harvard.edu
**Work Fax:**          617-724-2808

**Place of Birth:**    Quito, Ecuador


**Education:**

09/82 - 06/86  BA
               Fordham University, New York, NY

08/86 – 06/90  MD
               New York University School of Medicine, New York, NY


**Postdoctoral Training:**

07/90-06/91    General Medicine Internship
               Massachusetts General Hospital, Boston, MA

07/91-08/92    General Psychiatry Residency
               Massachusetts General Hospital, Boston, MA

07/97-06/00    General Psychiatry Residency
               Boston University Medical Center, Boston, MA

07/99-06/00    Fellowship in Traumatic Stress Studies
               Boston University Medical Center, The Trauma Center, Boston, MA

07/12-06/14    Forensic Psychiatry Fellow
               Massachusetts General Hospital, Boston, MA

*Jose A. Hidalgo, MD*

**Faculty Academic Appointments:**

| | |
|---|---|
| 07/90-06/91 | Clinical Fellow in Medicine, Harvard Medical School |
| 07/91-08/92 | Clinical Fellow in Psychiatry, Harvard Medical School |
| 07/97-06/00 | Instructor in Psychiatry, Boston University School of Medicine |
| 07/12-06/14 | Clinical Fellow in Psychiatry, Harvard Medical School |
| 07/14 - | Instructor in Psychiatry, part time, Harvard Medical School |

**Appointments at Hospitals/Affiliated Institutions:**

| | |
|---|---|
| 07/90- 06/91 | First Year Resident in Medicine, Massachusetts General Hospital, Boston, MA |
| 07/91- 08/92 | Resident in Psychiatry, Massachusetts General Hospital, Boston, MA |
| 08/92- 07/94 | Staff Psychiatrist, Arbour Hospital, Boston, MA |
| 09/92- 06/03 | Staff Psychiatrist, South End Community Health Center, Boston, MA |
| 02/93 -09/04 | Medical Director, Boston ASAP, Boston, MA |
| 09/93- 06/03 | Doctor-on-Call Psychiatrist, Cambridge Psychiatric Associates, Cambridge, MA on-call for the following hospitals: Mount Auburn Hospital, Cambridge, MA; Newton-Wellesley Hospital, Newton, MA; Deaconess Waltham Hospital, Waltham, MA. |
| 07/97- 06/20 | Resident in Psychiatry, Boston University Medical Center, Boston |
| 07/00 -11/06 | Staff Psychiatrist, The Trauma Center, Boston, MA |
| 07/00 - | Psychiatrist, Private Practice, Watertown, MA |
| 06/06 - 2012 | Medical Director, Latin American Health Institute, Boston, MA |
| 10/08 - 10/10 | Children's Hospital Medical Staff, Children's Hospital Boston |
| 08/11 - 2012 | Teaching Associate Staff, Cambridge Health Alliance, Cambridge, MA |
| 08/11- 07/12 | Consultant, Psychological Consulting Services, LLC, Salem MA |
| 07/12 -06/14 | Clinical Fellow, Massachusetts General Hospital, Boston, MA |
| 09/13 - | Psychiatrist Suffolk County House of Corrections |
| 07/14 – 3/18 | Assistant in Psychiatry, Massachusetts General Hospital, Boston, MA |
| 03/18 - | Psychiatrist, Massachusetts General Hospital, Boston, MA |

**Major Administrative Leadership Positions:**

| | |
|---|---|
| 2006 - 04/14 | Medical Director, Latin American Health Institute, Clinical Services, Boston MA |

**Committee Service:**

| | |
|---|---|
| 2006 - 2007 | Children, Trauma and Migration Colloquium, Harvard University Committee on Human Rights Studies and Carr Center for Human Rights Policy |
| 2007 - 2010 | Research-Practice-Policy Consortium, National Center for Victims of Crime and Georgetown University |
| 2008 - 2012 | Center for Refugee Trauma and Resilience Steering Committee, Boston Children's Hospital |

2

*Jose A. Hidalgo, MD*

**Professional Societies**:

| | |
|---|---|
| 2003 - 2013 | International Society for Traumatic Stress Studies |
| 2008 - 2012 | National Child Traumatic Stress Network |
| 2009 - | Massachusetts Medical Society |
| 2012 - | American Academy of Psychiatry and the Law |

**Honors and Prizes:**

| | |
|---|---|
| 2000 | Excellence in Psychiatry, Boston University Medical Center |
| 2000 | Murray Research Award, Boston University Medical Center |
| 2007 | Founders Award for Exceptional Service, Refugee Immigration Ministry |
| 2017 | Partners in Excellence, Team Award, Massachusetts General Hospital |

