UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE JOHN A. KRONSTADT

UNITED STATES DISTRICT JUDGE PRESIDING

- - -


MS. J.P., ET AL.,                      )
                                       )
             PLAINTIFFS,               )
                                       )
VS.                                    ) CV18-06081-JAK
                                       )
JEFFERSON B. SESSIONS, ET AL.,         )
                                       )
             DEFENDANTS.               )
_____)




REPORTER'S TRANSCRIPT OF PROCEEDINGS

LOS ANGELES, CALIFORNIA

THURSDAY, SEPTEMBER 20, 2018; 1:30 PM




_____

ALEXANDER T. JOKO, CSR NO. 12272
FEDERAL OFFICIAL COURT REPORTER
350 WEST FIRST STREET, ROOM 4311
LOS ANGELES, CA 90012
AJ_CSR@YAHOO.COM

1    **APPEARANCES OF COUNSEL:**

2    FOR PLAINTIFFS:      MARK E. HADDAD
                          UNIVERSITY OF SOUTHERN CALIFORNIA
3                         USC GOULD SCHOOL OF LAW
                          699 EXPOSITION BLVD.
4                         LOS ANGELES, CA 90089-0071

5                         MARK D. ROSENBAUM
                          PUBLIC COUNSEL
6                         610 SOUTH ARDMORE AVENUE
                          LOS ANGELES, CA 90005
7
                          KEVIN M. FEE
8                         SIDLEY AUSTIN LLP
                          ONE SOUTH DEARBORN
9                         CHICAGO, IL 60603

10                        LOGAN PERRY BROWN
                          SIDLEY AUSTIN LLP
11                        1999 AVENUE OF THE STARS 17TH FLOOR
                          LOS ANGELES, CA 90067
12
                          AMY P. LALLY
13                        SIDLEY AUSTIN LLP
                          1999 AVENUE OF THE STARS 17TH FLOOR
14                        LOS ANGELES, CA 90067

15   FOR DEFENDANTS:      MICHAEL C. HEYSE
                          US DEPARTMENT OF JUSTICE
16                        CIVIL DIVISION - OIL
                          PO BOX 878 BEN FRANKLIN STATION
17                        WASHINGTON, DC 20044

18                        MICHELLE R. SLACK
                          US DEPARTMENT OF JUSTICE
19                        CIVIL DIVISION
                          OFFICE OF IMMIGRATION LITIGATION
20                        PO BOX 878 BEN FRANKLIN STATION
                          WASHINGTON, DC 20044
21

22

23

24

25

```
 1          LOS ANGELES, CALIFORNIA; THURSDAY, SEPTEMBER 20, 2018

 2                              1:30 PM

 3                           -  -  -  -  -

 4

 5

 6          THE COURT:  GOOD AFTERNOON.

 7               ITEM NO. 9, CV18-06081, MS. J.P., ET AL.

 8     V. JEFFERSON B. SESSIONS, ET AL.

 9               WOULD YOU STATE YOUR APPEARANCES, PLEASE,

10     STARTING WITH PLAINTIFF'S COUNSEL.

11          MR. ROSENBAUM:  GOOD AFTERNOON, YOUR HONOR.

12     MARK ROSENBAUM ON BEHALF OF PLAINTIFFS.

13          MS. LALLY:  GOOD AFTERNOON, YOUR HONOR.  AMY

14     LALLY FROM SIDLEY AUSTIN ON BEHALF OF THE PLAINTIFFS,

15     ALONG WITH KEVIN FEE, BRIDGET JOHNSON AND LOGAN BROWN

16     FROM SIDLEY AUSTIN.

17               THERE ARE A NUMBER OF MATTERS ON CALENDAR

18     FOR TODAY.  IF IT PLEASE THE COURT, MR. FEE WILL

19     HANDLE --

20          THE COURT:  IF YOU COULD JUST INTRODUCE WHO IS

21     HERE, PLEASE, AND WE'LL GET TO OTHER MATTERS LATER.

22          MR. HADDAD:  MARK HADDAD FOR THE PLAINTIFFS.

23          THE COURT:  GOOD AFTERNOON.

24          MR. HEYSE:  GOOD AFTERNOON, YOUR HONOR.

25     MICHAEL HEYSE FOR THE DEFENDANTS, HERE WITH MICHELLE
```

1    SLACK ALSO FROM THE DOJ.

2          THE COURT:  GOOD AFTERNOON.

3                WELL, WE'RE HERE ON THE MOTION FOR

4    PRELIMINARY INJUNCTION AND THE MOTION FOR CLASS

5    CERTIFICATION.

6                I'VE REVIEWED YOUR FILINGS, AND I HAVE

7    SOME QUESTIONS.

8                WITH RESPECT TO THE -- WELL, THEY'RE

9    OVERLAPPING INASMUCH AS -- WELL, THEY OVERLAP SOMEWHAT.

10                ONE OF THE ARGUMENTS THAT THE DEFENDANTS

11    HAVE ADVANCED IS THE FIRST TO FILE RULE.  AND I'D LIKE

12    TO HEAR FROM YOU ON THAT ISSUE INASMUCH AS THE MS. L.

13    MATTER IN THE SOUTHERN DISTRICT OF CALIFORNIA RAISED

14    THE ISSUES CONCERNING THE CONSTITUTIONALITY OF THE

15    POLICY OF SEPARATING PARENTS AND CHILDREN.  AND THE

16    DETERMINATIONS THERE ARE, I KNOW, SUBJECT TO APPELLATE

17    REVIEW.

18                THE COMPLAINT IN THAT ACTION STATED, IN

19    TERMS OF THE RELIEF SOUGHT, "AND OTHER APPROPRIATE

20    RELIEF" OR WORDS TO THAT EFFECT.

21                SO I'M MINDFUL THAT THE ISSUE OF THE

22    FIRST TO FILE RULE, IT'S NOT AN ABSOLUTE RULE OR ONE

23    THAT IS NOT TO BE PART OF THE EXERCISE OF DISCRETION.

24    BUT I'D LIKE TO HEAR FROM YOU ON THIS, PARTICULARLY

25    INASMUCH AS BECAUSE AT LEAST TWO OF THE THREE NAMED

```
 1    PLAINTIFFS HERE ARE MEMBERS OF THAT CLASS.  AND ALL
 2    THREE MAY BE.  I CAN'T TELL FROM WHAT'S BEEN FILED.
 3              NOW, I RECOGNIZE, AGAIN, THAT A PERSON
 4    DOESN'T HAVE TO OPT OUT OF AN INJUNCTIVE RELIEF CLASS
 5    ACTION.  BUT IF THE SAME PERSONS ARE MEMBERS OF THE
 6    CLASS, AND IF THE UNDERLYING -- AN UNDERLYING BASIS FOR
 7    RELIEF IS THE RELIEF THAT WAS GRANTED IN THAT CLASS,
 8    THEN I'D LIKE TO KNOW WHY TWO SEPARATE ACTIONS AND,
 9    POTENTIALLY, TWO DIFFERENT PATHS OF APPELLATE REVIEW
10    WOULD BE NECESSARY BECAUSE, AS YOU BOTH KNOW, THERE IS
11    APPELLATE REVIEW NOW PENDING WITH RESPECT TO AT LEAST
12    CERTAIN ORDERS ENTERED IN THE MS. L. CLASS.
13              THE SECOND QUESTION THAT I HAVE ABOUT
14    WHICH I'D LIKE TO HEAR CONCERNS, NOT THE ISSUE OF
15    MENTAL HEALTH RELIEF, MEDICAL HEALTH RELIEF DURING THE
16    TIME A PERSON IS IN CUSTODY, BUT PROVIDING SUCH RELIEF
17    AFTER THE PERSON IS NO LONGER IN CUSTODY.
18              I KNOW YOU HAVE CITED CASES ON THIS
19    TOPIC, INCLUDING A CASE IN WHICH -- A PRESCRIPTION -- A
20    PERSON WHO WAS DISCHARGED FROM CUSTODY WAS DETERMINED
21    SHOULD HAVE SUFFICIENT PRESCRIPTION TO FACILITATE
22    TRANSITION TO NO LONGER BEING IN CUSTODY.
23              BUT I'D LIKE TO KNOW WHAT OTHER -- IF
24    THERE'S ANY OTHER BASIS FOR THE CONTENTION THAT,
25    FOLLOWING RELEASE FROM CUSTODY - AND I MIGHT AMEND THAT
```

```
1    TO SAY, "POTENTIALLY FOLLOWING RELEASE FROM CUSTODY AND

2    ANY CONTINUED SUPERVISION," - ORDERING AN INJUNCTION,

3    WHICH I THINK WOULD BE IN THE FORM OF AFFIRMATIVE

4    RELIEF, THAT WOULD REQUIRE ONGOING CARE IS CONSISTENT

5    WITH THE REQUIREMENTS.

6              OTHER ISSUES HAVE BEEN PRESENTED TO THE

7    EXTENT, FOR EXAMPLE, THAT THE CLASS CONSISTS, AS

8    PROPOSED, OF THOSE WHO HAVE BEEN RELEASED ARE THE --

9    WHICH INCLUDES THE CLASS REPRESENTATIVES, I BELIEVE.

10   ARE THEY SUITABLE REPRESENTATIVES, POTENTIALLY, FOR

11   THOSE WHO HAVE NOT BEEN RELEASED?

12             AND, SIMILARLY, THE MIRROR IMAGE OF THAT.

13   TO THE EXTENT THAT THE DEFENDANTS CONTEND ALL SUCH

14   PERSONS MAY HAVE BEEN RELEASED, DOES THAT REALLY CREATE

15   MOOTNESS WHERE THIS ISSUE COULD BE RENEWED AND EVADE

16   REVIEW BECAUSE CERTAIN PERSONS ARE DETAINED AND THEN

17   RELEASED.

18             SO THOSE ARE SOME OF THE MATTERS ON WHICH

19   I'D LIKE TO HEAR FROM YOU.

20             I'M MINDFUL THAT THE GOVERNMENT -- THAT

21   THE DEFENDANTS HAVE FILED AN EX PARTE APPLICATION TO

22   ADVANCE THE DATE ON A HEARING ON A MOTION TO DISMISS,

23   WHICH I'M DISINCLINED TO GRANT.  THE ISSUES, I THINK,

24   AS TO THAT, I DON'T KNOW THAT THERE'S ANY URGENCY TO

25   THAT, INASMUCH AS THE ISSUES CONCERNING THE LIKELIHOOD
```

```
 1    OF SUCCESS ON THE MERITS, WHICH HAVE BEEN FULLY BRIEFED

 2    HERE, OVERLAP WITH THE MOTION TO DISMISS.

 3              SO RECOGNIZING THAT A DETERMINATION ON A

 4    MOTION FOR A PRELIMINARY INJUNCTION IS NOT FINAL AS TO

 5    THE ISSUE OF LIKELIHOOD OF SUCCESS, BUT GIVEN THE

 6    OVERLAP IN ARGUMENTS, I DON'T SEE THE EMERGENCY NEED TO

 7    ACCELERATE THE HEARING ON THAT.

 8              SO, MS. LALLY, WHO WILL BE ADDRESSING

 9    THESE ISSUES FOR THE PLAINTIFFS?

10         MS. LALLY:  THANK YOU, YOUR HONOR.

11              KEVIN FEE IS PREPARED TO TALK ABOUT THE

12    BACKGROUND OF THE CASE, THE PRELIMINARY INJUNCTION

13    MOTION, ALL THOSE ARGUMENTS THAT OVERLAP BETWEEN THE

14    P.I. AND THE CLASS CERT MOTION.  THAT WOULD CERTAINLY

15    INCLUDE THE SECOND ISSUE YOU ASKED TO BE ADDRESSED.

16              AND LOGAN BROWN, AN ASSOCIATE FROM OUR

17    OFFICE, IS HERE TO TALK ABOUT THE PROCEDURES OF THE

18    CLASS CERTIFICATION MOTION.

19              I THINK I WOULD ASK TO START WITH

20    MR. FEE, IF WE MAY?

21         THE COURT:  THANK YOU.

22              MR. FEE?

23         MR. FEE:  YOUR HONOR, KEVIN FEE ON BEHALF OF

24    THE PLAINTIFFS.

25              MAY IT PLEASE THE COURT.  THE SUPREME
```

1    COURT HAS HELD THAT THE DUE PROCESS CLAUSE OF THE FIFTH

2    AMENDMENT WAS INTENDED TO PREVENT THE GOVERNMENT FROM

3    ABUSING ITS POWER OR FROM EMPLOYING IT AS AN INSTRUMENT

4    OF OPPRESSION.

5              NOW, THE QUOTE THAT I JUST READ WAS FROM

6    DESHANEY VERSUS WINNEBAGO, YOUR HONOR.  AND IT IS OFTEN

7    QUOTED IN THE LINE OF CASES THAT FOLLOWED IT.  AND

8    THOSE CASES TEACH THAT, IN SOME INSTANCES, THE

9    GOVERNMENT CAN VIOLATE INDIVIDUAL'S RIGHTS EVEN

10   INDIRECTLY, SUCH AS IN THE CIRCUMSTANCE WHERE THEY FAIL

11   TO PROTECT PEOPLE FROM HARM THAT ARE UNDER THE

12   GOVERNMENT'S CARE, SUCH AS IN DETENTION OR IN INSTANCES

13   WHERE THEY FAIL TO PROTECT PEOPLE FROM HARM FROM EVEN

14   THIRD PARTIES IN INSTANCES WHERE THE GOVERNMENT HAS

15   CREATED A DANGER.  SO THE SCOPE OF DUE PROCESS

16   PROTECTIONS IS SUFFICIENT TO EXTEND TO EVEN THOSE

17   CASES.

18             NOW, THIS CASE, HOWEVER, YOUR HONOR,

19   INVOLVES A MUCH MORE EGREGIOUS HARM THAN THOSE.  AND

20   THAT'S BECAUSE THIS IS NOT A CASE OF A ONE-OFF INJURY

21   TO AN INDIVIDUAL BECAUSE OF AN ISOLATED GOVERNMENT

22   EMPLOYEE ASLEEP AT THE SWITCH.  THIS IS A CASE OF A

23   GRIEVOUS HARM THAT WAS COMMITTED DIRECTLY, DIRECTLY BY

24   THE GOVERNMENT ITSELF, THROUGH A CONCERTED POLICY OF

25   PHYSICALLY SEPARATING FAMILIES AT OUR NATION'S BORDERS

```
1    AND INFLICTING SEVERE AND ONGOING TRAUMA THROUGH THAT

2    SEPARATION.  AND THEN, IMPORTANTLY, ALLOWING THAT

3    TRAUMA TO PERSIST AND, IN SOME CASES, EVEN INTENSIFY BY

4    FAILING TO ADDRESS IT, EVEN AT A TIME THAT THE

5    GOVERNMENT WAS IN A POSITION TO DO SO.

6                 SO THIS HARM WAS DIRECT.  THIS HARM WAS

7    SYSTEMIC AND WIDE-RANGING.  THIS WAS A POLICY OF HARM

8    RATHER THAN AN ISOLATED INCIDENT.  IN THIS CASE, IT WAS

9    THE RULE, NOT THE EXCEPTION.

10                AND THE POLICY WAS IMPLEMENTED WITH FULL

11   KNOWLEDGE OF THE HARM THAT COULD BE CAUSED.  THERE WAS

12   SWORN TESTIMONY BEFORE CONGRESS FROM REPRESENTATIVES OF

13   THE O.R.R. EXPLAINING THAT THEY HAD WARNED WHAT SHOULD

14   HAVE BEEN OBVIOUS, THAT THIS POLICY OF TEARING FAMILIES

15   APART AT THE BORDER WOULD BE HARMFUL TO PARENTS AND

16   CHILDREN ALIKE.

17                AND, IMPORTANTLY, THE POLICY OF HARM WAS

18   NOT INCIDENTAL.  THE POLICY OF HARM WAS INTENTIONAL.

19   AGAIN, PUBLIC STATEMENTS FROM TOP ADMINISTRATION

20   OFFICIALS THAT AT LEAST PART OF THE PURPOSE OF THIS

21   POLICY WAS DETERRENCE, DETERRENCE.  BY HARMING SOME

22   PEOPLE, YOU ENSURE THAT OTHERS WILL BE WARNED THAT THEY

23   MIGHT GET THE SAME TREATMENT FROM OUR GOVERNMENT.  AND

24   IT WAS INFLICTED ON A CLASS OF ALREADY VULNERABLE

25   PEOPLE WHO WERE ARRIVING AT OUR NATION'S BORDER,
```

1    OFTENTIMES FLEEING DANGEROUS CONDITIONS IN THEIR HOME

2    COUNTRY AND LOOKING TO OUR COUNTRY FOR HELP.

3              NOW, IT DOESN'T TAKE SPECIALIZED

4    KNOWLEDGE OR TRAINING.  IT DOESN'T TAKE A LAW DEGREE OR

5    A PSYCHOLOGY DEGREE TO SEE THAT PURPOSELY RIPPING

6    FAMILIES APART IS A TRAUMA, YOUR HONOR.  IT'S A TRAUMA

7    OF THE HIGHEST ORDER.  IT'S A TRAUMA NOT ONLY TO KIDS,

8    BUT TO PARENTS AND, FRANKLY, TO THE BONDS OF THE FAMILY

9    THEMSELVES.

10             THE MEDICAL AND MENTAL HEALTHCARE

11   COMMUNITIES HAVE CRIED OUT IN UNISON ON THIS.  IT HAS

12   BEEN A MATTER OF PUBLIC KNOWLEDGE, AS I'M SURE YOUR

13   HONOR IS WELL AWARE.  AND COURTS HAVE NOW MADE CLEAR

14   THAT IT IS NOW A LEGALLY-COGNIZABLE HARM AND A DUE

15   PROCESS VIOLATION TO SEPARATE THESE INDIVIDUALS AT THE

16   BORDER.  AND, FRANKLY, THE QUESTION OF THIS TRAUMA,

17   THIS TRAUMA IS NOT THE SUBJECT OF SERIOUS DISPUTE AT

18   THIS POINT.

19             AND THANKS, IN PART, TO THE RULINGS OF

20   OTHER COURTS, THE REUNIFICATION, AT LEAST OF SOME OF

21   THESE FAMILIES, HAS BEGUN.  AND THAT'S A GOOD FIRST

22   STEP, CERTAINLY.  BUT THE HARM THAT THESE SEPARATIONS

23   HAVE CAUSED IS BY NO MEANS OVER.  AND THE REUNIFICATION

24   OF THESE FAMILIES BY NO MEANS ADDRESSES THE HARM

25   COMPLETELY.

1          MANY FAMILIES REMAIN SEPARATED.  FIRST OF

2    ALL, OVER 200 CHILDREN, I THINK, BY THE LAST COUNT

3    OFFERED BY THE GOVERNMENT DURING THE LAST HEARING IN

4    THE MS. L. CASE.  AND THE EXPERIENCE OF THE

5    REUNIFICATIONS HAS BEEN A ROCKY ONE.  THE LAST FEW

6    WEEKS HAVE BROUGHT HEART-WRENCHING STORIES IN THE MEDIA

7    ABOUT REUNIFICATIONS WHERE CHILDREN WERE SKEPTICAL OF

8    THEIR PARENTS, FEARFUL OF THEIR PARENTS, EVEN ANGRY AT

9    THEIR PARENTS, BLAMING THEM FOR THE SEPARATIONS, ALL OF

10   WHICH REALLY UNDERSCORES THE COMPLEXITY OF THE HARM

11   THAT WAS DONE HERE AND THE ONGOING NATURE OF THE TRAUMA

12   THAT WAS FIRST VISITED ON THESE FOLKS THROUGH THE

13   SEPARATION ITSELF.

14          AND, CRUCIALLY, THE FAMILIES REMAIN IN

15   DANGER, YOUR HONOR, THE DANGER THAT WAS INITIALLY

16   CAUSED BY THE SEPARATION.  THEY REMAIN IN DANGER OF

17   INTENSIFYING HARM AS TIME GOES BY.  WE SUBMITTED AN

18   EXTENSIVE RECORD BY TOP EXPERTS IN THE MENTAL HEALTH

19   FIELD THAT EXPLAIN IN DETAIL HOW IT IS THAT BOTH

20   PARENTS AND KIDS AND THE FAMILY UNIT ARE IN CONTINUING

21   DANGER AS LONG AS THIS TRAUMA IS LEFT UNTREATED.  THEY

22   ARE AT EXTREMELY ELEVATED RISK OF FUTURE MENTAL

23   DISORDERS, OF PROFESSIONAL AND SOCIAL CONSEQUENCES WELL

24   INTO THEIR LIVES.

25          AND SO THE GOVERNMENT CREATED THIS RISK

1    NOT ONLY BY INFLICTING THE HARM TO BEGIN WITH; BUT,

2    AGAIN, BY ALLOWING THIS HARM TO PERSIST AND EVEN

3    INTENSIFY WHILE THESE PEOPLE WERE, AT TIMES, EVEN STILL

4    IN THE GOVERNMENT'S CUSTODY.  AND THE GOVERNMENT WAS IN

5    A POSITION TO HELP.

6              AND SO THESE STAND AS TWO SEPARATE AND

7    INDEPENDENT CONSTITUTIONAL VIOLATIONS, YOUR HONOR, THE

8    INITIAL HARM CAUSED BY THE GOVERNMENT, THE SEPARATION,

9    AND THEN THE FAILURE TO ADDRESS THE SEPARATION CAUSED

10   BY THIS CONCERTED POLICY.

11             AND THIS CASE IS ABOUT RIGHTING THE

12   WRONGS OF THIS POLICY AND PUTTING INTO PLACE, FINALLY,

13   A PROCESS FOR MITIGATING AND STOPPING THE CATASTROPHIC

14   HARM THAT IT HAS BROUGHT.

15             SO UNDER THE LAW OF THIS CIRCUIT, AS YOU

16   KNOW, YOUR HONOR, PLAINTIFFS HAVE TO SHOW THAT, IN

17   ORDER TO BE ENTITLED TO PRELIMINARY INJUNCTIVE RELIEF,

18   LIKELY SUCCESS ON THE MERITS, LIKELY IRREPARABLE HARM

19   ABSENT PRELIMINARY RELIEF, BALANCE OF EQUITIES AND

20   INJUNCTION BEING IN THE PUBLIC'S INTEREST.  AND I WON'T

21   BORE YOUR HONOR UNLESS YOU WANT ME TO.

22        THE COURT:  NO, BUT I'D LIKE TO HEAR THE

23   RESPONSES TO THE QUESTIONS I ASKED AT THE OUTSET.

24        MR. FEE:  SURE.

25             SO THE RESPONSE -- THE SECOND QUESTION I

```
 1    THINK FALLS RIGHT WITHIN WHAT WE'RE TALKING ABOUT HERE.

 2    AND, THAT IS, THE NATURE OF THE DUE PROCESS VIOLATION

 3    THAT WE ALLEGE AND THE BASIS FOR POST ATTENTION MEDICAL

 4    RELIEF.

 5             SO THERE ARE TWO BASES, YOUR HONOR, AS WE

 6    HAVE PLED THEM.  THERE'S THE BASIS UNDER THE SPECIAL

 7    RELATIONSHIP TEST, ESSENTIALLY THE WAKEFIELD TEST, THAT

 8    SAYS THAT, WHEN THERE'S A SPECIAL RELATIONSHIP BETWEEN

 9    THE GOVERNMENT AND AN INDIVIDUAL, SUCH AS HERE WHERE

10    THEY'RE IN CUSTODY, THEY ARE REQUIRED TO HAVE A NUMBER

11    OF PROTECTIONS, INCLUDING ADEQUATE MEDICAL CARE.

12             THE COURT:  WHILE IN CUSTODY.

13             MR. FEE:  WHILE IN CUSTODY AND ALSO FOR A

14    PERIOD THEREAFTER.

15             THE COURT:  WHAT CASE SAYS THAT BESIDES THE

16    PRESCRIPTION CASE AND THE DISTRICT COURT CASES THAT

17    HAVE INTERPRETED IT?

18             MR. FEE:  WELL, THE WAKEFIELD CASE AND THEN

19    THERE'S ANOTHER CASE THAT WE CITED IN OUR BRIEF THAT

20    SUGGESTS THAT IT COULD EVEN GO AS FAR AS THREE MONTHS.

21    BUT IT HAS NOT BEEN LITIGATED ALL THAT MUCH.  SO THE

22    NATURE OF THAT TRANSITIONAL PERIOD IS NOT CRYSTAL

23    CLEAR.  SO THAT'S BASIS NUMBER ONE.

24             AND WHEN YOU LOOK AT THE RELIEF WE'RE

25    SEEKING, YOUR HONOR, IT IS IN SEVERAL STAGES.  THE
```

1    FIRST STAGE BEING A SCREENING, THE SCREENING THAT ALL

2    THESE FOLKS SHOULD HAVE GOTTEN, A TRAUMA-INFORMED

3    SCREENING USING PROFESSIONAL -- ACCEPTED PROFESSIONAL

4    STANDARDS WITHIN THE COMMUNITY OF MENTAL HEALTH

5    PROVIDERS.  THAT'S SOMETHING THAT EVERYONE SHOULD HAVE

6    GOTTEN WHILE THEY WERE IN CUSTODY.  IT'S SOMETHING THAT

7    EVERYONE SHOULD GET WHO IS CURRENTLY IN CUSTODY, WHICH

8    IS PART OF OUR CLASS.  IT'S SOMETHING THAT EVERYONE

9    SHOULD GET.  NOW, THAT'S BASIS NUMBER ONE.

10                BASIS NUMBER TWO IS THE STATE CREATED

11   DANGER DOCTRINE.  THE STATE CREATED DANGER DOCTRINE

12   HOLDS THAT THE GOVERNMENT IS RESPONSIBLE FOR PROTECTING

13   INDIVIDUALS FROM HARM WHERE THEY HAVE THE -- THE STATE

14   HAVE TAKEN AN ACTION THAT PUT THEM INTO A DANGEROUS

15   SITUATION THAT WOULD NOT HAVE EXISTED BUT FOR THE

16   GOVERNMENT'S ACTION.

17                NOW, CLEARLY, THE GOVERNMENT ACTION HERE

18   IS CRYSTAL CLEAR.  THE GOVERNMENT ACTUALLY CAUSED THE

19   HARM, WHICH DISTINGUISHES THIS FROM A LOT OF STATE

20   CREATED DANGER CASES.

21                AND, IN FACT, THE PANILLA CASE, YOUR

22   HONOR, EXPLICITLY REJECTED THE NOTION THAT THE SCOPE OF

23   DUE PROCESS RIGHTS AVAILABLE UNDER THE STATE CREATED

24   DANGER DOCTRINE WAS LIMITED BY CUSTODIAL STATUS.

25                THE GOVERNMENT HAD ARGUED THAT, BECAUSE

1  THE INDIVIDUAL IN THAT CASE -- WHEN THE GOVERNMENT HAD

2  PLACED THEM IN A POSITION OF DANGER THROUGH AFFIRMATIVE

3  ACTS.  THEY REJECTED THE NOTION THAT THE CARE THAT WAS

4  DUE TO THAT PERSON WAS NONEXISTENT BECAUSE THE PERSON

5  WAS NOT ACTUALLY IN POLICE CUSTODY.  THEY MERELY MOVED

6  HIM FROM HIS -- I THINK IT WAS PORCH TO THE INSIDE OF

7  HIS HOME.  SO HE WAS NOT IN POLICE CUSTODY.  AND,

8  THEREFORE, THEY ARGUED THERE WAS NO RIGHT TO ADEQUATE

9  MEDICAL CARE.  THERE WAS NO RIGHT TO ANY DUE PROCESS

10  VIOLATION OR DUE PROCESS PROTECTION.  AND THE

11  GOVERNMENT REJECTED THAT.  SO THE STATE CREATED DANGER

12  DOCTRINE IS NOT RESTRICTED BY SORT OF THE BOUNDS OF

13  THIS CONFINEMENT PARADIGM.

14          SO THE COMBINATION OF THOSE TWO GIVES

15  RISE TO THE DUE PROCESS RIGHTS THAT WE SEEK TO HAVE

16  VINDICATED HERE.

17          AND THERE HAVE BEEN CASES, YOUR HONOR,

18  THAT HAVE INVOLVED SORT OF THE INTERSECTION OF THE

19  THESE TWO RIGHTS.  I WOULD POINT YOUR HONOR TO THE WANG

20  V. RENO CASE, WHICH INVOLVED SORT OF A DUAL VIOLATION

21  AS HERE INVOLVING THE GOVERNMENT BRINGING A CHINESE

22  NATIONAL TO TESTIFY IN A DRUG CONSPIRACY IN THE UNITED

23  STATES, FORCING HIM TO TESTIFY IN A WAY THAT EXPOSED

24  HIM TO HARM.  AND THE GOVERNMENT GRANTED AN INJUNCTION

25  AFTER FINDING THAT HE WAS HARMED BOTH UNDER THE STATE

```
1    CREATED DANGER DOCTRINE AND THE DUE PROCESS RIGHTS THAT

2    ARISE OUT OF THE SPECIAL RELATIONSHIP THAT SPRINGS FROM

3    CUSTODIAL STATUS.

4              SO TO ANSWER YOUR QUESTION, YOUR HONOR,

5    AS TO WHAT WE THINK GIVES RISE TO THE RIGHT TO

6    POST-RELEASE RELIEF, IT'S THE COMBINATION OF THOSE TWO.

7              THE COURT:  IS THERE A DISTINCTION BASED ON

8    THE NATURE OF THE RELEASE?

9              SOME HAVE BEEN RELEASED AND ARE ON BOND,

10   I BELIEVE; CORRECT?

11             ARE OTHERS RELEASED AND SUBJECT TO OTHER

12   RESTRICTIONS?

13             AND ARE SOME WHO HAVE BEEN RELEASED NO

14   LONGER IN THE UNITED STATES?

15             MR. FEE:  I BELIEVE THAT IS TRUE, YOUR HONOR.

16             THE COURT:  ALL THREE?

17             MR. FEE:  ALL -- I BELIEVE THAT'S RIGHT, ALL

18   THREE.

19             AND I DON'T THINK THAT THERE'S A

20   DISTINCTION IN TERMS OF THE RELIEF THAT WE'RE SEEKING

21   BETWEEN THOSE DIFFERENT STATUSES.

22             THE COURT:  WELL, IF THERE WERE A PERSON WHO

23   IS NO LONGER IN THE UNITED STATES WHO IS A CLASS

24   MEMBER, HOW WOULD THAT PERSON RECEIVE THE MEDICAL

25   TREATMENT?
```

```
1              MR. FEE:  WELL -- AND I RECOGNIZE, YOUR HONOR,

2      THAT, IN THAT INSTANCE, THE PROVISION OF THE SERVICES

3      THAT INJUNCTION WOULD CALL FOR WOULD BE DIFFICULT.

4              BUT WHAT WE'RE SEEKING TODAY IS NOT SORT

5      OF A SOUP-TO-NUTS SOLUTION FOR HOW TO PROVIDE THIS.

6      WE'RE JUST ASKING FOR THE COURT TO ORDER THAT THE

7      GOVERNMENT COME INTO COMPLIANCE WITH ITS DUE PROCESS

8      RIGHTS.

9              AND IF -- THERE WILL CERTAINLY BE

10     INDIVIDUALS WHO ARE MORE DIFFICULT TO REACH THAN

11     OTHERS.  THERE MAY BE INDIVIDUALS WHO CHOOSE NOT TO

12     RECEIVE SERVICES.  BUT THE RIGHTS OF THE ENTIRE CLASS

13     ARE VERY MUCH THE SAME.

14             THE COURT:  HOW WOULD YOU ANTICIPATE THAT --

15     WITH RESPECT TO THOSE WHO ARE STILL WITHIN THE UNITED

16     STATES, BUT WHO ARE NOT IN CUSTODY, WHERE WOULD THEY GO

17     FOR TREATMENT?

18             MR. FEE:  AGAIN, THAT WOULD BE SOMETHING I

19     THINK THAT WE WOULD NEED TO WORK OUT THROUGH

20     DISCUSSIONS WITH THE GOVERNMENT AND THE COURT.

21             WE CAN ENVISION A NUMBER OF WORKABLE

22     SCENARIOS HERE INVOLVING SOME COMBINATION OF

23     GOVERNMENT-EMPLOYED THERAPISTS AND PRIVATE THERAPISTS.

24             WE'RE NOT, FRANKLY, IN A POSITION, NOR DO

25     WE THINK IT'S OUR BURDEN, TO COME UP WITH AN
```

