Amy P. Lally (SBN 198555)
alally@sidley.com
Ellyce R. Cooper (SBN 204453)
ecooper@sidley.com
SIDLEY AUSTIN LLP
1999 Avenue of the Stars, 17th Floor
Los Angeles, CA 90067
Telephone: +1 310 595-9500
Facsimile: +1 310 595-9501

Mark Rosenbaum (SBN 59940)
mrosenbaum@publiccounsel.org
Judy London (SBN 149431)
jlondon@publiccounsel.org
Talia Inlender (SBN 253796)
tinlender@publiccounsel.org
Alisa Hartz (SBN 285141)
ahartz@publiccounsel.org
Lucero Chavez (SBN 273531)
lchavez@publiccounsel.org
PUBLIC COUNSEL
610 S. Ardmore Avenue
Los Angeles, CA 90005
Telephone: +1 213 385-2977
Facsimile: +1 213 385-9089

*Attorneys for Plaintiffs*
*Additional Counsel on next page*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MS. J.P., MS. J.O., AND MS. R.M., on behalf of themselves and all others similiarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>JEFFERSON B. SESSIONS III, ATTORNEY GENERAL OF THE UNITED STATES; KIRSTJEN NIELSEN, SECRETARY OF HOMELAND SECURITY; U.S. DEPARTMENT OF HOMELAND SECURITY, AND ITS SUBORDINATE ENTITIES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; U.S. | Case No. 2:18-cv-06081-JAK-SK<br><br>**SUPPLEMENTAL DECLARATION OF R.M.**<br><br>Date: September 20, 2018<br>Time: 1:30 p.m.<br>Judge: Hon. John A. Kronstadt<br>Courtroom: 10B |

**SUPPLEMENTAL DECLARATION OF R.M.**

| | |
|---|---|
| CUSTOMS AND BORDER PROTECTION; ALEX M. AZAR II, SECRETARY OF HEALTH AND HUMAN SERVICES; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; SCOTT LLOYD, DIRECTOR OF THE OFFICE OF REFUGEE RESETTLEMENT; OFFICE OF REFUGEE RESETTLEMENT; DAVID MARIN, LOS ANGELES FIELD OFFICE DIRECTOR, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; LISA VON NORDHEIM, WARDEN, JAMES A. MUSICK FACILITY; MARC J. MOORE, SEATTLE FIELD OFFICE DIRECTOR, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; LOWELL CLARK, WARDEN, TACOMA NORTHWEST DETENTION CENTER,<br><br>Defendants. | |

| | |
|---|---|
| Carter G. Phillips* <br> cphillips@sidley.com <br> Jennifer J. Clark* <br> jennifer.clark@sidley.com <br> SIDLEY AUSTIN LLP <br> 1501 K Street, N.W. <br> Washington, D.C. 20005 <br> Telephone: +1 202 736-8000 <br> Facsimile: +1 202 736-8711 | Mark E. Haddad (SBN 205945) <br> markhadd@usc.edu <br> Part-time Lecturer in Law <br> USC Gould School of Law** <br> University of Southern California <br> 699 Exposition Blvd. <br> Los Angeles, CA 90089 <br> Telephone: +1 213 675-5957 |
| Michael Andolina* <br> mandolina@sidley.com <br> Timothy Payne* <br> tpayne@sidley.com <br> Kevin Fee* <br> kfee@sidley.com <br> SIDLEY AUSTIN LLP <br> One South Dearborn <br> Chicago, IL 60603 <br> Telephone: +1 312 853-7000 <br> Facsimile: +1 312 853-7036 | Luis Cortes Romero (SBN 310852) <br> lcortes@ia-lc.com <br> Alma L. David (SBN 257676) <br> adavid@ia-lc.com <br> IMMIGRANT ADVOCACY & LITIGATION CENTER, PLLC <br> 19309 68th Avenue South, Suite R-102 <br> Kent, WA 98032 <br> Telephone: +1 253 872-4730 <br> Facsimile: +1 253 237-1591 |

**SUPPLEMENTAL DECLARATION OF R.M.**

| | |
|---|---|
| 1 | Sean A. Commons (SBN 217603) |
| 2 | scommons@sidley.com |
| | Bridget S. Johnsen (SBN 210778) |
| 3 | bjohnsen@sidley.com |
| 4 | SIDLEY AUSTIN LLP |
| | 555 West Fifth Street |
| 5 | Los Angeles, CA 90013 |
| 6 | Telephone: +1 213 896-6000 |
| | Facsimile: +1 213 896-6600 |
| 7 | |
| 8 | *Admitted pro hac vice |
| 9 | ** Institution listed for identification purposes only |
| 10 | |
| ... | |
| 28 | |

