# DEFENDANTS' EXHIBIT A

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MS. JP,, et al.<br><br>  Plaintiffs,<br><br>vs.<br><br>WILLIAM P. BARR, et al,<br><br>  Defendants. | Case No. 2;18-cv-06081-JAK-SK<br><br>Hon. John A. Kronstadt |

## DECLARATION OF REAR ADMIRAL ERICA G. SCHWARTZ, M.D., J.D., M.P.H.

I, Rear Admiral Erica G. Schwartz, declare, pursuant to 28 U.S.C. § 1746, the following:

1. I am a Rear Admiral with the U.S. Public Health Service Commissioned Corps ("USPHS" or "Commissioned Corps") and currently serve as the Deputy Surgeon General of the United States. I advise and support the Surgeon General regarding the operations of the Commissioned Corps. I have served in the Commissioned Corps since 2005. Before that, I served in the U.S. Navy as an occupational medicine physician. My responsibilities in my current position are varied, but, at their core, involve communicating the best available scientific information to advance the health of the nation, and promoting the Commissioned Corps' goal of filling essential public health leadership and clinical service roles across the Federal Government.

1

2. The statements in this declaration are based on my personal knowledge, information I have acquired in the course of performing my official duties, information supplied to me by federal government employees, and my review of the November 5, 2019 Court Order.

### a. U.S. Public Health Service Commissioned Corps

3. The Commissioned Corps is the federal uniformed service of the U.S. Public Health Service of the U.S. Department of Health and Human Services ("HHS"). The Commissioned Corps is led by the Surgeon General, under the direction of the Assistant Secretary for Health.

4. The Commissioned Corps' stated mission is to (1) protect, promote, and advance the health and safety of our nation; (2) provide health care and related services to medically underserved populations; (3) prevent and control diseases; (4) improve the nation's mental health; (4) ensure that drugs and medical devices are safe and effective; and (5) conduct and support biomedical, behavioral, and health-services research.

5. Commissioned Corps officers are trained and equipped to respond to public health crises and national emergencies, such as natural disasters, disease outbreaks, pandemics, or terrorist attacks. The teams are multidisciplinary and are capable of supporting or leading domestic and international humanitarian missions.

6. Over the past several years, Commissioned Corps officers have deployed in response to Hurricanes Florence, Isaac, Michael, and Olivia in 2018; Hurricanes Harvey, Irma, and Maria in 2017; major flooding in Louisiana in 2016-17; Hurricane Matthew in

2016; the Ebola containment efforts in West Africa in 2014-16; the Japan earthquake and tsunami in 2011; the Haiti earthquake in 2010; the Deepwater Horizon oil spill in 2010; and the September 11th terrorist attacks and anthrax attacks in 2001. In these notable deployments, Commissioned Corps officers helped provide medical care on the ground in challenging circumstances and worked closely with local, State, tribal, and national health authorities to plan for long-term, public-health needs.

7. The Commissioned Corps' response to national health threats and other recent disasters underscores the value to our nation of having a highly trained, multidisciplinary, and quickly mobilized cadre of officers.

8. The Commissioned Corps has over 6,100 full-time, well-trained, and highly qualified public health professionals.

9. Approximately 222 of these health professionals are licensed mental health providers, including licensed clinical psychologists, clinical social workers, and psychiatrists. Among the 222 licensed mental health providers, approximately 11 have self-identified as being able to speak basic, intermediate, advanced, or fluent Spanish.

10. Many of the 222 Commissioned Corps officers who are licensed mental health providers are assigned to other HHS agencies, including the Administration for Children and Families (ACF), the Centers for Disease Control and Prevention (CDC), the Centers for Medicare & Medicaid Services (CMS), the Indian Health Service (IHS), the Food and Drug Administration (FDA), the Health Resources & Services Administration (HRSA), and the Substance Abuse and Mental Health Services Administration (SAMSHA). Other officers

are assigned to other federal departments and agencies, including the Bureau of Prisons (BOP), the Department of Defense (DOD), the Department of Homeland Security (DHS), the Department of Veterans Affairs (VA), the Department of Agriculture, and the Department of Commerce. The officers assigned to these departments and agencies deliver critical services, including providing direct mental health treatment to underserved populations such as members of Indian tribes, and federal detainees and prisoners.

