JOSEPH H. HUNT
Assistant Attorney General
JEFFREY S. ROBINS
Deputy Director
NICOLE N. MURLEY
Senior Litigation Counsel

LINDSAY M. VICK
Trial Attorney
U.S. Department of Justice
Office of Immigration Litigation
PO Box 868, Ben Franklin Station
Washington, D.C. 20044
Lindsay.Vick@usdoj.gov
Telephone: (202) 532-4023
Fax: (202) 616-8962

*Attorneys for Defendants*

Amy P. Lally (SBN 198555)
alally@sidley.com
Ellyce R. Cooper (SBN 204453)
ecooper@sidley.com
SIDLEY AUSTIN LLP
1999 Avenue of the Stars, 17th Floor
Los Angeles, CA 90067
Telephone: +1 310 595 9522
Facsimile: +1 310 595 9501

Mark Rosenbaum (SBN 59940)
mrosenbaum@publiccounsel.org
Judy London (SBN 149431)
jlondon@publiccounsel.org
Talia Inlender (SBN 253796)
tinlender@publiccounsel.org
Amanda Savage (SBN325996)
asavage@publiccounsel.org
PUBLIC COUNSEL
610 S. Ardmore Avenue
Los Angeles, CA 90005
Telephone: +1 213 385-2977
Facsimile: +1 213 385-9089

*Attorneys for Plaintiffs*
*Additional Counsel on next page*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ms. J.P., et al.,<br><br>        Plaintiffs,<br><br>    vs.<br><br>WILLIAM P. BARR, et al.,<br><br>        Defendants. | Case No.  2:18-CV-06081-JAK-SK<br><br>**JOINT STATUS REPORT**<br><br>Assigned to:  Hon. John A. Kronstadt<br>            and the Hon. Steve Kim<br><br>Date:    February 13, 2020<br>Time:    1:30 p.m.<br>Place:   United States Courthouse<br>         350 W. First Street<br>         Courtroom 10B<br>         Los Angeles, CA 90012<br>Action Filed:  July 12, 2018<br>Discovery Cutoff Date: October 5, 2020<br>Pretrial Conference: TBA<br>Trial Date: April 20, 2021 |

Carter G. Phillips[*]
cphillips@sidley.com
Jennifer J. Clark[*]
jennifer.clark@sidley.com
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Telephone: +1 202 736-8000
Facsimile: +1 202 736-8711

Mark E. Haddad (SBN 205945)
markhadd@usc.edu
Part-time Lecturer in Law
USC Gould School of Law[**]
University of Southern California
699 Exposition Boulevard
Los Angeles, CA 90089
Telephone: +1 213 675-5957

Michael Andolina[*]
mandolina@sidley.com
Timothy Payne[*]
tpayne@sidley.com
Kevin Fee[*]
kfee@sidley.com
Daniel Craig[*]
dcraig@sidley.com
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
Telephone: +1 312 853-7000
Facsimile: +1 312 853-7036

Luis Cortes Romero (SBN 310852)
lcortes@ia-lc.com
Alma L. David (SBN 257676)
adavid@ia-lc.com
IMMIGRANT ADVOCACY &
LITIGATION CENTER, PLLC
19309 68th Avenue South, Suite R-102
Kent, WA 98032
Telephone: +1 253 872-4730
Facsimile: +1 253 237-1591

Sean A. Commons (SBN 217603)
scommons@sidley.com
SIDLEY AUSTIN LLP
555 West Fifth Street
Los Angeles, CA 90013
Telephone: +1 213 896-6000
Facsimile: +1 213 896-6600

[*]*Admitted pro hac vice*

[**] *Institution listed for identification purposes only*

Pursuant to the Court's Order dated January 13, 2020 (Dkt. No. 272), the parties met and conferred, and submit the following report stating their collective and/or respective positions regarding the status of issues addressed at the January 13, 2020 status conference:

## I.     INTRODUCTION

### i.     *Defendants' Introduction*

On November 5, 2019, this Court issued an order granting Plaintiffs' motions for class certification and for a preliminary injunction, and requiring the United States to provide mental-health services to migrant families separated at the Southwest border. Dkt. No. 251. The Court noted that the relief available to the Released Subclass (class members who have been released from government custody) would be subject to certain limitations. These include "the length of the 'transitional period' after release," "the location and identities of the Released Subclass," "the willingness of the Released Subclass to participate in Government-sponsored mental health care," and "the appropriate nature, scope, and implementation of the relief." *Id*. at 42. The Order also directed the parties to meet, confer, and file a joint report regarding the notice and relief ordered. *Id*. at 46.

On November 26, 2019, the parties filed a joint status report addressing their respective positions on the implementation of the preliminary-injunction order. Dkt. No. 260. In that filing, the parties sought clarification from the district court on the scope of the preliminary injunction. *Id.* ay 20-21. Among other things, the government asked the district court to clarify: (1) the scope of the certified class; (2) whether members of the Released Subclass who have been removed from the United States are entitled to preliminary-injunctive relief; and (3) the definition of the term "transitional treatment." *Id*. After holding a status conference on January 13, 2020, and reviewing the parties' status report, the district court scheduled a status conference for February 13, 2020. Dkt. No. 272.  In advance of the scheduled status

1

conference, Defendants state their current positions and proposals as follows.[1] To the extent that the Court would benefit from a more involved discussion of any of the issues outlined below, Defendants request the opportunity to provide further briefing.

ii. *Plaintiffs' Introduction*[2]

Plaintiffs are a group of refugee parents seeking to repair the severe and unconstitutional trauma caused by Defendants' unconstitutional separation of migrant parents from their children at the border. Following extensive briefing and oral argument, on November 5, 2019, the Court certified the class and enjoined Defendants to make available medically and culturally appropriate mental health treatment to class members and their children. Dkt. 251 at 29-30, 45-46. The injunction was based on multiple constitutional grounds including, for the released subclass, *both* the special relationship doctrine under *Wakefield* (referenced by Defendants) *and* the state-created danger doctrine. *Id.* at 38-41 (citing, *inter alia*, *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1066, 1074 (9th. Cir. 2005). The Court also ordered the parties to meet-and-confer to discuss mechanisms for implementing the Preliminary Injunction. *Id.* at 46. Since then, the parties have filed a joint status

---

[1] Defendants gave Class Counsel the opportunity to review its submission on February 5 at 3:15pm ET, Defendants did not receive Plaintiffs' positions until February 6, 2020 at 7pm ET, which makes it impossible for Defendants to respond to points/arguments that were not previously discussed as part of the meet and confer process, and which we have been unable to fully discuss with counsel for the Defendant agencies. Defendants reserve the right to seek leave to file a supplement statement upon careful review of Plaintiffs' submission.