## Report of Funded and Unfunded Projects

| | |
|---|---|
| 2003 -2006 | Project REACH |
| | Office of Victims of Crime, #2003-VT-BX-k004 |
| | PI ($428,383) |
| | The goal of the grant was to develop a national technical assistance program to address the mental health needs of victims of human trafficking |
| 2008 -2011 | PATHS to Resilience |
| | Administration of Children and Families, Office of Refugee and Resettlement, 90XR0013/02 |
| | PI ($1,826,037) |
| | The goal of the grant was to develop a capacity building program to promote trauma-informed services for unaccompanied migrant children in U.S. custody within the Division of Unaccompanied Children Services |

**Current Unfunded Projects:**

| | |
|---|---|
| 2017 - | Co-founded an outpatient mental health program for victims of human trafficking and poly-victimization, Massachusetts General Hospital, Boston MA |

## Report of Local Teaching and Training

**Formal Teaching of Residents, Clinical Fellows, and Research Fellows (post-docs):**

| | |
|---|---|
| 2016- | Supervisor for a correctional rotation at Nashua Street Jail for PGY3 psychiatry residents.  The rotation is designed to introduce psychiatry residents to principles of correctional psychiatry. |
| 2014- | Supervision of forensic fellows at the Suffolk County House of Corrections and MGH Law and Psychiatry Service |

*Jose A. Hidalgo, MD*

|  | Lecture topics include: Correctional Psychiatry; Aid in Sentencing; Expert Testimony & Human Trafficking; Violence Risk Assessment; Culture and Forensic Issues. |
| --- | --- |
| 2000-06 | Supervision of residents and fellows, The Trauma Center, Boston, MA |

## Local Invited Presentations:

| 2007 | Workshop on Human Trafficking and Mental Health, The New England Society for the Treatment of Trauma and Dissociation |
| --- | --- |
| 2009 | Collaborative Resilience and Trauma Interventions for Migrant Children – A Model for Refugee Health for The Massachusetts Medical Society and Harvard School of Public Health Annual Public Health Leadership Forum |
| 2011 | Trial Advocacy Workshop: Lead psychiatrist for demonstration trial, Harvard Law School |
| 2014 | Human Trafficking: A Hidden Reality, Panel on The Role of Forensic Evaluation in Human Trafficking Cases, The National Association of Women Judges and The Executive Office of the Trial Court Judicial Institute |

# Report of Regional, National, and International Invited Teaching and Presentations

## Regional, National, and International Invited Presentations and Courses:

### National

| 2001 | Psychopharmacologic Approaches to Acute and Chronic Trauma, The Trauma Center's Annual Conference, Boston MA |
| --- | --- |
| 2002 | Psychopharmacologic Approaches to Acute and Chronic Trauma, The Trauma Center's Annual Conference |
| 2003 | Psychopharmacologic Approaches to Acute and Chronic Trauma, The Trauma Center's Annual Conference, Boston MA |
| 2004 | Psychopharmacologic Approaches to Acute and Chronic Trauma, The Trauma Center's Annual Conference, Boston MA |
| 2005 | Psychopharmacologic Approaches to Acute and Chronic Trauma, The Trauma Center's Annual Conference, Boston MA |
| 2005 | Human Trafficking and Trauma, Office of Victims of Crime National Conference |
| 2005 | Human Trafficking and Trauma, Freedom Network National conference |
| 2005 | Human Trafficking and Trauma, New Jersey anti-trafficking network |
| 2005 | Human Trafficking and Trauma, Houston anti-trafficking network |

*Jose A. Hidalgo, MD*

| | |
|---|---|
| 2006 | Psychopharmacologic Approaches to Acute and Chronic Trauma, The Trauma Center's Annual Conference, Boston MA |
| 2007 | The Impact of Trauma on Attachment and Development, Division of Unaccompanied Children's Services/ Office of Refugee and Resettlement Annual Conference |
| 2008 | Child Trauma Initiative, Division of Unaccompanied Children's Services/ Office of Refugee and Resettlement annual conference |
| 2009 | Vicarious Trauma Workshop for immigration court interpreters, The National Immigration Judge's Conference |
| 2011 | PATHS to Resilience: Results of implementation of trauma and resilience program, The Division of Unaccompanied Children Services Conference |
| 2013 | American Bar Association's Litigation Section, Conference on Human Trafficking, Chicago, Expert Testimony Demonstration |
| 2013 | American Bar Association's Litigation Section, Conference on Human Trafficking, Washington D.C, Expert Testimony Demonstration |
| 2013 | National Association of Women Judges Leadership Conference, Section on Human Trafficking, Washington D.C., Expert Testimony Demonstration |
| 2016 | Complex Trauma and Trauma Informed Care workshops for the conference in Human Trafficking: A Multi-Disciplinary Approach for Eastern Iowa and Western Illinois. |
| 2017 | Tango: Resource for Trauma Therapists.  Demonstration and workshop highlighting the importance of relational and attunement capacities for trauma therapists. The Trauma Center's Annual Trauma Conference, Boston MA |