1   AFFIRMATIVE LOGISTICAL PLAN FOR HOW TO DEAL --

2           THE COURT:  WELL, TO THE EXTENT THAT THE

3   GOVERNMENT IS ARGUING THAT THE RELIEF SOUGHT IS MORE IN

4   LINE WITH FINANCIAL RELIEF AND/OR DAMAGES, IF I -- I

5   THINK I DO NEED TO UNDERSTAND THE NATURE OF THE RELIEF,

6   DON'T I?

7               BECAUSE IF, FOR EXAMPLE, YOUR POSITION IS

8   THAT, THOSE WHO ARE STILL WITHIN THE UNITED STATES, BUT

9   NOT IN CUSTODY, MIGHT HAVE A RIGHT TO GO TO A PRIVATE

10  THERAPIST, WHO IS GOING TO PAY THE THERAPIST?

11          MR. FEE:  AGAIN, THAT WOULD BE -- YOU KNOW,

12  THOSE DETAILS, I THINK WOULD BE UP TO OUR DISCUSSIONS

13  WITH THE GOVERNMENT.  IT MAY WELL BE THE GOVERNMENT.

14  BUT, YOUR HONOR, THIS IS --

15          THE COURT:  WHY WOULDN'T -- IF THE -- SUPPOSE

16  THAT A PERSON IS RELEASED AND IS GIVEN A VOUCHER THAT

17  CAN BE USED FOR TREATMENT.  OKAY?  AND THROUGH THAT

18  VOUCHER, THE PERSON CAN GO AND GET TREATMENT FROM A

19  PRIVATE PARTY.

20              WHY IS THAT INJUNCTIVE RELIEF AT THAT

21  POINT AS OPPOSED TO FINANCIAL RELIEF ALLOWING MEDICAL

22  CARE?

23          MR. FEE:  WELL, IN THE INSTANCE OF A VOUCHER,

24  I THINK WE WOULD HAVE A DIFFERENT CASE.

25              BUT IN THIS CASE, WE'RE NOT SEEKING

```
1    VOUCHERS.  WE'RE SEEKING -- AND THE REASON WE'RE

2    SEEKING INJUNCTIVE RELIEF IS BECAUSE THIS IS A SYSTEMIC

3    POLICY THAT WE NEED TO HAVE HALTED.

4              THE COURT:  BUT IF THE VOUCHER RAISES AN ISSUE

5    IN TERMS OF WHETHER INJUNCTIVE RELIEF WOULD BE

6    APPROPRIATE, THEN IS IT APPROPRIATE FOR ME TO -- CAN I

7    DETERMINE WHETHER INJUNCTIVE RELIEF IS APPROPRIATE WHEN

8    I DON'T KNOW HOW THE RELIEF WOULD BE PROVIDED?

9              AND IF THE RELIEF WERE THE SAME AS A

10   VOUCHER, WOULD THAT CREATE AN ISSUE?

11             MR. FEE:  YOUR HONOR, I DON'T THINK IT WOULD

12   BE THE SAME AS A VOUCHER.  THE RELIEF THAT WE'RE

13   SEEKING IS TO PROVIDE MEDICAL SERVICES THAT WERE

14   ALREADY DUE AND TO CONTINUE TO ADDRESS AND TO PREVENT

15   THE FUTURE VIOLATION OF FEDERAL LAW THROUGH THE

16   CONTINUED INFLICTION OF THIS TRAUMA.  THAT'S ALL WE'RE

17   SEEKING.  WE'RE SEEKING A BROAD ORDER THAT ALLOWS THE

18   GOVERNMENT TO THEN WORK TO BRING ITSELF INTO

19   COMPLIANCE.

20             JUST AS THE PLAINTIFFS IN THE MS. L. CASE

21   DID NOT WORK OUT THE DETAILS OF HOW TO FLY INDIVIDUALS

22   TO AND FROM DETENTION CENTERS, NOR ARE WE, FRANKLY, IN

23   THE POSITION TO DO SOMETHING SIMILAR IN THIS CASE.

24             WE RECOGNIZE THAT THERE ARE ISSUES AND

25   CONCERNS THAT THE GOVERNMENT IS LIKELY TO HAVE THAT WE
```

1  DON'T HAVE FULL VISIBILITY AND TRANSPARENCY INTO.  AND

2  THAT'S WHY WE WOULD ENVISION SORT OF A PHASED APPROACH

3  TO THIS.  WE COULD WORK WITH THE GOVERNMENT TO WORK OUT

4  A SOLUTION FOR THE DELIVERY OF THESE SERVICES.

5          BUT THIS IS AN EXTRAORDINARY HARM, YOUR

6  HONOR.  THIS IS AN EXTRAORDINARY HARM THAT, FRANKLY,

7  BECAUSE OF THE NATURE OF THESE PEOPLE'S CUSTODIAL

8  STATUS AND THE FACT THAT THE GOVERNMENT HAS BEEN

9  RELEASING THEM BEFORE WE CAN GET TO HEARING, WILL

10  ESCAPE REVIEW UNLESS WE HAVE A SORT OF SYSTEMIC

11  APPROACH LIKE THE ONE WE'RE SEEKING HERE THROUGH OUR

12  INJUNCTION.

13          THE COURT:  JUST A MINUTE.

14          IF A PERSON WHO IS IN CUSTODY SUSTAINED A

15  PHYSICAL INJURY WHILE IN CUSTODY AND STATED THAT THE

16  PHYSICAL INJURY WAS AS A RESULT OF BELOW STANDARD OF

17  CARE BY THE GOVERNMENT, AND THEN REACHED THE END OF

18  THAT PERSON'S SENTENCE, SO THE PERSON IS GOING TO BE

19  DISCHARGED WITHOUT HAVING FULLY RECOVERED FROM THE

20  INJURY, WHAT WOULD HAPPEN?

21          MR. FEE:  THAT WOULD BE MORE ALONG THE LINES

22  OF SORT OF 1983 BIVENS STYLE CASES THAT INVOLVE

23  ISOLATED INCIDENTS THAT ARE THE RESULT OF INADVERTENT

24  SUBSTANDARD CARE, AS OPPOSED TO A CASE LIKE THIS WHERE

25  WE HAVE A WIDESPREAD, CLASSWIDE INTENTIONAL INFLICTION

```
1    OF HARM.

2              SO I GUESS WHAT I WOULD SAY IS THAT,

3    MAYBE THE MORE CLOSER ANALOGY, YOUR HONOR, MIGHT BE A

4    CASE WHERE THE GOVERNMENT PURPOSELY INJECTED

5    INCARCERATED PEOPLE WITH A TOXIN OR EXPOSED THEM TO

6    RISK OF A DISEASE.  AND THEN THE INDIVIDUALS WERE

7    RELEASED BEFORE THE CASE COULD GET TO HEARING.  AND IN

8    THAT INSTANCE, WOULD WE REALLY SAY THAT THE GOVERNMENT

9    HAD ESCAPED REVIEW AND ESCAPED COURT SCRUTINY OF THAT

10   ACTION SIMPLY BY VIRTUE OF THE FACT THAT THE PEOPLE

11   WERE RELEASED BEFORE WE CAN GET BEFORE A COURT?

12             THE COURT:  NO, I DON'T THINK -- AND I DON'T

13   THINK THAT WAS THE BASIS FOR MY QUESTION EITHER.

14             THE ISSUE IS, WHAT'S THE RIGHT REMEDY?

15             MR. FEE:  SO IN A CASE --

16             THE COURT:  BY THE WAY, I DON'T SEE THE

17   DIFFERENCE WHETHER THIS IS AN INDIVIDUAL CLAIM OR A

18   CLASS CLAIM CAUSE CLASS CLAIMS ARE SUPPOSED TO BE ONES

19   THAT ARE BASED ON VERY COMMON INDIVIDUAL CLAIMS.

20             MR. FEE:  WELL, I THINK IT'S DIFFERENT IN

21   TERMS OF MEASURING THE GRAVITY OF THE HARM, YOUR HONOR.

22   I MEAN, IT'S UNPRECEDENTED TO HAVE, YOU KNOW, A SORT OF

23   POLICY DRIVEN AND INTENTIONAL CAMPAIGN OF HARM LIKE WE

24   HAVE IN THIS CASE.  YOU KNOW, IN THE INDIVIDUAL ACTIONS

25   WHERE INDIVIDUAL DOCTORS FAILED TO TREAT INDIVIDUALS
```

```
 1   APPROPRIATELY, I MEAN, IT'S JUST A FUNDAMENTALLY
 2   DIFFERENT TYPE OF CLAIM.
 3            AND, LOOK, IN THIS CASE, PERHAPS A
 4   DAMAGES CLAIM WOULD HAVE BEEN POSSIBLE WERE IT NOT FOR
 5   THE IMMEDIACY AND THE GRAVITY OF THIS HARM.  BUT IN
 6   THIS CASE, WE HAVE PEOPLE WHO ARE BEING VICTIMIZED
 7   DAY-TO-DAY STILL BY SOMETHING THAT HAPPENED TO THEM A
 8   RELATIVELY SHORT TIME AGO.  WE DON'T HAVE TIME FOR THIS
 9   TO WIND ITS WAY THROUGH THE SYSTEM AND DETERMINE
10   DAMAGES DOWN THE ROAD.
11            IF WE WERE DEALING WITH A ONE-OFF
12   SITUATION, I THINK IT WOULD BE DIFFERENT.  BUT IN A
13   CASE LIKE THIS WHERE YOU HAVE A POLICY -- A
14   GOVERNMENT-WIDE POLICY THAT'S AFFECTED THIS HUGE GROUP
15   OF HIGHLY-VULNERABLE PEOPLE, YOU KNOW, AN INJUNCTION IS
16   THE ONLY WAY TO ADDRESS THAT MEANINGFULLY IN A WAY THAT
17   WILL ADEQUATELY REMEDY THIS HARM THAT, FRANKLY, IS
18   GETTING WORSE BY THE DAY.
19            THE COURT:  ALL RIGHT.  IS THERE ANYTHING ELSE
20   YOU WANTED TO ADD AT THIS POINT, MR. FEE?
21            MR. FEE:  NOTHING AT THE MOMENT.
22            THE COURT:  ARE YOU GOING TO ADDRESS THE FIRST
23   TO FILE RULE?
24            MR. FEE:  I THINK WE'RE GOING TO SORT OF WIND
25   THAT INTO OUR CLASS CERTIFICATION MOTION PRESENTATION.
```

```
1              THE COURT:  OKAY.  WHO IS GOING TO ADDRESS
2    THAT ISSUE?
3              I DON'T WANT TO HAVE YOU JUST REPEAT
4    EVERYTHING THAT'S IN THE PAPERS.  I WOULD LIKE YOU TO
5    FOCUS ON THE ISSUES I'VE RAISED.  SO I'M CURIOUS ABOUT
6    THAT ONE AS WELL.
7              FOR EXAMPLE, YOUR COMMENT THAT THIS NEEDS
8    IMMEDIATE -- WARRANTS IMMEDIATE RELIEF RAISES THE
9    QUESTION AS TO WHY THEN, GIVEN WHAT HAPPENED IN THE
10   MS. L. CASE WHERE THE COMPLAINT SAID "OTHER RELIEF THAT
11   IS JUST AND PROPER" -- AND I BELIEVE IN ONE OF THE
12   FILINGS IN THAT CASE IN A STATUS REPORT THERE, THE
13   PLAINTIFFS REQUESTED THAT DEFENDANTS, QUOTE, "ESTABLISH
14   A FUND TO PAY FOR PROFESSIONAL MENTAL HEALTH COUNSELING
15   WHICH WILL BE USED TO TREAT CHILDREN WHO ARE SUFFERING
16   FROM SEVERE TRAUMA AS A RESULT OF THEIR FORCIBLE
17   SEPARATION FROM THEIR PARENTS.  THE AMOUNT COULD BE SET
18   AT A LATER TIME SUBJECT TO FURTHER NEGOTIATIONS BETWEEN
19   THE PARTIES AND THE RULINGS FROM THE COURT."
20            MR. FEE:  YOUR HONOR, MY UNDERSTANDING OF THAT
21   REQUEST IS THAT, IT'S STILL PENDING.  IT HAS NOT BEEN
22   RULED UPON.  AND ITS STATUS IS, FRANKLY, NOT CLEAR
23   GIVEN THE FACT THAT THEY HAVE JUST REACHED A SETTLEMENT
24   IN THAT CASE.  AND I'M NOT SURE THAT OUR CLIENTS ARE IN
25   A POSITION TO --
```

```
 1          THE COURT:  THE ENTIRE MATTER HAS BEEN

 2   SETTLED?

 3              THE APPEAL TO THE NINTH CIRCUIT HAS --

 4          MR. FEE:  NO.  BUT ASPECTS OF THE CASE ARE

 5   SUBJECT TO A SETTLEMENT THAT'S BEING FINALIZED.

 6          THE COURT:  OKAY.  THANK YOU, MR. FEE.

 7              WOULD YOU RESTATE YOUR APPEARANCE,

 8   PLEASE?

 9          MR. BROWN:  YOUR HONOR, LOGAN BROWN ON BEHALF

10   OF PLAINTIFFS.

11          THE COURT:  GOOD AFTERNOON AGAIN, MR. BROWN.

12          MR. BROWN:  SO MAY IT PLEASE THE COURT, I WILL

13   JUMP RIGHT INTO YOUR FIRST TO FILE QUESTION, IF I MAY?

14          THE COURT:  YES.

15          MR. BROWN:  SO AS YOU ARE AWARE FROM THE

16   BRIEFS AND FROM YOUR STATEMENT EARLIER, THAT THE MAJOR

17   POINT ABOUT THE FIRST TO FILE RULE IS THAT IT'S

18   ABSOLUTELY DISCRETIONARY.  AND I THINK THAT'S VERY

19   IMPORTANT TO KEEP IN MIND.

20          THE COURT:  SLOW DOWN, PLEASE.

21          MR. BROWN:  AND THEN THE OTHER THING, AS MY

22   COLLEAGUE, MR. FEE, HAS TALKED ABOUT, IS, THE MAIN

23   ISSUE IN MS. L. AND THE OTHER CASES THERE IS THE

24   SEPARATION IN AND OF ITSELF.  IT'S THE "WHETHER OR NOT

25   SEPARATING PARENTS FROM THEIR FAMILIES" -- "FORCIBLY
```

```
1    SEPARATING THEM IS UNCONSTITUTIONAL, WHETHER OR NOT

2    THEY SHOULD BE REUNIFIED."  AND, FRANKLY, THE REQUEST

3    FOR, MAYBE, A FUND TO ADDRESS OTHER HARMS AND THE -- AS

4    YOU SAID, THE OTHER APPROPRIATE RELIEF AS THE COURT

5    DETERMINES ARE VERY SECONDARY IN THAT CASE.

6              WHEREAS, IN OUR CASE, THIS IS EXACTLY

7    WHAT -- THIS IS THE TRAUMA AND ADDRESSING THE TRAUMA.

8    AND NOT JUST ADDRESSING THE TRAUMA, BUT ADDRESSING THE

9    GOVERNMENT'S RESPONSIBILITY TO CARE FOR AND TO PROTECT

10   PEOPLE BOTH IN ITS CUSTODY AND PEOPLE WHO HAVE BEEN

11   HURT THROUGH THE GOVERNMENT'S CONDUCT.  THAT IS, PEOPLE

12   WHO HAVE BEEN TRAUMATIZED BY THE GOVERNMENT.  THAT IS

13   THE CENTER OF THIS CASE.  THAT IS THE MAIN PURPOSE OF

14   THIS CASE.

15             THE COURT:  BUT ISN'T THE PREMISE OF THAT WHAT

16   WAS DECIDED IN THE MS. LEE CASE?

17             THE "MS. L. CASE," EXCUSE ME.

18             MR. BROWN:  I THINK, AS THE STARTING POINT,

19   THEY ARE VERY SIMILAR.  RIGHT?  THEY START FROM THE

20   SAME FAMILY SEPARATION POLICY.

21             THE COURT:  BUT IN THAT CASE, IT WAS

22   DETERMINED THAT THE FAMILY SEPARATION POLICY VIOLATED

23   THE DUE PROCESS CLAUSE.

24             AND ISN'T THAT A PREMISE OF THE RELIEF

25   THAT'S BEING SOUGHT HERE?
```

1          MR. BROWN:  SO THAT IS PART OF THE COMPLAINT

2     AND PART OF THE PRELIMINARY INJUNCTION REQUEST.

3               HOWEVER, DUE TO -- THERE ARE MULTIPLE

4     LEVELS HERE.  AND THAT IS ONLY THE VERY BEGINNING OF

5     THIS CASE.

6               AND WHERE THIS CASE ACTUALLY CENTERS AND

7     FOCUSES IS ACTUALLY ON THE TRAUMA AND THE GOVERNMENT'S

8     DUTY TO ADEQUATELY CARE FOR THOSE THAT IT HAS

9     TRAUMATIZED.

10              THAT IS NOT AN ISSUE THAT IS AT STAKE IN

11    THE MS. L. CASE.

12              AS MY COLLEAGUE WAS DISCUSSING ABOUT THE

13    SETTLEMENT IN THE MS. L. CASE, IT'S NOT AN ACTUAL

14    SETTLEMENT, BUT IT IS -- IT'S A BIT VAGUE IN THEIR

15    PAPERS, BUT THEY SAY THIS OUTLINES THE CENTRAL PARTS OF

16    WHAT THEY SEE AS WOULD BECOME A SETTLEMENT.

17              AND AS FAR AS THE DIFFERENCE IN FOCUS OF

18    THE TWO DIFFERENT LITIGATIONS AND WHERE THE MS. L. CASE

19    CURRENTLY STANDS, THAT GOES KIND OF TO THE PURPOSE OF

20    THE FIRST TO FILE RULE, WHICH IS, JUDICIAL EFFICIENCY

21    AND, YOU KNOW, NOT WASTING THE COURT'S RESOURCES.  AND

22    BECAUSE THE ISSUE -- THE MAIN ISSUE HERE AND THE

23    QUESTION HERE IS DIFFERENT THAN THE QUESTION DOWN

24    THERE, AND BECAUSE THEY ARE ALREADY IN SETTLEMENT

25    TALKS, SENDING THIS CASE DOWN THERE MAY THROW THAT CASE

```
 1    FOR A LOOP.

 2                    AND, IN ANY EVENT, THESE -- THE DISCOVERY

 3    THAT'S GOING TO HAVE TO TAKE PLACE, THE EVIDENTIARY

 4    MATTERS THAT WILL HAVE TO TAKE PLACE TO DEAL WITH THE

 5    ISSUE OF THE GOVERNMENT'S OBLIGATION TO PROVIDE THIS

 6    MENTAL HEALTHCARE IS GOING TO HAVE TO BE ADDRESSED BY

 7    ONE OF THE COURT.  SO THE EFFICIENCY GAINS BY

 8    TRANSFERRING THE CASE WOULD BE MINIMAL.

 9                    THE COURT:  OKAY.

10                    MR. BROWN:  SO IF THE -- BASED ON THE -- YOUR

11    INSTRUCTIONS, YOUR HONOR, I WILL FIRST FOCUS ON THE

12    QUESTION ABOUT, IF THE CLASS PLAINTIFFS ARE ADEQUATE

13    GIVEN THAT THEY HAVE BEEN RELEASED.  THAT IS YOUR --

14                    THE COURT:  THAT WAS ONE OF MY QUESTIONS.

15                    MR. BROWN:  RIGHT.

16                    SO I WOULD SAY THE ANSWER TO THIS IS

17    THREE-FOLD.  THE FIRST AND THE MOST FUNDAMENTAL ANSWER

18    IS, THAT THE HARM IN THIS CASE, THE -- WHAT WE ARE

19    SEEKING IS NOT ENDED BY THE RELEASE, BY THE

20    REUNIFICATION.  WE ARE SEEKING TRAUMA-INFORMED MENTAL

21    HEALTHCARE.

22                    AND WHILE REUNIFICATION IS ABSOLUTELY A

23    FIRST STEP REQUIRED TO RECEIVE THAT WHICH WE SEEK, IT

24    IS NOT EVEN CLOSE TO THE END-ALL AND BE-ALL OF WHAT IS

25    NECESSARY.  AND SO THE INDIVIDUAL CLAIMS FOR THE CLASS
```

1    PLAINTIFFS HAVE NOT BEEN MOOTED.  AND THEY ADEQUATELY

2    REPRESENT THE INTERESTS OF THOSE STILL IN CUSTODY.

3              THERE'S NOTHING TO SUGGEST THAT THEIR

4    INTERESTS WOULD BE ADVERSE TO THOSE IN CUSTODY.  THE

5    INJUNCTION TO RECEIVE ADEQUATE MENTAL HEALTHCARE AND

6    MENTAL HEALTHCARE SCREENS WOULD BENEFIT BOTH THOSE IN

7    CUSTODY AND THOSE WHO HAVE BEEN RELEASED AND THOSE WHO

8    POTENTIALLY MAY BECOME SEPARATED, BECOME DETAINED BY

9    THE GOVERNMENT.

10             AND THEN -- SO THAT IS -- THE MOST

11   FUNDAMENTAL PART OF THAT IS, THAT THEY'RE NOT -- THEIR

12   OWN INDIVIDUAL HARM IS NOT MOOTED.  THEY STILL SHARE

13   THE SAME DAMAGE AS THE -- EXCUSE ME, THE SAME TRAUMA AS

14   THOSE WHO ARE STILL DETAINED.

15             THE OTHER TWO IS --

16             THE COURT:  YOUR ESTIMATE IS THERE ARE

17   APPROXIMATELY 1,000 PARENTS WHO WOULD BE IN THE CLASS,

18   IS THAT RIGHT, WHO ARE RELATED TO 3,000 MINORS?

19             MR. BROWN:  THAT IS ONE OF THE ESTIMATES, YOUR

20   HONOR.

21             THE COURT:  WHAT IS YOUR ESTIMATE, IF YOU HAVE

22   ONE, AS TO HOW MANY OF THOSE 1,000 REMAIN IN CUSTODY?

23             MR. BROWN:  AS I'M STANDING HERE, I DO NOT

24   HAVE AN ESTIMATE FOR YOU.

25             I WOULD -- SORRY.

```
 1                    SO I WOULD SAY THE SECOND TWO POINTS HERE
 2       ARE THAT THIS -- IN TERMS OF THE CLASS INTERESTS, THIS
 3       WOULD BE THE CLASSIC EXAMPLE OF A HARM THAT IS CAPABLE
 4       OF REPETITION AND YET EVADING REVIEW.  SO EVEN IF,
 5       WHICH IS NOT THE CASE, THAT THEIR CLAIMS WERE -- YOU
 6       KNOW, ALL THEY CLAIMED WAS SATISFIED BY BEING RELEASED,
 7       WHICH IS NOT THE CASE, THEY WOULD -- IT STILL FITS THE
 8       PERFECT EXAMPLE OF CAPABLE OF REPETITION AND YET
 9       EVADING REVIEW.  THE GOVERNMENT COULD ALWAYS JUST
10       RELEASE A PLAINTIFF AS SOON AS WE IDENTIFY THEM.
11                    AND THEN ON THAT NOTE, AS SOON AS WE
12       IDENTIFY A POTENTIAL CLASS PLAINTIFF, WE, AS ADVOCATES,
13       WILL HAVE TO DO OUR BEST IN ORDER TO BOTH RELEASE
14       THEM -- GET THE GOVERNMENT TO RELEASE THEM AND TO
15       REUNIFY THEM WITH THEIR CHILD, WHICH, BY THE TIME WE
16       GET TO TRIAL ON A HEARING LIKE THIS, IF WE DO OUR JOBS,
17       WE SHOULD BE ABLE TO HOPEFULLY GET THEM RELEASED AND
18       REUNIFIED.
19                    I DON'T KNOW IF YOU HAVE OTHER QUESTIONS
20       ON THAT EXACT POINT OR --
21                    THE COURT:  NO.  YOU'VE ADDRESSED THAT ONE.
22       THANK YOU.
23                    MR. BROWN:  OKAY.  SO GOING BACK TO THE
24       GENERAL THEME AND THE GENERAL PURPOSE OF BRINGING A
25       CLASS CLAIM IN THIS CASE IS THE FACT THAT WE ARE
```

```
1    CHALLENGING A POLICY -- A GOVERNMENTAL POLICY THAT HAS

2    IMPACTED ALL CLASS MEMBERS, THAT HAS INJURED ALL CLASS

3    MEMBERS AND WHICH PRESENTS FUNDAMENTAL QUESTIONS, WHICH

4    PRESENTS QUESTIONS WITH COMMON ANSWERS THAT WILL DRIVE

5    THE RESOLUTION OF THIS CASE.  NAMELY, WHAT IS THE

6    GOVERNMENT'S OBLIGATION TO THESE CLASS MEMBERS?  HAS

7    THE GOVERNMENT MET ITS OBLIGATION TO PROVIDE ADEQUATE

8    MENTAL HEALTHCARE?  AND WHAT MUST THE GOVERNMENT DO TO

9    MEET SUCH AN OBLIGATION?

10               THE REMEDY SOUGHT HERE TO -- THIS GOES TO

11   A BIT OF WHAT YOUR -- YOUR DISCUSSION WITH MY COLLEAGUE

12   EARLIER.  THE REMEDY SOUGHT HERE DOES NOT REQUIRE THE

13   COURT TO MAKE INDIVIDUALIZED INQUIRIES INTO EACH CLASS

14   MEMBER, INTO EACH CLASS PLAINTIFF AND THEIR OWN

15   CIRCUMSTANCES, INTO THEIR OWN PRIOR TRAUMA, INTO THE

16   TRAUMA --

17               THE COURT:  NO, I UNDERSTAND.

18               YOUR POSITION WOULD BE THAT, THEY NEED TO

19   BE EVALUATED.  AND THAT'S A COMMON NEED; CORRECT?

20               MR. BROWN:  WELL -- YES.  YES, AT BOTTOM.

21               THE COURT:  WHAT TREATMENT MIGHT BE DETERMINED

22   AS APPROPRIATE FOLLOWING THAT EVALUATION MAY VARY, BUT

23   THAT'S NOT THE ISSUE IN TERMS OF THE RELIEF OF AN

24   EVALUATION; CORRECT?

25               MR. BROWN:  CORRECT.
```

```
 1              WHAT WE ARE LOOKING FOR IS ACCESS TO
 2    MENTAL HEALTHCARE WHICH HAS NOT BEEN PROVIDED AND RAISE
 3    AN ELEVATION IN THE BASIC PROVISIONS OF MENTAL
 4    HEALTHCARE FOR THE ENTIRE CLASS.  SUCH AN INJUNCTION
 5    ORDERING THE GOVERNMENT TO PROVIDE THIS STANDARD OF
 6    CARE WOULD BENEFIT ALL CLASS MEMBERS, PLAINTIFFS AND
 7    PROPOSED CLASS MEMBERS.
 8              THE COURT:  JUST A MINUTE.
 9              SUPPOSE, HYPOTHETICALLY, THAT THE CLASS
10    WERE LIMITED TO THOSE WHO REMAINED CONFINED OR THERE
11    WERE SUBCLASSES AND THAT WAS ONE OF THEM, AND SUPPOSE
12    THAT IT WERE DETERMINED THAT THE REQUIREMENTS OF RULE
13    23 WERE MET AND THE REQUIREMENTS FOR PRELIMINARY
14    INJUNCTION WERE MET.  IF THERE WERE THEN -- AND I
15    UNDERSTAND THE GOVERNMENT HAS SUBMITTED COMPETING
16    EVIDENCE AS TO THE SCREENING THAT IT'S DOING.  BUT
17    LET'S SUPPOSE, HYPOTHETICALLY, THAT OCCURRED.  AND
18    THERE WAS RELIEF GRANTED REQUIRING THE SCREENING AND
19    THEN APPROPRIATE RESPONSIVE TREATMENT.
20              WOULD THAT BE -- WOULD THAT BE EFFECTIVE
21    IN TERMS OF THE ISSUES THAT I'VE RAISED EARLIER
22    CONCERNING HOW WOULD THIS BE DONE WITH THOSE WHO ARE
23    NOT IN CUSTODY OR NO LONGER IN THE UNITED STATES?
24              WOULD YOU LEARN FROM THAT AND POTENTIALLY
25    BE ABLE BETTER TO FRAME THE ISSUES WITH RESPECT TO
```

```
1    THOSE IN THAT OTHER CATEGORY?
2              MR. BROWN:  YES, YOUR HONOR.  I THINK THAT
3    WOULD HELP.
4              MY ONE CONCERN WOULD ONLY BE THAT -- SO
5    SUBCLASSES WOULD POTENTIALLY HELP.  MY -- SO I GUESS I
6    HAVE TO ASK A QUESTION OF YOU.  YOU'RE PROPOSING TO
7    HAVE A SUBCLASS OF --
8              THE COURT:  I'M NOT PROPOSING.  I'M ASKING
9    QUESTIONS.
10             MR. BROWN:  YOU'RE ASKING IF YOU HAD A
11   SUBCLASS OF THOSE STILL INCARCERATED AND THEN A
12   SUBCLASS OF THOSE NO LONGER INCARCERATED?
13             THE COURT:  MY QUESTION IS, IF THE CLASS WERE
14   LIMITED OR THERE WAS A SUBCLASS ESTABLISHED OF THOSE
15   WHO REMAINED INCARCERATED AND, HYPOTHETICALLY, RELIEF
16   WAS GRANTED ON A PRELIMINARY BASIS THAT THEY WERE TO BE
17   SCREENED IN A MORE ROBUST MANNER THAN THEY HAD
18   PREVIOUSLY BEEN SCREENED AND THEN PROVIDED RESPONSIVE
19   CARE.  I RECOGNIZE THAT THE POSITION YOU'RE ADVANCING
20   IS, THAT THAT WOULDN'T HELP THOSE WHO ARE NO LONGER IN
21   CUSTODY OR DETENTION OR SOME RELATED PORTION OF THAT.
22             BUT GOING BACK TO THE QUESTIONS THAT I
23   PREVIOUSLY ASKED OF MR. FEE WHERE HE SAID, "WELL, THIS
24   DEPENDS ON WHAT WE LEARN AND WHAT WE KNOW."  MY
25   QUESTION IS, WHETHER THIS WOULD POTENTIALLY PROVIDE
```

```
1    INSIGHT THAT MIGHT BE THEN APPLIED SHOULD I -- IN

2    CONNECTION WITH A LATER POTENTIAL CERTIFICATION OF

3    EITHER A BROADER CLASS OR A DIFFERENT SUBCLASS?

4              MR. BROWN:  YES, YOUR HONOR.

5              SORRY, I MISUNDERSTOOD BEFORE.

6              YES, ABSOLUTELY THAT WOULD PROVIDE

7    EXACTLY WHAT YOU WERE SAYING.

8              THE COURT:  OKAY.

9              MR. BROWN:  IF YOUR HONOR HAS NO MORE

10   QUESTIONS --

11             THE COURT:  THANK YOU, MR. BROWN.

12             IS THERE ANYONE ELSE WHO IS GOING TO

13   SPEAK FOR THE PLAINTIFFS AT THIS POINT?

14             MR. ROSENBAUM:  GOOD AFTERNOON.

15             I KNOW I SPEAK ON BEHALF OF ALL COUNSEL

16   IN THANKING THE COURT FOR THE DEGREE OF PREPARATION,

17   WHICH IS ALREADY QUITE EVIDENT.

18             I WANT TO SPEAK BRIEFLY TO THE FIRST TO

19   FILE QUESTION THAT THE COURT HAS RAISED.

20             THE COURT:  I THINK THAT WAS JUST ANSWERED.

21             IS THERE SOMETHING NEW?

22             MR. ROSENBAUM:  YES.  I JUST WANTED TO RAISE

23   ONE POINT WITH RESPECT TO THE EFFICIENCY CAUSE YOUR

24   HONOR PUT HIS FINGER ON THE -- WHAT IS THE DISTINCTIVE

25   ISSUE?  AND THAT IS, IF IN FACT, IN THAT CASE, IF IT
```

```
 1    WERE NOT AT THE POINT OF PROGRESS THAT IT IS NOW, AND

 2    IF IN FACT SCREENINGS HAD TAKEN PLACE, THEN THERE MIGHT

 3    BE AN EFFICIENCY IN TERMS OF PUTTING IT ALL UNDER THE

 4    SAME TENT.

 5              BUT WHERE THE SCREENINGS IN FACT HAVE NOT

 6    TAKEN PLACE, AND AS COUNSEL HAS REPRESENTED, THAT CASE

 7    IS MOVING ALONG.  TO SAY PUT THE BRAKES ON IT IN ORDER

 8    FOR THE SCREENINGS TO TAKE PLACE, IN ORDER FOR US TO

 9    LEARN WHAT THE DEGREE AND THE SCOPE OF THE REMEDY WOULD

10    HAVE TO BE, WOULD IN FACT -- THAT'S A WHOLE NEW SET OF

11    ISSUES FOR JUDGE SABRAW.  THAT'S A WHOLE NEW SET OF

12    FACTS FOR JUDGE SABRAW.  AND IT IS IN FACT A DIFFERENT

13    OPERATIVE THEORY THAN WHAT IS TAKING PLACE IN THAT

14    PARTICULAR CASE.

15              THE COURT:  WELL, I THINK IT'S A DIFFERENT

16    REMEDY.

17              THE REMEDY SOUGHT THERE WAS INJUNCTIVE

18    RELIEF WITH RESPECT TO THE POLICY AND THE NEED TO

19    REUNITE; CORRECT?

20              IT WASN'T ABOUT WHAT OTHER REMEDIES MIGHT

21    THEN BE APPROPRIATE, IF THERE WERE A BASIS FOR THAT

22    ONE.

23              MR. ROSENBAUM:  EXACTLY RIGHT.

24              SO THE REUNIFICATIONS HAVE TAKEN PLACE

25    AND THE POLICY HAS STOPPED.  BUT THERE HAS BEEN NO
```

```
 1    INSIGHT IN TERMS OF WHAT MENTAL HEALTH NEEDS ARE FOR
 2    ANY OF THE INDIVIDUALS THEMSELVES THAT ARE INVOLVED,
 3    WHICH GOES TO THE SECOND POINT THAT I UNDERSTAND YOUR
 4    COURT -- YOUR HONOR TO MAKE.  AND THAT IS, LOOK, WE'RE
 5    TALKING ABOUT PRACTICALITIES HERE.  IF INDIVIDUALS ARE
 6    IN ANOTHER COUNTRY RIGHT NOW, THAT AFFECTS THE
 7    INJUNCTIVE BALANCE IN TERMS OF WHAT MAY BE A REASONABLE
 8    SORT OF SOLUTION IN THIS SITUATION.
 9              BUT WHERE WE ARE SEEKING AS A STARTING
10    POINT ARE SCREENINGS.  SO THAT WE KNOW PRECISELY WHAT
11    WE'RE DEALING WITH AND WHERE WE HAVE A NETWORK OF THE
12    LEADING PROFESSIONALS IN THIS COUNTRY WHO HAVE STATED
13    THAT THEY ARE WILLING TO BE INVOLVED IN THAT PROCESS.
14    THAT'S AN ENTIRELY DIFFERENT MATTER.
15              MOREOVER, JUDGE SABRAW HAS NOT RULED ON
16    THE ISSUE.  HE HAS RULED, AS YOUR HONOR HAS POINTED
17    OUT, ON THE ISSUE AS TO WHETHER OR NOT THE SEPARATION
18    ITSELF CREATED A CONSTITUTIONAL VIOLATION.
19              WHAT HE HAS NOT CONSIDERED IS WHETHER OR
20    NOT A DELIBERATE POLICY OF INFLICTING TRAUMA ON
21    INDIVIDUALS ITSELF CREATES A SEPARATE CONSTITUTIONAL
22    CLAIM.  THAT MATTER IS NOT ON APPEAL.  THAT MATTER WAS
23    NEVER ADJUDICATED.  WE'RE STARTING FROM SCRATCH WITH
24    RESPECT TO THAT PARTICULAR ISSUE.
25              THE COURT:  OKAY.  ALL RIGHT.  THANK YOU,
```

```
 1   MR. ROSENBAUM.

 2            MR. ROSENBAUM:  THANK YOU.

 3            THE COURT:  MR. HEYSE, LET ME HEAR FROM YOU,

 4   PLEASE.

 5            MR. HEYSE:  MICHAEL HEYSE ON BEHALF OF THE

 6   DEFENDANTS FROM THE UNITED STATES DEPARTMENT OF

 7   JUSTICE.

 8            THE COURT:  THANK YOU.

 9            MR. HEYSE:  ADDRESSING YOUR HONOR'S QUESTIONS

10   IN ORDER.  REGARDING THE FIRST TO FILE RULE, THIS CASE

11   INVOLVES AN IDENTICAL GROUP OF INDIVIDUALS.  THE

12   CLASSES, THE CLASS DEFINITIONS MATCH ALMOST VERBATIM.

13   I THINK THERE'S A TWO-WORD DIFFERENCE.

14                 THE QUESTION THAT PLAINTIFFS WANT YOUR

15   HONOR TO SEE IS THAT, THE INDIVIDUALS IN MS. L. HAVE

16   NOT SOUGHT THIS RELIEF.  SO THAT'S THE DEPARTURE.

17   THEY'RE SEEKING DIFFERENT RELIEF, AS YOUR HONOR JUST

18   POINTED OUT.

19            THE COURT:  JUST A MINUTE.

20                 THERE IS A DIFFERENCE IN THE CLASS

21   DEFINITIONS BECAUSE, HERE, IT'S, "WERE, ARE OR WILL BE

22   DETAINED."  AND, THERE, IT'S NOT.  IT'S "ARE OR WILL

23   BE."

24            MR. HEYSE:  I BELIEVE IT SAID, "HAVE BEEN," IF

25   I REMEMBER CORRECTLY.  I CITED --
```