**SUPPLEMENTAL DECLARATION OF R.M.**

# DECLARACIÓN SUPLEMENTARIA DE R.M.

YO, R.M., hago esta declaración en base a mi propio conocimiento personal y si soy llamada como testigo podría y testificaría sobre los siguientes asuntos:

1. Esta declaración suplementa mi declaración del 11 de Julio del 2018.

2. Durante el tiempo que estuve detenida por las autoridades de inmigración de los Estados Unidos, no recibí servicios de salud mental de manera significativa. Cuando llegué al centro de detención en Tacoma, Washington, los oficiales me dieron un formulario médico para llenar. Nadie me explicó el propósito de ese formulario ni me ayudaron a llenarlo. Había otras personas detenidas conmigo y a todos nos entregaron el formulario, nos ordenaron llenarlo, firmarlo, y nos dijeron que se lo entregáramos a los oficiales. Yo recuerdo que la forma preguntaba más que nada sobre antecedentes médicos y uso de drogas. Sí recuerdo que al final del formulario había una pregunta sobre si queríamos ver a un proveedor de salud mental, pero nadie me explicó que podía utilizar esa pregunta para decir cómo me sentía en ese momento por la separación de mi hija, ni que al llenarla podría comunicarme con mi hija más pronto. Más bien los oficiales de inmigración nos dieron a entender que el formulario era una parte rutinaria en el proceso de transferirnos a un nuevo centro de detención. Junto con el formulario médico también nos dieron documentos para pedir la talla correcta de nuestros uniformes, y para escribir una lista de las pertenencias que teníamos cuando llegamos a Tacoma. Para mí, ese formulario médico fue una hoja más que nos hicieron llenar antes de admitirnos en el centro de detención en Tacoma, y no una evaluación formal de nuestro estado mental.

3. Una semana después de llegar al centro de detención en Tacoma me aislaron de los otros inmigrantes en detención porque dijeron que había un brote de varicela. Yo nunca presenté ningún síntoma, nunca reporté sentir fiebre o tener ronchas en la piel, pero aun así me mantuvieron completamente sola en cuarentena por dos semanas. Durante la primera semana que estuve en cuarentena un oficial de inmigración vino a buscarme a mi celda y me dijo que me iba a llevar a ver un médico. No me explicó qué tipo de médico ni por qué tenía que ir a verlo, solo llamó mi nombre y me ordeno que lo siguiera. Yo pensé que iba ser una consulta relacionada al brote de varicela, y no fue hasta que llegué a la oficina médica que una doctora me recibió y me dijo que era doctora en psicología.

1

Declaración Suplementaria de R.M.

4. Mi conversación con la psicóloga en el centro de detención fue cordial. Ella no hablaba español, así que utilizó un intérprete por teléfono para comunicarse conmigo. La psicóloga se sentó frente a su computadora viendo su pantalla, y empezó a hacerme una serie de preguntas sobre mi estado físico, uso de drogas, si tenía pensamientos de lastimarme a mí misma, cosas así. La mujer interpretando por teléfono tradujo las preguntas y mis respuestas. Cuando la psicóloga me pregunto si estaba teniendo dificultad durmiendo, yo le dije que solo podía dormir por ratos cortos y espaciados. No entramos en más detalle después de eso, y continuamos con las demás preguntas. Al final, la psicóloga me pregunto que qué deseaba hacer una vez que saliera de detención, y yo le dije que mi primera preocupación era estar de nuevo con mi hija. La doctora me dijo que intentara mantenerme tranquila como lo había hecho hasta ese momento, pero a mí no me hizo sentido su consejo porque yo no había estado tranquila desde que me separaron de S.Q. También me dijo que pronto saldría del centro de detención y que no iba a estar ahí para siempre. La psicóloga no me ofreció ningún tipo de apoyo ni tratamiento, y tampoco me pregunto en específico cómo me sentía a causa de la separación. Aunque hubiéramos hablado en más detalle sobre la separación, no me hubiera ayudado a sentirme mejor porque en ese entonces aun no tenía a mi hija.