11. The Commissioned Corps has deployed members of mental health teams 21 times over the last 5 years to include the Water Emergency Response in Flint, MI in 2016 and Hurricanes Harvey/Irma/Maria in 2017. Currently members of a mental health team are deployed to stem suicides on an Indian reservation.

b. ***District Court's Injunction and the Released Subclass***

12. On November 5, 2019, the district court in *Ms. J.P.* certified the following class:

> All adult parents nationwide who entered the United States at or between designated ports of entry, who (1) on or after July 1, 2017, were, are or will be detained in immigration custody by DHS; and (2) have a minor child who has been, is, or will be separated from them by DHS and detained in DHS or Office of Refugee Resettlement custody or foster care, absent a demonstration in a hearing that the parent is unfit or presents a danger to the child.

The district court "exclude[d] from the class definition – without prejudice to later request to redefine the class based on new information – parents with a criminal history or communicable disease, or those apprehended in the interior of the country."

4

13. The Court certified two subclasses: (i) the Custody Subclass, which is defined as all members of the class who are currently or will be detained in immigration custody by DHS; and (ii) the Released Subclass, which is defined as all members of the class who were previously detained in immigration custody by DHS, but who have since been released.

14. My understanding is that the preliminary injunction requires the Government to "work collaboratively and promptly to establish a process to provide members of both the Custody and Released Subclasses with notice of the available mental health screenings and treatment." The Government must then provide for "[m]edically appropriate mental health screenings" and "appropriate, transitional treatment" to certain Released Subclass members from locations that are "reasonably convenient to [the Released Subclass members] given their current locations and restrictions on travel under their respective terms and conditions of release." *Ms. J.P.* Order at pp. 45-46. The Government's obligations are subject to certain limitations that "include, but are not limited to: (i) the length of the 'transitional period' after release during which Defendants are obligated to provide medical care …; (ii) the location and identities of the Released Subclass; (iii) the willingness of the Released Subclass to participate in Government-sponsored mental health care; and (iv) the appropriate nature, scope, and implementation of the relief." *Id.* at p. 42.

15. The Government does not yet know how many members of the Released Subclass are in the United States and will elect to receive mental health screenings; how many of those members of the Released Subclass will elect to receive treatment; what type,

duration, and level of treatment(s) will be required; or the geographic locations of the Released Subclass members and their children.

16. The current high-level operating assumption of the Commissioned Corps—which may change as the Commissioned Corps continues to receive new information—is that the members of the Released Subclass who will seek services will likely number in the hundreds or thousands, will be geographically dispersed across the United States, and will primarily speak Spanish or indigenous Central American languages.

17. With that operating assumption in mind, the Commissioned Corps is the only entity within HHS that reasonably has both the operational and clinical capability to directly implement the preliminary injunction for the Released Subclass.

18. As discussed below, however, direct implementation of the preliminary injunction would disrupt the day-to-day operations of numerous federal departments and agencies to the detriment of those served by Commissioned Corps officers. The cost to the Nation would be even greater if a national or global public health emergency or terrorist attack were to occur during the direct implementation of the preliminary injunction.

c. ***Direct Implementation Would Cripple the Ability of the Commissioned Corps to Provide Mental Health Services to Underserved Populations and to Respond to Public Health Emergencies***

19. Since the district court preliminary enjoined HHS on November 5, 2019, HHS, in conjunction with the Commissioned Corps has been working to determine how it might implement the preliminary injunction as to the Released Subclass.

6

20. One model is direct implementation. Plaintiffs would provide the Commissioned Corps with the names and contact information for the Released Subclass members who have elected to undergo mental health screening. The Commissioned Corps would then deploy its licensed mental health providers to coordinate referrals of the Released Subclass members to existing, no- or low-cost providers of mental health screening and treatment. When necessary and appropriate, the Commissioned Corps would deploy its licensed mental health providers directly into the field to deliver the mental health screening or treatment directly to the Released Subclass members.

21. In those situations where the Commissioned Corps would be required to deploy mental health providers into the field for extended periods of time, particularly in rural or remote areas, the burden on HHS would be particularly heavy.

22. The scope and duration of such a deployment would depend partly on the diagnoses and treatments for the Released Subclass members. For example, Plaintiffs allege that they may have post-traumatic stress disorder (PTSD). The most common evidence-based treatments for PTSD are trauma-focused psychotherapies and, if necessary, medication. The majority of licensed mental health providers in the Commissioned Corps are not psychiatrists and therefore cannot prescribe psychotropic medications. The recommended course of psychotherapy is weekly sessions for 12 to 15 weeks. To screen and treat hundreds or thousands of Released Subclass members (and their children) dispersed across the United States, all of the 222 Commissioned Corps officers who are licensed mental health providers would likely have to deploy indefinitely to myriad

7

geographic locations that are "reasonably convenient" for individual Released Subclass members. The Commissioned Corps would have to procure translators—or telephonic translation services—and build foreign language capabilities into each deployment to an individual Released Subclass member.