[2] Plaintiffs requested to receive Defendants' portion of the Joint Status Report at 9 a.m. Wednesday so Plaintiffs could respond. Defendants requested more time, which Plaintiffs granted, necessarily delaying the time that Plaintiffs could respond back to Defendants. Plaintiffs received Defendants' 16 page submission and turned their responses in just over 24 hours. Defendants then, without notice to Plaintiffs, significantly altered certain of their positions, providing them to Plaintiffs at 6:20 p.m. Pacific on the day this Joint Status Report was due. In addition, Seneca received notice the morning of the day this Joint Status Report was due that Defendant HHS had accepted Seneca's proposal which is a major (and, in Plaintiffs' view highly positive) development. *See infra* Section C. In light of the need to fully review HHS' acceptance of Seneca's proposal and the short time Plaintiffs have had to review Defendants' edits, Plaintiffs reserve the right to seek leave to file a supplemental statement upon careful review of Defendants' submission and HHS' acceptance.

**JOINT STATUS REPORT**

report, held a status conference with the Court, and engaged in multiple meet-and-confers. Dkt. 260, 272. To date, no class member has received treatment or been screened despite diligence on the part of Plaintiffs and the NGO Seneca. As the Court recognized in its Preliminary Injunction, Plaintiffs face irreparable harm and need the relief as soon as possible. Dkt. 251 at 42-43. In advance of the Court's February 13, 2020 status conference, Plaintiffs state their current positions and proposals regarding the issues to be discussed. Plaintiffs hope to resolve these issues expeditiously because time continues to be of the essence. To the extent the Court believes that further briefing on any topic would be of use, Plaintiffs welcome the opportunity and would request an expedited and accelerated schedule for such briefing.

**A. Schedule for the Appeal of the Preliminary Injunction**

*Defendants' Position:*

Defendants' opening brief is due on February 21, 2020. Defendants filed a notice of appeal on November 27, 2019, and their opening brief was initially due on December 26, 2019. Defendants have sought extensions to afford the Government time to complete the U.S. Department of Justice's internal processes for approving an appeal, including whether to seek a stay. Although the Government filed a protective notice of appeal, the Office of the Solicitor General has not yet made a final decision on whether the Government will pursue this appeal or seek a stay.

*Plaintiffs' Position:*

Plaintiffs have opposed Defendants' repeated requests to extend the appeal schedule (as they have opposed Defendants' various requests in this Court to stay this case or discovery) because any delay or uncertainty in the implementation of the Court's order granting a Preliminary Injunction causes irreparable harm to Plaintiffs. Dkt. 251 at 45. In light of the "the trauma [Plaintiffs] experienced as a result of the family separation policy," the Court found that such trauma "will cause irreparable injury unless [Plaintiffs] are provided with *immediate* care." *Id.* at 42-43 (emphasis

3

added). To remedy that harm, the Court ordered medical treatment for mental health conditions caused by prior or ongoing family separation. *Id.* at 45. To date, not a single class member has obtained any relief. Plaintiffs will be prejudiced by additional delay because, so long as the appeal is pending, contractors providing the relief under the Preliminary Injunction will lack certainty as to the scope of their work, and the government may lack an incentive to provide the relief ordered by the Preliminary Injunction with the haste that the extreme harm to Plaintiffs and their children requires. Defendants' consistent pattern of delays both in this Court and at the Appeals Court should not be countenanced, because it serves to delay and deprive class members of the mental health treatment necessitated by Defendants' family separation policy.

**B. Status of Pending Discovery**

*Defendants' Position:*

Plaintiffs served Defendants with Requests for Production (RFPs) on January 10, 2019, while decisions on Plaintiffs' Motions for Preliminary Injunction and Class Certification and Defendants' Motion to Dismiss were pending. Shortly thereafter, this case was referred for settlement discussions. Dkt. No. 187. For several months, the parties engaged in settlement negotiations, but the matter was not resolved through the settlement process and was returned to the Court's active docket on October 17, 2019. Dkt. No. 233.

Following the Court's November 5, 2019 Order, discovery resumed. On November 12, 2019, Defendants responded to Plaintiffs' RFPs, and Defendants supplemented their responses to the RFPs on December 17, 2019.

Since this case was returned to the Court's active docket, Defendants have continued to work diligently with Plaintiffs to resolve discovery issues concerning a protective order, a claw back agreement, and Plaintiffs' RFPs. At the January 13, 2020 status conference, the Court ordered the parties to file a joint submission

4

**JOINT STATUS REPORT**

addressing the parties' respective positions on the disputes regarding the protective order and clawback agreement. Dkt. No. 272. The parties submitted their joint report to this Court on January 31, 2020, noticing a hearing for DATE. Dkt. 280. That submission remains pending.

On January 15, 2020, the parties submitted their Joint Stipulation addressing Plaintiffs' Motion to Compel regarding the RFPs. Dkt. No. 275. On January 17, 2020, Magistrate Judge Kim issued an order granting in part, and denying in-part Plaintiffs' motion to compel. Dkt. No. 278. The Court ordered Defendants to provide a class list to Plaintiffs by February 14, 2020. Defendants provided the list to Plaintiffs' counsel on January 24, 2020.[3]

With regard to RFPs 2-3 and 11, Magistrate Judge Kim ordered that Defendants "must produce documents relevant to their knowledge or awareness of the potential or actual effects of the enforcement of the zero-tolerance policy on the mental health of separated family members."[4] Dkt. No. 278. With regard to RFP 8, Magistrate Judge Kim ordered that Defendants must produce all responsive documents, and directed that Defendants should produce the responsive document within 60-days, unless the parties agree to—or the Court orders—an alternate schedule for production. *Id.* at 2. With regard to RFPs 12-14, the Court denied Plaintiffs' motion as moot to the extent that Defendants had proposed—and Plaintiffs' agreed to—a method for identifying and producing responsive medical records. *Id.* Defendants were instructed to set out a reasonable production schedule for those documents. *Id.*

---

[3] Plaintiffs have agreed to hold the class list Confidential pursuant to Defendants' version of the protective order until the Court enters a protective order, at which point it will be held Confidential pursuant to that order.

[4] The Court denied Plaintiffs' motion to compel for RFPs 4-7, 9-10, 15-16.