<u>International</u>

| | |
|---|---|
| 2005 | Psychological Coercion in Survivors of Torture and Human Trafficking, The International Society for Traumatic Stress Studies |
| 2006 | Psychological Trauma and The Law on Human Trafficking, Law Mind and Brain, Interdisciplinary Colloquium at University College of London |
| 2006 | Chair of Panel discussion: Human Trafficking, Trauma and Resilience in Modern Day Slavery, The International Society for Traumatic Stress Studies |
| 2009 | Chair ½ Day Pre-meeting Institute: Building Effective Self-Sustaining Programs for Children and Families for the International Society, Traumatic Stress Studies |
| 2011 | Systemic Resilience: Human Hearts Can Only be Healed by Other Human Hearts, The Society for Research in Child Development, March 2011 |
| 2012 | Innovative Interventions for Gang Related Youth, International Society for Traumatic Stress Studies meeting, November |

*Jose A. Hidalgo, MD*

## Report of Clinical Activities and Innovations

**Current Licensure and Certification:**

| | |
|---|---|
| 1991 | Massachusetts Medical License |
| 2002 | Board Certification, American Board of Psychiatry and Neurology, re-certified 2014 |
| 2015 | Board Certification, American Board of Psychiatry and Neurology, Forensic Psychiatry |

**Clinical Innovations:**

Project REACH (2003 – 2007) is a program with national scope to educate providers working with victims of human trafficking on the behavioral consequences of psychological trauma. Project REACH continues to offer training and consultation services.

PATHS to Resilience (2008 – 2011) was a program to foster resilience and trauma healing in unaccompanied migrant children in U.S. Custody.  The program successfully blended a resilience-based intervention (an intervention that uses play and collaborative games) along side a conventional clinical intervention, Trauma Systems Therapy.  The program was disseminated to 16 facilities across the U.S. A mixed method evaluation of the program revealed significant improvement of moral in the staff and reduction of restraints rates and behavioral incidents in the youth.

CONNECT (2017) is an outpatient mental health clinic for victims of human trafficking.  The program addresses the complex needs of this marginalized population by adapting evidence-based trauma treatments to the needs of this population, including forensic advocacy and a coordinated community response.

## Report of Scholarship

**Publications**

**Peer Reviewed Publications in print or other media:**

Luxenberg T., Spinazzola J., Hidalgo J., Hunt C., Van der Kolk. Complex Trauma and Disorders of Extreme Stress. *Treatment. Directions in Psychiatry* 2001; 21, 395 – 415

Sadruddin H., Walter N., Hidalgo J. Human Trafficking in the United States: Expanding Victim Protection Beyond Prosecution Witnesses. *Stanford Law & Policy Review*, 2005; Volume 16, 379-416.

Hopper E., Hidalgo J. Invisible Chains: Psychological Coercion of Human Trafficking Victims. *Intercultural Human Rights Law Review* 2006; Volume 1, 185

Hidalgo J., Maravic C.M., Milet R., Beck J.: Promoting Collaborative Relationships in

Residential Care of Vulnerable and Traumatized Youth: A Playfulness Approach
Integrated with Trauma Systems Therapy. *Journal of Child and Adolescent Trauma* 2016

Judge A., Murphy J., Hidalgo J., Konstantopoulos W: Engaging Survivors of Human
Trafficking: Complex Healthcare Needs and Scarce Resources. Annals of Internal Medicine,
2018

Reviews, chapters, monographs and editorials

Schouten R, Edersheim JG, Hidalgo JA: Chapter 85 Informed Consent, Competency, Civil
Commitment, and Treatment Refusal. In Stern TA, Rosenbaum JF, Fava M, Biederman J, Rauch
SL, Eds. Comprehensive Clinical Psychiatry.  Philadelphia: Mosby Elsevier (In Press)

Schouten R, Hidalgo JA: Neuroscience in the judicial system. McGraw-Hill Yearbook of
Science & Technology. 2014. New York: McGraw-Hill.