37

```
1          THE COURT:  "ALL ADULT PARENTS WHO, ONE, ARE
2     OR WILL BE DETAINED IN IMMIGRATION CUSTODY," DOT, DOT,
3     DOT.  "TWO, HAVE A MINOR CHILD WHO IS OR WILL BE
4     SEPARATED FROM THEM BY DHS AND DETAINED IN O.R.R.
5     CUSTODY," DOT, DOT, DOT.
6               WHEREAS, HERE, MY UNDERSTANDING IS, "ALL
7     ADULT PARENTS NATIONWIDE WHO WERE, ARE OR WILL BE
8     DETAINED."
9          MR. HEYSE:  I CAN GRAB MY FILING.
10              THIS WAS PULLED DIRECTLY FROM THE MS. L.
11    DECISION.  I'M NOT SURE FROM WHAT YOUR HONOR IS
12    READING.
13              I HAVE, FROM MS. L., QUOTE, "ALL ADULT
14    PARENTS WHO ENTER THE UNITED STATES AT OR BETWEEN
15    DESIGNATED PORTS OF ENTRY WHO, ONE, HAVE BEEN, ARE OR
16    WILL BE DETAINED IN IMMIGRATION CUSTODY BY DHS.  AND,
17    TWO, HAVE A MINOR CHILD WHO IS OR WILL BE SEPARATED
18    FROM THEM BY DHS AND DETAINED IN O.R.R. CUSTODY, O.R.R.
19    FOSTER CARE OR DHS CUSTODY ABSENT A DETERMINATION THAT
20    THE PARENT IS UNFIT OR PRESENTS A DANGER TO THE CHILD."
21          THE COURT:  WHAT'S THE DATE OF THAT ORDER?
22          MR. HEYSE:  JUNE 26TH, 2018.
23          THE COURT:  OKAY.  WELL, I'LL LOOK AT IT
24    AGAIN.
25              THE ORDER FROM WHICH I'M READING IS THE
```

```
1    SAME DATE, DOCKET 82 AT PAGE 5.

2              MR. HEYSE:  INTERESTING.

3              THE COURT:  GO AHEAD.

4              MR. HEYSE:  WE CAN RESOLVE THAT.

5                  BUT, ULTIMATELY, THE QUESTION IS NOT

6    WHETHER OR NOT THEY HAVE SOUGHT THAT RELIEF.  IT'S

7    WHETHER OR NOT THEY COULD HAVE.  AND, IN FACT, THEY

8    HAVE.  AS YOUR HONOR POINTED OUT IN THE JOINT REPORT

9    THAT WAS SUBMITTED ON JULY 12TH -- OR JULY -- I BELIEVE

10   IT WAS JULY 12TH.  THE JOINT REPORT THAT DAY

11   REQUESTED -- I BELIEVE IT'S PARAGRAPH 7, THE LAST PAGE

12   REQUESTS A MENTAL HEALTH FUND.  THIS IS NOT SOME VAGUE

13   REQUEST FOR OTHER RELIEF.  THIS IS A MENTAL HEALTH

14   TREATMENT FUND.

15             THE COURT:  DO YOU KNOW THE STATUS OF -- ARE

16   YOU COUNSEL IN THAT CASE?

17             MR. HEYSE:  I'M NOT.  THE DEPARTMENT OF

18   JUSTICE HAS MANY, MANY ATTORNEYS WORKING ON ALL OF

19   THESE MATTERS.

20             THE COURT:  NO, I UNDERSTAND.  BECAUSE IT'S

21   JUST A STATEMENT IN A STATUS REPORT BY ONE SIDE, I

22   DON'T KNOW WHAT HAPPENED TO IT.

23             MR. HEYSE:  RIGHT.

24                  BUT THAT'S THE POINT, IS THAT THEY COULD

25   ASK FOR IT.  AS YOUR HONOR POINTED OUT EARLIER, IN
```

```
1    THEIR COMPLAINT, THEY COULD SEEK OTHER FORMS OF RELIEF.

2    AND THAT'S CERTAINLY SOMETHING THAT WOULD MAKE SENSE

3    FOR THEM TO PURSUE, WHICH IS WHY CLAIM SPLITTING IS A

4    DOCTRINE THAT TALKS ABOUT EFFICIENCY, IF IT'S

5    SOMETHING -- AND, YOU KNOW, EVENTUALLY GETTING INTO

6    RES JUDICATA PRINCIPLES, COLLATERAL ESTOPPEL, THINGS

7    LIKE THAT.  IT'S CLAIMS THAT SHOULD HAVE BEEN RAISED

8    THAT WEREN'T OR THAT STILL COULD BE.  THERE'S NO

9    REASON, IN MS. L., THAT THEY COULD NOT FILE AN AMENDED

10   COMPLAINT.

11        THE COURT:  WELL, IT'S NOT UNCOMMON IN CIVIL

12   LITIGATION TO HAVE DIFFERENT CLASS ACTIONS FILED AT THE

13   SAME TIME WHICH COVER SOME OR ALL OF THE SAME CLAIMS;

14   RIGHT?

15             AND THEN MANAGEMENT HAS TO BE DONE,

16   DECISIONS MADE ABOUT HOW TO DEAL WITH THESE

17   OVERLAPPING -- POTENTIALLY OVERLAPPING CLASS CLAIMS.

18        MR. HEYSE:  YES.  IT IS A DISCRETIONARY

19   QUESTION, THE FIRST TO FILE RULE.  SO IT'S UP TO YOUR

20   HONOR WHETHER OR NOT YOUR HONOR WANTS TO EXPEND THE

21   MASSIVE AMOUNTS OF RESOURCES REQUIRED TO DEAL WITH A

22   CLASS ACTION SUIT.  THERE'S NO QUESTION THAT THESE

23   CASES ARE NOT SIMPLE.  AND IT --

24        THE COURT:  DID YOU FIND ANY AUTHORITY THAT

25   SAYS, IN THE CLASS ACTION CONTEXT, A MEMBER OF AN
```

```
 1    INJUNCTIVE RELIEF CLASS THAT HAS BEEN CERTIFIED IS

 2    LIMITED IN BRINGING -- BEING A CLASS REPRESENTATIVE IN

 3    A SEPARATE CLASS?

 4           MR. HEYSE:  WELL, IT'S WAL-MART.  IT STATES

 5    THAT AN INDIVIDUAL THAT'S A MEMBER OF AN EXISTING

 6    INJUNCTIVE RELIEF CLASS, A B(2) CLASS, CANNOT OPT-OUT

 7    FROM THAT CLASS.  SO IT'S NOT EXACTLY THE SAME THING.

 8    THEY'RE TRYING TO BE MEMBERS OF TWO CLASSES AT THE SAME

 9    TIME.

10           THE COURT:  OKAY.

11           MR. HEYSE:  BUT, ULTIMATELY, THEY'RE TRYING TO

12    CREATE A SECOND CASE THAT IS GOING BEYOND WHAT HAS BEEN

13    SOUGHT IN MS. L.  WHY THAT WASN'T MORE SPECIFICALLY

14    PLED, WHY IT WASN'T RAISED IN A COMPLAINT, WHY IT

15    HASN'T BEEN FURTHER DEVELOPED IS NOT CLEAR.  BUT IT

16    CERTAINLY COULD HAVE BEEN.  SO THAT GETS TO THE

17    QUESTION OF EFFICIENCY OF COURT RESOURCES.

18              ULTIMATELY, THE QUESTION HERE ON A

19    PRELIMINARY INJUNCTION IS WHETHER OR NOT THEY HAVE

20    DEMONSTRATED A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE

21    MERITS OF THEIR CLAIMS.  AND AS YOUR HONOR POINTED OUT,

22    THERE ARE DISTINCT DIFFERENCES BETWEEN DETAINED

23    INDIVIDUALS AND RELEASED INDIVIDUALS.  ALL OF THE

24    PLAINTIFFS HERE HAVE BEEN RELEASED AND REUNITED WITH

25    THEIR CHILDREN.
```

1        THE COURT:  YOU MEAN THE CLASS

2    REPRESENTATIVES?

3        MR. HEYSE:  YES.  THE NAMED PLAINTIFFS THAT WE

4    HAVE HERE.

5            AND THAT'S ACTUALLY AN IMPORTANT QUESTION

6    AS WELL, IS WHETHER OR NOT THE CHILDREN ARE DE FACTO

7    PLAINTIFFS HERE AS WELL.  SO IT'S A QUESTION WE'LL BACK

8    COME BACK TO.  BUT MANY OF THE CLAIMS IN THIS CASE

9    INVOLVE --

10        THE COURT:  CAN CHILDREN BE PLAINTIFFS WITHOUT

11   A GUARDIAN AD LITEM?

12        MR. HEYSE:  TO THE EXTENT THAT THERE ARE

13   CLAIMS AS TO TREATMENT THE CHILDREN RECEIVED, THEY

14   SHOULD BE PLAINTIFFS.  THE PARENTS HERE ARE CLAIMING

15   THAT THEY NEED MENTAL HEALTHCARE, BUT THAT IS FAMILY

16   BASED.  THAT INHERENTLY INVOLVE THE CHILDREN.  ALSO

17   RIFE THROUGHOUT THEIR PLEADINGS ARE STATEMENTS ABOUT

18   THE HARM TO THE CHILDREN.

19            IN ANY EVENT, WHAT THEY'RE SEEKING HERE

20   IS COMPENSATORY DAMAGES --

21        THE COURT:  WAIT A MINUTE.

22            WITH RESPECT TO THE CHILDREN, ARE YOU --

23   ISN'T THERE -- ISN'T THE NORM THAT PARENTS MAKE

24   DECISIONS ABOUT THEIR CHILDREN ABSENT THE LIMITATIONS

25   HERE THAT THE PARENT IS A DANGER OR DOESN'T WANT TO BE

```
1    REUNITED?  AND YOU'RE SAYING THAT, ANYTIME A PARENT

2    SEEKS SOME RELIEF AS TO A CHILD, THE CHILD GETS -- HAS

3    SEPARATE COUNSEL?

4           MR. HEYSE:  NOT SEPARATE COUNSEL, BUT THEY

5    NEED TO BE SPECIFICALLY INCLUDED IN THIS MATTER.  AT

6    THIS POINT, THEY'RE PRESENT.  BUT THEY HAVEN'T -- THEIR

7    OWN INDIVIDUAL CLAIMS ARE NOT DIRECTLY BEFORE THE

8    COURT.

9              FOR EXAMPLE, THERE'S A PRETTY BIG

10   DISTINCTION BETWEEN BEING IN IMMIGRATION DETENTION AS

11   OPPOSED TO O.R.R. CUSTODY, WHICH IS ABSOLUTELY NOT

12   DETENTION.  O.R.R. HAS SEPARATE STANDARDS THAT APPLY TO

13   TREATMENT OF CHILDREN FOR OBVIOUS REASONS.  THERE'S A

14   WHOLE HOST OF ISSUES ASSOCIATED WITH BEING AN

15   UNACCOMPANIED MINOR IN THE UNITED STATES, WHEREAS

16   PARENTS ARE SUBJECTED TO DHS DETENTION STANDARDS.

17             SO TO THE EXTENT THERE ARE DIVERGENT

18   INTERESTS THERE, OBVIOUSLY, THE PARENT IS PRESUMED TO

19   WANT THE BEST INTERESTS -- TO FULFILL THE BEST

20   INTERESTS OF THE CHILD.  BUT, ULTIMATELY, HERE, WE

21   HAVE, AT A MINIMUM, MIXED CLAIMS.

22            THE COURT:  I DON'T WANT TO OVERDO THIS, BUT

23   ARE YOU -- WHAT ARE YOU SUGGESTING?

24             HOW WOULD THE CHILDREN BE HEARD OTHER

25   THAN THROUGH THEIR PARENTS?
```

```
 1              MR. HEYSE:  THEY SHOULD BE NAMED PLAINTIFFS.

 2              THE COURT:  NAMED PLAINTIFFS?

 3              MR. HEYSE:  ADDED AS NAMED PLAINTIFFS.

 4              THE COURT:  AND WHAT VALUE DOES THAT ADD IF

 5   THEY'RE REPRESENTED BY THE SAME COUNSEL WHO ARE SAYING

 6   THE PARENTS WANT TO HAVE THIS BENEFIT FOR THE CHILDREN?

 7              MR. HEYSE:  AN EXAMPLE IS A PENDING MATTER IN

 8   THE DISTRICT OF MASSACHUSETTS, K.O. VERSUS SESSIONS.

 9   IT WAS FILED LAST WEEK.  IT SEEKS TORT DAMAGES ON

10   BEHALF OF CHILDREN THAT WERE DENIED MENTAL HEALTHCARE.

11   IT'S THIS CASE SPECIFIC TO JUST THE CHILDREN.

12              THE COURT:  IT'S A FEDERAL TORT CLAIMS ACT

13   CASE?

14              MR. HEYSE:  YES, YOUR HONOR.

15              THE COURT:  AND CLAIMS ARE BEING BROUGHT ON

16   BEHALF -- SEEKING --

17              MR. HEYSE:  JUST THE CHILDREN.

18              THE COURT:  OKAY.

19              MR. HEYSE:  THERE'S A LOT OF COMPETING

20   STANDARDS, IS THE POINT.  THERE'S -- AGAIN, O.R.R. HAS

21   DIFFERENT OBLIGATIONS DIFFERENT THAN DHS.

22              THE COURT:  NO, I UNDERSTAND THAT.

23              BUT THE REMEDY BEING SOUGHT THERE IS

24   MONEY DAMAGES FOR THE PLAINTIFFS WHO ARE CHILDREN.  SO

25   THEY WOULD HAVE TO HAVE, PRESUMABLY, GUARDIAN AD LITEM
```

1    REPRESENTATION ON WHAT THEIR INTERESTS ARE.  I'M NOT

2    QUITE SURE HOW THAT APPLIES IN THE INJUNCTIVE RELIEF

3    CONTEXT WHERE THE INJUNCTIVE RELIEF BEING SOUGHT IS

4    SCREENING AND THEN POTENTIALLY SERVICES.

5             MR. HEYSE:  ULTIMATELY, AGAIN, THE QUESTION IS

6    WHAT SERVICES ARE TO BE PROVIDED?  THE SERVICES WHILE

7    IN DETENTION VERSUS CUSTODY -- EXCUSE ME, THE SERVICES

8    PROVIDED IN THAT CONTEXT TO BE CONSTITUTIONAL MUST BE

9    ADEQUATE.

10             PLAINTIFFS ARGUE THAT THE -- WHAT THEY

11   RECEIVED SO FAR IS NOT.  DEFENDANT'S DISAGREE.  THE

12   SERVICES PROVIDED INVOLVED COUNSELING SESSIONS, THE

13   OPPORTUNITY TO REQUEST SERVICES.  THEY ARE SCREENED

14   UPON ARRIVAL.  THEY RECEIVE MEDICAL SCREENINGS

15   IMMEDIATELY UPON ARRIVAL.  THEY ARE AVAILED OF OTHER

16   SERVICES ON SITE.  THEY CAN AFFIRMATIVELY REQUEST MORE

17   SERVICES.  THERE'S ALSO INSTANCES WHERE THE OTHER

18   DETAINEES WILL REPORT OTHER PROBLEMS THAT SOMEONE ELSE

19   IS HAVING TO DETENTION STAFF, AND THEY WILL ACT ON

20   THAT.

21             OBVIOUSLY, THIS WILL COME OUT IN

22   DISCOVERY.  BUT THE POINT IS, WHAT IS CONSTITUTIONALLY

23   ADEQUATE DOES NOT RISE TO THE LEVEL OF THE, QUOTE,

24   "APPROPRIATE CARE" THAT PLAINTIFFS ARE ASKING FOR.

25             WHAT THEY'RE ASKING FOR -- AND IT'S

```
1    CONFUSING, AS WE'VE HEARD TODAY.  WE DON'T ACTUALLY
2    KNOW WHAT THEY'RE ASKING FOR.  WE DON'T KNOW WHAT KIND
3    OF CARE THEY WANT OR HOW IT WOULD BE ADMINISTERED, HOW
4    IT WOULD BE PAID FOR.  WOULD IT BE A VOUCHER?  WOULD IT
5    BE --
6              THE COURT:  YOU'RE TALKING NOW ABOUT THOSE WHO
7    ARE NO LONGER IN CUSTODY THEN; RIGHT?
8              MR. HEYSE:  YES.
9                IN TERMS OF THOSE THAT ARE IN CUSTODY,
10   THE CARE THAT THEY ARE RECEIVING IS ADEQUATE.
11   DEFENDANT'S POSITION IS THAT THEY ARE RECEIVING THIS
12   CARE.  AS I DETAILED, THEY DO RECEIVE SCREENINGS.  THEY
13   DO HAVE A FORM THAT IS MADE AVAILABLE TO FILL OUT.  IF
14   THEY ARE CONTINUING TO SUFFER, THE LIKELIHOOD WHILE IN
15   DETENTION THAT IT WOULD GO COMPLETELY IGNORED IS SIMPLY
16   IMPOSSIBLE -- VIRTUALLY IMPOSSIBLE.  NEVER SAY "NEVER,"
17   YOUR HONOR.
18                BUT IN ORDER FOR THAT CARE, THE CARE THAT
19   IS PROVIDED TO RISE TO THE LEVEL OF A CONSTITUTIONAL
20   VIOLATION, IT MUST BE CONSCIENCE SHOCKING, DELIBERATE
21   INDIFFERENCE TO THE NEEDS OF THESE INDIVIDUALS.
22             THE COURT:  IN TERMS OF THE CURRENT SCREENING,
23   THAT'S DONE THROUGH THE -- IS THAT THE PSIQ?
24             MR. HEYSE:  I BELIEVE THAT SOUNDS ACCURATE.
25             THE COURT:  WELL, THERE'S COMPETING EVIDENCE
```

1    ON THAT ISSUE AS TO WHETHER THAT'S ADEQUATE SCREENING

2    OR THE WAY IT'S DONE IS ADEQUATE SCREENING.

3                  BUT WITH RESPECT TO THOSE WHO ARE IN

4    DETENTION, IF WHAT YOU'RE SAYING IS, THERE'S A POLICY

5    TO PROVIDE THEM WITH APPROPRIATE MEDICAL CARE,

6    INCLUDING MENTAL HEALTH SERVICES, AND THERE'S A

7    SCREENING THAT'S DONE TO DETERMINE WHAT, IF ANY, SUCH

8    SERVICES ARE APPROPRIATE, IF IT WERE DETERMINED THAT

9    THE PSIQ PROCESS IN THAT SCREENING PROCESS WAS NOT

10   APPROPRIATE UNDER THE STANDARDS OF A PRELIMINARY

11   INJUNCTION, THEN WHY WOULD IT BE INAPPROPRIATE TO GRANT

12   THAT RELIEF, BETTER SCREENING, IF IT'S ALREADY

13   SOMETHING THAT'S ACKNOWLEDGED?

14               MR. HEYSE:  IN THIS CASE, THAT RUNS INTO AN

15   INTERESTING PROCEDURAL SITUATION INASMUCH AS THE NAMED

16   PLAINTIFFS THAT WE HAVE HERE LACK STANDING TO BRING

17   THAT CLAIM INASMUCH AS THEY ARE NO LONGER DETAINED.

18               THE COURT:  WHAT ABOUT THE ARGUMENT THAT THE

19   MOOTNESS -- THE EQUIVALENT OF A MOOTNESS ARGUMENT,

20   LIKELY TO BE REPEATED WITHOUT BEING REVIEWED?

21               MR. HEYSE:  FIRST, THAT'S CONCEDING THAT THEIR

22   CLAIMS ARE MOOT.

23               SECOND, THAT'S ALSO ASSUMING THAT THE

24   GOVERNMENT IS GOING TO VIOLATE AN EXISTING COURT ORDER

25   THAT PREVENTS THE GOVERNMENT FROM SEPARATING PARENTS

```
1    FROM THEIR CHILDREN.

2                IF YOUR HONOR IS TALKING ABOUT CHANGING

3    THE ENTIRE MENTAL HEALTH POLICY OF DHS AS TO DETAINEES,

4    THAT'S GOING FAR BEYOND THE SCOPE OF THIS CASE.

5            THE COURT:  NO.  I'M FOCUSING ON THE

6    INDIVIDUAL -- THE CLASS -- THE PROPOSED CLASS HERE.

7    AND I'M ASKING, IF THE RELIEF BEING SOUGHT WERE

8    GRANTED -- IF SOME OF THE RELIEF BEING SOUGHT WERE

9    GRANTED, WHICH INCLUDES SCREENING, IS THAT MATERIALLY

10   DIFFERENT THAN -- ISN'T SCREENING PRESENTLY PART OF

11   WHAT HAPPENS?

12           MR. HEYSE:  YES.

13                AS YOUR HONOR WAS INDICATING, IF THAT

14   SCREENING IS FOUND TO BE INADEQUATE, CAN THIS COURT

15   ORDER A CHANGE TO THE SCREENING PROCEDURE?

16           THE COURT:  ASSUMING THE REQUIREMENTS OF THE

17   PRELIMINARY INJUNCTION ARE SATISFIED OR ULTIMATELY IN A

18   FINAL INJUNCTION.

19           MR. HEYSE:  RIGHT.

20                THERE'S, AGAIN, A LOT OF OTHER MOVING

21   PARTS TO THAT.

22                THE QUESTION HERE IS, WHETHER OR NOT

23   THESE INDIVIDUALS CAN SEEK THAT.

24           THE COURT:  I UNDERSTAND.

25           MR. HEYSE:  SO, AGAIN, THE GOVERNMENT IS
```

```
1    ACTIVELY WORKING TO COMPLY WITH THE MS. L. INJUNCTION.

2    THERE ARE WEEKLY STATUS REPORTS AS TO --

3              THE COURT:  WITH JUDGE SABRAW?

4              MR. HEYSE:  YES.

5              I BELIEVE THERE'S A REPORT DUE TODAY,

6    ACTUALLY.  THE LAST REPORT WE HAVE IS FROM LAST FRIDAY,

7    I BELIEVE.  IT MIGHT BE THURSDAY.

8              THE COURT:  DO YOU HAVE ANY ESTIMATE -- I

9    ASKED EARLIER ABOUT THIS, THE ESTIMATE OF A THOUSAND --

10   THERE WOULD UP TO A THOUSAND ADULTS IN THE PROPOSED

11   CLASS HERE.

12             DO YOU HAVE ANY ESTIMATE OF WHETHER THAT

13   IS ACCURATE?

14             AND, IF SO, WHAT PERCENTAGE OF THAT GROUP

15   IS STILL IN CUSTODY?

16             MR. HEYSE:  THE FIGURES PROVIDED IN MS. L.

17   FOCUSED ON THE CHILDREN.  THERE WERE A LITTLE OVER 2600

18   CHILDREN IN O.R.R. CUSTODY AS PART OF THIS.  20 --

19   ABOUT 84 PERCENT OF THEM HAVE BEEN RELEASED AND

20   REUNITED WITH THEIR PARENT.

21             YOUR HONOR'S QUESTION EARLIER ASKED, HOW

22   MANY OF THE POTENTIAL CLASS MEMBERS REMAIN DETAINED?

23   SEVEN CHILDREN STILL IN O.R.R. CUSTODY HAVE A PARENT

24   WHO IS IN SOME KIND OF LAW ENFORCEMENT CUSTODY,

25   "SEVEN."
```

49

```
 1              THE COURT:  NATIONWIDE?

 2              MR. HEYSE:  YES.

 3                   THERE ARE 211 CLASS MEMBER CHILDREN

 4    REMAINING TO BE REUNIFIED.  OF THOSE, 165 OF THEIR

 5    PARENTS ARE OUTSIDE OF THE UNITED STATES.

 6              THE COURT:  JUST A MINUTE.

 7              MR. HEYSE:  THE CHARTS THAT ARE PROVIDED ARE

 8    DIFFICULT.

 9              THE COURT:  JUST A MOMENT.

10                   IF I UNDERSTAND WHAT YOU JUST SAID,

11    NATIONWIDE, AT THIS TIME, THERE ARE ONLY SEVEN CHILDREN

12    WHO REMAIN IN O.R.R. CUSTODY WHOSE PARENTS ARE ALSO IN

13    SOME FORM OF CUSTODY?

14              MR. HEYSE:  YES, YOUR HONOR.

15              THE COURT:  SO ONE CALCULATION -- IF I

16    UNDERSTAND WHAT YOU'RE SAYING, ASSUMING EACH OF THESE

17    SEVEN HAD TWO PARENTS, THAT WOULD BE -- THAT COULD BE

18    AS MANY AS 14 PARENTS.  THERE COULD BE STEP-PARENTS, I

19    SUPPOSE, OR ADOPTIVE PARENTS.  IT COULD BE HIGHER.

20                   IS THAT YOUR VIEW, THAT THE NUMBER OF

21    PARENTS IN THIS PROPOSED CLASS WHO REMAIN DETAINED IS

22    LESS THAN 20?

23              MR. HEYSE:  YES.

24              THE COURT:  OKAY.  GO AHEAD.

25              MR. HEYSE:  OKAY.  WITH RESPECT TO THEIR --
```

```
1    THESE EXISTING PLAINTIFFS' CLAIMS, AGAIN, THEY HAVE --

2              THE COURT:  WITH RESPECT TO THE PARENTS, 20 --

3    LESS THAN 20 ARE DETAINED?

4              MR. HEYSE:  YES.

5              THE COURT:  IS THERE A HIGHER -- ARE THERE

6    OTHERS WHO HAVE NOT BEEN FULLY -- SOME ARE NO LONGER IN

7    THE UNITED STATES?

8              MR. HEYSE:  YES.

9              THE COURT:  ARE THERE OTHERS WHO HAVE BEEN

10   RELEASED ON CERTAIN CONDITIONS OR UNDER RESTRICTIONS,

11   WHETHER BOND OR OTHERWISE?

12             MR. HEYSE:  I BELIEVE MANY BONDED OUT, YES.

13   THEY HAVE BEEN RELEASED ON BOND.  AND THEY'RE IN

14   REMOVAL PROCEEDINGS OF SOME KIND.

15             THE COURT:  IS THERE ANY OTHER CATEGORY

16   BESIDES IN CUSTODY, OUT OF CUSTODY, ON BOND AND LEFT

17   THE UNITED STATES?

18             MR. HEYSE:  THERE'S ONE PARENT WHO RAISED A,

19   QUOTE, "RED FLAG" PREVENTING REUNIFICATION.  THEY'RE

20   NOT --

21             THE COURT:  THE APPROPRIATENESS OF HAVING THAT

22   PARENT REUNITED WITH HIS OR HER CHILDREN?

23             MR. HEYSE:  YES.

24              THERE ARE A FEW CASES, I BELIEVE, WHERE

25   THE PARENT HAD BEEN CONVICTED OF SOME KIND OF CHILD
```

1    MOLESTATION OR CHILD ABUSE, SOMETHING LIKE THAT.

2                BUT WE ARE NOT TALKING ABOUT AN

3    INCREDIBLE NUMBER OF DETAINED INDIVIDUALS AT THIS

4    POINT.

5                THERE ARE, AT THIS TIME, BY MY MATH, 437

6    CHILDREN NOT YET REUNITED WITH THEIR PARENTS.  BUT,

7    AGAIN, THERE'S SO MANY SUBDIVISIONS AS TO WHY AND WHERE

8    THEY ARE.

9                THE CHART IS TABLE 1, ECF DOCKET NUMBER

10   222 IN MS. L.  IT'S ON PAGE 4 OF THAT DOCUMENT.