5. Después de dos meses bajo la custodia de inmigración, salí del centro de detención en Tacoma, Washington el 12 de Julio del 2018. Cuando yo salí de detención y me di cuenta que mi niña no había salido junto conmigo, me sentí completamente desesperada. Desde afuera hablaba con S.Q. por teléfono y ella me decía "mami por favor venga por mí, venga por mí" siempre llorando. Yo lloraba con ella y me sentía perdida y desesperada por no tenerla conmigo. Hasta que tuve a mi hija conmigo no pude sentir seguridad. S.Q. salió de detención el 16 de Julio del 2018. Nuestra reunión en el aeropuerto donde me la entregaron fue muy emocional. Yo sentí como que me habían regresado una parte de mi cuerpo. S.Q. corrió hacia mí y me abrazo fuerte. Ella lloró con tanta fuerza que sentía su cuerpo temblando contra el mío, y yo también lloré de tenerla conmigo de nuevo.

6. Ahora S.Q. y yo estamos juntas, pero aún me queda el sentimiento de desilusión por lo que nos han hecho sufrir en este país. Cuando apenas había salido del centro de detención, yo me

sentía tan nerviosa de ver patrullas de policía que hasta me temblaban las piernas. También sentía un malestar en la cabeza y debilidad.

7. Todo lo que nos ha pasado nos sigue afectando. Quizás con el tiempo pueda lograr olvidar todo lo que nos ha pasado, pero ahora siento ese sufrimiento vivo. Siento dolor en el pecho cuando recuerdo lo que nos sucedió como si acabara de pasar. Casi todos los días veo las noticias sobre lo que está pasando en la frontera con familias inmigrantes como la nuestra, y me da pena que todavía siga sucediendo lo que S.Q. y yo sufrimos. Me entra un nerviosismo muy fuerte de que por cualquier razón pueda volver inmigración a recogerme a mí y a S.Q. para volvernos a separar. A causa de estos temores, no me separo de S.Q. Si salimos a caminar, salimos juntas. Si vamos a la tienda, nos vamos juntas. Siempre nos mantenemos juntas. La única razón por la que dejaría a S.Q. apartarse de mi lado es para que ella pueda asistir a la escuela cuando comiencen las clases.

8. Yo me doy cuenta que esta experiencia sigue afectando a mi hija, incluso ahora que estamos juntas con familia. S.Q. de repente llora porque teme que nos separen otra vez. Ese sigue siendo su temor más grande. Mi hija también se pone triste cuando recuerda su tiempo en detención. Ella se acuerda mucho de otras niñas que conoció en el centro de detención, y cómo algunas de ellas querían cortarse las venas por la desesperación de haber sido separadas de sus familias y no poder salir. Yo noto que esta experiencia ha hecho que S.Q. madure muy rápido. Su forma de expresarse desde que salió de detención es mucho más seria y pensativa. Ella sigue viviendo su niñez, pero ya no se comunica de una manera infantil, es muy consiente de todo lo que sucede a su alrededor. Yo siento que cuando hablo ahora con S.Q. es muy distinto a antes de que nos separaran, para mí es como platicar con una persona ya adulta y no con una niña joven como lo es mi hija.

Declaro bajo pena de perjurio al amparo de las leyes de los Estados Unidos que lo anterior es verdadero y correcto.

Realizado: 21-08-2018

_____
R.M.

3
Declaración Suplementaria de R.M.

**SUPPLEMENTAL STATEMENT OF R.M.**

I, R.M., make this statement based on my own personal knowledge and if I am called as a witness I could and would testify on the following issues:

1. This statement supplements my statement dated July 11, 2018.

2. During the time I was detained by the immigration authorities of the United States, I did not receive significant mental health services. When I arrived at the detention center in Tacoma, Washington, the officers gave me a medical form to fill it out. Nobody explained me the purpose of that form or helped me fill it out. There were other people detained with me and we were all given the form, ordered us to fill it out, sign it and told us to hand it over to the officers. I remember that the form included questions mostly about medical background and drug use. I did remember that at the end of the form there was a question about whether I would like to see a metal health provider, but nobody explained me that I could use said question to state how I felt at that moment about the separation from my daughter, or that I could get in contact with my daughter sooner by responding to that question. Rather, the immigration officers implied that the form was a routine portion of the process of transferring us to a new detention center. Along with the medical form, they also gave us documents to ask for the correct size of our uniforms, and to write a list of the belongings we had when we arrived at Tacoma. To me, that medical form was only a sheet that they made us fill out before admitting us in the detention center in Tacoma, and not a formal evaluation of our mental state.