23. Such an indefinite deployment would depart completely from the normal operations of the Commissioned Corps. The Commissioned Corps typically deploys to a single geographic location, sometimes at multiple sites, for approximately two weeks at a time, and provides basic health care services to primarily English-speaking individuals. It has never deployed indefinitely to myriad locations across the United States to deliver services to a population of foreign nationals who primarily speak Spanish or indigenous Central American languages.[1]

24. To the best of my knowledge, the Commissioned Corps has never had to deploy officers indefinitely. It would need to do just that to comply with the Court's preliminary injunction. Such a deployment—an indefinite deployment of officers who are licensed mental health providers—would undermine the duties and responsibilities of the federal departments and agencies that rely upon them. During this time, Commissioned Corps officers would be unavailable to perform their normal functions, including the delivery of mental health services to underserved and vulnerable communities. Indeed, forty-five percent of Commissioned Corps officers serve at agencies that deliver clinical

---

[1] In Fiscal Year 2019, the Commissioned Corps deployed to support the Department of Homeland Security at locations at the southwest United States border where Commissioned Corps officers conducted medical screenings of incoming migrants. The deployment was not indefinite and was limited to one region of the United States.

8

services to populations such as veterans, service members, Native Americans, and individuals in federal custody. An indefinite deployment would cause disruptions in clinical services and continuity of mental health care, even assuming the Commissioned Corps could back-fill positions during the deployment. Taking Commissioned Corps officers away from their normal functions would jeopardize the ability of the Commissioned Corps to protect the health and safety of vulnerable communities.

25. The deployed officers' home agencies would bear the costs of their salaries and would have to find back-fill support during their deployments to comply with the preliminary injunction. Back-fill support would be needed in positions that have been deemed hazardous duty or are subject to isolated hardship agreements.

26. The deployment of Commissioned Corps officers to implement the preliminary injunction would also impact the ability of Commissioned Corps to provide lifesaving support after natural and manmade disasters or to help combat infectious disease outbreaks. Vulnerable communities would lose access to Commissioned Corps personnel in natural disaster areas where short-term deployments are needed.

27. In sum, the Commissioned Corps and the deployed officers' home agencies would sustain immediate and substantial operational and financial hardship if the Commissioned Corps must proceed with implementing the preliminary injunction directly.

      d.    ***HHS, in coordination with the Commissioned Corps, is pursuing a subcontracting model for complying with the preliminary injunction.***

28. The alternative to direct implementation is contracting. HHS, in coordination with the Commissioned Corps, would contract with a provider (or providers) of administrative services—and possibly a mental health provider network or individual mental health providers—to create an infrastructure to coordinate and deliver mental health screening and treatment nationwide. Plaintiffs would provide HHS with the names and contact information for the Released Subclass members who have elected to undergo mental health screening. A smaller deployment of Commissioned Corps officers would then work with the subcontractors to coordinate referrals of the Released Subclass members to existing, no or low-cost providers of mental health screening and treatment. When necessary and appropriate, the subcontractors would deliver or provide for the delivery of the mental health screening or treatment to the Released Subclass members.

29. HHS is working expeditiously to try to develop a viable contract model for complying with the preliminary injunction. At this time, HHS is still attempting to identify providers who could potentially provide the services consistent with the Commissioned Corps' current operational assumption.

30. The development of a contract model—and the procurement of contract providers—is challenging given variables that are presently unknown and that could materially impact the scope, duration, speed, cost, and staffing of the work. Those variables include, but are not limited to: the number of Released Subclass members who are in the United States and elect mental health screening; the number of Released Subclass members

who undergo mental health screening and require and elect to receive mental health treatment; the geographic locations of such individual Released Subclass members and their children; the English language proficiency of such individual Released Subclass members and their children; the diagnoses and recommended treatments for such individual Released Subclass members and their children; the availability of no or low-cost providers of mental health care in proximity to such individual Released Subclass members and their children; the potential for disagreements between the parties about the proper interpretation of the preliminary injunction; the potential for clinical disagreements between the parties in individual cases; and the availability of contractors capable of performing some or all of the work in the relevant geographic areas in a compliant manner.  HHS is attempting to account for all of these factors as it works expeditiously to try to develop a contract model.

31.  Even if HHS were to succeed in leveraging contract resources, the operational burden on the Commissioned Corps of ensuring compliance with the preliminary injunction would remain immense.  A smaller but not insubstantial number of Commissioned Corps officers would have to remain deployed for the operation indefinitely.

I declare under penalty of perjury that the foregoing is true and correct. Executed on November 13, 2019.

_____
Rear Admiral Erica G. Schwartz