5

**JOINT STATUS REPORT**

In light of Magistrate Judge Kim's order, Defendants have started the process of collecting responsive medical records, continuing to collect responsive ESI (including identifying custodians and search terms and conducting initial searches), and reviewing material for responsiveness and privilege. Defendants anticipate being able to begin producing responsive material once the Court enters a protective order, but anticipate needing to propose a more extended reasonable production schedule for both the medical records and the policy-related documents once they determine the likely scope of the production. Defendants will continue to meet and confer with Class Counsel on this topic.

*Plaintiffs' Position:*

Plaintiffs first served discovery on Defendants on January 10, 2019. To date, after two failed attempts to first stay discovery and then stay this case entirely and after losing a motion to compel, more than a year after discovery was first served, Defendants have produced a single document: the class list, which they themselves note contains inadequate and outdated information. *See infra* Section C. Despite being ordered to do so by Judge Kim, Defendants have as yet to amend their responses to RFPs 12-14 and inform Plaintiffs when they will begin to produce documents or when they will complete production. Dkt. No. 278 ¶ 3. Defendants have also not provided Plaintiffs with a proposed sample of Plaintiffs for RFP 12-14 despite having had the class list since at least January 24, 2020 (when it was produced).

With regard to the remaining discovery compelled by Judge Kim, Defendants have now said in this report that they will not meet the 60 day requirement imposed by Judge Kim's Order. *Id.* ¶6. Ominously, Defendants have refused to provide discovery by date certain and simply state that they expect to begin rolling productions, without noting a specific start or an end date.

**JOINT STATUS REPORT**

Defendants should immediately amend their discovery responses in line with Judge Kim's order to explain when they will begin and when they will conclude their production in response to RFP's 12-14. They should immediately provide a proposed sample of Plaintiffs whose records they will produce to Plaintiffs' counsel for review. They should also complete discovery on other matters, as compelled, within 60 days. More than a year has already passed since discovery requests were served and the Court has already had to intervene by granting a motion to compel; further delay is inexcusable.

**C. The content of class notice and the manner in which it would be provided, as well as how those who receive notice should proceed in communications about the process for receiving information about available services, and the services**

*Defendants' Position:*

Defendants are willing to confer with Class Counsel to craft the language and content of any class notice that would be provided to both the Custody Subclass and the Released Subclass. With regard to the Released Subclass, Defendant HHS anticipates that it will contract with a qualified non-profit organization to provide administrative notice (the Contractor). The Contractor will mail the notice and follow-up with telephone calls or in-person visits as appropriate depending on the circumstances. The Contractor will also make efforts to locate class members for whom the Government does not have contact information because the last-known contact information in the Government's possession is outdated. Class members interested in receiving mental health assessments will then express their interest directly to the Contractor (not to attorneys for the Government or Class Counsel).

As to the Custody Subclass, Defendants will distribute the notice to Custody Subclass members in person, and publicly post the written notice in facilities where Custody Subclass members are detained. Defendant ICE also proposes to promptly

7

**JOINT STATUS REPORT**

assess or reassess all Custody Subclass members who are in ICE custody; and therefore, the delivered and/or posted notice itself will not be the only or ultimate notice to class members of inclusion in, and relief available to, the Custody Subclass. Specifically, each Custody Subclass member will also directly receive notice at the time his or her assessment or reassessment is scheduled and provided. Each Custody Subclass member's respective decision to participate further in the relief afforded by the preliminary injunction can then be communicated before, during, or after the assessment.

Plaintiffs have suggested that they believe that in-person solicitation of responses by non-governmental persons in ICE facilities is required by the preliminary injunction. Defendants oppose this suggestion. Defendants take the position that the Court envisioned a process by which legal notice of class membership and availability of relief under the preliminary injunction may be conveyed to class members via judicially-acceptable means of providing notice. *Ferrell v. Buckingham Prop. Mgmt.*, No. 119CV00332LJOSAB, 2020 WL 291042, at *24 (E.D. Cal. Jan. 21, 2020) (Under Rule 23, in the class-wide settlement context, courts "must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort.").  Such a requirement that notice to the Custody Subclass be provided in-person by non-governmental persons in ICE facilities is unnecessary in light of the proposed procedures set forth in this report, which include automatic scheduling of assessments for Custody Subclass members in ICE custody with the option to opt-out—rather than opt-in—of receiving relief. Moreover, Plaintiffs' suggestion would impose needless operational difficulties on detention facilities without providing any substantial benefit.

8

**JOINT STATUS REPORT**

1

*Plaintiffs' Position:*

2

In its Preliminary Injunction, the Court ordered notification to members of both

3

subclasses "through the process adopted pursuant to subparagraph vii," which

4

provides:

5

Counsel for the parties shall work collaboratively and promptly to establish a

6

process to provide members of both the Custody and Released Subclasses with
notice of the available mental health screenings and treatment and of their

7

ability to elect whether to undergo such screenings and accept prescribed

8

treatment. The notice to the members of the Released Subclass shall include
the location(s) at which such screenings will be available.

9

Dkt. No. 251 at 46.

10

On February 6, 2020, the date this joint status report was due to this Court, the

11

Seneca Family of Agencies ("Seneca") was advised by the U.S. Department of Health

12

and Human Services ("HHS") that HHS would accept Seneca's proposal for both

13

notice and referral coordination, and that HHS had accepted Seneca's proposed

14

budget for its services. Declaration of Kenneth Berrick ("Berrick Decl.") ¶ 8.

15

Seneca's current proposal is attached as Exhibit A to the Declaration of Kenneth

16

Berrick filed herewith. As explained in the Berrick Declaration and detailed in

17

Seneca's proposal, to effectively inform members of the Released Subclass of the

18

availability of mental health screenings and treatment, Seneca will locate class

19

members (location); notify them orally and in writing of the Preliminary Injunction,

20

of "the available mental health screenings and treatment[,] and of their ability to elect

21

whether to undergo such screenings and accept prescribed treatment" (notification);

22

provide information about the available screenings and treatment and respond to class

23

members' questions and concerns regarding those screenings and treatment

24

(education); and determine whether class members elect to participate in those

25

screenings and treatment (election). Berrick Decl. ¶¶ 10-13. Each of these steps is

26

necessary to afford class members meaningful notice of the available relief. *Id.* Oral

27

notification (by telephone or through a local representative) in addition to written

28

9

**JOINT STATUS REPORT**

1  notification is especially critical, "because class members likely speak a variety of
2  languages that do not include English, and they likely have limited literacy and will
3  be unable to read and understand the written notice." *Id.* ¶ 11.