11               ULTIMATELY, WHAT IS BEFORE THE COURT HERE

12   IS, IN REALITY, AN INTENTIONAL INFLICTION OF EMOTIONAL

13   DISTRESS CLAIM.  THAT'S A TORT.  IT INVOLVES A DUTY,

14   BREACH, HARM AND CAUSE.

15               AND WHETHER OR NOT THE GOVERNMENT OWES

16   SOME KIND OF COMPENSATION OR REMEDY FROM THAT IS NOT

17   APPROPRIATE FOR INJUNCTIVE RELIEF.

18               WITH RESPECT TO ANY OBLIGATION POST

19   RELEASE --

20          THE COURT:  A CLAIM FOR INTENTIONAL -- I

21   UNDERSTAND WHAT YOU'RE SAYING.  APPARENTLY, THE CASE TO

22   WHICH YOU REFERRED IN MASSACHUSETTS MAY BE BRINGING

23   SUCH CLAIMS.  I DON'T KNOW.  BUT THOSE ARE TORT CLAIMS

24   FOR WHICH THERE CAN BE ECONOMIC DAMAGES.  AND I SUPPOSE

25   THE ECONOMIC DAMAGES MIGHT INCLUDE THE COST OF

```
 1    TREATMENT, PERHAPS, MAYBE.

 2              MR. HEYSE:  PRESUMABLY.

 3              THE COURT:  BUT IS THAT --

 4              MR. HEYSE:  THAT'S COMPENSATORY DAMAGES

 5    DESIGNED TO MAKE THE INDIVIDUAL WHOLE.

 6              THE COURT:  OKAY.

 7              MR. HEYSE:  THE DIFFERENCE IS, THOSE ARE B(1)

 8    AND (3) CASES OR A BIVENS CASE.  NOT THIS.  INJUNCTIVE

 9    RELIEF REQUIRES CEASING SOME ONGOING ACTION OR TAKING

10    ACTION THAT ISN'T HAPPENING NOW THAT THE GOVERNMENT IS

11    OBLIGATED TO FULFILL.

12              PROVIDING CARE POST-RELEASE WITH NO

13    DEFINITION AND WITH NO EXPLANATION OF HOW IT'S PAID FOR

14    OR FROM WHOM --

15              THE COURT:  SUPPOSE THAT THERE'S SOMEBODY WHO

16    IS DETAINED AND HE OR SHE IS EXAMINED AND SCREENED FOR

17    MENTAL HEALTH ISSUES BASED ON THE SEPARATION FROM HIS

18    OR HER CHILDREN OR CHILD.  AND SUPPOSE THAT THE PERSON

19    WHO DOES THAT SCREENING CONCLUDES THAT THE FOLLOWING

20    PATH OF TREATMENT IS APPROPRIATE AND SHOULD START

21    IMMEDIATELY, AND IT STARTS IMMEDIATELY.  AND THEN

22    SUPPOSE THAT PERSON IS RELEASED.

23              DOES THE GOVERNMENT NO LONGER HAVE ANY

24    OBLIGATION TO ASSURE THAT THE TREATMENT THAT HAS BEEN

25    RECOMMENDED CONTINUES?
```

```
 1              MR. HEYSE:  THAT'S PRECISELY WAKEFIELD.  WHAT
 2    WAS HAPPENING -- IT'S ACTUALLY A SLIGHT EXTENSION OF
 3    WAKEFIELD INASMUCH AS WAKEFIELD INVOLVED A PORTABLE
 4    PRESCRIPTION THAT SHOULD HAVE BEEN GIVEN TO THAT
 5    INDIVIDUAL FOR ABOUT, I THINK, A TWO-WEEK PERIOD POST
 6    RELEASE.
 7              THE COURT:  THE INDIVIDUAL HAD BEEN TAKING THE
 8    PRESCRIPTIVE MEDICATION.  AND THE ISSUE IS, WHETHER THE
 9    INDIVIDUAL HAD TO BE PROVIDED WITH SOME OF THAT SAME
10    PRESCRIPTIVE DRUG WHEN THE INDIVIDUAL LEFT CUSTODY TO
11    TRANSITION TO HAVING ANOTHER SOURCE OF GETTING IT;
12    RIGHT?
13              MR. HEYSE:  ANOTHER SOURCE OF GETTING IT,
14    THAT'S PRECISELY THE POINT.
15              WHAT PLAINTIFFS HAVE SUGGESTED HERE IS
16    THAT THE GOVERNMENT OWES A DUTY TO -- A DUTY OF CARE
17    UNTIL THEIR HARM IS REMEDIED, UNTIL IT IS CURED.
18    WAKEFIELD WAS TWO WEEKS WORTH OF PRESCRIPTION DRUGS.
19              NOW, PROVIDING -- IF THERE WAS A
20    TREATMENT -- ONGOING TREATMENT WHILE THE INDIVIDUAL IS
21    DETAINED, DHS POLICY PROVIDES A DISCHARGE PLAN FOR THAT
22    INDIVIDUAL.  BUT IT'S UP TO THAT INDIVIDUAL, ONCE
23    THEY'RE IN THE COMMUNITY, TO OBTAIN CARE FOR
24    THEMSELVES.  THAT'S THE ENTIRE POINT OF -- I BELIEVE
25    IT'S ESTELLE THAT TALKS ABOUT THE REASON THAT THE
```

```
1    GOVERNMENT OWES THE DUTY OF CARE IS BECAUSE THEY'RE

2    DETAINED, BECAUSE THEY'RE UNABLE TO PROVIDE THE CARE

3    FOR THEMSELVES.  BUT ONCE THEY'RE RELEASED, THAT DUTY

4    DROPS OFF.

5              THE COURT:  WELL, DOES -- AGAIN, BACK TO MY

6    HYPOTHETICAL AND WHAT YOU HAVE JUST STATED.  IF THE

7    POLICY IS THAT THERE'S A TRANSITION PLAN TO WHERE THE

8    INDIVIDUAL CAN THEN PROVIDE -- FIND AN ALTERNATIVE

9    SOURCE OF CARE, GIVEN THE MEMBERS OF THIS CLASS, WOULD

10   THE GOVERNMENT DETERMINE WHETHER OR NOT THEY COULD FIND

11   AN ALTERNATIVE MEANS OF CARE?

12             MR. HEYSE:  SHOULD THE GOVERNMENT BE

13   RESPONSIBLE OR --

14             THE COURT:  WELL, IF THE GOVERNMENT'S PLAN

15   UPON RELEASE OF SUCH A PERSON IS, THEY DO NEED

16   CONTINUED CARE, AND WE'LL -- BUT THEY HAVE TO

17   TRANSITION TO GETTING IT, DOES THE GOVERNMENT HAVE NO

18   OBLIGATION TO FACILITATE THEIR GETTING IT GIVEN THAT,

19   FOR EXAMPLE, SOME OF THESE -- SOME OR MANY, IF NOT ALL,

20   OF THESE PEOPLE MAY NOT HAVE RESOURCES OR MEDICAL

21   INSURANCE?

22             MR. HEYSE:  CERTAINLY.  THE GOVERNMENT'S

23   OBLIGATION, IF ANY, IS EXTREMELY LIMITED, INASMUCH AS

24   THEY WERE NOT INVOLUNTARILY BROUGHT INTO THE

25   UNITED STATES.
```

```
1              IF THERE'S AN OBLIGATION OF CARE POST
2    RELEASE AS TO SOMETHING THAT THE GOVERNMENT CAUSED, IF
3    THE GOVERNMENT IS RESPONSIBLE FOR THEIR HARM, THAT'S A
4    BIVENS CASE.  THAT'S A TORT CASE.  THAT'S AN FTCA CASE.
5    THAT'S NOT INJUNCTIVE RELIEF.
6              PLUS, IT'S NOT ENDLESS.
7              ALSO, THROUGHOUT PLAINTIFF'S PLEADINGS,
8    WE SEE THAT THEY'RE ASKING FOR, QUOTE, "APPROPRIATE
9    CARE FROM NON-GOVERNMENT-PROVIDED INDIVIDUALS."  NOW WE
10   HEAR TODAY THAT IT COULD BE PROVIDED, MAYBE, BY
11   GOVERNMENT INDIVIDUALS OR NOT.
12             THEY ALSO ASK THAT IT BE OUTSIDE OF
13   GOVERNMENT DETENTION FACILITIES BECAUSE THAT WILL NOT
14   BE EFFECTIVE TO THE TREATMENT.
15             AND AS YOUR HONOR POINTED OUT, HOW ARE
16   INDIVIDUALS THAT ARE NO LONGER IN THE UNITED STATES TO
17   RECEIVE TREATMENT?
18             THE COURT:  LET ME ASK YOU THIS WITH RESPECT
19   TO YOUR BIVENS ARGUMENT:  WHAT IS YOUR RESPONSE TO THE
20   PLAINTIFF'S ARGUMENT THAT, UNDER THIS HYPOTHETICAL,
21   THERE'S A PERSON WHO IS RELEASED FROM CUSTODY WHO HAS A
22   SERIOUS MEDICAL PROBLEM WHICH REQUIRES EXPENSIVE
23   MEDICATIONS.  AND, INDEED, THAT MEDICAL PROBLEM WAS
24   CAUSED BECAUSE THIS PERSON WAS EXPOSED TO ANOTHER
25   PERSON DURING THE TIME OF CUSTODY, AND IT WAS THE
```

1    GOVERNMENT'S RESPONSIBILITY THAT THAT EXPOSURE

2    OCCURRED.

3                IF THE PERSON JUST HAS THE RIGHT TO BRING

4    A BIVENS CLAIM, BUT BY THE TIME THAT IS DONE, THE

5    PERSON MAY HAVE HAD SERIOUS HEALTH ISSUES OR EVEN DIED

6    BECAUSE THE PERSON COULDN'T GET THE NECESSARY

7    TREATMENT, IS THE BIVENS CLAIM REALLY THE ONLY REMEDY?

8                MR. HEYSE:  ULTIMATELY, THE QUESTION IS, WHAT

9    COULD A COURT ORDER FACED WITH THAT TYPE OF CLAIM?  IF

10   THERE'S SOME KIND OF PRELIMINARY RELIEF AVAILABLE, THAT

11   WOULD BE AN INJUNCTION ATTENDED TO A BIVENS CLAIM, TO

12   ESSENTIALLY COMPELLING ACTION BASED ON A LIKELIHOOD OF

13   SUCCESS ON THE MERITS, OR SOME KIND OF, I GUESS,

14   SPOLIATION OR PREVENTATIVE MEASURE.

15               WHAT'S IMPORTANT HERE IS THAT THE

16   RESOURCES PLAINTIFFS ARE AFTER ARE IN FACT AVAILABLE TO

17   THEM.  THAT WAS ACTUALLY DIRECTLY DISCUSSED IN THE

18   MS. L. JOINT REPORT -- OR JOINT STATUS REPORT REQUEST

19   FOR A FUND, WAS THE AVAILABILITY OF $25 MILLION WORTH

20   OF PRO BONO MENTAL HEALTH SERVICES.  THE CLAIM IN

21   MS. L. WAS THAT THAT WAS GOING TO BE INADEQUATE.  AND

22   THESE INDIVIDUALS SHOULDN'T -- OR THE PROVIDERS

23   SHOULDN'T BE EXPECTED TO BE PROVIDING THE PRO BONO

24   SERVICES THAT THEY ARE IN FACT VOLUNTEERING.  SO IT WAS

25   ACTUALLY SEEKING COMPENSATION FOR THEM FOR SERVICES

```
 1   THAT ARE AVAILABLE TO THESE INDIVIDUALS.

 2              WE ALSO HAVE NO SUGGESTION HERE THAT

 3   THESE INDIVIDUALS HAVE SOUGHT THIS TREATMENT OR HAVE

 4   REQUESTED THAT THE -- THAT THE NAMED PLAINTIFF HERE,

 5   THAT THEY HAVE AVAILED THEMSELVES OF THAT.  THEY HAVE A

 6   DUTY TO MITIGATE THE HARM --

 7              THE COURT:  SLOW DOWN.

 8              MR. HEYSE:  I APOLOGIZE, YOUR HONOR.

 9              THEY HAVE A DUTY TO MITIGATE THE HARM

10   THAT THEY HAVE SUFFERED TO MINIMIZE DAMAGES TO THE

11   EXTENT THAT THEY ARE WAITING FOR SERVICES TO BE GIVEN

12   TO THEM WITHOUT EXPLAINING HOW THEY WANT IT.

13              THE COURT:  WELL -- ALL RIGHT.

14              BUT, AGAIN, IN A HYPOTHETICAL, THESE

15   INDIVIDUALS WHO HAVE BEEN DETAINED FOR ALLEGEDLY

16   ILLEGALLY ENTERING THE COUNTRY AND NOT HAVING A BASIS

17   FOR SEEKING ASYLUM OR OTHER THINGS, YOUR EXPECTATION IS

18   THEN IS, THAT THEY WOULD BE ABLE TO NAVIGATE TO FIND A

19   PRO BONO SERVICE PROVIDER WITHOUT HAVING NECESSARILY AN

20   EVALUATION THAT TELLS THEM WHAT KIND OF SERVICES THEY

21   NEED?

22              MR. HEYSE:  WELL, THAT'S -- AGAIN, THAT GETS

23   BACK TO WHAT IS DHS DOING FOR THEM?

24              IF THEY ARE KNOWN TO BE SUFFERING FROM

25   SOME KIND OF MENTAL HEALTH ISSUE THAT WAS MANIFESTED
```

1    WHILE THEY WERE IN CARE, WHETHER OR NOT IT WAS OBSERVED

2    BY DHS OR THEY AFFIRMATIVELY PUT THEIR HAND UP AND

3    SAID, "I NEED HELP."

4              I SEE THERE'S A PINK SLIP SITTING ON

5    COUNSEL'S TABLE HERE.  THAT'S A FORM THAT A DETAINED

6    INDIVIDUAL CAN PROVIDE, CAN SUBMIT CONFIDENTIALLY

7    REQUESTING MORE CARE.  SO WE DON'T HAVE ANY EVIDENCE OF

8    ANYTHING LIKE THAT WAS IGNORED.

9              BUT IN THE EVENT THAT THAT HAPPENED, THAT

10   INDIVIDUAL, PURSUANT TO DHS REGULATIONS, WOULD BE GIVEN

11   SOME KIND OF DISCHARGE PLAN.  PRESUMABLY, THAT WOULD

12   INCLUDE REFERRALS TO LOCAL RESOURCES.

13             AND THIS, AGAIN, GETS TO THE DISTINCTION

14   BETWEEN THE PARENTS AND THE CHILDREN.  THE O.R.R., THE

15   EXACT SAME THING, PROVIDES DISCHARGE PLANS.  THERE'S A

16   WHOLE SLATE OF PROCEDURES IN WHICH THEY ENGAGE, AND

17   THEY REFER THESE INDIVIDUALS TO AVAILABLE PROVIDERS.

18             ALSO, SPECIFIC TO THESE INDIVIDUALS, THE

19   NAMED PLAINTIFFS HAVE COUNSEL THAT IS, OBVIOUSLY,

20   CAPABLE OF POINTING THEM IN THAT DIRECTION TO HELP

21   GUIDE THEM.

22             AS TO ABSENT CLASS MEMBERS, THAT MIGHT BE

23   A DIFFERENT STORY.

24        THE COURT:  THERE ARE THREE NAMED PLAINTIFFS.

25        MR. HEYSE:  RIGHT.

```
 1              THE COURT:  THERE'S ALLEGEDLY UP TO A THOUSAND

 2    CLASS MEMBERS.

 3              MR. HEYSE:  RIGHT, ALLEGEDLY, OR SEVEN.

 4              THE COURT:  NO, I UNDERSTAND.  I'VE ASKED THE

 5    QUESTION.  I UNDERSTAND.

 6              MR. HEYSE:  THE POINT BEING IS, THE RESOURCES

 7    ARE OUT THERE.  DOCTORS ARE OUT THERE.  WHETHER OR NOT

 8    AN INDIVIDUAL WITH A LANGUAGE ISSUE OR THAT HAS

 9    SUFFERED SOME KIND OF TRAUMA WOULD KNOW TO SEEK THAT,

10    IT'S A QUESTION OF WHETHER OR NOT SERVICES WILL BE

11    FORCED UPON THEM OR THEY WILL ADHERE TO THEIR DUTY TO

12    MITIGATE THE DAMAGES THAT THEY CLAIM THEY SUFFERED.

13              I FEEL LIKE I'M CROSSING OVER BETWEEN THE

14    PRELIMINARY INJUNCTION AND CLASS ISSUES A BIT.

15              THE COURT:  THEY DO OVERLAP.

16              MR. HEYSE:  ABSOLUTELY.

17              THE THIRD QUESTION -- I BELIEVE I'VE

18    ADDRESSED THE FIRST TWO QUESTIONS YOUR HONOR HAD ABOUT

19    FIRST TO FILE RULE.

20              IF THERE ARE NO FURTHER QUESTIONS ON THAT

21    POINT?

22              WE WERE JUST DISCUSSING PROVIDING RELIEF

23    AFTER CUSTODY.

24              THERE WAS ONE OTHER CASE.  I DON'T WANT

25    TO GET INTO THE MERITS OF THE MOTION TO DISMISS FILING,
```

1    BUT A CASE WE CITED IN THERE WAS CHARLES OUT OF THE

2    SOUTHERN DISTRICT OF NEW YORK THAT HESITATED TO EXTEND

3    WAKEFIELD ANY FURTHER, ESPECIALLY, IN PART, BECAUSE THE

4    ACTIONS THERE WERE NOT CONSCIENCE SHOCKING AND

5    DELIBERATELY INDIFFERENT TO THE HARM THAT WAS SUFFERED.

6    AND THAT'S A CRITICAL POINT HERE.

7                THE CONSTITUTIONALITY OF THE POLICY, THE

8    GOVERNMENT'S SEPARATION POLICY IS NOT BEFORE THIS

9    COURT.  THAT IS THE QUESTION BEFORE MS. L.

10               WHAT'S BEFORE THIS COURT IS THE ALLEGED

11   HARM ARISING OUT OF THAT POLICY.

12               SO WHETHER OR NOT THE SEPARATION WAS

13   CONSCIENCE SHOCKING IS A SEPARATE QUESTION FROM WHETHER

14   OR NOT THE ALLEGED FAILURE TO PROVIDE TREATMENT WHILE

15   IN DETENTION AND AFTERWARDS, IS THAT CONSCIENCE

16   SHOCKING?

17               AND THE GOVERNMENT SUBMITS THAT THE

18   PROCEDURES IN PLACE THAT DHS EXECUTES BASED ON

19   FIRSTHAND EXPERIENCE IS NOT CONSCIENCE SHOCKING.  IT IS

20   DELIVERED BY HUMANS, INDIVIDUALS THAT RECOGNIZE AND --

21   RECOGNIZE THEIR RESPONSIBILITY OF CARE FOR INDIVIDUALS

22   IN THEIR CUSTODY.

23               THE THIRD QUESTION YOUR HONOR RAISED WAS

24   ABOUT WHETHER OR NOT THESE PLAINTIFFS ARE SUITABLE TO

25   REPRESENT THE CLASS GIVEN THAT THEY HAVE BEEN RELEASED.

```
 1    AGAIN, I THINK THAT SPEAKS FOR ITSELF, IS THAT THEY

 2    LACK ANY INTEREST WHATSOEVER IN CONTINUING TO REPRESENT

 3    INDIVIDUALS WHO ARE DETAINED, HOWEVER MANY THERE ARE.

 4    WE BELIEVE THERE ARE ONLY TO BE SEVEN POTENTIAL CLASS

 5    MEMBERS THAT REMAIN DETAINED.  SO, REALLY, THE CASE

 6    BECOMES ABOUT REPRESENTING INDIVIDUALS THAT ARE

 7    RELEASED.  AND THAT GETS BACK TO THE QUESTION OF

 8    WHETHER OR NOT THERE IS A DUTY OF CARE.

 9            THE COURT:  GOING BACK TO THE DISTRICT COURT

10    DECISION IN CHARLES.  DID YOU SAY THAT YOU THINK --

11    WHAT IS YOUR POSITION ON WHAT IT DID?

12            MR. HEYSE:  THE COURT HESITATED TO EXTEND

13    WAKEFIELD.  AGAIN, THAT'S A COURT NOT BOUND BY

14    WAKEFIELD.  BUT THEY CONSIDERED WAKEFIELD, AND THEY

15    WERE GETTING INTO ALL THE ISSUES THAT ARE ESSENTIALLY

16    THE SAME ISSUES HERE.  IT WAS THE MENTAL HEALTH ASPECTS

17    ATTENDANT TO IMMIGRATION DETENTION, AND DID THE

18    GOVERNMENT BEAR A BURDEN OF CARE POST RELEASE.

19            THE COURT:  AND THEY WERE DIAGNOSED WITH

20    MENTAL HEALTH ISSUES.  AND THEY WERE BEING TREATED FOR

21    THAT WHILE IN CUSTODY.

22                WEREN'T THEY PROVIDED WITH CERTAIN

23    POST-CUSTODY CARE CONSISTENT WITH THAT THAT THEY HAD

24    BEEN RECEIVING WHILE IN CUSTODY?

25            MR. HEYSE:  THEY WERE -- I BELIEVE IN THAT
```

```
 1    CASE THEY SHOULD HAVE, BUT DID NOT RECEIVE DISCHARGE

 2    PLANS.  IT WAS NOTED THERE THAT DHS, I THINK IN THE

 3    INTERIM -- I'M TRYING TO REMEMBER THE EXACT FACTS OF

 4    THE CASE.  DHS HAD CHANGED ITS POLICY WITH RESPECT TO

 5    DISCHARGE PLANS.

 6              BUT THOSE INDIVIDUALS, HAVING HAD A

 7    MENTAL HEALTH ISSUE DIAGNOSED, SHOULD HAVE -- AT A

 8    MINIMUM, SHOULD HAVE RECEIVED --

 9              THE COURT:  WAS ONE OF THEM GIVEN A 12-MONTH

10    PLAN AND THE OTHER AN 8-MONTH PLAN?

11              MR. HEYSE:  THAT SOUNDS ACCURATE, YOUR HONOR.

12              THE COURT:  IS THAT INCONSISTENT WITH THE

13    RELIEF BEING SOUGHT HERE?

14              MR. HEYSE:  THE ULTIMATE POINT -- THE

15    CONCLUSION THE COURT REACHED THERE WAS THAT THE FAILURE

16    TO PROVIDE THOSE PLANS -- I THINK IT WAS RECOMMENDED

17    THAT THEY SHOULD BE GIVEN THOSE PLANS AND DIDN'T.  THE

18    FAILURE TO PROVIDE THOSE PLANS WAS NOT CONSCIENCE

19    SHOCKING.  IT WAS NOT DELIBERATE INDIFFERENCE TO THEIR

20    CARE.  SO, THUS, THE COURT DISMISSED THEIR COMPLAINT

21    ENTIRELY.

22              ALSO WORTH NOTING THAT THAT WAS A TORT

23    CASE.

24              WITH RESPECT TO THE CLASS ISSUES, I THINK

25    WE WERE BEGINNING TO TALK ABOUT WHETHER OR NOT THEY
```

```
1    WERE ADEQUATE REPRESENTATIVES.  I THINK WE HAVE COVERED

2    THAT.  IF YOUR HONOR HAS ANY FURTHER QUESTIONS?

3              THE COURT:  I DON'T.  THANK YOU.

4              MR. HEYSE:  OKAY.  AGAIN, COMPENSATORY DAMAGES

5    ARE EXTREMELY RARE IN INJUNCTIVE RELIEF CASES.  THIS

6    AMOUNTS TO COMPENSATORY DAMAGES, ESPECIALLY INASMUCH AS

7    PLAINTIFFS CAN'T DEFINE EXACTLY WHAT IT IS THEY'RE

8    AFTER.  WHAT BEHAVIOR ARE THEY SEEKING TO ENJOIN?  AND

9    EVEN IF IT IS SPECIFIC TO DETENTION, HOW WILL THEY

10   BENEFIT FROM IT?

11             THE COURT:  I DON'T THINK IT IS THAT THEY'RE

12   SEEKING DAMAGES.

13                  ISN'T THE REQUEST FOR RELIEF THAT THEY BE

14   SCREENED AND THEN PROVIDED CARE, AND THAT THE COST OF

15   THE CARE BE COVERED BY THE GOVERNMENT AS OPPOSED TO

16   MONEY FLOWING TO THE PLAINTIFFS OR THE CLASS MEMBERS?

17             MR. HEYSE:  IT'S NOT STRAIGHT CASH IN THEIR

18   POCKET, NO.

19                  THE DIFFERENCE BEING, IN ORDER FOR THAT

20   LATTER STEP TO HAPPEN, THERE HAS TO BE SOME

21   CONSTITUTIONAL DUTY UNDERPINNING IT, A DUTY TO PROVIDE

22   THAT CARE.  IF IT IS NOT A DUTY OF THE GOVERNMENT TO

23   PROVIDE CARE POST RELEASE, WHICH, AGAIN, GOES FAR

24   BEYOND WAKEFIELD, THAT'S COMPENSATORY DAMAGES.  THAT IS

25   SIMPLY GOING BEYOND WHAT THE GOVERNMENT IS OBLIGATED TO
```

1    DO.

2                    AND THAT'S NOT TO SAY THE GOVERNMENT

3    ISN'T OBLIGATED TO DO THAT IN THE EVENT THE GOVERNMENT

4    HAS CAUSED HARM, IF THAT'S PROVEN.  BUT THAT'S A TORT

5    CASE OR A BIVENS CASE OR A FEDERAL TORT CLAIMS ACT

6    CASE, NOT AN INJUNCTION.

7                    AGAIN, COMPENSATORY DAMAGES ARE DESIGNED

8    TO BE COMMENSURATE WITH THE INJURY SUFFERED.  THAT'S

9    BLACK LETTER LAW FROM 1800 SUPREME COURT CASES.

10                   ULTIMATELY, WHAT'S SOUGHT HERE IS --

11   AMOUNTS TO CREATIVE LAWYERING.  AS THE SUPREME COURT

12   SAID IN GREAT WEST, "LAWYERLY INVENTIVENESS MAY ENABLE

13   ANY CLAIM TO BE PHRASED IN INJUNCTIVE TERMS."  THAT'S

14   WHAT WE HAVE HERE.

15                   MORE RECENTLY IN WAL-MART, THE COURT

16   EXPLAINED THAT FOR A B(2) ACTION TO PROCEED, THE ENTIRE

17   CLASS MUST BENEFIT OR NONE.  AND WHAT WE HAVE HERE IS A

18   AN INCREDIBLE MIXED BAG OF WHO MAY BE BENEFIT FROM THIS

19   RELIEF SOUGHT AND HOW IT WOULD BE ADMINISTERED.

20                   YOUR HONOR HINTED EARLIER TO THE

21   REMARKABLE LOGISTICS INHERENT IN DELIVERING MENTAL

22   HEALTH SERVICES TO SOMEONE OUTSIDE OF THE UNITED

23   STATES.  HOW IS THAT EVEN POSSIBLE?  IT'S LITERALLY

24   DIFFICULT TO CONTEMPLATE.

25                   THE COURT:  LET'S PUT ASIDE THOSE WHO ARE

```
 1    OUTSIDE THE UNITED STATES BECAUSE, AGAIN, THAT COULD --

 2    THAT COULD BE ADDRESSED BY THE CLASS DEFINITION,

 3    COULDN'T IT?

 4              MR. HEYSE:  IT COULD.  THEY COULD REDEFINE THE

 5    CLASS OR --

 6              THE COURT:  IF THE ISSUE IS WHAT TREATMENT

 7    IS -- A SCREENING TO DETERMINE WHAT TREATMENT IS

 8    APPROPRIATE, THERE MAY BE CERTAIN CLASS MEMBERS WHERE

 9    IT'S DETERMINED NO TREATMENT NEEDED.

10              MR. HEYSE:  YES.

11              THE COURT:  AND -- OKAY.

12              MR. HEYSE:  THERE'S ALSO THE ISSUE OF WHETHER

13    OR NOT SOME CLASS MEMBERS OR PROPOSED CLASS MEMBERS

14    DON'T WANT WHAT THESE PLAINTIFFS ARE AFTER.  AND

15    THAT'S, AGAIN, K.O., THE DISTRICT COURT CASE IN

16    MASSACHUSETTS WHERE THEY'RE SEEKING MONEY DAMAGES.

17    PRECISELY SHOWS THAT THERE IS STRONG POTENTIAL FOR

18    ANTAGONISM.  WHY DIDN'T THEY SEEK THIS RELIEF IN

19    MS. L.?

20                   OR THEY HAVE AND WHY HAVEN'T THEY BETTER

21    PURSUED IT?

22                   THERE'S CLEAR ANTAGONISM BETWEEN WHAT

23    THESE INDIVIDUALS ARE AFTER.  SO HOW CAN THESE

24    INDIVIDUALS PURPORT TO REPRESENT THIS MASSIVE CLASS --

25              THE COURT:  WHAT'S THE ANTAGONISM?  I'M NOT
```

```
 1    FOLLOWING THAT.

 2              YOU'RE SAYING BECAUSE THEY DON'T SEEK

 3    MONETARY RELIEF?

 4              MR. HEYSE:  AS YOUR HONOR SUGGESTED, AND AS --

 5    THE CONFUSION IN TERMS OF EXACTLY WHAT THEY'RE AFTER

 6    DISPLAYS THAT THERE IS STRONG POTENTIAL FOR ANTAGONISM

 7    BETWEEN ALL OF THESE CLASSES.  YOU HAVE INDIVIDUALS --

 8    THE MS. L. INDIVIDUALS HAVE -- MAYBE REQUESTED HARM --

 9    A FUND TO TREAT MENTAL HEALTH.  THE K.O. CASE, THEY'RE

10    EXPRESSLY SEEKING MONETARY DAMAGES.  THEY WANT MONEY TO

11    COMPENSATE THEM FOR HARM THEY ALLEGEDLY SUFFERED AS A

12    RESULT OF THE FAMILY SEPARATION POLICY AND DENIAL OF

13    CARE WHILE DETAINED.

14              AND WE HAVE, HERE, A REQUEST FOR AN

15    INJUNCTION TO PROVIDE THE CARE THAT IS SOUGHT IN K.O.,

16    BUT WITHOUT A DIRECT MONEY EXCHANGE.  BUT THAT GETS

17    BACK TO THE POINT OF HOW?  HOW IS THAT CARRIED OUT?

18    AND YOUR HONOR WAS ASKING WOULD A VOUCHER SYSTEM WORK

19    OR --

20              THE COURT:  I WAS ASKING A HYPOTHETICAL ABOUT

21    WHY THAT WAS NOT DIFFERENT.

22              MR. HEYSE:  SURE.

23              IT'S LOGISTICALLY, EXTREMELY COMPLICATED;

24    BUT ALSO DEMONSTRATES THAT THEY DON'T ALL WANT THE SAME

25    THINGS.  SO IF THEY'RE GOING TO REPRESENT INDIVIDUALS
```