3. A week after arriving at the detention center in Tacoma I was isolated from the other detained immigrants because they said there had been a chickenpox outbreak. I never had any symptoms, never reported to have fever or have skin rashes, but even so I was kept completely alone in quarantine for two weeks. During the first week I was in quarantine, an immigration officer came to my cell and told me that he was going to take me to see a doctor. He did not explain what kind of doctor or what I had to go see that doctor, he only called my name and told me to follow him. I thought it was going to be an appointment related to the chickenpox outbreak, and it was not until I arrived at the medical office that a doctor received me and told me she was a psychologist.

4. My conversation with the psychologist in the detention center was friendly. She did not speak Spanish, so she used an interpreter on the phone to communicate with me. The psychologist sat

in front of her computer looking at her screen, and started asking me a series of questions about my physical condition, drug use, if I had thoughts about hurting myself, things like that. The interpreter translated the questions and my answers over the phone. When the psychologist asked me if I had difficulty sleeping, I told her that I could only sleep for short and spaced periods. We did not go into more detail after that, and continued with the other questions. In the end, the psychologist asked me what I wanted to do after leaving the detention center, and I told her that my first concern was to be with my daughter again. The doctor told me to try to remain calm as I had been until then, but her advice did not make any sense to me because I had not been calm since I was separated from S.Q. She also told me that I would leave the detention center soon and that I was not going to be there forever. The psychologist did not offer me any kind of support or treatment, nor specifically asked me how I felt about the separation. Although we had talked in more detail about the separation, that would not have helped me feel better because at that time I still did not have my daughter with me.

5. After two months in immigration custody, I left the detention center in Tacoma, Washington on July 12, 2018. When I left detention center and realized that my daughter had not left with me, I felt completely desperate. I would speak with S.Q. on the phone from outside and she would tell me "Mommy please come for me, come for me" always crying. I cried with her and I felt lost and desperate for not having her with me. Until I had my daughter with me I could not feel safe. S.Q. left the detention center on July 16, 2018. Our meeting at the airport where she was given to me was very emotional. I felt like a part of my body had been returned to me. S.Q. ran to me and hugged me hard. She cried so hard that I felt her body trembling against mine, and I also cried to have her with me again.

6. Now S.Q. and I are together, but I still have the feeling of disappointment for what they have made us suffer in this country. When I had just left the detention center, I was so nervous to see police patrols that even my legs were shaking. I also felt discomfort in my head and weakness.

7. Everything that has happened to us continues to affect us. Maybe I can forget everything that has happened to us over time, but I now feel this suffering alive. I feel pain in my chest when I remember what happened to us as if it had just happened. Almost every day, I see the news about what is happening on the border with immigrant families like ours, and I feel sad that

what S.Q. and I suffered is still happening. I get very nervous that for any reason the immigration authorities could return to pick me and S.Q. up and get separated again. Because of these fears, I do not separate myself from S.Q. If we go for a walk, we go out together. If we go to the store, we go together. We always stay together. The only reason why I would let S.Q. get away from my side is so that she can go to school when classes begin.

8. I realize that this experience continues to affect my daughter, even now that we are together with family. S.Q. suddenly cries because she fears that we will get separated again. That remains to be her greatest fear. My daughter also gets sad when she remembers her time in the detention center. She remembers a lot other girls she met in the detention center, and how some of them wanted to cut their wrists in desperation of having been separated from their families and not being able to go out. I notice that this experience has made S.Q. grow up very fast. Her way of expressing herself since she left the detention center is much more serious and thoughtful. She continues to live her childhood, but she no longer communicates like a kid, she is very aware of everything that happens around her. I feel that when I now speak with S.Q. is very different from before we got separated, to me it's like talking to an already grown-up person and not as a young girl like my daughter.

I state under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Performed: _____

_____
R.M.

3
Statement of R.M.

# Coloquia Language Arts, LLP

*...where languages and cultures meet.*

## Certificate of Translation

### No 009252473

I, Suyapa Marisela Reyes, hereby certify that to the best of my knowledge and belief the foregoing to be a true, accurate and complete translation from Spanish into English of the document:

**SUPPLEMENTAL STATEMENT OF R.M.**

hereto attached and to which I refer, in Houston, on the 22nd day of the month of August 2018.

MARIA ALEJANDRA FOUT
Notary Public, State of Texas
Notary ID # 12911321-6
My Commission Expires
September 4, 2020

*********************************

Subscribed and sworn before me

This 22nd day of August, 2017.

_____
Suyapa Marisela Reyes
Translation Department

Notary Public, State of Texas

My commission expires: 09-04-2020

18-0399

15119 Memorial Dr., Suite 108, Houston, Texas 77079
Tel: (281) 679 8787 | ale@coloquia.com