4       With respect to the Custody Subclass, "appropriate notice" likewise requires
5  oral (live telephonic) and written notification in a linguistically- and culturally-
6  appropriate manner, as well as a meaningful opportunity for class members to ask
7  questions and express concerns about the available services. Berrick Decl. ¶ 25. Oral
8  and written notice of the available screenings and treatment should be provided by
9  Seneca, Class Counsel, or each class member's immigration counsel. Notice should
10  not be provided by Defendants or their agents, because "class members are likely to
11  associate [them] with the trauma they experienced" and may perceive them "as
12  threatening or intimidating," and because class members are likely to fear that
13  informing Defendants or their agents of their decision to receive services will result
14  in adverse immigration consequences. *Id.* ¶ 24.

15       To the extent Defendants argue that the notice described above differs from
16  the notice set forth in Federal Rule of Civil Procedure 23(c)(2)(B), such notice is
17  mandatory only for a class certified under Rule 23(b)(3). Fed. R. Civ. P. 23(c)(2)(B)
18  (stating that "for any class certified under Rule 23(b)(3) . . . the court *must*" provide
19  notice pursuant to Fed. R. Civ. P. 23(c)(2)(B) (emphasis added)). It is not required
20  here, where the Court certified the class pursuant to Rule 23(b)(2), and thus has the
21  discretion "to direct appropriate notice to the class." Fed. R. Civ. P. 23(c)(2)(A). With
22  respect to the Custody Subclass, "appropriate notice" in this case must be provided
23  in a trauma-informed (i.e., not provided by Defendants or their agents) and
24  linguistically- and culturally-appropriate manner. Berrick Decl. ¶¶ 24-25.

25       As noted above, Seneca was only informed on the date the Joint Status Report
26  was due that their proposal had been accepted. Should there be further developments,

27

28

10

**JOINT STATUS REPORT**

representatives of Seneca will be available at the Status Conference to answer questions.

**D. Depending on the nature of the notice to the members of the class, who would be responsible for the associated costs**

*Defendants' Position*:

Defendant HHS anticipates that it will contract with a third-party to provide notices to members of the Released Subclass who are currently in the United States. The contract would not cover notice to removed parents or those who are in DHS Custody. The Government will pay for the fees associated with providing Class Notice for the Released Subclass.

For the Custody Subclass members in ICE custody, Defendant DHS will provide notice to those class members and will assume the cost of providing the notice agreed upon by the parties. As explained above, Defendants are opposed to Plaintiffs' suggestion that in-person solicitation of responses by non-governmental persons in ICE facilities is required. Defendant DHS does not agree to assume any costs associated with this needlessly cumulative proposal.

*Plaintiffs' Position*:

On February 6, 2020, Seneca was advised by HHS that HHS had accepted Seneca's proposed budget for both notice and referral coordination. Berrick Decl. ¶ 8.

Defendants should pay for the fees associated with providing the notice described to members of the Custody Subclass in Plaintiffs' Sections C and F.

Should there be further developments, representatives of Seneca will be available at the Status Conference to answer questions.

**JOINT STATUS REPORT**

**E. Whether some affirmative contacts with class members other than sending notice is appropriate to facilitate decision-making by those class members**

*Defendants' Position:*

Defendant HHS anticipates that it will contract with a third-party to provide notices to members of the Released Subclass who are currently in the United States. The Contractor will mail the notice, and will follow-up with telephone calls or in-person visits as appropriate depending on the circumstances. The Contractor will generate a list of Released Subclass members who are interested in seeking mental-health services; not interested in mental -health services; or undecided and requests additional information.  The Contractor will provide the list to the Government and Plaintiffs' counsels.

The Contractor will coordinate referrals for mental-health assessments and treatment for Released Subclass members who are interested in receiving the services.  The Contractor will seek, in the first instance, to refer such Released Subclass members (together with their children, as appropriate) to no- or low-cost providers of mental health services, such as the federally qualified health centers (FQHCs)  supported by the Health Resources Services Administration of HHS, and mental health clinics that are part of HHS' National Child Traumatic Stress Initiative (NCTSI).  When making the referral, the Contractor will take into consideration the geographic location, access to transportation, disability or access/functional needs, acute mental health presentation, or other special needs of the Released Subclass members.

As to the Custody Subclass, as described above, Defendant ICE proposes to schedule and provide assessments or reassessments for all Custody Subclass members. Each Custody Subclass member's respective decision to participate further

12

**JOINT STATUS REPORT**

1  in the relief afforded by the preliminary injunction can then be communicated before,

2  during, or after the assessment.

3          As explained above, Defendants are opposed to Plaintiffs' suggestion that in-

4  person solicitation of responses by non-governmental persons in ICE facilities is

5  required.

6          *Plaintiffs' Position*:

7          Under Seneca's proposal, which HHS advised Seneca that it would accept on

8  February 6, 2020, Seneca will facilitate Released Subclass members' decision-

9  making regarding whether to participate in available mental health screenings and

10 treatment by notifying class members orally and in writing of the Preliminary

11 Injunction and of the available screenings and treatment; providing information about

12 the available screenings and treatment; and responding to class members' questions

13 and concerns regarding those screenings and treatment. Berrick Decl. ¶¶ 8, 10-12.

14 These affirmative contacts are appropriate because, as explained in the Berrick

15 Declaration, "a written mailing alone will prove largely ineffective because class

16 members likely speak a variety of languages that do not include English, and they

17 likely have limited literacy and will be unable to read and understand the written

18 notice." Berrick Decl. ¶ 11. Consequently, oral notification and follow-up contacts

19 are necessary to facilitate informed decision-making by class members, who may "be

20 reluctant to engage with Seneca upon first contact" due to fears that accessing mental

21 health services or sharing personal information could "interfere with their asylum

22 proceedings or result in their deportation." *Id.* ¶ 12. Affirmative contacts will aid and

23 facilitate class members' decision-making by allowing Seneca's outreach/referral

24 coordinators to address such concerns and to answer any questions class members

25 may have in deciding whether to participate in the available screenings and

26 treatments. *Id.* Affirmative contacts will also enable Seneca's outreach/referral

27 coordinators to address cultural barriers that might otherwise deter class members

28

13

**JOINT STATUS REPORT**

from seeking mental health services, "including the stigma of mental illness." *Id.* Once a class member elects to receive services, Seneca will communicate with that class member pursuant to the Referral Coordination process described in the Declaration of Kenneth Berrick. *Id.* ¶¶ 15-20.