1    HERE THAT DON'T WANT THIS CARE -- THERE'S INDIVIDUALS

2    THAT MIGHT NOT NEED THE CARE.  THERE'S INDIVIDUALS

3    THAT, PERHAPS, NEEDED THE CARE AT SOME TIME, BUT NOW

4    THEY'RE NOT IN NEED OF CARE.  THERE'S JUST SIMPLY A

5    WIDE VARIETY OF -- THERE'S ALSO INDIVIDUALS -- AND THAT

6    GETS BACK TO THE COMMONALITY ISSUES AND ADEQUACY ISSUES

7    AS TO THE INCREDIBLY DIFFERENT IN NATURE OF THE HARMS

8    THAT THEY SUFFERED BEFORE THEY GOT HERE.  THESE ARE

9    INDIVIDUALS THAT WERE FLEEING THEIR HOMES FROM

10   THOUSANDS OF MILES AWAY.  THAT IN AND OF ITSELF IS A

11   BIG DEAL.  THAT AN INDIVIDUAL IS LEAVING THEIR HOME

12   SOMEPLACE THEY, PRESUMABLY, HAVE NEVER LEFT BEFORE,

13   LEAVING EVERYTHING BEHIND AND COMING TO A FOREIGN

14   COUNTRY WHERE THEY, PRESUMABLY, DON'T SPEAK THE

15   LANGUAGE, EXPERIENCING A DIFFICULT JOURNEY ALONG THE

16   WAY, THAT'S NOT TO BE DISCOUNTED.  BUT IT ALL PLAYS

17   INTO WHAT HARM ARE THEY SUFFERING NOW?  THAT GETS BACK

18   TO WHAT KIND OF CARE DO THEY NEED?  THAT GOES BEYOND A

19   SCREENING.  A SCREENING WOULD BE A RELATIVELY SIMPLE

20   THING TO DO.  AGAIN, DO THEY HAVE STANDING TO SEEK

21   THAT?  THAT'S A DIFFERENT QUESTION.

22              BUT GOING BEYOND THAT IS WHAT THIS CASE

23   IS ABOUT.  THIS CASE IS ABOUT MORE THAN JUST MENTAL

24   HEALTH SCREENINGS.  THIS IS ABOUT, QUOTE, "APPROPRIATE

25   CARE" PROVIDED TO THESE INDIVIDUALS WITH NO END IN

```
 1    SIGHT AND NO EXPLANATION OF HOW IT IS TO BE PROVIDED,
 2    BY WHOM OR WHERE OR FOR HOW MUCH.
 3              THE COURT:  WELL, IF THE SCREENING -- IF A
 4    SCREENING OCCURS, AND IT'S DETERMINED THAT A CERTAIN
 5    PROTOCOL IS APPROPRIATE, AND THE PERSON REMAINS IN
 6    CUSTODY, THEN I ASSUME THAT THE APPROPRIATE CARE WOULD
 7    BE PROVIDED; CORRECT?
 8              MR. HEYSE:  CORRECT.  DHS'S POSITION IS THAT
 9    THE CARE --
10              THE COURT:  AND IF A SCREENING OCCURRED AND IT
11    WERE DETERMINED THAT, POST RELEASE FOR SOME TRANSITION
12    PERIOD, SOME CARE WERE APPROPRIATE, THAT MIGHT BE
13    PROVIDED BY THE GOVERNMENT, IS THAT RIGHT, UNDER THE
14    STANDARD PRACTICE?
15              MR. HEYSE:  THE GOVERNMENT IN THAT INSTANCE
16    WOULD BE PROVIDING A DISCHARGE PLAN.  ACTUAL DIRECT
17    PROVISION OF SERVICES IS NOT AUTHORIZED BY STATUTE.
18              THE COURT:  BUT IF THE INJUNCTIVE RELIEF WERE,
19    HYPOTHETICALLY, LIMITED TO SCREENING, THEN THE ISSUE OF
20    WHAT CARE MIGHT LATER BE PROVIDED UPON RELEASE COULD
21    BE -- MIGHT BE SEPARATELY ADJUDICATED, IF AT ALL?
22              MR. HEYSE:  SEPARATELY ADJUDICATED IN TERMS OF
23    A TORT CASE OR --
24              THE COURT:  WELL, COULD BE.  I MEAN, I DON'T
25    KNOW.  BUT I DON'T KNOW -- I'M COMING BACK TO THE POINT
```

```
 1    THAT, WITH RESPECT TO INDIVIDUALIZED DETERMINATIONS,

 2    WHICH IS PART OF THE RULE 23 ANALYSIS, I UNDERSTAND

 3    YOUR COMMENT THAT DIFFERENT PEOPLE HAVE DIFFERENT

 4    BACKGROUNDS, CAME FROM DIFFERENT PLACES AND MAY,

 5    THEREFORE, HAVE UNIQUE CHARACTERISTICS TO PRESENT TO

 6    THE SCREENER.  BUT I DON'T KNOW THAT THE FACT THAT

 7    EVERYBODY WOULD BE SCREENED IS SO DIFFERENT.  EVERYONE

 8    WOULD -- THE SCREENER WOULD EVALUATE ALL OF THAT.

 9              MR. HEYSE:  YES.

10              IT GETS TO THE POINT OF WHY?  IF THEY'RE

11    TO BE SCREENED -- IF A MENTAL HEALTH ISSUE IS TO BE

12    IDENTIFIED, THEN WHAT?  THAT'S THE --

13              THE COURT:  HAVE YOU PRESENTED THIS PINK SLIP

14    AS PART OF THE SUBMISSIONS?

15              MR. HEYSE:  WE ACTUALLY JUST OBTAINED THAT

16    YESTERDAY.

17              THE COURT:  COULD I SEE THAT?

18              MR. HEYSE:  CERTAINLY.

19              THE COURT:  IS THAT PROVIDED, BY THE WAY, IN

20    MORE THAN ONE LANGUAGE TO THOSE WHO ARE --

21              MR. HEYSE:  IT'S IN SPANISH ON THE BACK.

22              THE COURT:  THANK YOU.

23              HAVE YOU SEEN THIS?

24              MR. FEE:  WE HAVE NOT SEEN IT.

25              MR. HEYSE:  I CAN GIVE YOU A COPY, IF YOU
```

```
1    WOULD LIKE.
2                WHEN WE VISITED -- THAT'S FROM THE JAMES
3    A. MUSICK FACILITY WHERE ONE OF THE NAMED PLAINTIFFS
4    WAS DETAINED.  WE VISITED THAT FACILITY YESTERDAY TO
5    SEE FOR OURSELVES WHAT IS GOING ON THERE.  AND IT WAS,
6    NOT TO OVERSTATE THINGS, AN IMPRESSIVE OPERATION.  THEY
7    HAVE A WELL-MANAGED, WELL-OILED MACHINE THERE THAT HAS
8    MEN AND WOMEN SEPARATED.
9                THE COURT:  IS THIS A PRIVATE --
10               MR. HEYSE:  THAT GOES INTO A BOX.
11               THE COURT:  NO.
12                   THE INSTITUTION THAT GENERATED THIS FORM,
13   IS THAT A GOVERNMENT INSTITUTION OR A PRIVATE --
14               MR. HEYSE:  IT'S AN ORANGE COUNTY OPERATED
15   FACILITY THAT HOUSES DHS DETAINEES.
16               THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.
17               MR. HEYSE:  AT THAT FACILITY THERE ARE --
18               THE COURT:  COULD YOU FILE THAT ON THE DOCKET,
19   PLEASE?
20               MR. HEYSE:  SURE.
21               THE COURT:  WE'RE GOING TO MAKE A COPY SO I
22   HAVE IT.
23                   JUST FILE IT ON THE DOCKET
24               MR. HEYSE:  WILL DO, YOUR HONOR.
25               THE COURT:  THANK YOU.
```

```
1              MR. HEYSE:  I WAS HESITANT TO PRESENT EVIDENCE
2    AT A PRELIMINARY INJUNCTION HEARING.  BUT THE POINT IS
3    THAT, WE TALKED WITH THEM THERE.  AND THE PROCEDURES
4    THAT ARE DESCRIBED BY THE PLAINTIFFS SIMPLY DON'T MATCH
5    WITH THEIR EXPERIENCE.  EVEN SPECIFIC TO -- I BELIEVE
6    IT WAS J.P. THAT WAS DETAINED AT MUSICK BRIEFLY.  SHE
7    DISPLAYED NO OUTWARD SIGNS OF MENTAL HEALTH ISSUES.
8    SHE WAS ASKED ABOUT THOSE MENTAL HEALTH ISSUES.  IF SHE
9    WAS SUFFERING AND WANTED TO RAISE THAT CONCERN
10   CONFIDENTIALLY, SHE HAD THIS SLIP MADE AVAILABLE TO
11   HER.
12              THERE WAS ALSO WHAT THEY DESCRIBED --
13   "THEY" BEING THE DETENTION OFFICERS AND THE INDIVIDUALS
14   WITH WHICH WE SPOKE.  THEY TALKED ABOUT HOW THERE'S A
15   COLLEGIAL ATMOSPHERE AMONG THE DETAINEES.  THAT IF ONE
16   INDIVIDUAL IS SUFFERING, THEY'LL SAY SOMETHING.
17   SOMEONE WILL SAY SOMETHING.
18              THE COURT:  I DON'T -- YOU'RE RIGHT.  I DON'T
19   HAVE EVIDENCE ON THIS.
20              DO YOU HAVE ANY DATA CONCERNING HOW MANY
21   OF THESE PINK SLIPS WERE SUBMITTED?
22              MR. HEYSE:  WE DON'T.
23              WE'RE IN THE PROCESS OF COLLECTING ALL
24   AVAILABLE INFORMATION TO COMPLY WITH THE DISCOVERY THAT
25   IS ONGOING.
```

```
1              ULTIMATELY, THE POINT IS, IS AN

2    INJUNCTION NECESSARY HERE?  IS THERE A LIKELIHOOD OF

3    SUCCESS ON THE MERITS?  AND TO WHAT END?  WHAT HARM IS

4    GOING TO BE CURED HERE OR PREVENTED?  WHAT BEHAVIOR IS

5    GOING TO BE CEASED?

6              ULTIMATELY, THEY'RE ASKING FOR DAMAGES.

7    IT MIGHT BE DESCRIBED AS AN INJUNCTION, BUT IT IS

8    ULTIMATELY COMPENSATORY DAMAGES.  THAT IS INAPPROPRIATE

9    FOR A PRELIMINARY INJUNCTION, AS WELL AS A B(2) CLASS

10   MOTION.

11              NO FURTHER QUESTIONS?

12         THE COURT:  NO.  THANK YOU, MR. HEYSE.

13              IS THERE ANYTHING NEW FROM THE

14   PLAINTIFF'S SIDE?

15         MR. FEE:  YES, YOUR HONOR.

16         THE COURT:  GO AHEAD, MR. FEE.

17         MR. FEE:  YOUR HONOR, I WOULD JUST LIKE TO

18   RESPOND TO A FEW OF THE THINGS THAT MR. HEYSE HAD

19   MENTIONED.

20              FIRST, STARTING WITH THIS PINK SLIP,

21   WHICH WE'RE, OBVIOUSLY, JUST LOOKING AT FOR THE FIRST

22   TIME, BUT THIS IS REALLY VERY MUCH IN LINE WITH THE

23   OTHER EVIDENCE THAT WAS SUBMITTED HERE, WHICH IS TO

24   SAY, IT'S EVIDENCE OF GENERALIZED -- THE EXISTENCE OF

25   SORT OF GENERALIZED MEDICAL CARE.  NOTHING ABOUT IT IS
```

```
1     TRAUMA INFORMED.  NOTHING ABOUT IT IS SPECIFIC.  THIS

2     IS VERY MUCH LIKE -- IT'S ACTUALLY EVEN LESS DETAILED

3     THAN THE FORM THAT WE ALREADY ADDRESSED AND OUR EXPERTS

4     ADDRESSED IN THE PAPERS.

5                    THERE ARE CERTAIN PROFESSIONAL STANDARDS,

6     YOUR HONOR, THAT ARE EXPLAINED IN THE DECLARATIONS WE

7     SUBMITTED FOR HOW TO DIAGNOSE AND TREAT TRAUMA.

8                    GIVING A PERSON A FORM ON DAY 1 THAT

9     LOOKS LIKE THE FORM THAT WAS IN THE PAPERS, AND THIS

10    SORT OF HALF-FORM THAT WE'VE GOT TODAY, IS BY NO MEANS

11    A SUBSTITUTE FOR THAT KIND OF VERY SPECIFIC RELIEF.

12                   AND I WOULD JUST POINT YOUR HONOR TO THE

13    DECLARATION SUBMITTED WITH OUR REPLY.

14           THE COURT:  I UNDERSTAND.  I DON'T HAVE ANY

15    EVIDENCE ON THIS YET WITH RESPECT TO THIS FORM.

16           MR. FEE:  SURE.

17                   AND -- BUT, YOUR HONOR, JUST TO BE CLEAR,

18    YOU DO HAVE EVIDENCE ON --

19           THE COURT:  I HAVE EVIDENCE -- I DON'T HAVE

20    EVIDENCE ON THE PINK FORM AND HOW IT WAS USED AND

21    WHETHER IT WAS STEP 1 TO SOME OTHER MORE THOROUGH

22    ANALYSIS.  I DON'T KNOW.

23           MR. FEE:  WHAT WE HAVE PUT IN OUR RECORD IS

24    THAT, NONE OF OUR CLIENTS RECEIVED THESE MENTAL HEALTH

25    SERVICES.
```

```
 1              AND, FRANKLY, THE AFFIRMATIVE EVIDENCE
 2   THAT WAS SUBMITTED BY THE GOVERNMENT ONLY UNDERSCORES
 3   THAT THE KIND OF SPECIFIC TRAUMA INFORMED SERVICES
 4   THAT'S NECESSARY TO TREAT THIS HARM WAS NEVER PROVIDED.
 5   IT SIMPLY WAS NEVER PROVIDED.  THERE'S NOTHING IN THE
 6   RECORD THAT SUGGESTS THAT IT WAS.  THERE'S, YOU KNOW,
 7   "WE HAVE DOCTORS."  THERE'S NOTHING THAT SUGGESTS THAT
 8   WHAT MR. SPRINSON AND DR. HILDALGO AND ALL OF OUR
 9   EXPERTS WHO ARE AT THE TOP OF THEIR FIELD HAVE
10   EXPLAINED ARE THE BARE MINIMUM FOR THE TREATMENT OF
11   THIS KIND OF HARM.
12              THERE WAS A DECLARATION THAT WAS ALSO
13   SUBMITTED ON THE DOCKET LAST NIGHT THAT'S SIMILAR.  THE
14   EVIDENCE THAT WE SUBMITTED SAYS THAT, FIRST OF ALL, YOU
15   HAVE TO HAVE PROVIDERS WHO ARE TRAINED IN THESE KINDS
16   OF VERY SPECIFIC TRAUMA-INFORMED SERVICES.  AND THEN
17   THEY HAVE TO PROVIDE THESE VERY SPECIFIC SERVICES.
18              THE COURT:  YOU'RE TALKING ABOUT DOCKET 136-1?
19              MR. FEE:  YES.
20              THE COURT:  I HAVE THAT.
21              MR. FEE:  AND THIS IS ANOTHER, I THINK, GOOD
22   EXAMPLE OF WHY IT'S CLEAR FROM THE RECORD THAT THE KIND
23   OF SERVICES THAT WE'RE SEEKING ARE NOT PROVIDED.  THIS
24   IS ESSENTIALLY IDENTICAL TO THE FIRST DECLARATION FROM
25   THIS INDIVIDUAL --
```

```
1              THE COURT:  NO, I UNDERSTAND.

2              MR. FEE:  -- MR. DE LA CRUZ.

3                  AND THE FIRST THING --

4              THE COURT:  I'VE REVIEWED THIS.

5              MR. FEE:  LET ME JUST POINT YOU TO --

6              THE COURT:  THE ONLY CHANGES TO THIS THAT I'VE

7    NOTICED ARE AT PARAGRAPHS 15 AND 16 FROM WHAT WAS

8    PREVIOUSLY SUBMITTED.

9              MR. FEE:  THAT'S RIGHT.

10                 AND THERE'S NOTHING IN HERE ABOUT HAVING

11   TRAUMA-INFORMED SERVICE TRAINING.  I SUSPECT THAT IF HE

12   DID, IT WOULD BE IN THERE.  THERE'S NOTHING ABOUT THE

13   SPECIFIC SERVICES, THEIR TRAUMA-INFORMED SERVICES THAT

14   HE PROVIDED TO OUR CLIENTS OR ANY CLASS MEMBERS.

15                 AND, AGAIN, I SUSPECT, IF HE HAD, WE

16   WOULD SEE IT BECAUSE THE ROAD MAP TO THOSE KINDS OF

17   SERVICES WAS LAID OUT IN GREAT DETAIL IN OUR EXPERTS'

18   DECLARATIONS.

19                 AND, YOU KNOW, I WOULD ALSO POINT TO THE

20   FACT THAT, IN THIS DECLARATION THAT WAS SUBMITTED LAST

21   NIGHT, IT ACTUALLY, IF ANYTHING, DEMONSTRATES THAT THE

22   GOVERNMENT DOESN'T FOLLOW THEIR OWN POLICIES.  I MEAN,

23   ON PAGE 5 OF THE DECLARATION, IT STATES THAT -- AND

24   PARAGRAPH 11, ONE OF THE CHILDREN, FOR INSTANCE, WAS

25   REPORTEDLY ABUSED BY A STRANGER IN HER HOME COUNTRY AND
```

```
1    WAS ROBBED DURING THE JOURNEY TO THE UNITED STATES.

2                AND THEN IF YOU FLIP LATER TO PAGE 6, IT

3    EXPLAINS WHEN DETAINED INDIVIDUALS MEET THE CRITERIA

4    FOR A HOME STUDY.  AND THEN FOOTNOTE 1, IT SAYS, THAT

5    ONE OF THE CRITERIA FOR A HOME STUDY IS THAT THE CHILD

6    HAS BEEN A VICTIM OF PHYSICAL OR SEXUAL ABUSE UNDER

7    CIRCUMSTANCES THAT INDICATE THAT THE CHILD'S HEALTH OR

8    WELFARE HAS BEEN SIGNIFICANTLY HARMED OR THREATENED.

9                AND THEN BACK UP TO THE TEXT, IT SAYS,

10   "THAT MY REVIEW OF THE RECORDS INDICATES THAT ALL THESE

11   CHILDREN WERE RELEASED WITHOUT A HOME STUDY."

12        THE COURT:  "MY REVIEW OF THE RECORDS

13   INDICATES THAT NONE OF THESE THREE CHILDREN MET THE

14   CRITERIA FOR HOME STUDY," CLOSED QUOTE.  I SEE THAT.

15        MR. FEE:  IT'S INTERNALLY INCONSISTENT.

16                AS YOU KNOW, YOUR HONOR, THE RECORD AND

17   THE MEDIA IS FULL OF EVIDENCE OF THE SERVICES AT THESE

18   DETENTION FACILITIES BEING BLASTED AS BEING INADEQUATE.

19                YOUR HONOR, FROM WHAT I HEARD FROM THE

20   GOVERNMENT A MOMENT AGO IS ESSENTIALLY A CONSTRUCT THAT

21   REALLY PROVIDES LITTLE TO NO LIMIT ON WHAT THE

22   GOVERNMENT CAN DO TO THESE PEOPLE WHILE THEY'RE IN

23   CUSTODY AS LONG AS THEY'RE RELEASED QUICKLY ENOUGH.

24                I MEAN, AS I UNDERSTAND IT, THERE'S -- AS

25   LONG AS THE PERSON -- EVEN IF THE GOVERNMENT INFLICTS
```

```
1    AN INTENTIONAL HARM, INTENTIONALLY HARMS THE PERSON

2    WHILE IN CUSTODY, AS LONG AS THEY'RE RELEASED BY THE

3    TIME IT -- AND DOESN'T AVAIL THEMSELVES OF KNOWLEDGE OF

4    THE HARM THAT WAS CAUSED BY SIMPLY NOT TALKING TO THE

5    PERSON ABOUT IT, THEN AS LONG AS THE PERSON IS RELEASED

6    BY THE TIME YOU GET TO COURT, THE GOVERNMENT NO LONGER

7    HAS A DUTY BECAUSE THE PERSON HAS BEEN RELEASED.  AND

8    THE GOVERNMENT CAN RELY ON THE FACT THAT HE DIDN'T ASK

9    HIM ABOUT THEIR MENTAL HEALTH ILLNESSES TO SAY THAT

10   THEY DON'T KNOW.

11          NOW, ALL OF THIS IGNORES THE CRUCIAL

12   SECOND PART OF OUR RELIEF, WHICH IS -- AND THE PART

13   THAT REALLY WAS IGNORED THROUGHOUT THE PAPERS AND IN

14   THE ARGUMENT TODAY, WHICH IS THE STATE CREATED DANGER

15   DOCTRINE.

16          THE COURT:  YOU MADE THIS POINT EARLIER.

17          MR. FEE:  RIGHT.

18          BUT I THINK THAT'S THE KEY ADDITIONAL

19   DISTINCTION.  FRANKLY, THAT'S ALSO PART OF WHAT

20   DISTINGUISHES OUR CASE FROM MS. L.  AND IT'S AN

21   ENTIRE -- IT'S NOT ONLY A SEPARATE REMEDY AS THE

22   GOVERNMENT SUGGESTED.  IT'S AN ENTIRELY SEPARATE

23   CONSTITUTIONAL VIOLATION.  TWO DIFFERENT DUE PROCESS

24   INTERESTS THAT WERE NOT AT ISSUE IN MS. L.  IT'S A

25   SEPARATE CLAIM.  IT'S NOT MERELY SEPARATE AND DIFFERENT
```

```
 1   RELIEF.  IT'S A FUNDAMENTALLY SEPARATE CLAIM, A
 2   SEPARATE INTEREST.  AND IT'S A SEPARATE CASE.
 3                NOW, ON THE -- I WON'T SAY MUCH ABOUT THE
 4   MONEY DAMAGES ISSUE.  I WOULD JUST POINT THE COURT TO
 5   THE BOWEN CASE AND OUR DISCUSSION OF THAT IN THE
 6   PAPERS.
 7                IT'S NOT MERELY COMPENSATORY RELIEF.
 8   IT'S -- IT'S MONEY DAMAGES.  THIS IS NOT A MONEY
 9   DAMAGES CASE.  WE ASKED FOR PROVISION OF SERVICES.
10   JUST AS YOU CAN -- YOU KNOW, THERE WAS A STATEMENT THAT
11   YOU CAN PHRASE ANYTHING AS INJUNCTIVE RELIEF.  YOU CAN
12   PHRASE ANYTHING AS MONETARY RELIEF TOO.
13                THE COURT:  YOU'RE TALKING ABOUT THE DIRECTIVE
14   THAT THE UNITED STATES FUND A STATE MEDICAL PROCESS AS
15   REQUIRED BY STATUTE?
16                MR. FEE:  I'M -- IN THE BOWEN CASE?
17                THE COURT:  YES.
18                MR. FEE:  I'M TALKING ABOUT THE DEFINITION
19   THERE FOR MONETARY RELIEF UNDER SECTION 702, WAIVER OF
20   SOVEREIGN IMMUNITY.
21                IT'S NOT MERELY COMPENSATORY RELIEF.
22   IT'S MONETARY RELIEF.
23                AND AS IT STATES IN BOWEN, IF IT'S AN
24   INJUNCTION -- IF THEY SEEK INJUNCTIVE RELIEF, EVEN IF
25   THAT INJUNCTIVE RELIEF HAPPENS TO INCLUDE THE PAYMENT
```