With respect to the Custody Subclass, affirmative contacts in the form of oral (live telephonic) notification in a linguistically- and culturally-appropriate manner, as well as a meaningful opportunity for class members to ask questions and express concerns about the available services, are appropriate and necessary to facilitate informed decision-making. Berrick Decl. ¶ 25. Such contacts should be made by Seneca, Class Counsel, or each class member's immigration counsel. Such contacts should not be made by Defendants or their agents, because "class members are likely to associate [them] with the trauma they experienced" and may perceive them "as threatening or intimidating," and because class members are likely to fear that informing Defendants or their agents of their decision to receive services will result in adverse immigration consequences. *Id.* ¶ 24.

As noted above, Seneca was only informed on the date the Joint Status Report was due that their proposal had been accepted. Should there be further developments, representatives of Seneca will be available at the Status Conference to answer questions.

**F. The method for providing notice to members of the class who are in custody.**

*Defendants' Position:*

Defendants are willing to confer with Class Counsel to craft the language and content of any class notice that would be provided to both the Custody Subclass and Released Subclass. As discussed above, for the Custody Subclass, Defendant ICE proposes to assess or reassess all Custody Subclass members. Each Custody Subclass member's respective decision to participate further in the relief afforded by the

14

**JOINT STATUS REPORT**

1  preliminary injunction can then be communicated before, during, or after the

2  assessment. Defendants are opposed to Plaintiffs' suggestion that in-person

3  solicitation of responses by non-governmental persons in ICE facilities is required.

4  *Plaintiffs' Position:*

5  Members of the Custody Subclass should receive oral (live telephonic) and

6  written notification of the Preliminary Injunction and the available screenings and

7  treatment in a linguistically- and culturally-appropriate manner, as well as a

8  meaningful opportunity for class members to ask questions and express concerns

9  about the available services. Berrick Decl. ¶ 25. Oral and written notice of the

10  available screenings and treatment should be provided by Seneca, Class Counsel, or

11  each class member's immigration counsel. Notice should not be provided by

12  Defendants or their agents, because "class members are likely to associate [them]

13  with the trauma they experienced" and may perceive them "as threatening or

14  intimidating," and because class members are likely to fear that informing Defendants

15  or their agents of their decision to receive services will result in adverse immigration

16  consequences. *Id.* ¶ 24.

17  **G. Whether services provided to class members who are in custody should be**

18      **provided by an outside party**

19  *Defendants' Position:*

20  Defendant ICE is willing, through the licensed mental health professionals at

21  its facilities, to promptly assess or reassess all Custody Subclass members who are in

22  ICE custody. These assessments or reassessments would be provided by members of

23  the ICE Health Service Corps (IHSC), and, if needed, Custody Subclass members

24  will be transferred to detention facilities where there are members of the IHSC

25  available to provide the assessment. The purpose of the assessment would be to

26  identify any mental health conditions that might be related to the separation of each

27  Custody Subclass member from his or her child. Defendant ICE is willing to consider

28

15

**JOINT STATUS REPORT**

1    materials or information that Class Counsel wishes to have the licensed mental health

2    professionals from the IHSC consider in advance of these assessments.

3           As discussed above, the parties are in disagreement regarding who should

4    provide the Notice, Screenings, and Treatment to the Custody Subclass.

5           *Plaintiffs' Position*:

6           The screenings and treatment should be provided to members of the Custody

7    Subclass (and their family members, to the extent clinically appropriate) at a facility

8    that is therapeutically appropriate (which excludes detention facilities) and equipped

9    to provide trauma-informed screenings and treatment in a linguistically- and

10   culturally-appropriate manner. *See* Berrick Decl. ¶ 26. Such providers may include

11   Federally-Qualified Health Centers, National Child Traumatic Stress Behavioral

12   Health Treatment Services Clinics, or other free or low-cost providers of culturally-

13   and linguistically-appropriate services. Because "[t]he effectiveness of mental health

14   services depends on ensuring that clients feel safe and secure with their provider and

15   in the place where treatment occurs," the screenings and treatment cannot be

16   effectively provided by ICE personnel or in detention facilities. *Id.* (explaining that

17   "[d]etained class members will likely fear sharing any personal information or

18   disclosing any harm or trauma caused by the Government" to Government employees

19   and that class members "are likely to associate employees or other agents of the

20   Government with the trauma they experienced").

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28

**H. Whether members of the class who are not in the United States qualify for the relief provided by the preliminary injunction**

*Defendants' Position:*

A plain reading of the Court's preliminary injunction order makes clear that individuals who are outside the United States do not qualify for relief under the preliminary injunction.[5]

In describing and certifying two subclasses, this Court identified the distinction between the two subclasses as being between "putative class members who are currently in immigration detention, and those who previously were detained, but have been released pending the completion of their asylum proceedings." Dkt. No. 251 at 15; *see also id.* at 36 (noting that the parties dispute whether Defendants' obligation to provide medical care "continues upon the release of parents and children from detention, pending the resolution of their asylum claims"). Individuals who have been removed from the United States are not "released pending the completion of their asylum proceedings[,]" but rather their proceedings have been completed and they have returned home. Thus, it appears from the language used by the Court, in the Preliminary Injunction Order, that the Court did not contemplate including in the Released Subclass individuals who have been removed and no longer have pending asylum claims.

---

[5] Defendants have been working to implement the preliminary injunction, and specifically to enter into the contracts necessary to provide relief to the Released Subclass. In so doing, Defendants have relied on their reading of the preliminary injunction Order to exclude individuals who have been removed from the United States. If the Court determines that these individuals should be included in the provision of relief under the Order, then Defendants anticipate that their ability to enter into these contracts, as well as the timing of these contracts, will be substantially impaired. It is Defendants' belief that providing relief to removed class members who are from multiple countries throughout the world, many of whom departed the United States in 2017 and 2018, would impose significant additional burdens on Defendants that would likely render provision of such relief impossible.