1    OF MONEY, WHICH OUR CASE DOES NOT, IT IS WITHIN THE

2    WAIVER, AND IT IS APPROPRIATE.

3              NOW, I DO BELIEVE THAT THERE ARE A COUPLE

4    OF CLASS CERTIFICATION RELATED ARGUMENTS THAT WE'D LIKE

5    TO RESPOND TO, YOUR HONOR.  AND I'D LIKE TO PASS THOSE

6    OFF TO MY COLLEAGUE, MR. BROWN.

7              THE COURT:  THE STATE CREATED DANGER DOCTRINE,

8    ISN'T THAT ORDINARILY APPLIED WITH RESPECT TO DANGER

9    CREATED BY THIRD PARTIES, NOT THE GOVERNMENT, SUCH AS

10   THE WITNESS WHO WAS BROUGHT HERE WAS SUBJECT TO RISK BY

11   THOSE AGAINST WHOM THE WITNESS MIGHT BE TESTIFYING?

12             MR. FEE:  IT IS, YOUR HONOR.

13             BUT THERE'S NO MEANINGFUL BASIS THAT I

14   COULD SEE WHY A RISK THAT IS CREATED BY A GOVERNMENT

15   HARM SHOULD BE SUBJECTED TO A LOWER STANDARD THAN THE

16   THIRD PARTY.  I THINK THAT THE STATE CREATED DANGER

17   DOCTRINE MERELY SHOWS THAT THE SCOPE OF DUE PROCESS

18   GUARANTEES IS QUITE A BIT BROADER THAN WHAT IS

19   NECESSARY IN THIS CASE.

20             THE COURT:  OKAY.  ALL RIGHT.  THANK YOU,

21   MR. FEE.

22             MR. FEE:  THANK YOU, YOUR HONOR.

23             THE COURT:  MR. BROWN?

24             MR. BROWN:  YOUR HONOR, I'LL BE VERY BRIEF.  I

25   JUST HAVE TWO QUICK FOLLOW-UP POINTS.

1    THE FIRST IS ON THE ISSUE OF POTENTIALLY

2    CREATING A SUBCLASS OF DETAINED MEMBERS.  I THINK IT

3    MAY NOT BE INSTRUCTIVE, AND IT IS CERTAINLY NOT

4    NECESSARY.  A TRAUMA-INFORMED MENTAL HEALTH SCREENING

5    IS A STRAIGHTFORWARD REQUEST.

6    FOR EXAMPLE, I GET THE DIFFICULTY WITH

7    CONTEMPLATING WHAT FORM OF RELIEF THIS MAY TAKE.  BUT,

8    FOR EXAMPLE, IN MS. L., JUDGE SABRAW DID NOT KNOW HOW

9    THE GOVERNMENT WAS GOING TO REUNITE DEPORTED CLASS

10   MEMBERS OR SEPARATED CLASS MEMBERS WHEN JUDGE SABRAW

11   ORDERED REUNIFICATION.  BUT REUNIFICATION WAS A

12   STRAIGHTFORWARD REQUEST THAT COULD AND SHOULD AND WAS

13   ORDERED ON A CLASS-WIDE BASIS.

14   RELATEDLY, MEDICAL MONITORING IS A

15   WELL-RECOGNIZED FORM OF RELIEF THAT HAS BEEN ORDERED ON

16   A CLASS-WIDE BASIS.

17   ANOTHER EXAMPLE OF SIMILAR RELIEF WOULD

18   BE AN INADEQUATE INTERPRETATION OF INSURANCE BENEFITS.

19   IN SUCH A CASE WHEN -- IF IT WAS FOUND THAT THE

20   DETERMINATION WAS IMPROPER, THE COURT WOULD BE ABLE TO

21   ORDER INJUNCTIVE RELIEF AND ORDER THAT THE INSURANCE

22   COMPANY TO REPROCESS THE CLAIM UNDER THE CORRECT

23   STANDARD.  AND THAT IS INJUNCTIVE RELIEF AND NOT

24   COMPENSATORY RELIEF.

25   SIMILAR TO THAT, A TRAUMA-INFORMED MENTAL

1    HEALTH SCREENING IS NO DIFFERENT.  AND DEFENDANTS ADMIT

2    THAT SUCH A SCREENING IS SIMPLE.  I WILL REFERENCE A

3    HYPOTHETICAL THAT MY COLLEAGUE MENTIONED EARLIER.  AND

4    THAT IS, IF YOU WERE TO CONSIDER A GROUP OF WOMEN AND

5    CHILDREN WHO WERE DETAINED AND EXPOSED TO HEPATITIS C,

6    AND THE PURPOSE OF THIS EXPOSURE WAS TO DETER THESE

7    WOMEN AND CHILDREN FROM COMING TO THE UNITED STATES,

8    AND THEN THEY WERE RELEASED AND NOT APPROPRIATELY

9    SCREENED OR TREATED FOR HEPATITIS, NOW ALL OF THESE

10   WOMEN AND CHILDREN WOULD NEED AND DESERVE APPROPRIATE

11   HEALTH SCREENINGS AND TREATMENT IMMEDIATELY.  IT WOULD

12   BE VERY IMPORTANT.  AND IT WOULD BE UNCONSCIONABLE TO

13   DELAY THE SCREENING AND TREATMENT OF WOMEN AND CHILDREN

14   WHO HAD BEEN RELEASED SIMPLY BECAUSE TREATING THEM AND

15   FINDING THEM WOULD BE DIFFICULT.

16                  THIS CASE IS NOT DIFFICULT.  THE MENTAL

17   HARM THE FAMILIES HAVE SUFFERED IS REAL, YOUR HONOR.

18   AND IT SHOULD BE REMEDIED ON A CLASS-WIDE BASIS.

19                  MY SECOND POINT IS, TO THE EXTENT THAT

20   DEFENDANTS ARE NOW ARGUING, AND HAVE ARGUED, THAT THEY

21   DO HAVE SUFFICIENT POLICIES AND PROCEDURES IN PLACE OR

22   THAT THEY DO NOT ACTUALLY HAVE A DUTY TO PROVIDE SUCH

23   CARE - CLAIMS WITH WHICH WE VEHEMENTLY DISAGREE - IN

24   THE TERMS OF THE MOTION FOR CLASS CERTIFICATION, THAT

25   IS A MERITS ARGUMENT.  AND IT DOES NOT DEFEAT CLASS

```
1    CERTIFICATION.

2                    THANK YOU, YOUR HONOR.

3           THE COURT:  LET ME ASK YOU ONE OTHER QUESTION,

4    MR. BROWN, ALTHOUGH I DON'T KNOW THAT YOU SPECIFICALLY

5    ADDRESSED IT.

6                    BUT IF SOMEBODY IS -- IF SOMEBODY IS --

7    GOING BACK TO THE GOVERNMENT'S POSITION AS TO TORT

8    CLAIMS.  IF A PERSON IS INJURED BY AN ALLEGED TORT IN

9    AN AUTOMOBILE ACCIDENT OR SOME OTHER MANNER, THERE ARE

10   TIMES WHERE THAT INDIVIDUAL CAN BE TREATED BY MEDICAL

11   PERSONS WHO DO THE TREATMENT WITHOUT CHARGING, BUT HAVE

12   A LIEN THAT THEY ESTABLISH WITH RESPECT TO ANY RECOVERY

13   THAT THE PLAINTIFF MIGHT OBTAIN AT THE END OF THE

14   LITIGATION.

15                   DOES THAT HAVE ANY APPLICATION HERE?

16           MR. BROWN:  I'M NOT UNDERSTANDING HOW IT WOULD

17   APPLY AT ALL.

18           THE COURT:  WELL, I UNDERSTAND THAT -- YOUR

19   POSITION IS, THIS IS AN INJUNCTIVE RELIEF.  THE

20   GOVERNMENT'S POSITION IS, THAT IT'S TORT RELIEF.  THERE

21   WAS A DISCUSSION EARLIER ABOUT, IF YOU HAD TO WAIT

22   UNTIL THE END OF THE FEDERAL TORT CLAIMS ACT FOR THE

23   TREATMENT THAT YOU NEEDED, IT WOULD BE TOO LATE.

24                   SO MY QUESTION IS, WHAT I JUST STATED.

25   YOU COULD GET -- COULD YOU GET THE TREATMENT
```

```
1    IMMEDIATELY?

2              AND THE PERSON WHO PROVIDED IT, DOING IT

3    WITHOUT REQUIRING CASH OR PAYMENT, BUT INSTEAD HAVING A

4    LIEN?

5              MR. BROWN:  I MEAN, I THINK THAT MISSTATES OUR

6    CASE AND OUR SITUATION.  I THINK, HERE, THE GOVERNMENT

7    HAD A DUTY TO PROVIDE THIS CARE.  AND THEY DID NOT

8    PROVIDE THAT DUTY.

9              THE COURT:  OKAY.  OKAY.  ALL RIGHT.  THANK

10   YOU, MR. BROWN.

11              IS THERE ANYTHING NEW YOU HAVE TO ADD,

12   MR. HEYSE?

13              MR. HEYSE:  IF I MAY?

14              THE COURT:  BRIEFLY.

15              MR. HEYSE:  VERY BRIEFLY.  I PROMISE.

16              JUST WITH RESPECT TO THE DE LA CRUZ

17   DECLARATION.  THE INCONSISTENCY BETWEEN PARAGRAPH 11

18   WHERE HE DESCRIBES AN INDIVIDUAL THAT WAS, QUOTE,

19   "REPORTEDLY ABUSED BY A STRANGER IN HER HOME COUNTRY,"

20   AS COMPARED TO FOOTNOTE 1 TALKING ABOUT, THAT THE TVPRA

21   REQUIRES A HOME STUDY IN THE EVENT THE CHILD HAS BEEN A

22   VICTIM OF PHYSICAL OR SEXUAL ABUSE.  THAT SPEAKS

23   CONCLUSIVELY THAT THE CHILD HAS INDEED BEEN A VICTIM.

24              PARAGRAPH 11 DESCRIBES "REPORTEDLY

25   ABUSED."  SO IT'S A SUGGESTION THAT THERE WAS ABUSE.
```

```
 1              THAT FOOTNOTE ALSO DESCRIBES HOW IT'S
 2    "THE TOTALITY OF THE CIRCUMSTANCES."  IT'S THE
 3    EVALUATION OF EVERYTHING.  AGAIN, IT SPEAKS TO WHAT
 4    TYPE OF REVIEW O.R.R. ENGAGES IN WHEN IT COMES TO
 5    HANDLING THESE INDIVIDUALS AND WHAT KIND OF CARE
 6    THEY'RE GIVEN AND WHAT KIND OF SERVICES ARE PROVIDED TO
 7    THEM.
 8              THE REVIEW WAS ON CONDUCTED.  AND IT
 9    WAS -- WHAT HIS STATEMENT IS STATING IS THAT A HOME
10    STUDY WAS NOT REQUIRED FOR THIS INDIVIDUAL.
11              OTHERWISE, WE STAND BY OUR PRIOR
12    ARGUMENTS.
13         THE COURT:  JUST A MINUTE.
14              HAVE YOU HAD ANY -- HAVE THERE BEEN ANY
15    DISCUSSIONS ABOUT TRYING INFORMALLY TO RESOLVE THIS
16    MATTER?
17              I'M NOT ASKING FOR THE SUBSTANCE OF THOSE
18    DISCUSSIONS.  JUST HAVE THERE BEEN ANY?
19         MR. HEYSE:  DURING OUR JOINT STATUS REPORT --
20    OUR JOINT REPORT CONFERENCE, WE AGREED THAT SETTLEMENT
21    DISCUSSIONS AT THIS TIME WERE INAPPROPRIATE -- OR
22    PREMATURE.
23         THE COURT:  DO YOU AGREE WITH THAT,
24    MS. LALLY?
25         MS. LALLY:  YOUR HONOR, I DID PARTICIPATE IN
```

```
1     THE RULE 26 CONFERENCE WITH MR. HEYSE.
2              MY RECOLLECTION IS THAT WE AGREED THAT,
3     AFTER THE COURT'S RULING ON THESE MOTIONS WOULD BE A
4     VERY OPPORTUNE TIME TO HAVE THAT -- THOSE NEGOTIATIONS.
5          THE COURT:  ALL RIGHT.
6          MR. HEYSE:  I AGREE WITH THAT.
7          THE COURT:  ALL RIGHT.  THE REASON THAT I ASK
8     IS, THERE WAS SOMETHING, I BELIEVE, MR. HEYSE, YOU SAID
9     DURING THE HEARING TODAY, WHICH IS, WITH RESPECT TO THE
10    MENTAL HEALTHCARE FOR THOSE WHO ARE NO LONGER DETAINED,
11    I THINK YOUR WORDS WERE TO THE EFFECT, QUOTE,
12    "RESOURCES ARE OUT THERE," CLOSED QUOTE.  AND I THINK
13    YOU WERE REFERRING TO SOME PRO BONO AND OTHER
14    OPPORTUNITIES.  RIGHT?
15         MR. HEYSE:  YES, YOUR HONOR.
16         THE COURT:  AND I THINK YOU HAVE ALSO STATED
17    THAT -- INCLUDING WITH THE PINK SLIP THAT WAS SUBMITTED
18    TODAY, ABOUT WHICH, AGAIN, I HAVE NO EVIDENCE.  BUT
19    THAT SCREENING IN SOME MANNER IS DONE.  AND YOU THINK
20    WHAT'S BEING DONE IS ADEQUATE TO IDENTIFY WHAT SERVICES
21    ARE NEEDED.  SO I KNOW THERE'S A DISAGREEMENT ON THE
22    ADEQUACY OF THE SCREENING.  AND THERE MAY BE -- THERE'S
23    A DISAGREEMENT ON THE NATURE OF THE SERVICES THAT ARE
24    BEING PROVIDED.  BUT IF THERE'S A MEANS OF SCREENING
25    AND THERE'S RESOURCES OUT THERE, THERE SEEMS TO BE A
```

```
1    PATH WHERE YOU MIGHT BE ABLE TO RESOLVE SOME OR ALL OF

2    THIS.

3              MR. HEYSE:  AS TO THE INDIVIDUALS THAT ARE

4    DETAINED, IF THEY NEED MORE SCREENING, THAT'S CERTAINLY

5    SOMETHING THE GOVERNMENT WOULD SAY IS ITS DUTY TO

6    PROVIDE ADEQUATE CARE.  IF THE COURT DECIDES THAT'S

7    PART OF THAT DUTY, THEN, YES.

8                   AS TO INDIVIDUALS THAT HAVE BEEN RELEASED

9    ALREADY, AGAIN, WAKEFIELD LIMITS --

10             THE COURT:  NO, I UNDERSTAND THE LEGAL

11   ARGUMENTS HERE.  I'M NOT ASKING YOU TO -- I'M ASKING

12   FOR YOU TO CONSIDER THESE THINGS AS YOU PROCEED WITH

13   YOUR POTENTIAL DISCUSSIONS TO EITHER RESOLVE THE MATTER

14   OR NARROW THE DISPUTES.

15             MR. HEYSE:  YES, CERTAINLY OPEN TO SUCH IDEAS.

16   AGAIN, IT'S A MATTER OF RESOURCES AVAILABLE TO THE

17   AGENCY, FUNDING, THINGS OF THAT NATURE.

18             THE COURT:  WITH RESPECT TO DATES IN THIS

19   MATTER, I THINK IT WOULD BE MORE PRODUCTIVE FOR ME TO

20   GET THROUGH THESE TWO MOTIONS BEFORE SETTING DATES.

21             I RECOGNIZE YOU HAVE ASKED FOR AN

22   ACCELERATED DATE ON THE MOTION TO DISMISS.  I THINK

23   I'LL BE IN A BETTER POSITION TO EVALUATE DATES WHEN I

24   GET THESE THROUGH THESE TWO MOTIONS.

25             MR. HEYSE:  OKAY.
```

1              MR. FEE:  THANK YOU, YOUR HONOR.

2              MR. HEYSE:  CLARIFICATION ON THE EX PARTE

3     MOTION?  THAT'S NOT BEEN DENIED.  IT'S JUST A DECISION

4     ON IT HAS BEEN DEFERRED?

5              THE COURT:  CORRECT.

6              MR. HEYSE:  OKAY.

7              THE COURT:  THANK YOU FOR YOUR HELP TODAY.

8              MR. HEYSE:  THANK YOU, YOUR HONOR.

9              MR. FEE:  THANK YOU, YOUR HONOR.

10                   **(END OF PROCEEDINGS)**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**CERTIFICATE OF OFFICIAL REPORTER**


COUNTY OF LOS ANGELES          )
                               )
STATE OF CALIFORNIA            )

              I, ALEXANDER T. JOKO, FEDERAL OFFICIAL

COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT

COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY

CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED

STATES CODE, THAT THE FOREGOING IS A TRUE AND CORRECT

TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS

HELD IN THE ABOVE-ENTITLED MATTER, AND THAT THE

TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED

STATES.

DATE:  SEPTEMBER 28, 2018



                    /S/ ALEXANDER T. JOKO
                    _____
                    ALEXANDER T. JOKO, CSR NO. 12272
                    FEDERAL OFFICIAL COURT REPORTER

< DATES >
JUNE 26TH, 2018
37:22
SEPTEMBER 20,
2018 1:30, 3:1
SEPTEMBER 28,
2018 88:28
THREE MAY 5:2
"TWO 37:3
$25 56:19
(3) 52:8
.O. 43:8,
65:15, 66:9,
66:15
/S/ 88:33

< 1 >
1 51:9, 73:8,
73:21, 76:4,
83:20
1,000 28:17,
28:22
11 75:24,
83:17, 83:24
12-MONTH 62:9
12272 1:38,
88:35
12TH 38:9,
38:10
136-1 74:18
14 49:18
15 75:7
16 75:7
165 49:4
17TH 2:21, 2:26
1800 64:9
1983 20:22
1999 2:21, 2:26
1:30 1:30, 3:4

< 2 >
20 48:18,
49:22, 50:2,
50:3
200 11:2
20044 2:33,
2:40
211 49:3

222 51:10
23 31:13, 69:2
26 85:1
2600 48:17
28 88:14

< 3 >
3,000 28:18
350 1:40

< 4 >
4 51:10
4311 1:40
437 51:5

< 5 >
5 38:1, 75:23

< 6 >
6 76:2
60603 2:17
610 2:11
699 2:6

< 7 >
7 38:11
702 78:19
753 88:14

< 8 >
8-MONTH 62:10
82 38:1
84 48:19
878 2:32, 2:39

< 9 >
9 3:10
90005 2:12
90012 1:41
90067 2:22,
2:27
90089-0071 2:7

< A >
A. 1:3, 70:3
ABLE 29:17,
31:25, 57:18,
80:20, 86:1
ABOVE-ENTITLED
88:20
ABSENT 12:19,
37:19, 41:24,
58:22
ABSOLUTE 4:22
ABSOLUTELY
24:18, 27:22,
33:6, 42:11,
59:16
ABUSE 51:1,
76:6, 83:22,
83:25
ABUSED 75:25,
83:19
ABUSED. 83:25
ABUSING 8:3
ACCELERATE 7:7
ACCELERATED
86:22
ACCEPTED 14:3
ACCESS 31:1
ACCIDENT 82:9
ACCURATE 45:24,
48:13, 62:11
ACKNOWLEDGED
46:13
ACT 43:12,
44:19, 64:5,
82:22
ACTION 4:18,
5:5, 14:14,
14:16, 14:17,
21:10, 39:22,
39:25, 52:9,
52:10, 56:12,
64:16
ACTIONS 5:8,
21:24, 39:12,
60:4
ACTIVELY 48:1
ACTS 15:3
ACTUAL 26:13,
68:16

ACTUALLY 14:18,
15:5, 26:6,
26:7, 41:5,
45:1, 48:6,
53:2, 56:17,
56:25, 69:15,
73:2, 75:21,
81:22
AD 41:11, 43:25
ADD 22:20,
43:4, 83:11
ADDED 43:3
ADDITIONAL
77:18
ADDRESS 9:4,
12:9, 19:14,
22:16, 22:22,
23:1, 25:3
ADDRESSED 7:15,
27:6, 29:21,
59:18, 65:2,
73:3, 73:4,
82:5
ADDRESSES 10:24
ADDRESSING 7:8,
25:7, 25:8,
36:9
ADEQUACY 67:6,
85:22
ADEQUATE 13:11,
15:8, 27:12,
28:5, 30:7,
44:9, 44:23,
45:10, 46:1,
46:2, 63:1,
85:20, 86:6
ADEQUATELY
22:17, 26:8,
28:1
ADHERE 59:11
ADJUDICATED
35:23, 68:21,
68:22
ADMINISTERED
45:3, 64:19
ADMINISTRATION
9:19
ADMIT 81:1
ADOPTIVE 49:19
ADULT 37:1,

37:7, 37:13
ADULTS 48:10
ADVANCE 6:22
ADVANCED 4:11
ADVANCING 32:19
ADVERSE 28:4
ADVOCATES 29:12
AFFECTED 22:14
AFFECTS 35:6
AFFIRMATIVE
6:3, 15:2,
18:1, 74:1
AFFIRMATIVELY
44:16, 58:2
AFTERNOON 3:9,
3:14, 3:16,
3:26, 3:27,
4:2, 24:11,
33:14
AFTERWARDS
60:15
AGENCY 86:17
AGO 22:8, 76:20
AGREE 84:23,
85:6
AGREED 84:20,
85:2
AHEAD 38:3,
49:24, 72:16
AJ_CSR@YAHOO.CO
M 1:42
AL 1:7, 1:13,
3:10, 3:11
ALEXANDER 1:38,
88:8, 88:33,
88:35
ALIKE 9:16
ALLEGE 13:3
ALLEGED 60:10,
60:14, 82:8
ALLEGEDLY
57:15, 59:1,
59:3, 66:11
ALLOWING 9:2,
12:2, 18:21
ALLOWS 19:17
ALMOST 36:12
ALREADY 9:24,
19:14, 26:24,
33:17, 46:12,

73:3, 86:9
ALTERNATIVE
54:8, 54:11
ALTHOUGH 82:4
AMEND 5:25
AMENDED 39:9
AMENDMENT 8:2
AMONG 71:15
AMOUNT 23:17
AMOUNTS 39:21,
63:6, 64:11
AMY 2:24, 3:16
ANALOGY 21:3
ANALYSIS 69:2,
73:22
AND/OR 18:4
ANGELES 1:28,
1:41, 2:7,
2:12, 2:22,
2:27, 3:1, 88:3
ANGRY 11:8
ANSWER 16:4,
27:16, 27:17
ANSWERED 33:20
ANSWERS 30:4
ANTAGONISM
65:18, 65:22,
65:25, 66:6
ANTICIPATE
17:14
ANYTIME 42:1
APART 9:15,
10:6
APOLOGIZE 57:8
APPARENTLY
51:21
APPEAL 24:3,
35:22
APPEARANCE 24:7
APPEARANCES
2:1, 3:12
APPELLATE 4:16,
5:9, 5:11
APPLICATION
6:21, 82:15
APPLIED 33:1,
79:8
APPLIES 44:2
APPLY 42:12,
82:17

APPROACH 20:2,
20:11
APPROPRIATE
4:19, 19:6,
19:7, 25:4,
30:22, 31:19,
34:21, 44:24,
46:5, 46:8,
46:10, 51:17,
52:20, 55:8,
65:8, 67:24,
68:5, 68:6,
68:12, 79:2,
81:10
APPROPRIATELY
22:1, 81:8
APPROPRIATENESS
50:21
APPROXIMATELY
28:17
ARDMORE 2:11
ARGUE 44:10
ARGUED 14:25,
15:8, 81:20
ARGUING 18:3,
81:20
ARGUMENT 46:18,
46:19, 55:19,
55:20, 77:14,
81:25
ARGUMENTS 4:10,
7:6, 7:13,
79:4, 84:12,
86:11
ARISE 16:2
ARISING 60:11
ARRIVAL 44:14,
44:15
ARRIVING 9:25
ASIDE 64:25
ASLEEP 8:22
ASPECTS 24:4,
61:16
ASSOCIATE 7:16
ASSOCIATED
42:14
ASSUME 68:6
ASSUMING 46:23,
47:16, 49:16
ASSURE 52:24

ASYLUM 57:17
ATMOSPHERE
71:15
ATTENDANT 61:17
ATTENDED 56:11
ATTENTION 13:3
ATTORNEYS 38:18
AUSTIN 2:15,
2:20, 2:25,
3:17, 3:19
AUTHORITY 39:24
AUTHORIZED
68:17
AUTOMOBILE 82:9
AVAIL 77:3
AVAILABILITY
56:19
AVAILABLE
14:23, 45:13,
56:10, 56:16,
57:1, 58:17,
71:10, 71:24,
86:16
AVAILED 44:15,
57:5
AVENUE 2:11,
2:21, 2:26
AWARE 10:13,
24:15
AWAY 67:10

< B >
B(1 52:7
B(2 40:6,
64:16, 72:9
B. 1:13, 3:11
BACK 29:23,
32:22, 41:7,
41:8, 54:5,
57:23, 61:7,
61:9, 66:17,
67:6, 67:17,
68:25, 69:21,
76:9, 82:7
BACKGROUND 7:12
BACKGROUNDS
69:4
BAG 64:18
BALANCE 12:19,

35:7
BARE 74:10
BASED 16:7,
21:19, 27:10,
41:16, 52:17,
56:12, 60:18
BASES 13:5
BASIC 31:3
BASIS 5:6,
5:24, 13:3,
13:6, 13:23,
14:9, 14:10,
21:13, 32:16,
34:21, 57:16,
79:13, 80:13,
80:16, 81:18
BE-ALL 27:24
BE. 36:23
BEAR 61:18
BECOME 26:16,
28:8
BECOMES 61:6
BEGIN 12:1
BEGINNING 26:4,
62:25
BEGUN 10:21
BEHALF 3:15,
3:17, 7:23,
24:9, 33:15,
36:5, 43:10,
43:16
BEHAVIOR 63:8,
72:4
BEHIND 67:13
BELIEVE 6:9,
16:10, 16:15,
16:17, 23:11,
36:24, 38:9,
38:11, 45:24,
48:5, 48:7,
50:12, 50:24,
53:24, 59:17,
61:4, 61:25,
71:5, 79:3,
85:8
BELOW 20:16
BEN 2:32, 2:39
BENEFIT 28:6,
31:6, 43:6,
63:10, 64:17,

64:18
BENEFITS 80:18
BESIDES 13:15,
50:16
BEST 29:13,
42:19
BETTER 31:25,
46:12, 65:20,
86:23
BEYOND 40:12,
47:4, 63:24,
63:25, 67:18,
67:22
BIG 42:9, 67:11
BIT 26:14,
30:11, 59:14,
79:18
BIVENS 20:22,
52:8, 55:4,
55:19, 56:4,
56:7, 56:11,
64:5
BLACK 64:9
BLAMING 11:9
BLASTED 76:18
BLVD 2:6
BOND 16:9,
50:11, 50:13,
50:16
BONDED 50:12
BONDS 10:8
BONO 56:20,
56:23, 57:19,
85:13
BORDER 9:15,
9:25, 10:16
BORDERS 8:25
BORE 12:21
BOTTOM 30:20
BOUND 61:13
BOUNDS 15:12
BOWEN 78:5,
78:16, 78:23
BOX 2:32, 2:39,
70:10
BRAKES 34:7
BREACH 51:14
BRIDGET 3:18
BRIEF 13:19,
79:24

BRIEFED 7:1
BRIEFLY 33:18,
71:6, 83:14,
83:15
BRIEFS 24:16
BRING 19:18,
46:16, 56:3
BRINGING 15:21,
29:24, 40:2,
51:22
BROAD 19:17
BROADER 33:3,
79:18
BROUGHT 11:6,
12:14, 43:15,
54:24, 79:10
BROWN 2:19,
3:18, 7:16,
24:9, 24:11,
24:12, 24:15,
24:21, 25:18,
26:1, 27:10,
27:15, 28:19,
28:23, 29:23,
30:20, 30:25,
32:2, 32:10,
33:4, 33:9,
33:11, 79:6,
79:23, 79:24,
82:4, 82:16,
83:5, 83:10
BURDEN 17:25,
61:18


< C >
C. 2:29
CA 1:41, 2:7,
2:12, 2:22,
2:27
CALCULATION
49:15
CALENDAR 3:20
CALIFORNIA 1:2,
1:28, 2:4, 3:1,
4:13, 88:5,
88:12
CALL 17:3
CAMPAIGN 21:23
CAPABLE 29:3,

29:8, 58:20
CARRIED 66:17
CASES 5:18,
8:7, 8:8, 8:17,
9:3, 13:16,
14:20, 15:17,
20:22, 24:23,
39:23, 50:24,
52:8, 63:5,
64:9
CASH 63:17,
83:3
CATASTROPHIC
12:13
CATEGORY 32:1,
50:15
CAUSE 21:18,
33:23, 51:14
CAUSED 9:11,
10:23, 11:16,
12:8, 12:9,
14:18, 55:2,
55:24, 64:4,
77:4
CEASED 72:5
CEASING 52:9
CENTER 25:13
CENTERS 19:22,
26:6
CENTRAL 1:2,
26:15, 88:12
CERT 7:14
CERTAIN 5:12,
6:16, 50:10,
61:22, 65:8,
68:4, 73:5
CERTAINLY 7:14,
10:22, 17:9,
39:2, 40:16,
54:22, 69:18,
80:3, 86:4,
86:15
CERTIFICATE
88:1
CERTIFICATION
4:5, 7:18,
22:25, 33:2,
79:4, 81:24,
82:1
CERTIFIED 40:1

CERTIFY 88:14
CHALLENGING 30:1
CHANGE 47:15
CHANGED 62:4
CHANGES 75:6
CHANGING 47:2
CHARACTERISTICS 69:5
CHARGING 82:11
CHARLES 60:1, 61:10
CHART 51:9
CHARTS 49:7
CHICAGO 2:17
CHILD 29:15, 37:3, 37:17, 42:2, 42:20, 50:25, 51:1, 52:18, 76:5, 76:7, 83:21, 83:23
CHILD. 37:20
CHILDREN 4:15, 9:16, 11:2, 11:7, 23:15, 40:25, 41:6, 41:10, 41:13, 41:16, 41:18, 41:22, 41:24, 42:13, 42:24, 43:6, 43:10, 43:11, 43:17, 43:24, 47:1, 48:17, 48:18, 48:23, 49:3, 49:11, 50:22, 51:6, 52:18, 58:14, 75:24, 76:11, 76:13, 81:5, 81:7, 81:10, 81:13
CHINESE 15:21
CHOOSE 17:11
CIRCUIT 12:15, 24:3
CIRCUMSTANCE 8:10
CIRCUMSTANCES 30:15, 76:7

CIRCUMSTANCES. 84:2
CITED 5:18, 13:19, 36:25, 60:1
CIVIL 2:31, 2:37, 39:11
CLAIM 21:17, 21:18, 22:2, 22:4, 29:25, 35:22, 39:3, 46:17, 51:13, 51:20, 56:4, 56:7, 56:9, 56:11, 56:20, 59:12, 64:13, 77:25, 78:1, 80:22
CLAIMED 29:6
CLAIMING 41:14
CLAIMS 21:18, 21:19, 27:25, 29:5, 39:7, 39:13, 39:17, 40:21, 41:8, 41:13, 42:7, 42:21, 43:12, 43:15, 46:22, 50:1, 51:23, 64:5, 81:23, 82:8, 82:22
CLARIFICATION 87:2
CLASS-WIDE 80:13, 80:16, 81:18
CLASSES 36:12, 40:8, 66:7
CLASSIC 29:3
CLASSWIDE 20:25
CLAUSE 8:1, 25:23
CLEAR 10:13, 13:23, 14:18, 23:22, 40:15, 65:22, 73:17, 74:22
CLEARLY 14:17
CLIENTS 23:24, 73:24, 75:14

CLOSE 27:24
CLOSED 76:14, 85:12
CLOSER 21:3
CODE 88:16
COLLATERAL 39:6
COLLEAGUE 24:22, 26:12, 30:11, 79:6, 81:3
COLLECTING 71:23
COLLEGIAL 71:15
COMBINATION 15:14, 16:6, 17:22
COMES 84:4
COMING 67:13, 68:25, 81:7
COMMENSURATE 64:8
COMMENT 23:7, 69:3
COMMITTED 8:23
COMMON 21:19, 30:4, 30:19
COMMONALITY 67:6
COMMUNITIES 10:11
COMMUNITY 14:4, 53:23
COMPANY 80:22
COMPARED 83:20
COMPELLING 56:12
COMPENSATE 66:11
COMPENSATION 51:16, 56:25
COMPENSATORY 41:20, 52:4, 63:4, 63:6, 63:24, 64:7, 72:8, 78:7, 78:21, 80:24
COMPETING 31:15, 43:19, 45:25
COMPLAINT 4:18,

23:10, 26:1, 39:1, 39:10, 40:14, 62:20
COMPLETELY 10:25, 45:15
COMPLEXITY 11:10
COMPLIANCE 17:7, 19:19
COMPLICATED 66:23
COMPLY 48:1, 71:24
CONCEDING 46:21
CONCERN 32:4, 71:9
CONCERNING 4:14, 6:25, 31:22, 71:20
CONCERNS 5:14, 19:25
CONCERTED 8:24, 12:10
CONCLUDES 52:19
CONCLUSION 62:15
CONCLUSIVELY 83:23
CONDITIONS 10:1, 50:10
CONDUCT 25:11
CONDUCTED 84:8
CONFERENCE 84:20, 85:1, 88:24
CONFIDENTIALLY 58:6, 71:10
CONFINED 31:10
CONFINEMENT 15:13
CONFORMANCE 88:22
CONFUSING 45:1
CONFUSION 66:5
CONGRESS 9:12
CONNECTION 33:2
CONSCIENCE 45:20, 60:4, 60:13, 60:15, 60:19, 62:18

CONSEQUENCES
11:23
CONSIDER 81:4,
86:12
CONSIDERED
35:19, 61:14
CONSISTENT 6:4,
61:23
CONSISTS 6:7
CONSPIRACY
15:22
CONSTITUTIONAL
12:7, 35:18,
35:21, 44:8,
45:19, 63:21,
77:23
CONSTITUTIONALI
TY 4:14, 60:7
CONSTITUTIONALL
Y 44:22
CONSTRUCT 76:20
CONTEMPLATE
64:24
CONTEMPLATING
80:7
CONTEND 6:13
CONTENTION 5:24
CONTEXT 39:25,
44:3, 44:8
CONTINUE 19:14
CONTINUED 6:2,
19:16, 54:16
CONTINUES 52:25
CONTINUING
11:20, 45:14,
61:2
CONVICTED 50:25
COPY 69:25,
70:21
CORRECT 16:10,
30:19, 30:24,
30:25, 34:19,
68:7, 68:8,
80:22, 87:5,
88:16
CORRECTLY 36:25
COST 51:25,
63:14
COUNSEL 2:1,
2:10, 3:13,

33:15, 34:6,
38:16, 42:3,
42:4, 43:5,
58:5, 58:19
COUNSELING
23:14, 44:12
COUNT 11:2
COUNTRY 10:2,
35:6, 35:12,
57:16, 67:14,
75:25, 83:19
COUNTY 70:14,
88:3
COUPLE 79:3
COURT. 23:19
COURTS 10:13,
10:20
COVER 39:13
COVERED 63:1,
63:15
CREATE 6:14,
19:10, 40:12
CREATED 8:15,
11:25, 14:10,
14:11, 14:20,
14:23, 15:11,
16:1, 35:18,
77:14, 79:7,
79:9, 79:14,
79:16
CREATES 35:21
CREATING 80:2
CREATIVE 64:11
CRIED 10:11
CRITERIA 76:3,
76:5, 76:14
CRITICAL 60:6
CROSSING 59:13
CRUCIAL 77:11
CRUCIALLY 11:14
CRUZ 75:2,
83:16
CRYSTAL 13:22,
14:18
CSR 1:38, 88:35
CURED 53:17,
72:4
CURIOUS 23:5
CURRENT 45:22
CURRENTLY 14:7,

26:19
CUSTODIAL
14:24, 16:3,
20:7
CV18-06081 3:10
CV18-06081-JAK
1:11


< D >
D. 2:9
DAMAGE 28:13
DAMAGES 18:4,
22:4, 22:10,
41:20, 43:9,
43:24, 51:24,
51:25, 52:4,
57:10, 59:12,
63:4, 63:6,
63:12, 63:24,
64:7, 65:16,
66:10, 72:6,
72:8, 78:4,
78:8, 78:9
DANGER 8:15,
11:15, 11:16,
11:21, 14:11,
14:20, 14:24,
15:2, 15:11,
16:1, 37:20,
41:25, 77:14,
79:7, 79:8,
79:16
DANGEROUS 10:1,
14:14
DATA 71:20
DATE 6:22,
37:21, 38:1,
86:22, 88:28
DATES 86:18,
86:20, 86:23
DAY 22:18,
38:10, 73:8
DAY-TO-DAY 22:7
DC 2:33, 2:40
DE 41:6, 75:2,
83:16
DEAL 18:1,
27:4, 39:16,
39:21, 67:11

DEALING 22:11,
35:11
DEARBORN 2:16
DECIDED 25:16
DECIDES 86:6
DECISION 37:11,
61:10, 87:3
DECISIONS
39:16, 41:24
DECLARATION
73:13, 74:12,
74:24, 75:20,
75:23, 83:17
DECLARATIONS
73:6, 75:18
DEFEAT 81:25
DEFENDANT
44:11, 45:11
DEFENDANTS
1:15, 2:29,
3:28, 4:10,
6:13, 6:21,
23:13, 36:6,
81:1, 81:20
DEFERRED 87:4
DEFINE 63:7
DEFINITION
52:13, 65:2,
78:18
DEFINITIONS
36:12, 36:21
DEGREE 10:4,
10:5, 33:16,
34:9
DELAY 81:13
DELIBERATE
35:20, 45:20,
62:19
DELIBERATELY
60:5
DELIVERED 60:20
DELIVERING
64:21
DELIVERY 20:4
DEMONSTRATED
40:20
DEMONSTRATES
66:24, 75:21
DENIAL 66:12
DENIED 43:10,

87:3
DEPARTMENT
2:30, 2:36,
36:6, 38:17
DEPARTURE 36:16
DEPENDS 32:24
DEPORTED 80:9
DESCRIBED 71:4,
71:12, 72:7
DESCRIBES
83:18, 83:24,
84:1
DESERVE 81:10
DESHANEY 8:6
DESIGNATED
37:15
DESIGNED 52:5,
64:7
DETAIL 11:19,
75:17
DETAILED 45:12,
73:2
DETAILS 18:12,
19:21
DETAINED 6:16,
28:8, 28:14,
37:2, 37:4,
37:16, 37:18,
40:22, 46:17,
48:22, 49:21,
50:3, 51:3,
52:16, 53:21,
54:2, 57:15,
58:5, 61:3,
61:5, 66:13,
70:4, 71:6,
76:3, 80:2,
81:5, 85:10,
86:4
DETAINED.
36:22, 37:8
DETAINEES
44:18, 47:3,
70:15, 71:15
DETENTION 8:12,
19:22, 32:21,
42:10, 42:12,
42:16, 44:7,
44:19, 45:15,
46:4, 55:13,

60:15, 61:17,
63:9, 71:13,
76:18
DETER 81:6
DETERMINATION
7:3, 37:19,
80:20
DETERMINATIONS
4:16, 69:1
DETERMINE 19:7,
22:9, 46:7,
54:10, 65:7
DETERMINED
5:20, 25:22,
30:21, 31:12,
46:8, 65:9,
68:4, 68:11
DETERMINES 25:5
DETERRENCE 9:21
DEVELOPED 40:15
DHS 37:4,
37:16, 37:18,
37:19, 42:16,
43:21, 47:3,
53:21, 57:23,
58:2, 58:10,
60:18, 62:2,
62:4, 68:8,
70:15
DIAGNOSE 73:7
DIAGNOSED
61:19, 62:7
DIED 56:5
DIFFERENCE
21:17, 26:17,
36:13, 36:20,
52:7, 63:19
DIFFERENCES
40:22
DIFFERENT 5:9,
16:21, 18:24,
21:20, 22:2,
22:12, 26:18,
26:23, 33:3,
34:12, 34:15,
35:14, 36:17,
39:12, 43:21,
47:10, 58:23,
66:21, 67:7,
67:21, 69:3,

69:4, 69:7,
77:23, 77:25,
81:1
DIFFICULT 17:3,
17:10, 49:8,
64:24, 67:15,
81:15, 81:16
DIFFICULTY 80:6
DIRECT 9:6,
66:16, 68:16
DIRECTION 58:20
DIRECTIVE 78:13
DIRECTLY 8:23,
37:10, 42:7,
56:17
DISAGREE 44:11,
81:23
DISAGREEMENT
85:21, 85:23
DISCHARGE
53:21, 58:11,
58:15, 62:1,
62:5, 68:16
DISCHARGED
5:20, 20:19
DISCOUNTED
67:16
DISCOVERY 27:2,
44:22, 71:24
DISCRETION 4:23
DISCRETIONARY
24:18, 39:18
DISCUSSED 56:17
DISCUSSING
26:12, 59:22
DISCUSSION
30:11, 78:5,
82:21
DISCUSSIONS
17:20, 18:12,
84:15, 84:18,
84:21, 86:13
DISEASE 21:6
DISINCLINED
6:23
DISMISS 6:22,
7:2, 59:25,
86:22
DISMISSED 62:20
DISORDERS 11:23

DISPLAYED 71:7
DISPLAYS 66:6
DISPUTE 10:17
DISPUTES 86:14
DISTINCT 40:22
DISTINCTION
16:7, 16:20,
42:10, 58:13,
77:19
DISTINCTIVE
33:24
DISTINGUISHES
14:19, 77:20
DISTRESS 51:13
DISTRICT 1:1,
1:2, 1:4, 4:13,
13:16, 43:8,
60:2, 61:9,
65:15, 88:10,
88:12
DIVERGENT 42:17
DIVISION 1:2,
2:31, 2:37
DOCKET 38:1,
51:9, 70:18,
70:23, 74:13,
74:18
DOCTORS 21:25,
59:7
DOCTORS. 74:7
DOCTRINE 14:11,
14:24, 15:12,
16:1, 39:4,
77:15, 79:7,
79:17
DOCUMENT 51:10
DOING 31:16,
57:23, 83:2
DOJ 4:1
DONE 11:11,
31:22, 39:15,
45:23, 46:2,
46:7, 56:4,
85:19, 85:20
DOT 37:2, 37:3,
37:5
DOWN 22:10,
24:20, 26:23,
26:25, 57:7
DRIVE 30:4