17

**JOINT STATUS REPORT**

1    Likewise, the Court's Order recognizes that the right for any individual to
2  receive relief under *Wakefield v. Thompson*, 177 F.3d 1160 (9th Cir. 1999), depends
3  on the conditions surrounding the individual's release. *See* Dkt. No. 251 at 39-40. In
4  discussing the situations in which *Wakefield* might apply, the Order relied on the
5  distinction made by the United States Court of Appeals for the Second Circuit in
6  *Jacobs v. Ramirez*, 400 F.3d 105 (2d Cir. 2005), between individuals released with
7  "only minimal restrictions" where "the corresponding obligations of the state
8  following release are . . . limited[,]" and those "released and placed on parole" where
9  "the state assumes the limited duty of ensuring that the location is habitable." Dkt.
10  No. 251 at 39 (discussing *Jacobs*, 400 F.3d at 107). Noting that "when members of
11  the Released Subclass leave custody, they are required to comply with certain terms
12  and conditions, including their appearance at future immigration and court
13  proceedings[,]" the Court stated, "that there are restrictions is relevant to the
14  assessment of whether transitional mental health care should be provided." *Id* at 40.
15    Read as a whole, the Court's Order therefore plainly expresses an intent that
16  the preliminary injunction should only apply to members of the Released Subclass
17  who remain in the United States and remain in asylum proceedings so that they have
18  a continuing obligation to appear at future immigration court proceedings.
19    *Plaintiffs' Position:*
20    Plaintiffs believe that the Preliminary Injunction covers class members outside
21  the United States, and that such Plaintiffs have rights under the state-created danger
22  doctrine. *See* Dkt. No. 251 at 40-41. Nevertheless, recognizing the practical
23  difficulties of contacting individuals outside of the United States, and given the desire
24  to use available resources to provide relief to class members inside the United Sates
25  as expeditiously as possible, Plaintiffs are prepared for the present to limit the
26  enforcement of the Preliminary Injunction to those class members inside the United
27  States.
28

18
**JOINT STATUS REPORT**

**I.   Whether the reference to a hearing as part of the process of identifying certain parents who may not qualify for further contact with their children should be modified**

_Defendants' Position_:

As discussed in the last joint status report and at the status conference, Defendants remain concerned that the Court certified a class that may unintentionally be broader than the class certified in _Ms. L._ In relevant part, the Court certified a class where, rather than "***absent a determination*** that the parent is unfit or presents a danger to the child," the _Ms. J.P._ class includes the language "***absent a demonstration in a hearing*** _that the parent is unfit or presents a danger to the child._" _See_ Dkt. No. 251 at 21 (emphasis added). This construction renders the _Ms. J.P._ class broader than that certified in _Ms. L._, as the _Ms. L._ class excludes those who were administratively determined to be a danger to the child or an unfit parent.

Defendants' position has not changed, and as of the drafting of Defendants' portion of this joint status report on February 4, 2020, Plaintiffs have yet to provide Defendants with an explanation of their position on this issue, beyond their statement that some "due process" is required. On February 3, 2020, in anticipation of the filing of this report, Defendants met and conferred with Plaintiffs about whether Plaintiffs would agree to the removal of this language. Plaintiffs have refused to so agree, and continue to state that they believe some "due process" is required, but they have not provided any explanation as to what "due process" they propose, nor have they proposed any alternative language reflecting their position. Therefore, Defendants reiterate their request that the Court clarify the class definition by removing this language.

Defendants note that in _Ms. L._, the Court recently rejected a challenge by the Plaintiffs in that case to separations that Defendants have made on the basis of fitness and danger since that Court's preliminary injunction order. _See Ms. L. v. ICE_, Case

19

No. 18-450, Dkt. No. 509, at 21-22 (S.D. Cal., Jan. 13, 2020). Noting that there had only been approximately twenty such separations, *id.* at 21, the Court stated:

> The factual circumstances under which these initial [separation] determinations are made do not lend themselves to micromanagement by the Court. This is especially so given the class action nature of this case. Defendants must be allowed discretion to make these decisions based on the available information. Concerns about lack of fitness and danger to a child often overlap and include many scenarios that are difficult to assess under ideal circumstances, let alone at the border: mental disorders, active users of illicit controlled substances, odd behavior (e.g., climbing cell fencing and feigning passing out), and potential criminal activity, including child trafficking, sexual abuse and physical abuse. (*See* Opp'n., Ex. 2 (Easterling Decl.) ¶¶ 25-29). The Court expects that field officers and agents and medical professionals will exercise their discretion in a reasonable manner based on the evidence then available, and that the reasonableness of those decisions will be reviewed by appropriate supervisors before separation decisions are made. It is expected the parties will meet and confer on disputed findings of fitness and danger, as they have been doing on the issues of communicable disease and gang affiliation. Given the intensely factual nature of these decisions and the processes now in place for parents to challenge such decisions, (see ECF No. 489 (Memorandum from Carla L. Prevost, Chief, U.S. Border Patrol to All Chief Patrol Agents and All Directorate Chiefs (Sep. 16, 2019) ("Prevost Memo") (explaining and attaching "Tear Sheet," which informs a parent who has been separated from his or her child of the reasons for separation, how to contact their child and how to contest separation from their child)), the Court declines to find Defendants are violating the injunction with respect to this factor.

*Id.* at 21-22. Given that Court's finding as to the adequacy of Defendants' existing procedures with regard to separations based on fitness and danger, there is good reason for this Court to likewise decline to micromanage Defendants' processes, and to define the class here in a manner that mirrors the class certified in *Ms. L.*

20

1

_Plaintiffs' Position_:

2

Plaintiffs disagree with Defendants that there is any lack of clarity with respect

3

to the class definition. From the outset of this litigation, Plaintiffs have sought

4

certification of a class of parents separated from their children without a

5

demonstration in a hearing that the parent is unfit or presents a danger to the child.

6

Defendants' request for modification of the hearing requirement is an improperly

7

drawn request for reconsideration of the Court's order certifying the class and

8

granting the Preliminary Injunction. Dkt. 251; _Torrent v. Yakult U.S.A., Inc._, No.

9

SACV1500124CJCJCGX, 2016 WL 6039188, at *2 (C.D. Cal. Mar. 7, 2016)

10

(denying renewed motion for class certification because it was a procedurally-

11

deficient motion for reconsideration that would require the court "to relitigat[e] issues

12

that have already been decided"). Pursuant to Local Rule 7.1, a motion for

13

reconsideration may only be made within 28 days of the Court's prior order certifying

14

the class—a period which has long since elapsed. Even if Defendants' had properly

15

moved for reconsideration, they are not permitted to repeat any written argument

16

made in support of or in opposition to the original motion as they have done here.

17

As Defendants note, the _Ms. L._ Court permitted Defendants to continue

18

separating families using an administrative process rather than a hearing to identify

19

whether a parent is unfit or poses a danger to the child. Plaintiffs believe that a hearing

20

or some other substantial form of due process continues to be necessary in light of

21

public reports drawing into question whether Border Patrol agents might violate class

22

members' due process rights.