DRIVEN 21:23
DROPS 54:4
DRUG 15:22, 53:10
DRUGS 53:18
DUAL 15:20
DUE 8:1, 8:15, 10:14, 13:2, 14:23, 15:4, 15:9, 15:10, 15:15, 16:1, 17:7, 19:14, 25:23, 26:3, 48:5, 77:23, 79:17
DURING 5:15, 11:3, 55:25, 76:1, 84:19, 85:9
DUTY 26:8, 51:13, 53:16, 54:1, 54:3, 57:6, 57:9, 59:11, 61:8, 63:21, 63:22, 77:7, 81:22, 83:7, 83:8, 86:5, 86:7

< E >
E. 2:3
EARLIER 24:16, 30:12, 31:21, 38:25, 48:9, 48:21, 64:20, 77:16, 81:3, 82:21
ECF 51:9
ECONOMIC 51:24, 51:25
EFFECT 4:20, 85:11
EFFECTIVE 31:20, 55:14
EFFICIENCY 26:20, 27:7, 33:23, 34:3, 39:4, 40:17
EGREGIOUS 8:19

EITHER 21:13, 33:3, 86:13
ELEVATED 11:22
ELEVATION 31:3
EMERGENCY 7:6
EMOTIONAL 51:12
EMPLOYEE 8:22
EMPLOYING 8:3
ENABLE 64:12
END 20:17, 67:25, 72:3, 82:13, 82:22, 87:10
END-ALL 27:24
ENDED 27:19
ENDLESS 55:6
ENFORCEMENT 48:24
ENGAGE 58:16
ENGAGES 84:4
ENJOIN 63:8
ENOUGH 76:23
ENSURE 9:22
ENTER 37:14
ENTERED 5:12
ENTERING 57:16
ENTIRE 17:12, 24:1, 31:4, 47:3, 53:24, 64:16, 77:21
ENTIRELY 35:14, 62:21, 77:22
ENTITLED 12:17
ENTRY 37:15
ENVISION 17:21, 20:2
EQUITIES 12:19
EQUIVALENT 46:19
ESCAPE 20:10
ESCAPED 21:9
ESPECIALLY 60:3, 63:6
ESSENTIALLY 13:7, 56:12, 61:15, 74:24, 76:20
ESTABLISH 23:13, 82:12
ESTABLISHED

32:14
ESTELLE 53:25
ESTIMATE 28:16, 28:21, 28:24, 48:8, 48:9, 48:12
ESTIMATES 28:19
ESTOPPEL 39:6
ET 1:7, 1:13, 3:10, 3:11
EVADE 6:15
EVADING 29:4, 29:9
EVALUATE 69:8, 86:23
EVALUATED 30:19
EVALUATION 30:22, 30:24, 57:20, 84:3
EVENT 27:2, 41:19, 58:9, 64:3, 83:21
EVENTUALLY 39:5
EVERYBODY 69:7
EVERYONE 14:5, 14:7, 14:8, 69:7
EVERYTHING 23:4, 67:13, 84:3
EVIDENCE 31:16, 45:25, 58:7, 71:1, 71:19, 72:23, 72:24, 73:15, 73:18, 73:19, 73:20, 74:1, 74:14, 76:17, 85:18
EVIDENT 33:17
EVIDENTIARY 27:3
EX 6:21, 87:2
EXACT 29:20, 58:15, 62:3
EXACTLY 25:6, 33:7, 34:23, 40:7, 63:7, 66:5
EXAMINED 52:16
EXAMPLE 6:7,

18:7, 23:7, 29:3, 29:8, 42:9, 43:7, 54:19, 74:22, 80:6, 80:8, 80:17
EXCEPTION 9:9
EXCHANGE 66:16
EXCUSE 25:17, 28:13, 44:7
EXECUTES 60:18
EXERCISE 4:23
EXISTED 14:15
EXISTENCE 72:24
EXISTING 40:5, 46:24, 50:1
EXPECTATION 57:17
EXPECTED 56:23
EXPEND 39:20
EXPENSIVE 55:22
EXPERIENCE 11:4, 60:19, 71:5
EXPERIENCING 67:15
EXPERTS 11:18, 73:3, 74:9, 75:17
EXPLAIN 11:19
EXPLAINED 64:16, 73:6, 74:10
EXPLAINING 9:13, 57:12
EXPLAINS 76:3
EXPLANATION 52:13, 68:1
EXPLICITLY 14:22
EXPOSED 15:23, 21:5, 55:24, 81:5
EXPOSITION 2:6
EXPOSURE 56:1, 81:6
EXPRESSLY 66:10
EXTEND 8:16, 60:2, 61:12
EXTENSION 53:2

EXTENSIVE 11:18
EXTENT 6:7,
6:13, 18:2,
41:12, 42:17,
57:11, 81:19
EXTRAORDINARY
20:5, 20:6
EXTREMELY
11:22, 54:23,
63:5, 66:23

< F >
FACED 56:9
FACILITATE
5:21, 54:18
FACILITIES
55:13, 76:18
FACILITY 70:3,
70:4, 70:15,
70:17
FACT 14:21,
20:8, 21:10,
23:23, 29:25,
33:25, 34:2,
34:5, 34:10,
34:12, 38:7,
56:16, 56:24,
69:6, 75:20,
77:8
FACTO 41:6
FACTS 34:12,
62:3
FAIL 8:10, 8:13
FAILED 21:25
FAILING 9:4
FAILURE 12:9,
60:14, 62:15,
62:18
FALLS 13:1
FAMILIES 8:25,
9:14, 10:6,
10:21, 10:24,
11:1, 11:14,
24:25, 81:17
FAMILY 10:8,
11:20, 25:20,
25:22, 41:15,
66:12
FAR 13:20,

26:17, 44:11,
47:4, 63:23
FEARFUL 11:8
FEDERAL 1:39,
19:15, 43:12,
64:5, 82:22,
88:8, 88:36
FEEL 59:13
FEW 11:5,
50:24, 72:18
FIELD 11:19,
74:9
FIFTH 8:1
FIGURES 48:16
FILE 4:11,
4:22, 22:23,
24:13, 24:17,
26:20, 33:19,
36:10, 39:9,
39:19, 59:19,
70:18, 70:23
FILED 5:2,
6:21, 39:12,
43:9
FILING 37:9,
59:25
FILINGS 4:6,
23:12
FILL 45:13
FINAL 7:4,
47:18
FINALIZED 24:5
FINALLY 12:12
FINANCIAL 18:4,
18:21
FIND 39:24,
54:8, 54:10,
57:18
FINDING 15:25,
81:15
FINGER 33:24
FIRST 1:40,
4:11, 4:22,
10:21, 11:1,
11:12, 14:1,
22:22, 24:13,
24:17, 26:20,
27:11, 27:17,
27:23, 33:18,
36:10, 39:19,

46:21, 59:18,
59:19, 72:20,
72:21, 74:14,
74:24, 75:3,
80:1
FIRSTHAND 60:19
FITS 29:7
FLAG 50:19
FLEEING 10:1,
67:9
FLIP 76:2
FLOOR 2:21,
2:26
FLOWING 63:16
FLY 19:21
FOCUS 23:5,
26:17, 27:11
FOCUSED 48:17
FOCUSES 26:7
FOCUSING 47:5
FOLKS 11:12,
14:2
FOLLOW 75:22
FOLLOW-UP 79:25
FOLLOWED 8:7
FOLLOWING 5:25,
6:1, 30:22,
52:19, 66:1
FOOTNOTE 76:4,
83:20, 84:1
FORCED 59:11
FORCIBLE 23:16
FORCIBLY 24:25
FORCING 15:23
FOREGOING 88:16
FOREIGN 67:13
FORM 6:3,
45:13, 49:13,
58:5, 70:12,
73:3, 73:8,
73:9, 73:15,
73:20, 80:7,
80:15
FORMAT 88:22
FORMS 39:1
FOSTER 37:19
FOUND 47:14,
80:19
FRAME 31:25
FRANKLIN 2:32,

2:39
FRANKLY 10:8,
10:16, 17:24,
19:22, 20:6,
22:17, 23:22,
25:2, 74:1,
77:19
FRIDAY 48:6
FTCA 55:4
FULFILL 42:19,
52:11
FULL 9:10,
20:1, 76:17
FULLY 7:1,
20:19, 50:6
FUND 23:14,
25:3, 38:12,
38:14, 56:19,
66:9, 78:14
FUNDAMENTAL
27:17, 28:11,
30:3
FUNDAMENTALLY
22:1, 78:1
FUNDING 86:17
FUTURE 11:22,
19:15

< G >
GAINS 27:7
GENERAL 29:24
GENERALIZED
72:24, 72:25
GENERATED 70:12
GETS 40:16,
42:2, 57:22,
58:13, 61:7,
66:16, 67:6,
67:17, 69:10
GETTING 22:18,
39:5, 53:11,
53:13, 54:17,
54:18, 61:15
GIVE 69:25
GIVEN 7:5,
18:16, 23:9,
23:23, 27:13,
53:4, 54:9,
54:18, 57:11,

58:10, 60:25, 62:9, 62:17, 84:6
GIVES 15:14, 16:5
GIVING 73:8
GOTTEN 14:2, 14:6
GOULD 2:5
GOVERNMENT-EMPLOYED 17:23
GOVERNMENT-WIDE 22:14
GOVERNMENTAL 30:1
GRAB 37:9
GRANT 6:23, 46:11
GRANTED 5:7, 15:24, 31:18, 32:16, 47:8, 47:9
GRAVITY 21:21, 22:5
GREAT 64:12, 75:17
GRIEVOUS 8:23
GROUP 22:14, 36:11, 48:14, 81:4
GUARANTEES 79:18
GUARDIAN 41:11, 43:25
GUESS 21:2, 32:5, 56:13
GUIDE 58:21

< H >
HADDAD 2:3, 3:25
HALF-FORM 73:10
HALTED 19:3
HAND 58:2
HANDLE 3:22
HANDLING 84:5
HAPPEN 20:20, 63:20
HAPPENED 22:7,

23:9, 38:22, 58:9
HAPPENING 52:10, 53:2
HAPPENS 47:11, 78:25
HARMED 15:25, 76:8
HARMFUL 9:15
HARMING 9:21
HARMS 25:3, 67:7, 77:1
HEALTH 5:15, 11:18, 14:4, 23:14, 35:1, 38:12, 38:13, 46:6, 47:3, 52:17, 56:5, 56:20, 57:25, 61:16, 61:20, 62:7, 64:22, 66:9, 67:24, 69:11, 71:7, 71:8, 73:24, 76:7, 77:9, 80:4, 81:1, 81:11
HEALTHCARE 10:10, 27:6, 27:21, 28:5, 28:6, 30:8, 31:2, 31:4, 41:15, 43:10, 85:10
HEAR 4:12, 4:24, 5:14, 6:19, 12:22, 36:3, 55:10
HEARD 42:24, 45:1, 76:19
HEARING 6:22, 7:7, 11:3, 20:9, 21:7, 29:16, 71:2, 85:9
HEART-WRENCHING 11:6
HELD 8:1, 88:20
HELP 10:2, 12:5, 32:3,

32:5, 32:20, 58:20, 87:7
HELP. 58:3
HEPATITIS 81:5, 81:9
HEREBY 88:12
HESITANT 71:1
HESITATED 60:2, 61:12
HIGHER 49:19, 50:5
HIGHEST 10:7
HIGHLY-VULNERABLE 22:15
HILDALGO 74:8
HINTED 64:20
HOLDS 14:12
HOME 10:1, 15:7, 67:11, 75:25, 76:4, 76:5, 76:11, 76:14, 83:19, 83:21, 84:9
HOMES 67:9
HONORABLE 1:3
HOPEFULLY 29:17
HOST 42:14
HOUSES 70:15
HUGE 22:14
HUMANS 60:20
HURT 25:11
HYPOTHETICAL 54:6, 55:20, 57:14, 66:20, 81:3
HYPOTHETICALLY 31:9, 31:17, 32:15, 68:19

< I >
IDEAS 86:15
IDENTICAL 36:11, 74:24
IDENTIFIED 69:12
IDENTIFY 29:10, 29:12, 85:20
IGNORED 45:15, 58:8, 77:13

IGNORES 77:11
IL 2:17
ILLEGALLY 57:16
ILLNESSES 77:9
IMAGE 6:12
IMMEDIACY 22:5
IMMEDIATE 23:8
IMMEDIATELY 44:15, 52:21, 81:11, 83:1
IMMIGRATION 2:38, 37:2, 37:16, 42:10, 61:17
IMMUNITY 78:20
IMPACTED 30:2
IMPLEMENTED 9:10
IMPORTANT 24:19, 41:5, 56:15, 81:12
IMPORTANTLY 9:2, 9:17
IMPOSSIBLE 45:16
IMPRESSIVE 70:6
IMPROPER 80:20
INADEQUATE 47:14, 56:21, 76:18, 80:18
INADVERTENT 20:23
INAPPROPRIATE 46:11, 72:8, 84:21
INASMUCH 4:9, 4:12, 4:25, 6:25, 46:15, 46:17, 53:3, 54:23, 63:6
INCARCERATED 21:5, 32:11, 32:12, 32:15
INCIDENT 9:8
INCIDENTAL 9:18
INCIDENTS 20:23
INCLUDE 7:15, 51:25, 58:12, 78:25
INCLUDED 42:5

INCLUDES 6:9,
47:9
INCLUDING 5:19,
13:11, 46:6,
85:17
INCONSISTENCY
83:17
INCONSISTENT
62:12, 76:15
INCREDIBLE
51:3, 64:18
INCREDIBLY 67:7
INDEPENDENT
12:7
INDICATE 76:7
INDICATES
76:10, 76:13
INDICATING
47:13
INDIFFERENCE
45:21, 62:19
INDIFFERENT
60:5
INDIRECTLY 8:10
INDIVIDUAL 8:9,
8:21, 13:9,
15:1, 21:17,
21:19, 21:24,
21:25, 27:25,
28:12, 40:5,
42:7, 47:6,
52:5, 53:5,
53:7, 53:9,
53:10, 53:20,
53:22, 54:8,
58:6, 58:10,
59:8, 67:11,
71:16, 74:25,
82:10, 83:18,
84:10
INDIVIDUALIZED
30:13, 69:1
INDIVIDUALS.
55:9
INFLICTED 9:24
INFLICTING 9:1,
12:1, 35:20
INFLICTION
19:16, 20:25,
51:12

INFLICTS 76:25
INFORMALLY
84:15
INFORMATION
71:24
INFORMED 73:1,
74:3
INHERENT 64:21
INHERENTLY
41:16
INITIAL 12:8
INITIALLY 11:15
INJECTED 21:4
INJUNCTION 4:4,
6:2, 7:4, 7:12,
12:20, 15:24,
17:3, 20:12,
22:15, 26:2,
28:5, 31:4,
31:14, 40:19,
46:11, 47:17,
47:18, 48:1,
56:11, 59:14,
64:6, 66:15,
71:2, 72:2,
72:7, 72:9,
78:24
INJUNCTIVE 5:4,
12:17, 18:20,
19:2, 19:5,
19:7, 34:17,
35:7, 40:1,
40:6, 44:2,
44:3, 51:17,
52:8, 55:5,
63:5, 64:13,
68:18, 78:11,
78:24, 78:25,
80:21, 80:23,
82:19
INJURED 30:2,
82:8
INJURY 8:20,
20:15, 20:16,
20:20, 64:8
INQUIRIES 30:13
INSIDE 15:6
INSIGHT 33:1,
35:1
INSTANCE 17:2,

18:23, 21:8,
68:15, 75:24
INSTANCES 8:8,
8:12, 8:14,
44:17
INSTEAD 83:3
INSTITUTION
70:12, 70:13
INSTRUCTIONS
27:11
INSTRUCTIVE
80:3
INSTRUMENT 8:3
INSURANCE
54:21, 80:18,
80:21
INTENDED 8:2
INTENSIFY 9:3,
12:3
INTENSIFYING
11:17
INTENTIONAL
9:18, 20:25,
21:23, 51:12,
51:20, 77:1
INTENTIONALLY
77:1
INTEREST 12:20,
61:2, 78:2
INTERESTING
38:2, 46:15
INTERESTS 28:2,
28:4, 29:2,
42:18, 42:19,
42:20, 44:1,
77:24
INTERIM 62:3
INTERNALLY
76:15
INTERPRETATION
80:18
INTERPRETED
13:17
INTERSECTION
15:18
INTRODUCE 3:23
INVENTIVENESS
64:12
INVOLUNTARILY
54:24

INVOLVE 20:22,
41:9, 41:16
INVOLVED 15:18,
15:20, 35:2,
35:13, 44:12,
53:3
INVOLVES 8:19,
36:11, 51:13
INVOLVING
15:21, 17:22
IRREPARABLE
12:18
ISOLATED 8:21,
9:8, 20:23
ISSUE 4:12,
4:21, 5:14,
6:15, 7:5,
7:15, 19:4,
19:10, 21:14,
23:2, 24:23,
26:10, 26:22,
27:5, 30:23,
33:25, 35:16,
35:17, 35:24,
46:1, 53:8,
57:25, 59:8,
62:7, 65:6,
65:12, 68:19,
69:11, 77:24,
78:4, 80:1
ISSUES 4:14,
6:6, 6:23,
6:25, 7:9,
19:24, 23:5,
31:21, 31:25,
34:11, 42:14,
52:17, 56:5,
59:14, 61:15,
61:16, 61:20,
62:24, 67:6,
71:7, 71:8
ITEM 3:10
ITSELF 8:24,
11:13, 19:18,
24:24, 35:18,
35:21, 61:1,
67:10


< J >

JAMES 70:2
JEFFERSON 1:13, 3:11
JOBS 29:16
JOHN 1:3
JOHNSON 3:18
JOINT 38:8, 38:10, 56:18, 84:19, 84:20
JOKO 1:38, 88:8, 88:33, 88:35
JOURNEY 67:15, 76:1
JUDGE 1:4, 34:11, 34:12, 35:15, 48:3, 80:8, 80:10
JUDICATA 39:6
JUDICIAL 26:20, 88:24
JULY 38:9, 38:10
JUMP 24:13
JUSTICE 2:30, 2:36, 36:7, 38:18

< K >
KEEP 24:19
KEVIN 2:14, 3:18, 7:11, 7:23
KEY 77:18
KIDS 10:7, 11:20
KIND 26:19, 45:2, 48:24, 50:14, 50:25, 51:16, 56:10, 56:13, 57:20, 57:25, 58:11, 59:9, 67:18, 73:11, 74:3, 74:11, 74:22, 84:5, 84:6
KINDS 74:15, 75:16
KNOW. 32:24

KNOWLEDGE 9:11, 10:4, 10:12, 77:3
KNOWN 57:24
KRONSTADT 1:3

< L >
L. 4:12, 5:12, 11:4, 19:20, 23:10, 24:23, 25:17, 26:11, 26:13, 26:18, 36:15, 37:10, 37:13, 39:9, 40:13, 48:1, 48:16, 51:10, 56:18, 56:21, 60:9, 65:19, 66:8, 77:20, 77:24, 80:8
LA 75:2, 83:16
LACK 46:16, 61:2
LAID 75:17
LALLY 2:24, 3:16, 3:17, 7:8, 7:10, 84:24, 84:25
LANGUAGE 59:8, 67:15, 69:20
LAST 11:2, 11:3, 11:5, 38:11, 43:9, 48:6, 74:13, 75:20
LATE 82:23
LATER 3:24, 23:18, 33:2, 68:20, 76:2
LATTER 63:20
LAW 2:5, 10:4, 12:15, 19:15, 48:24, 64:9
LAWYERING 64:11
LAWYERLY 64:12
LEADING 35:12
LEARN 31:24, 32:24, 34:9
LEAST 4:25,

5:11, 9:20, 10:20
LEAVING 67:11, 67:13
LEE 25:16
LEFT 11:21, 50:16, 53:10, 67:12
LEGAL 86:10
LEGALLY-COGNIZA BLE 10:14
LESS 49:22, 50:3, 73:2
LETTER 64:9
LEVEL 44:23, 45:19
LEVELS 26:4
LIEN 82:12, 83:4
LIKELIHOOD 6:25, 7:5, 40:20, 45:14, 56:12, 72:2
LIKELY 12:18, 19:25, 46:20
LIMIT 76:21
LIMITATIONS 41:24
LIMITED 14:24, 31:10, 32:14, 40:2, 54:23, 68:19
LIMITS 86:9
LINE 8:7, 18:4, 72:22
LINES 20:21
LITEM 41:11, 43:25
LITERALLY 64:23
LITIGATED 13:21
LITIGATION 2:38, 39:12, 82:14
LITIGATIONS 26:18
LITTLE 48:17, 76:21
LIVES 11:24
LLP 2:15, 2:20, 2:25

LOCAL 58:12
LOGAN 2:19, 3:18, 7:16, 24:9
LOGISTICAL 18:1
LOGISTICALLY 66:23
LOGISTICS 64:21
LONG 11:21, 76:23, 76:25, 77:2, 77:5
LONGER 5:17, 5:22, 16:14, 16:23, 31:23, 32:12, 32:20, 45:7, 46:17, 50:6, 52:23, 55:16, 77:6, 85:10
LOOK 13:24, 22:3, 35:4, 37:23
LOOKING 10:2, 31:1, 72:21
LOOKS 73:9
LOOP 27:1
LOS 1:28, 1:41, 2:7, 2:12, 2:22, 2:27, 3:1, 88:3
LOT 14:19, 43:19, 47:20
LOWER 79:15

< M >
M. 2:14
MACHINE 70:7
MAIN 24:22, 25:13, 26:22
MAJOR 24:16
MANAGEMENT 39:15
MANIFESTED 57:25
MANNER 32:17, 82:9, 85:19
MAP 75:16
MARK 2:3, 2:9, 3:15, 3:25

MASSACHUSETTS 43:8, 51:22, 65:16
MASSIVE 39:21, 65:24
MATCH 36:12, 71:4
MATERIALLY 47:9
MATH 51:5
MATTER 4:13, 10:12, 24:1, 35:14, 35:22, 42:5, 43:7, 84:16, 86:13, 86:16, 86:19, 88:20
MATTERS 3:20, 3:24, 6:18, 27:4, 38:19
MEAN 21:22, 22:1, 41:1, 68:24, 75:22, 76:24, 83:5
MEANINGFUL 79:13
MEANINGFULLY 22:16
MEANS 10:23, 10:24, 54:11, 73:10, 85:24
MEASURE 56:14
MEASURING 21:21
MEDIA 11:6, 76:17
MEDICAL 5:15, 10:10, 13:3, 13:11, 15:9, 16:24, 18:21, 19:13, 44:14, 46:5, 54:20, 55:22, 55:23, 72:25, 78:14, 80:14, 82:10
MEDICATION 53:8
MEDICATIONS 55:23
MEET 30:9, 76:3
MEMBER 16:24, 30:14, 39:25, 40:5, 49:3

MEMBERS 5:1, 5:5, 30:2, 30:3, 30:6, 31:6, 31:7, 40:8, 48:22, 54:9, 58:22, 59:2, 61:5, 63:16, 65:8, 65:13, 75:14, 80:2, 80:10
MEN 70:8
MENTAL 5:15, 10:10, 11:18, 11:22, 14:4, 23:14, 27:6, 27:20, 28:5, 28:6, 30:8, 31:2, 31:3, 35:1, 38:12, 38:13, 41:15, 43:10, 46:6, 47:3, 52:17, 56:20, 57:25, 61:16, 61:20, 62:7, 64:21, 66:9, 67:23, 69:11, 71:7, 71:8, 73:24, 77:9, 80:4, 80:25, 81:16, 85:10
MENTIONED 72:19, 81:3
MERELY 15:5, 77:25, 78:7, 78:21, 79:17
MERITS 7:1, 12:18, 40:21, 56:13, 59:25, 72:3, 81:25
MET 30:7, 31:13, 31:14, 76:13
MICHAEL 2:29, 3:28, 36:5
MICHELLE 2:35, 3:28
MILES 67:10
MILLION 56:19
MIND 24:19

MINDFUL 4:21, 6:20
MINIMAL 27:8
MINIMIZE 57:10
MINIMUM 42:21, 62:8, 74:10
MINOR 37:3, 37:17, 42:15
MINORS 28:18
MINUTE 20:13, 31:8, 36:19, 41:21, 49:6, 84:13
MIRROR 6:12
MISSTATES 83:5
MISUNDERSTOOD 33:5
MITIGATE 57:6, 57:9, 59:12
MITIGATING 12:13
MIXED 42:21, 64:18
MOLESTATION 51:1
MOMENT 22:21, 49:9, 76:20
MONETARY 66:3, 66:10, 78:12, 78:19, 78:22
MONEY 43:24, 63:16, 65:16, 66:10, 66:16, 78:4, 78:8, 79:1
MONITORING 80:14
MONTHS 13:20
MOOT 46:22
MOOTED 28:1, 28:12
MOOTNESS 6:15, 46:19
MOTION 4:3, 4:4, 6:22, 7:2, 7:4, 7:13, 7:14, 7:18, 22:25, 59:25, 72:10, 81:24, 86:22, 87:3

MOTIONS 85:3, 86:20, 86:24
MOVED 15:5
MOVING 34:7, 47:20
MS 1:7, 3:10, 3:16, 4:12, 5:12, 7:8, 7:10, 11:4, 19:20, 23:10, 24:23, 25:16, 25:17, 26:11, 26:13, 26:18, 36:15, 37:10, 37:13, 39:9, 40:13, 48:1, 48:16, 51:10, 56:18, 56:21, 60:9, 65:19, 66:8, 77:20, 77:24, 80:8, 84:24, 84:25
MULTIPLE 26:3
MUSICK 70:3, 71:6

< N >
NAMED 4:25, 41:3, 43:1, 43:2, 43:3, 46:15, 57:4, 58:19, 58:24, 70:3
NAMELY 30:5
NARROW 86:14
NATION 8:25, 9:25
NATIONAL 15:22
NATIONWIDE 37:7, 49:1, 49:11
NATURE 11:11, 13:2, 13:22, 16:8, 18:5, 20:7, 67:7, 85:23, 86:17
NAVIGATE 57:18
NECESSARILY 57:19

NECESSARY 5:10,
27:25, 56:6,
72:2, 74:4,
79:19, 80:4
NEED 7:6,
17:19, 18:5,
19:3, 30:18,
30:19, 34:18,
41:15, 42:5,
54:15, 57:21,
58:3, 67:2,
67:4, 67:18,
81:10, 86:4
NEEDED 65:9,
67:3, 82:23,
85:21
NEEDS 23:7,
35:1, 45:21
NEGOTIATIONS
23:18, 85:4
NETWORK 35:11
NEW 33:21,
34:10, 34:11,
60:2, 72:13,
83:11
NIGHT 74:13,
75:21
NINTH 24:3
NO. 1:38, 3:10,
24:4, 29:21,
47:5, 63:18,
70:11, 72:12,
88:35
NON-GOVERNMENT-
PROVIDED 55:9
NONE 64:17,
73:24, 76:13
NONEXISTENT
15:4
NOR 17:24,
19:22
NORM 41:23
NOTE 29:11
NOTED 62:2
NOTHING 22:21,
28:3, 72:25,
73:1, 74:5,
74:7, 75:10,
75:12
NOTICED 75:7

NOTING 62:22
NOTION 14:22,
15:3
NUMBER 3:20,
13:10, 13:23,
14:9, 14:10,
17:21, 49:20,
51:3, 51:9


< O >
O. 9:13, 37:4,
37:18, 42:11,
42:12, 43:20,
48:18, 48:23,
49:12, 58:14,
84:4
OBLIGATED
52:11, 63:25,
64:3
OBLIGATION
27:5, 30:6,
30:7, 30:9,
51:18, 52:24,
54:18, 54:23,
55:1
OBLIGATIONS
43:21
OBSERVED 58:1
OBTAIN 53:23,
82:13
OBTAINED 69:15
OBVIOUS 9:14,
42:13
OBVIOUSLY
42:18, 44:21,
58:19, 72:21
OCCURRED 31:17,
56:2, 68:10
OCCURS 68:4
OFFERED 11:3
OFFICE 2:38,
7:17
OFFICERS 71:13
OFFICIAL 1:39,
88:1, 88:8,
88:36
OFFICIALS 9:20
OFTEN 8:6
OFTENTIMES 10:1

OIL 2:31
OKAY 18:17,
23:1, 24:6,
27:9, 29:23,
33:8, 35:25,
37:23, 40:10,
43:18, 49:24,
49:25, 52:6,
63:4, 65:11,
70:16, 79:20,
83:9, 86:25,
87:6
ONCE 53:22,
54:3
ONE 2:16, 4:10,
4:22, 20:11,
23:6, 23:11,
27:7, 27:14,
28:19, 28:22,
31:11, 32:4,
33:23, 37:1,
37:15, 38:21,
49:15, 50:18,
59:24, 62:9,
69:20, 70:3,
71:15, 75:24,
76:5, 82:3
ONE-OFF 8:20,
22:11
ONE. 11:5,
13:23, 14:9,
29:21, 34:22
ONES 21:18
ONGOING 6:4,
9:1, 11:11,
52:9, 53:20,
71:25
OPEN 86:15
OPERATED 70:14
OPERATION 70:6
OPERATIVE 34:13
OPPORTUNE 85:4
OPPORTUNITIES
85:14
OPPORTUNITY
44:13
OPPOSED 18:21,
20:24, 42:11,
63:15
OPPRESSION 8:4

OPT 5:4
OPT-OUT 40:6
ORANGE 70:14
ORDER 10:7,
12:17, 17:6,
19:17, 29:13,
34:7, 34:8,
36:10, 37:21,
37:25, 45:18,
46:24, 47:15,
56:9, 63:19,
80:21
ORDERED 80:11,
80:13, 80:15
ORDERING 6:2,
31:5
ORDERS 5:12
ORDINARILY 79:8
OTHERS 9:22,
16:11, 17:11,
50:6, 50:9
OTHERWISE
50:11, 84:11
OURSELVES 70:5
OUTLINES 26:15
OUTSET 12:23
OUTSIDE 49:5,
55:12, 64:22,
65:1
OUTWARD 71:7
OVERDO 42:22
OVERLAP 4:9,
7:2, 7:6, 7:13,
59:15
OVERLAPPING
4:9, 39:17
OVERSTATE 70:6
OWES 51:15,
53:16, 54:1
OWN 28:12,
30:14, 30:15,
42:7, 75:22


< P >
P. 2:24
PAGE 38:1,
38:11, 51:10,
75:23, 76:2,
88:22

PAID 45:4,
52:13
PANILLA 14:21
PAPERS 23:4,
26:15, 73:4,
73:9, 77:13,
78:6
PARADIGM 15:13
PARAGRAPH
38:11, 75:24,
83:17, 83:24
PARAGRAPHS 75:7
PARENT 37:20,
41:25, 42:1,
42:18, 48:20,
48:23, 50:18,
50:22, 50:25
PARENTS 4:15,
9:15, 10:8,
11:8, 11:9,
11:20, 23:17,
24:25, 28:17,
37:1, 37:7,
37:14, 41:14,
41:23, 42:16,
42:25, 43:6,
46:25, 49:5,
49:12, 49:17,
49:18, 49:19,
49:21, 50:2,
51:6, 58:14
PART 4:23,
9:20, 10:19,
14:8, 26:1,
26:2, 28:11,
47:10, 48:18,
60:3, 69:2,
69:14, 77:12,
77:19, 86:7
PARTE 6:21,
87:2
PARTICIPATE
84:25
PARTICULAR
34:14, 35:24
PARTICULARLY
4:24
PARTIES 8:14,
23:19, 79:9
PARTS 26:15,

47:21
PARTY 18:19,
79:16
PASS 79:5
PATH 52:20,
86:1
PATHS 5:9
PAY 18:10,
23:14
PAYMENT 78:25,
83:3
PENDING 5:11,
23:21, 43:7
PEOPLE 8:11,
8:13, 9:22,
9:25, 12:3,
20:7, 21:5,
21:10, 22:6,
22:15, 25:10,
25:11, 54:20,
69:3, 76:22
PERCENT 48:19
PERCENTAGE
48:14
PERFECT 29:8
PERHAPS 22:3,
52:1, 67:3
PERIOD 13:14,
13:22, 53:5,
68:12
PERRY 2:19
PERSIST 9:3,
12:2
PERSON 5:3,
5:16, 5:17,
5:20, 15:4,
16:22, 16:24,
18:16, 18:18,
20:14, 20:18,
52:18, 52:22,
54:15, 55:21,
55:24, 55:25,
56:3, 56:5,
56:6, 68:5,
73:8, 76:25,
77:1, 77:5,
77:7, 82:8,
83:2
PERSONS 5:5,
6:14, 6:16,