23

First, administrative determinations of parental fitness and safety are highly

24

suspect, because they are made quickly, by non-legal personnel, and with inadequate

25

opportunity for class members to contest the determinations. This leads to a high risk

26

of error. Further, to the extent parents must be separated for a short time due to fitness

27

or danger (referencing the example of a parent with hypothermia raised by

28

21

**JOINT STATUS REPORT**

Defendants at the January 13, 2020 status conference), there is no reason for those parents to be removed from their children long-term or removed from the class. After a rapid treatment for hypothermia or dehydration, most patients recover and parents should be reunited with their children. To the extent they – like the other class members – were then kept from their children for weeks or months, they would suffer the trauma that the Preliminary Injunction is designed to remedy due to that long-term separation and not due to the brief period where they received medical treatment for hypothermia or dehydration. Such parents should not be excluded from the class.

Second, public reporting has documented determinations of parental unfitness or danger that do not comport with due process. According to public reports, agents have cited ordinary traffic violations and diseases like HIV (*i.e.* diseases not readily transmitted to a parent's child) to show that a class member is unfit to be a parent or poses a danger to their child. Richard Gonzalez, *ACLU: Administration Is Still Separating Migrant Families Despite Court Order to Stop*, N.P.R., July 30, 2019, https://n.pr/2uoPdsr; Tyler, Jasmine, *HIV Status No Justification for Family Separation in the US*, Human Rights Watch, July 31, 2019, https://bit.ly/383TsIp.

Third, public reporting has documented potential grounds for bias among agents making determinations regarding fitness or danger for class members, which must be countered with due process. A.C. Thompson, *Inside the Secret Border Patrol Facebook Group Where Agents Joke About Migrant Deaths and Post Sexist Memes*, ProPublica, July 1, 2019, https://bit.ly/374JLZ4. To the extent the initial determination is made by someone whose view is affected by xenophobia or racism towards Plaintiffs, sufficient due process is necessary to ensure that parents are not unnecessarily separated from their children.

To the extent that Defendants believe that a hearing that resembles a court procedure would be unduly burdensome, Plaintiffs remain open to exploring alternatives that preserve Plaintiffs' due process while recognizing administrative

22

1  constraints during meet-and-confers. Defendants have refused to propose
2  alternatives. Plaintiffs even asked for clarification on Defendants' definition of
3  parental unfitness or danger to a child during meet-and-confers. Defendants refused
4  to provide that information and did not explain any of the protections Defendants
5  allege have been given until they appeared, without explanation, in this joint status
6  report. Defendants' refusals are consistent with a long-standing pattern of obfuscation
7  and delay requiring round after round of meet-and-confers consuming weeks and
8  months and designed to thwart relief for class members.

9  **J. Whether the services provided by the Office of Refugee Resettlement**
10  **(ORR) to minors are subject to the terms of the preliminary injunction**
11  *Defendants' Position*:

12  The Court's class certification order defined the class, relevant here, "[a]ll
13  adult parents"— the order is clear that children are not class members. Dkt. No. 251
14  at 29. It is Defendants' position that the separated children currently in the care of the
15  Office of Refugee Resettlement (ORR) do not fall within the definition of the class,
16  and that, as such, ORR is not under an obligation to alter its practices with regard to
17  the medical and mental health care provided children in its custody. To the extent
18  that the relief ordered by the Court involves children, it is in the context of whether
19  treatment of parent class members should include "interaction with their minor
20  children." *Id.* at 45. Out of an abundance of caution, ORR sought confirmation of its
21  understanding of the Court's prior order, *i.e.*, that ORR does not need to make
22  changes to its current practices.

23  *Plaintiffs' Position*:

24  Children of class members who are in ORR custody should not be treated any
25  differently under the Preliminary Injunction than children of class members who are
26  not in ORR custody, because nothing in the Court's order supports such
27  discrimination. If a health service provider under the auspices of the Preliminary

28

23

**JOINT STATUS REPORT**

Injunction determines that treatment should be provided to a class member as a family unit, such treatment should be provided to parents and children together, regardless of whether the child is in ORR custody. Based on meet-and-confer discussions and Defendants' statements at the January 13, 2020 status conference, Plaintiffs believe that Defendants agree with this and agree that ORR should support family-based mental health treatment where recommended by the health service provider under the Preliminary Injunction.

Beyond that, Defendants' arguments made at the prior status conference regarding the adequacy or inadequacy of treatment in ORR custody are beyond the scope of this case and are inappropriate to raise here. The parties have not exchanged any discovery on the subject (and Defendants would likely object to any such discovery on the grounds that it was irrelevant to this case). The factual record before this Court is devoid of any evidence substantiating Defendants' assertions regarding the adequacy of ORR treatment, and Plaintiffs are not in a position to comment or opine on whether such treatment is adequate or whether the treatment described is actually appropriate or is the treatment provided to children in ORR custody in every case. These issues are the subject of ongoing litigation and appeal elsewhere and should be addressed in that case with a full record and not here without one. *Flores v. Sessions*, 394 F. Supp. 3d 1041, 1070 (C.D. Cal. 2017).

**K. The definition and duration of "transitional treatment."**

*Defendants' Position:*

The Court ordered the Defendants to provide "mental health screenings" and "appropriate, transitional treatment" to the Released Subclass "until those members . . . , through reasonable good faith efforts and with the assistance of Class Counsel, are able to locate and enter the care of other adequate health providers." Dkt. No. 251 at 45-56. The Court did not provide any timeframe for the government-provided mental health services to end, nor did it address what effect the fact that some of the

24

former detainees were released over two years ago should have on the relief provided. Indeed, it is possible that some Released Subclass members may have already sought and received mental health services, or are capable of procuring such care independently but have made an independent decision not to do so.

To begin these discussions, Defendants propose the following non-exhaustive list of considerations that should be included in evaluating which Released Subclass members can appropriately be found to remain within the transitional period and therefore entitled to injunctive relief: (1) as discussed, individuals who have departed the United States, whether voluntarily or at the conclusion of removal proceedings, are outside the transitional period; (2) for the same reasons, individuals who are no longer in removal proceedings are outside of the transitional period; (3) individuals who acknowledge having received mental health screening and/or treatment since leaving government custody should be excluded from relief; and (4) individuals who acknowledge having had access to mental health screening and/or treatment, whether or not they have availed themselves of such treatment, should be excluded from relief. Defendants reserve the right to propose additional considerations as these discussions proceed.

*Plaintiffs' Position:*

Since this case started, Defendants have engaged in a brazen pattern of dilatory conduct that has thwarted class members' efforts to obtain relief. The parties engaged in settlement discussions for many months. Over a year ago on January 10, 2019, Plaintiffs served Defendants with Requests for Production including a request for a list of class members. Only after a motion to compel and an order requiring Defendants to supplement their productions, did Plaintiffs receive a single document—over a year after serving discovery requests. Defendants moved to stay discovery, which was denied, and then moved to stay this matter pending appeal in an *ex parte* application filed the day before Thanksgiving, which the Court denied.