82:11
PHASED 20:2
PHRASE 78:11,
78:12
PHRASED 64:13
PHYSICAL 20:15,
20:16, 76:6,
83:22
PHYSICALLY 8:25
PINK 58:4,
69:13, 71:21,
72:20, 73:20,
85:17
PLACE 12:12,
27:3, 27:4,
34:2, 34:6,
34:8, 34:13,
34:24, 60:18,
81:21
PLACED 15:2
PLACES 69:4
PLAINTIFF 3:13,
29:10, 29:12,
30:14, 55:7,
55:20, 57:4,
72:14, 82:13
PLAINTIFFS 1:9,
2:3, 3:15,
3:17, 3:25,
5:1, 7:9, 7:24,
12:16, 19:20,
23:13, 24:10,
27:12, 28:1,
31:6, 33:13,
36:14, 40:24,
41:3, 41:7,
41:10, 41:14,
43:1, 43:2,
43:3, 43:24,
44:10, 44:24,
46:16, 50:1,
53:15, 56:16,
58:19, 58:24,
60:24, 63:7,
63:16, 65:14,
70:3, 71:4
PLAN 18:1,
53:21, 54:7,
54:14, 58:11,
62:10, 68:16

PLANS 58:15,
62:2, 62:5,
62:16, 62:17,
62:18
PLAYS 67:16
PLEADINGS
41:17, 55:7
PLEASE 3:12,
3:21, 3:24,
7:25, 24:8,
24:12, 24:20,
36:4, 70:19
PLED 13:6,
40:14
PLUS 55:6
PM 1:30, 3:4
PO 2:32, 2:39
POCKET 63:18
POINT 15:19,
18:21, 22:20,
24:17, 25:18,
29:20, 33:13,
33:23, 34:1,
35:3, 35:10,
38:24, 42:6,
44:22, 53:24,
59:6, 59:21,
60:6, 62:14,
66:17, 68:25,
69:10, 71:2,
72:1, 73:12,
75:5, 75:19,
77:16, 78:4,
81:19
POINT. 10:18,
43:20, 51:4,
53:14
POINTED 35:16,
36:18, 38:8,
38:25, 40:21,
55:15
POINTING 58:20
POINTS 29:1,
79:25
POLICE 15:5,
15:7
POLICIES 75:22,
81:21
POLICY 4:15,
8:24, 9:7,

9:10, 9:14,
9:17, 9:18,
9:21, 12:10,
12:12, 19:3,
21:23, 22:13,
22:14, 25:20,
25:22, 30:1,
34:18, 34:25,
35:20, 46:4,
47:3, 53:21,
54:7, 60:7,
60:8, 60:11,
62:4, 66:12
PORCH 15:6
PORTABLE 53:3
PORTION 32:21
PORTS 37:15
POSITION 9:5,
12:5, 15:2,
17:24, 18:7,
19:23, 23:25,
30:18, 32:19,
45:11, 61:11,
68:8, 82:7,
82:19, 82:20,
86:23
POSSIBLE 22:4,
64:23
POST 13:3,
51:18, 53:5,
55:1, 61:18,
63:23, 68:11
POST-CUSTODY
61:23
POST-RELEASE
16:6, 52:12
POTENTIAL
29:12, 33:2,
48:22, 61:4,
65:17, 66:6,
86:13
POTENTIALLY
5:9, 6:1, 6:10,
28:8, 31:24,
32:5, 32:25,
39:17, 44:4,
80:1
POWER 8:3
PRACTICALITIES
35:5

PRACTICE 68:14
PRECISELY
35:10, 53:1,
53:14, 65:17
PRELIMINARY
4:4, 7:4, 7:12,
12:17, 12:19,
26:2, 31:13,
32:16, 40:19,
46:10, 47:17,
56:10, 59:14,
71:2, 72:9
PREMATURE 84:22
PREMISE 25:15,
25:24
PREPARATION
33:16
PREPARED 7:11
PRESCRIPTION
5:19, 5:21,
13:16, 53:4,
53:18
PRESCRIPTIVE
53:8, 53:10
PRESENT 42:6,
69:5, 71:1
PRESENTATION
22:25
PRESENTED 6:6,
69:13
PRESENTLY 47:10
PRESENTS 30:3,
30:4, 37:20
PRESIDING 1:4
PRESUMABLY
43:25, 52:2,
58:11, 67:12,
67:14
PRESUMED 42:18
PRETTY 42:9
PREVENT 8:2,
19:14
PREVENTATIVE
56:14
PREVENTED 72:4
PREVENTING
50:19
PREVENTS 46:25
PREVIOUSLY
32:18, 32:23,

75:8
PRINCIPLES 39:6
PRIOR 30:15,
84:11
PRIVATE 17:23,
18:9, 18:19,
70:9, 70:13
PRO 56:20,
56:23, 57:19,
85:13
PROBLEM 55:22,
55:23
PROBLEMS 44:18
PROCEDURAL
46:15
PROCEDURE 47:15
PROCEDURES
7:17, 58:16,
60:18, 71:3,
81:21
PROCEED 64:16,
86:12
PROCEEDINGS
1:26, 50:14,
87:10, 88:18
PROCESS 8:1,
8:15, 10:15,
12:13, 13:2,
14:23, 15:9,
15:10, 15:15,
16:1, 17:7,
25:23, 35:13,
46:9, 71:23,
77:23, 78:14,
79:17
PRODUCTIVE
86:19
PROFESSIONAL
11:23, 14:3,
23:14, 73:5
PROFESSIONALS
35:12
PROGRESS 34:1
PROMISE 83:15
PROPER 23:11
PROPOSED 6:8,
31:7, 47:6,
48:10, 49:21,
65:13
PROPOSING 32:6,

32:8
PROTECT 8:11,
8:13, 25:9
PROTECTING
14:12
PROTECTION
15:10
PROTECTIONS
8:16, 13:11
PROTOCOL 68:5
PROVEN 64:4
PROVIDE 17:5,
19:13, 27:5,
30:7, 31:5,
32:25, 33:6,
46:5, 54:2,
54:8, 58:6,
60:14, 62:16,
62:18, 63:21,
63:23, 66:15,
74:17, 81:22,
83:7, 83:8,
86:6
PROVIDED 19:8,
31:2, 32:18,
44:6, 44:8,
44:12, 45:19,
48:16, 49:7,
53:9, 55:10,
61:22, 63:14,
67:25, 68:1,
68:7, 68:13,
68:20, 69:19,
74:4, 74:5,
74:23, 75:14,
83:2, 84:6,
85:24
PROVIDER 57:19
PROVIDERS 14:5,
56:22, 58:17,
74:15
PROVIDES 53:21,
58:15, 76:21
PROVIDING 5:16,
52:12, 53:19,
56:23, 59:22,
68:16
PROVISION 17:2,
68:17, 78:9
PROVISIONS 31:3

PSIQ 45:23, 46:9
PSYCHOLOGY 10:5
PUBLIC 2:10, 9:19, 10:12, 12:20
PULLED 37:10
PURPORT 65:24
PURPOSE 9:20, 25:13, 26:19, 29:24, 81:6
PURPOSELY 10:5, 21:4
PURSUANT 58:10, 88:14
PURSUE 39:3
PURSUED 65:21
PUT 14:14, 33:24, 34:7, 58:2, 64:25, 73:23
PUTTING 12:12, 34:3

< Q >
QUESTION 5:13, 10:16, 12:25, 16:4, 21:13, 23:9, 24:13, 26:23, 27:12, 32:6, 32:13, 32:25, 33:19, 36:14, 38:5, 39:19, 39:22, 40:17, 40:18, 41:5, 41:7, 44:5, 47:22, 48:21, 56:8, 59:5, 59:10, 59:17, 60:9, 60:13, 60:23, 61:7, 67:21, 82:3, 82:24
QUESTIONS 4:7, 12:23, 27:14, 29:19, 30:3, 30:4, 32:9, 32:22, 33:10, 36:9, 59:18,

59:20, 63:2, 72:11
QUICK 79:25
QUICKLY 76:23
QUITE 33:17, 44:2, 79:18
QUOTE 8:5, 23:13, 37:13, 44:23, 50:19, 55:8, 67:24, 76:14, 83:18, 85:11, 85:12
QUOTED 8:7

< R >
R. 2:35
RAISE 31:2, 33:22, 71:9
RAISED 4:13, 23:5, 31:21, 33:19, 39:7, 40:14, 50:18, 60:23
RAISES 19:4, 23:8
RARE 63:5
RATHER 9:8
REACH 17:10
REACHED 20:17, 23:23, 62:15
READ 8:5
READING 37:12, 37:25
REAL 81:17
REALITY 51:12
REALLY 6:14, 11:10, 21:8, 56:7, 61:5, 72:22, 76:21, 77:13
REASON 19:1, 39:9, 53:25, 85:7
REASONABLE 35:7
REASONS 42:13
RECEIVE 16:24, 17:12, 27:23, 28:5, 44:14, 45:12, 55:17,

62:1
RECEIVED 41:13, 44:11, 62:8, 73:24
RECEIVING 45:10, 45:11, 61:24
RECENTLY 64:15
RECOGNIZE 5:3, 17:1, 19:24, 32:19, 60:20, 60:21, 86:21
RECOGNIZING 7:3
RECOLLECTION 85:2
RECOMMENDED 52:25, 62:16
RECORD 11:18, 73:23, 74:6, 74:22, 76:16
RECORDS 76:10, 76:12
RECOVERED 20:19
RECOVERY 82:12
RED 50:19
REDEFINE 65:4
REFER 58:17
REFERENCE 81:2
REFERRALS 58:12
REFERRED 51:22
REFERRING 85:13
REGARDING 36:10
REGULATIONS 58:10, 88:24
REJECTED 14:22, 15:3, 15:11
RELATED 28:18, 32:21, 79:4
RELATEDLY 80:14
RELATIONSHIP 13:7, 13:8, 16:2
RELATIVELY 22:8, 67:19
RELEASE 5:25, 6:1, 16:8, 27:19, 29:10, 29:13, 29:14, 51:19, 53:6, 54:15, 55:2,

61:18, 63:23, 68:11, 68:20
RELEASED 6:8, 6:11, 6:14, 6:17, 16:9, 16:11, 16:13, 18:16, 21:7, 21:11, 27:13, 28:7, 29:6, 29:17, 40:23, 40:24, 48:19, 50:10, 50:13, 52:22, 54:3, 55:21, 60:25, 61:7, 76:11, 76:23, 77:2, 77:5, 77:7, 81:8, 81:14, 86:8
RELEASING 20:9
RELY 77:8
REMAIN 11:1, 11:14, 11:16, 28:22, 48:22, 49:12, 49:21, 61:5
REMAINED 31:10, 32:15
REMAINING 49:4
REMAINS 68:5
REMARKABLE 64:21
REMEDIED 53:17, 81:18
REMEDIES 34:20
REMEDY 21:14, 22:17, 30:10, 30:12, 34:9, 34:16, 34:17, 43:23, 51:16, 56:7, 77:21
REMEMBER 36:25, 62:3
REMOVAL 50:14
RENEWED 6:15
RENO 15:20
REPEAT 23:3
REPEATED 46:20
REPETITION 29:4, 29:8

REPLY 73:13
REPORT 23:12,
38:8, 38:10,
38:21, 44:18,
48:5, 48:6,
56:18, 84:19,
84:20
REPORTED 88:18
REPORTEDLY
75:25, 83:19,
83:24
REPORTER 1:39,
88:1, 88:10,
88:36
REPORTER'S 1:26
REPORTS 48:2
REPRESENT 28:2,
60:25, 61:2,
65:24, 66:25
REPRESENTATION
44:1
REPRESENTATIVE
40:2
REPRESENTATIVES
6:9, 6:10,
9:12, 41:2,
63:1
REPRESENTED
34:6, 43:5
REPRESENTING
61:6
REPROCESS 80:22
REQUEST 23:21,
25:2, 26:2,
38:13, 44:13,
44:16, 56:18,
63:13, 66:14,
80:5, 80:12
REQUESTED
23:13, 38:11,
57:4, 66:8
REQUESTING 58:7
REQUESTS 38:12
REQUIRE 6:4,
30:12
REQUIRED 13:10,
27:23, 39:21,
78:15, 84:10
REQUIREMENTS
6:5, 31:12,

31:13, 47:16
REQUIRES 52:9,
55:22, 83:21
REQUIRING
31:18, 83:3
RES 39:6
RESOLUTION 30:5
RESOLVE 38:4,
84:15, 86:1,
86:13
RESOURCES
26:21, 39:21,
40:17, 54:20,
56:16, 58:12,
59:6, 85:12,
85:25, 86:16
RESPECT 4:8,
5:11, 17:15,
31:25, 33:23,
34:18, 35:24,
41:22, 46:3,
49:25, 50:2,
51:18, 55:18,
62:4, 62:24,
69:1, 73:15,
79:8, 82:12,
83:16, 85:9,
86:18
RESPOND 72:18,
79:5
RESPONSE 12:25,
55:19
RESPONSES 12:23
RESPONSIBILITY
25:9, 56:1,
60:21
RESPONSIBLE
14:12, 54:13,
55:3
RESPONSIVE
31:19, 32:18
RESTATE 24:7
RESTRICTED
15:12
RESTRICTIONS
16:12, 50:10
RESULT 20:16,
20:23, 23:16,
66:12
REUNIFICATION

10:20, 10:23,
27:20, 27:22,
50:19, 80:11
REUNIFICATIONS
11:5, 11:7,
34:24
REUNIFIED
29:18, 49:4
REUNIFIED. 25:2
REUNIFY 29:15
REUNITE 34:19,
80:9
REUNITED 40:24,
42:1, 48:20,
50:22, 51:6
REVIEW 4:17,
5:9, 5:11,
6:16, 20:10,
21:9, 29:4,
29:9, 76:10,
76:12, 84:4,
84:8
REVIEWED 4:6,
46:20, 75:4
RIFE 41:17
RIGHTING 12:11
RIGHTS 8:9,
14:23, 15:15,
15:19, 16:1,
17:8, 17:12
RIPPING 10:5
RISE 15:15,
16:5, 44:23,
45:19
RISK 11:22,
11:25, 21:6,
79:10, 79:14
ROAD 22:10,
75:16
ROBBED 76:1
ROBUST 32:17
ROCKY 11:5
ROOM 1:40
ROSENBAUM 2:9,
3:14, 3:15,
33:14, 33:22,
34:23, 36:1,
36:2
RULE 4:11,
4:22, 9:9,

22:23, 24:17,
26:20, 31:12,
36:10, 39:19,
59:19, 69:2,
85:1
RULED 23:22,
35:15, 35:16
RULING 85:3
RULINGS 10:19,
23:19
RUNS 46:14


< S >
SABRAW 34:11,
34:12, 35:15,
48:3, 80:8,
80:10
SATISFIED 29:6,
47:17
SAYING 33:7,
42:1, 43:5,
46:4, 49:16,
51:21, 66:2
SAYS 13:8,
13:15, 39:25,
74:14, 76:4,
76:9
SCENARIOS 17:22
SCHOOL 2:5
SCOPE 8:15,
14:22, 34:9,
47:4, 79:17
SCRATCH 35:23
SCREENED 32:17,
32:18, 44:13,
52:16, 63:14,
69:7, 69:11,
81:9
SCREENER 69:6,
69:8
SCREENING 14:1,
14:3, 31:16,
31:18, 44:4,
45:22, 46:1,
46:2, 46:7,
46:9, 46:12,
47:9, 47:10,
47:14, 47:15,
52:19, 65:7,

67:19, 68:3,
68:4, 68:10,
68:19, 80:4,
81:1, 81:2,
81:13, 85:19,
85:22, 85:24,
86:4
SCREENINGS
34:2, 34:5,
34:8, 35:10,
44:14, 45:12,
67:24, 81:11
SCREENS 28:6
SCRUTINY 21:9
SECOND 5:13,
7:15, 12:25,
29:1, 35:3,
40:12, 46:23,
77:12, 81:19
SECONDARY 25:5
SECTION 78:19,
88:14
SEEK 15:15,
27:23, 39:1,
47:23, 59:9,
65:18, 66:2,
67:20, 78:24
SEEKING 13:25,
16:20, 17:4,
18:25, 19:1,
19:2, 19:13,
19:17, 20:11,
27:19, 27:20,
35:9, 36:17,
41:19, 43:16,
56:25, 57:17,
63:8, 63:12,
65:16, 66:10,
74:23
SEEKS 42:2,
43:9
SEEMS 85:25
SEEN 69:23,
69:24
SENDING 26:25
SENSE 39:2
SENTENCE 20:18
SEPARATE 5:8,
10:15, 12:6,
35:21, 40:3,

42:3, 42:4,
42:12, 60:13,
77:21, 77:22,
77:25, 78:1,
78:2
SEPARATED 11:1,
28:8, 37:4,
37:17, 70:8,
80:10
SEPARATELY
68:21, 68:22
SEPARATING
4:15, 8:25,
24:25, 25:1,
46:25
SEPARATION 9:2,
11:13, 11:16,
12:8, 12:9,
23:17, 24:24,
25:20, 25:22,
35:17, 52:17,
60:8, 60:12,
66:12
SEPARATIONS
10:22, 11:9
SERIOUS 10:17,
55:22, 56:5
SERVICE 57:19,
75:11
SERVICES 17:2,
17:12, 19:13,
20:4, 44:4,
44:6, 44:7,
44:12, 44:13,
44:16, 44:17,
46:6, 46:8,
56:20, 56:24,
56:25, 57:11,
57:20, 59:10,
64:22, 68:17,
73:25, 74:3,
74:16, 74:17,
74:23, 75:13,
75:17, 76:17,
78:9, 84:6,
85:20, 85:23
SESSIONS 1:13,
3:11, 43:8,
44:12
SET 23:17,

34:10, 34:11
SETTING 86:20
SETTLED 24:2
SETTLEMENT
23:23, 24:5,
26:13, 26:14,
26:16, 26:24,
84:20
SEVEN 48:23,
49:11, 49:17,
61:4
SEVEN. 48:25,
59:3
SEVERAL 13:25
SEVERE 9:1,
23:16
SEXUAL 76:6,
83:22
SHARE 28:12
SHOCKING 45:20,
60:4, 60:13,
60:16, 60:19,
62:19
SHORT 22:8
SHOULDN'T
56:22, 56:23
SHOW 12:16
SHOWS 65:17,
79:17
SIDE 38:21,
72:14
SIDLEY 2:15,
2:20, 2:25,
3:17, 3:19
SIGHT 68:1
SIGNIFICANTLY
76:8
SIGNS 71:7
SIMILAR 19:23,
25:19, 74:13,
80:17, 80:25
SIMILARLY 6:12
SIMPLE 39:23,
67:19, 81:2
SIMPLY 21:10,
45:15, 63:25,
67:4, 71:4,
74:5, 77:4,
81:14
SITE 44:16

SITTING 58:4
SITUATION
14:15, 22:12,
35:8, 46:15,
83:6
SKEPTICAL 11:7
SLACK 2:35, 4:1
SLATE 58:16
SLIGHT 53:2
SLIP 58:4,
69:13, 71:10,
72:20, 85:17
SLIPS 71:21
SLOW 24:20,
57:7
SOCIAL 11:23
SOLUTION 17:5,
20:4, 35:8
SOMEBODY 52:15,
82:6
SOMEONE 44:18,
64:22, 71:17
SOMEPLACE 67:12
SOMEWHAT 4:9
SOON 29:10,
29:11
SORRY 28:25,
33:5
SORT 15:12,
15:18, 15:20,
17:4, 20:2,
20:10, 20:22,
21:22, 22:24,
35:8, 72:25,
73:10
SOUGHT 4:19,
18:3, 25:25,
30:10, 30:12,
34:17, 36:16,
38:6, 40:13,
43:23, 44:3,
47:7, 47:8,
57:3, 62:13,
64:10, 64:19,
66:15
SOUNDS 45:24,
62:11
SOUP-TO-NUTS
17:5
SOURCE 53:11,

53:13, 54:9
SOUTH 2:11,
2:16
SOUTHERN 2:4,
4:13, 60:2
SOVEREIGN 78:20
SPANISH 69:21
SPEAKS 61:1,
83:22, 84:3
SPECIAL 13:6,
13:8, 16:2
SPECIALIZED
10:3
SPECIFIC 43:11,
58:18, 63:9,
71:5, 73:1,
73:11, 74:3,
74:16, 74:17,
75:13
SPECIFICALLY
40:13, 42:5,
82:4
SPLITTING 39:3
SPOKE 71:14
SPOLIATION
56:14
SPRINGS 16:2
SPRINSON 74:8
STAFF 44:19
STAGE 14:1
STAGES 13:25
STAKE 26:10
STAND 12:6,
84:11
STANDARD 20:16,
31:5, 68:14,
79:15, 80:23
STANDARDS 14:4,
42:12, 42:16,
43:20, 46:10,
73:5
STANDING 28:23,
46:16, 67:20
STANDS 26:19
STARS 2:21,
2:26
START 7:19,
25:19, 52:20
STARTING 3:13,
25:18, 35:9,

35:23, 72:20
STARTS 52:21
STATE 3:12,
14:10, 14:11,
14:13, 14:19,
14:23, 15:11,
15:25, 77:14,
78:14, 79:7,
79:16, 88:5
STATED 4:18,
20:15, 35:12,
54:6, 82:24,
85:16
STATEMENT
24:16, 38:21,
78:10, 84:9
STATEMENTS
9:19, 41:17
STATES 1:1,
1:4, 15:23,
16:14, 16:23,
17:16, 18:8,
31:23, 36:6,
37:14, 40:4,
42:15, 49:5,
50:7, 50:17,
54:25, 55:16,
64:23, 65:1,
75:23, 76:1,
78:14, 78:23,
81:7, 88:10,
88:16, 88:26
STATING 84:9
STATION 2:32,
2:39
STATUS 14:24,
16:3, 20:8,
23:12, 23:22,
38:15, 38:21,
48:2, 56:18,
84:19
STATUSES 16:21
STATUTE 68:17,
78:15
STENOGRAPHICALL
Y 88:18
STEP 10:22,
27:23, 63:20,
73:21
STEP-PARENTS

49:18
STOPPED 34:25
STOPPING 12:13
STORIES 11:6
STORY 58:23
STRAIGHT 63:17
STRAIGHTFORWARD
80:5, 80:12
STRANGER 75:25,
83:19
STREET 1:40
STRONG 65:17,
66:6
STUDY 76:4,
76:5, 76:14,
83:21, 84:10
STUDY. 76:11
STYLE 20:22
SUBCLASS 32:7,
32:11, 32:12,
32:14, 33:3,
80:2
SUBCLASSES
31:11, 32:5
SUBDIVISIONS
51:7
SUBJECT 4:16,
10:17, 16:11,
23:18, 24:5,
79:10
SUBJECTED
42:16, 79:15
SUBMISSIONS
69:14
SUBMIT 58:6
SUBMITS 60:17
SUBMITTED
11:17, 31:15,
38:9, 71:21,
72:23, 73:7,
73:13, 74:2,
74:13, 74:14,
75:8, 75:20,
85:17
SUBSTANCE 84:17
SUBSTANDARD
20:24
SUBSTANTIAL
40:20
SUBSTITUTE

73:11
SUCCESS 7:1,
7:5, 12:18,
40:20, 56:13,
72:3
SUFFER 45:14
SUFFERED 57:10,
59:9, 59:12,
60:5, 64:8,
66:11, 67:8,
81:17
SUFFERING
23:15, 57:24,
67:17, 71:9,
71:16
SUFFICIENT
5:21, 8:16,
81:21
SUGGEST 28:3
SUGGESTED
53:15, 66:4,
77:22
SUGGESTING
42:23
SUGGESTION
57:2, 83:25
SUGGESTS 13:20,
74:6, 74:7
SUIT 39:22
SUITABLE 6:10,
60:24
SUPERVISION 6:2
SUPPOSE 18:15,
31:9, 31:11,
31:17, 49:19,
51:24, 52:15,
52:18, 52:22
SUPPOSED 21:18
SUPREME 7:25,
64:9, 64:11
SUSPECT 75:11,
75:15
SUSTAINED 20:14
SWITCH 8:22
SWORN 9:12
SYSTEM 22:9,
66:18
SYSTEMIC 9:7,
19:2, 20:10

< T >
T. 1:38, 88:8,
88:33, 88:35
TABLE 51:9,
58:5
TALKED 24:22,
71:3, 71:14
TALKS 26:25,
39:4, 53:25
TEACH 8:8
TEARING 9:14
TELLS 57:20
TENT 34:4
TERMS 4:19,
16:20, 19:5,
21:21, 29:2,
30:23, 31:21,
34:3, 35:1,
35:7, 45:9,
45:22, 66:5,
68:22, 81:24
TERMS. 64:13
TEST 13:7
TESTIFY 15:22,
15:23
TESTIFYING
79:11
TESTIMONY 9:12
TEXT 76:9
THANKING 33:16
THANKS 10:19
THEME 29:24
THEMSELVES
10:9, 35:2,
53:24, 54:3,
57:5, 77:3
THEORY 34:13
THERAPIST 18:10
THERAPISTS
17:23
THEREAFTER
13:14
THEY'LL 71:16
THIRD 8:14,
59:17, 60:23,
79:9, 79:16
THOROUGH 73:21
THOUSAND 48:9,
48:10, 59:1

THOUSANDS 67:10
THREATENED 76:8
THREE 4:25,
13:20, 16:16,
58:24, 76:13
THREE-FOLD
27:17
THREE. 16:18
THROUGHOUT
41:17, 55:7,
77:13
THROW 26:25
THURSDAY 1:30,
3:1, 48:7
TITLE 88:14
TODAY 3:21,
17:4, 45:1,
48:5, 55:10,
73:10, 77:14,
85:9, 85:18,
87:7
TOP 9:19,
11:18, 74:9
TOPIC 5:19
TORT 43:9,
43:12, 51:13,
51:23, 55:4,
62:22, 64:4,
64:5, 68:23,
82:7, 82:8,
82:20, 82:22
TOTALITY 84:2
TOXIN 21:5
TRAINED 74:15
TRAINING 10:4,
75:11
TRANSCRIPT
1:26, 88:18,
88:22
TRANSFERRING
27:8
TRANSITION
5:22, 53:11,
54:7, 54:17,
68:11
TRANSITIONAL
13:22
TRANSPARENCY
20:1
TRAUMA 9:1,

9:3, 10:6,
10:7, 10:16,
10:17, 11:11,
11:21, 19:16,
23:16, 25:7,
25:8, 26:7,
28:13, 30:15,
30:16, 35:20,
59:9, 73:1,
73:7, 74:3
TRAUMA-INFORMED
14:2, 27:20,
74:16, 75:11,
75:13, 80:4,
80:25
TRAUMATIZED
25:12, 26:9
TREAT 21:25,
23:15, 66:9,
73:7, 74:4
TREATED 61:20,
81:9, 82:10
TREATING 81:14
TREATMENT 9:23,
16:25, 17:17,
18:17, 18:18,
30:21, 31:19,
38:14, 41:13,
42:13, 52:1,
52:20, 52:24,
53:20, 55:14,
55:17, 56:7,
57:3, 60:14,
65:6, 65:7,
65:9, 74:10,
81:11, 81:13,
82:11, 82:23,
82:25
TRIAL 29:16
TRUE 16:15,
88:16
TRYING 40:8,
40:11, 62:3,
84:15
TVPRA 83:20
TWO 4:25, 5:8,
5:9, 12:6,
13:5, 14:10,
15:14, 15:19,
26:18, 28:15,

29:1, 37:17,
40:8, 49:17,
53:18, 59:18,
77:23, 79:25,
86:20, 86:24
TWO-WEEK 53:5
TWO-WORD 36:13
TWO. 16:6
TYPE 22:2,
56:9, 84:4


< U >
ULTIMATE 62:14
ULTIMATELY
38:5, 40:11,
40:18, 42:20,
44:5, 47:17,
51:11, 56:8,
64:10, 72:1,
72:6, 72:8
UNABLE 54:2
UNACCOMPANIED
42:15
UNCOMMON 39:11
UNCONSCIONABLE
81:12
UNCONSTITUTIONA
L 25:1
UNDERLYING 5:6
UNDERPINNING
63:21
UNDERSCORES
11:10, 74:2
UNDERSTAND
18:5, 30:17,
31:15, 35:3,
38:20, 43:22,
47:24, 49:10,
49:16, 51:21,
59:4, 59:5,
69:2, 73:14,
75:1, 76:24,
82:18, 86:10
UNDERSTANDING
23:20, 37:6,
82:16
UNFIT 37:20
UNIQUE 69:5
UNISON 10:11

UNIT 11:20
UNITED 1:1,
1:4, 15:22,
16:14, 16:23,
17:15, 18:8,
31:23, 36:6,
37:14, 42:15,
49:5, 50:7,
50:17, 54:25,
55:16, 64:22,
65:1, 76:1,
78:14, 81:7,
88:10, 88:14,
88:24
UNIVERSITY 2:4
UNLESS 12:21,
20:10
UNPRECEDENTED
21:22
UNTIL 53:17,
82:22
UNTREATED 11:21
URGENCY 6:24
USC 2:5
USING 14:3

< V >
V. 3:11, 15:20
VAGUE 26:14,
38:12
VALUE 43:4
VARIETY 67:5
VARY 30:22
VEHEMENTLY
81:23
VERBATIM 36:12
VERSUS 8:6,
43:8, 44:7
VICTIM 76:6,
83:22, 83:23
VICTIMIZED 22:6
VIEW 49:20
VINDICATED
15:16
VIOLATE 8:9,
46:24
VIOLATED 25:22
VIOLATION
10:15, 13:2,

15:10, 15:20,
19:15, 35:18,
45:20, 77:23
VIOLATIONS 12:7
VIRTUALLY 45:16
VIRTUE 21:10
VISIBILITY 20:1
VISITED 11:12,
70:2, 70:4
VOLUNTEERING
56:24
VOUCHER 18:16,
18:18, 18:23,
19:4, 19:10,
19:12, 45:4,
66:18
VOUCHERS 19:1
VS 1:11
VULNERABLE 9:24

< W >
WAIT 41:21,
82:21
WAITING 57:11
WAIVER 78:19,
79:2
WAKEFIELD 13:7,
13:18, 53:1,
53:3, 53:18,
60:3, 61:13,
61:14, 63:24,
86:9
WAL-MART 40:4,
64:15
WANG 15:19
WANTED 22:20,
33:22, 71:9
WANTS 39:20
WARNED 9:13,
9:22
WARRANTS 23:8
WASHINGTON
2:33, 2:40
WASTING 26:21
WEEK 43:9
WEEKLY 48:2
WEEKS 11:6,
53:18
WELFARE 76:8

WELL-MANAGED
70:7
WELL-OILED 70:7
WELL-RECOGNIZED
80:15
WEST 1:40,
64:12
WESTERN 1:2
WHATSOEVER 61:2
WHEREAS 25:6,
37:6, 42:15
WHETHER 19:5,
19:7, 21:17,
24:24, 25:1,
32:25, 35:17,
35:19, 38:6,
38:7, 39:20,
40:19, 41:6,
46:1, 47:22,
48:12, 50:11,
51:15, 53:8,
54:10, 58:1,
59:7, 59:10,
60:12, 60:13,
60:24, 61:8,
62:25, 65:12,
73:21
WHOLE 34:10,
34:11, 42:14,
52:5, 58:16
WHOM 52:14,
68:2, 79:11
WIDE 67:5
WIDE-RANGING
9:7
WIDESPREAD
20:25
WILL 3:21, 7:8,
9:22, 17:9,
20:9, 22:17,
23:15, 24:12,
27:4, 27:11,
29:13, 30:4,
36:21, 36:22,
37:2, 37:3,
37:7, 37:16,
37:17, 44:18,
44:19, 44:21,
55:13, 59:10,
59:11, 63:9,

70:24, 71:17,
81:2
WILLING 35:13
WIND 22:9,
22:24
WINNEBAGO 8:6
WITHIN 13:1,
14:4, 17:15,
18:8, 79:1
WITHOUT 20:19,
41:10, 46:20,
57:12, 57:19,
66:16, 76:11,
82:11, 83:3
WITNESS 79:10,
79:11
WOMEN 70:8,
81:4, 81:7,
81:10, 81:13
WORDS 4:20,
85:11
WORK 17:19,
19:18, 19:21,
20:3, 66:18
WORKABLE 17:21
WORKING 38:18,
48:1
WORSE 22:18
WORTH 53:18,
56:19, 62:22
WRONGS 12:12

< Y >
YESTERDAY
69:16, 70:4
YORK 60:2