25

**JOINT STATUS REPORT**

1   Dkt. 267. Defendants have further sought multiple delays of the appellate briefing
2   schedule, which Plaintiffs opposed. This record demonstrates that Defendants have
3   engaged in a pattern of obfuscation and delay to prevent class members from
4   obtaining relief.

5          After engaging in such dilatory tactics, Defendants now hope to persuade the
6   Court that enough time has passed that any transitional period must have ended.
7   According to Defendants, by now class members' wounds which the Government
8   has inflicted should be healed. But as explained in the Berrick Declaration, the harms
9   of detention and separation "are ongoing for these families," are "not resolved
10  through reunification," and "do[] not subside over time without appropriate and
11  effective mental health interventions." Berrick Decl. ¶¶ 5-6. Defendants seek to use
12  their dilatory tactics to frustrate any and all relief, and this Court should not allow
13  that to happen.

14         ***Not a single class member*** has obtained any benefit from the Court's order
15  granting a Preliminary Injunction. No child held in Defendants' border cages has
16  received counseling with their families to remedy the harms to the class and their
17  children inflicted by the Government. While Defendants delay the relief that the
18  Court has ordered, they continue to deport class members from the country. Once
19  deported, Defendants conveniently argue that class members are no longer entitled to
20  any relief.

21         First, again, Defendants ignore that this Court's order rests on *both* the special
22  relationship doctrine *and* the state-created doctrine. Under the state-created danger
23  doctrine, the Government which caused the harm by separating the class members
24  from their children must remedy that harm. Dkt. 251 at 40-41 (citing *Hernandez*, 897
25  F.3d at 1137; *Kennedy*, 439 F.3d at 1062). Since no class member has received mental
26  health treatment, Defendants have not remedied the harm as required by the
27  Preliminary Injunction.

28

**JOINT STATUS REPORT**

1     Defendants' request to narrowly define the transitional period and add multiple

2 new factors into determining whether Plaintiffs qualify for relief are a thinly veiled

3 attempt at asking the Court to reconsider the Preliminary Injunction and read the

4 period for transitional treatment out of the Court's Preliminary Injunction Order. Dkt.

5 251 at 45-46. The Court recognized at the time that it issued the Preliminary

6 Injunction Order that class members still very much needed mental health care and

7 were entitled to transitional mental health care, and no relief has been offered in the

8 time since that order was issued that would have improved the position of Plaintiffs.

9 Nevertheless, Defendants seek to moot the import of the Court's order by trying to

10 define the transitional period to exclude all of the Plaintiffs. Defendants may not

11 disguise a procedurally deficient motion to reconsider in this manner, *Torrent*, 2016

12 WL 6039188, at *2. Defendants also have offered a list of criteria (which they warn

13 is non-exhaustive) that can be used to exclude class members from obtaining relief.

14 Even more, Defendants reserve the right to add more exclusionary criteria, without

15 any grounding in the Court's order. That turns this request into an attempt to fully –

16 and without adequate reasoning or briefing – rewrite and reconsider the ordered

17 relief.

18     Plaintiffs reject Defendants' attempt to narrow the transitional period into

19 oblivion. The Court should not reward Defendants' attempt to run out the clock by

20 relieving Defendants of their obligations under the state-created danger doctrine,

21 shortening the period for transitional treatment, or adding new exclusionary criteria.

22 **L. Whether the selection of a neutral to work with the parties through an**

23     **informal dispute resolution process as to the implementation of the**

24     **preliminary injunction would be worthwhile.**

25     *Defendants' Position:*

26     Because Defendant HHS is planning to contract with Seneca for both Phase 1

27 and 2 (which covers both notice and referral coordination for the Released Subclass),

28

27

**JOINT STATUS REPORT**

and Defendant ICE has agreed to rescreen all Custody Subclass members, Defendants do not believe the assignment of an independent neutral party is necessary at this time. The parties views regarding the remaining issues are well-established, discussed in the prior JSR and this one, and unlikely to benefit from a third-party neutral.

*Plaintiffs' Position:*

On February 6, 2020, the date this joint status report was due to this Court, Seneca was advised by HHS that HHS would accept Seneca's proposal for both notice and referral coordination, and that HHS had accepted Seneca's proposed budget for its services. Berrick Decl. ¶ 8. To the extent that this contract is approved and signed expeditiously, Plaintiffs do not believe that a third-party neutral will be necessary.

**M. Whether a status conference would be appropriate to discuss and potentially resolve any open issues.**

*Defendants' Position:*

In light of the remaining disputes between Plaintiffs and Defendants, Defendants believe that the Court should keep on the calendar the status conference currently scheduled for February 13, 2020, so that the parties and the Court can discuss and potentially resolve the disputes and issues identified above. Defendants' counsel will appear for the conference in-person and do not request to appear telephonically.

*Plaintiffs' Position:*

Plaintiffs concur. Plaintiffs' counsel will appear for the conference in-person.

///

///

///

DATED:     February 7, 2020                SIDLEY AUSTIN LLP

                                           */s/* Amy P. Lally
                                           _____
                                           Amy P. Lally
                                           *Attorney for Plaintiffs*

DATED:     February 7, 2020                UNITED          STATES
                                           DEPARTMENT  OF  JUSTICE,
                                           OFFICE    OF   IMMIGRATION
                                           LITIGATION

                                           */s/* Nicole N. Murley
                                           _____
                                           Nicole N. Murley
                                           Senior Litigation Counsel
                                           *Attorneys for Defendants*

### FILER'S ATTESTATION

Pursuant to Local Rule 5-4.3.4(a)(2) of the Central District of California, I attest that I have concurrence in the filing of this document.

                                    By: */s/* Amy P. Lally
                                        _____

29
**JOINT STATUS REPORT**

**CERTIFICATE OF SERVICE**

I am employed in the County of Los Angeles, State of California. I am over the age of 18 years and not a party to the within action. My business address is 1999 Avenue of the Stars, 17th Floor, Los Angeles, California 90067.

On February 7, 2020, I served the foregoing document(s) described as **NOTICE OF MOTION AND JOINT MOTION FOR PROTECTIVE ORDER** on all interested parties in this action by the method described below:

I electronically filed the foregoing with the Clerk of District Court using its CM/ECF system, which electronically provides notice.

I declare under penalty of perjury that the foregoing is true and correct.


*/s/* Amy P. Lally
Amy P. Lally
Attorney for Plaintiffs

**JOINT STATUS REPORT**