# DECLARATION OF KENNETH BERRICK

## I. Preliminary Statements

1. I, Kenneth Berrick, have been retained by counsel for Plaintiffs as an expert in connection with the above-captioned litigation. My professional background, experience, and publications are detailed in my curriculum vitae, which was previously submitted in connection with my previous declaration in this matter, signed on July 8, 2018. ECF No. 47.

2. In preparing this declaration, I have relied on my years of experience in this field, as set out in my curriculum vitae, and on the materials listed therein. The materials I have relied upon in preparing this declaration are the same types of materials that experts in my field of study regularly rely upon when forming opinions on the subject.

3. I am not being compensated for the time devoted to providing expert advice or preparing declarations. The opinions I express, or testimony I provide, do not depend on any compensation.

4. If further testimony would be of benefit to the court, I would be available by telephone or in person to participate in the status conference on this matter.

## II. Separated Families Continue to Suffer Severe and Ongoing Trauma

5. My organization, Seneca Family of Agencies ("Seneca"), currently serves parents and children who were separated by the Government's Family Separation Policy. The harms of detention and separation are ongoing for these families.

6. The harm caused by the separation and detention is not resolved through reunification and does not subside over time without appropriate and effective mental health interventions. It is critical that families receive mental health services as quickly as possible to start the process.

### III. Proposal for the Provision of Mental Health Evaluation and Services to Released Class Members to Address Trauma of Familial Separation

7. In my expert opinion, every parent separated from his or her child as a result of the government's family separation policy should have the opportunity to be assessed for trauma and, if necessary, provided services. Seneca has developed a notice and referral coordination proposal that can be immediately implemented to locate Ms. J.P. class members and connect them with free and low-cost trauma assessment and treatment.

8. On February 6, 2020, the U.S. Department of Health and Human Services informed Seneca that it would accept Seneca's proposal for both notice and referral coordination, and that it had accepted Seneca's proposed budget for its services.

9. Seneca's proposal, which our organization stands ready to carry out in cooperation with subcontracted partners, is attached as Exhibit A and has been shared with both Plaintiffs' Counsel and the Government's Counsel. A brief description of the proposal and an explanation of its necessary elements follows.

   A. *Class Member Location, Notification, Education, and Determination of Elections*

10. To meaningfully notify class members of available trauma assessment and treatment, Seneca must first locate them. It is Seneca's understanding that the Government's class list contains incomplete and outdated information about class members' current locations and contact information. To locate class members, Seneca will have to use family tracing techniques, a methodology that my agency uses on a regular basis to locate family members for the youth we serve. In this context, Seneca will start with the information provided in the class list and then use social media, connections to resettlement organizations and immigration advocacy organizations, and additional family tracing techniques in order to locate class members. Seneca

anticipates that it may have to follow up to five leads of persons connected to the class member before connecting with an individual class member and his or her family. Seneca will have to have the capacity to conduct these efforts in a variety of languages, including Spanish, and will have to rely on oral communication and/or coordinate with local community supports as we anticipate that class members will have limited literacy.

11. Second, Seneca will provide both oral and written notice of the preliminary injunction and the availability of relief to the class members. Notice through a written mailing alone would prove largely ineffective because class members likely speak a variety of languages that do not include English, and they likely have limited literacy and will be unable to read and understand the written notice. Additionally, because class members will likely fear that accessing services will have adverse immigration consequences, live oral communication is necessary to allow class members to ask questions and raise concerns about participating in the available screenings and treatment. To provide oral notice, Seneca's outreach/referral coordinators will read a prepared script to notify class members of the preliminary injunction and the availability of relief. The outreach/referral coordinators will provide this notice telephonically or through a local representative to the greatest extent possible. An outreach/referral coordinator will travel to a class member only if he or she is fearful to speak by phone, does not have access to a reliable phone line, or speaks a rare indigenous language requiring specialized translation services.

12. Third, Seneca will answer class members' questions about the available screenings and treatment, both during the initial contact and through follow-up outreach conducted in a trauma-informed and culturally appropriate manner. Seneca anticipates that class members will be reluctant to engage with Seneca upon first contact due to perceived ramifications of being found by a particular individual or party. Class members may fear that if they access services, their personal information (including whether they suffer from trauma) will be provided to the Government and will interfere with their asylum proceedings or result in their deportation. Class

members will likely face culturally specific barriers to seeking mental health supports, including the stigma of mental illness. Therefore, after providing oral notice to class members, outreach/referral coordinators will answer any questions, and respond to any concerns, that class members may have regarding the available screenings and treatment. Because class members may be reluctant to engage with Seneca, outreach/referral coordinators may have to coordinate with individuals that have the trust of the class members or, in limited circumstances, travel to the class members in order to help address their fears and concerns about engaging with Seneca.

13.     Fourth, Seneca will ascertain whether a class member decides to receive services. After providing the initial oral and written notice, outreach/referral coordinators will make three further contacts over a one-month period to a class member who remains undecided, and attempt to resolve any questions or concerns regarding the available screenings and treatment. Once a class member indicates that he or she is no longer interested in receiving services, outreach/referral coordinators will cease contact with the class member.

14.     In light of the trauma that class members have already suffered, it is critical that any notice and outreach to this population be conducted in a trauma-informed and culturally appropriate manner. For this reason, such outreach will not be conducted by employees or other agents of the Government, whom class members are likely to associate with the trauma they experienced and who may be perceived as threatening or intimidating, making it far less likely that class members would be open to seeking assessments for the mental health issues. Additionally, efforts to identify and provide notice to class members will be conducted in a culturally appropriate manner. This means engaging class members in their native language or a language they speak fluently, and it means addressing culturally specific barriers to seeking mental health supports, including the stigma of mental illness.

    B.    Referral Coordination

15. Once a class member elects to receive services, Seneca staff will conduct an initial needs assessment to determine the class member's potential need for mental health services and match him or her with an appropriate provider. Seneca will also gather information using a Referral Checklist to evaluate, among other factors, geographical restrictions, desire for individual and/or family services, literacy, language capabilities, appropriate cultural sensitivity, transportation accessibility, childcare needs, disability or access/functional needs, acute mental health presentation, and the capacity to satisfy co-pays or other financials needs associated with participation in services.

16. Using all available information regarding the presenting needs illuminated in the needs assessment and the Referral Checklist, Seneca will identify at least one appropriate match for the class member, and ideally, at least one alternative referral. Seneca will conduct online searches for free or low-cost providers who are culturally and linguistically appropriate and are located in an area reasonably convenient to the class member's current location. Priority will be given to National Child Traumatic Stress Behavioral Health Treatment Services Clinics (SAMHSA Clinics) and Federally-Qualified Health Centers (FQHC Clinic).

17. If a SAMHSA or FQHC Clinic is not available due to distance, type of mental health services offered, linguistic capabilities, or extended waitlists, Seneca will research other low cost options, including local mental health agencies or tele-mental health providers, and provide a list of appropriate options to the Government.

18. Seneca will ensure that the mental health services provided to class members occur in language(s) that the class members speak fluently, whether that is a clinician who is fluent in the necessary languages or through an interpretation service.

19. Seneca will work with class members to ensure that their participation in services will be confidential, and that information will not be shared with the Government. Such assurances are critical to addressing class members' concerns and fears that accessing mental health services and the Court's relief will negatively impact their efforts to gain asylum.

20. Once a provider or providers are identified, Seneca will communicate to the identified provider options for the initial assessment with the class member and their family and decide which appointment to pursue. The provider will conduct the initial assessment(s) of the individual class member and their children to determine the appropriate services to include in the individual and family treatment plan(s). Seneca will work with the provider and class member to establish an appointment calendar for treatment sessions that may include individual and/or family services for the class member and child(ren).

### C.   *Implementation of Proposal*

21. I worked closely with my staff at Seneca to design the proposal above and know it reflects industry-wide best practices for delivering the type of trauma-informed mental health care needed by parents and children who were subjected to the Government's family separation policy.

22. The longer families go without being assessed for trauma, the more devastating and long-lasting the effects of that trauma may be on themselves and on their children.

## IV.   Custody Subclass

23. I understand that there are several class members still in Government detention that are subject to the Court's Preliminary Injunction.

### A.   *Notice to Custody Subclass*

24. As with the Released Subclass, in light of the trauma that class members have already suffered, oral and written notice must be provided in a trauma-informed manner. For this reason, notice must not be provided by employees or other agents of the Government, whom class members are likely to associate with the trauma they experienced and who may be perceived as threatening or intimidating, making it far

less likely that class members would be open to seeking assessments for their mental health issues. Moreover, detained class members are likely to resist any offer of services from the Government out of fear that any acknowledgment of trauma could impact their efforts to gain asylum or could ensure deportation.

25. In addition to written notice, live oral (telephonic) notice to class members in their native language or a language they speak fluently is necessary because class members likely speak a variety of languages that do not include English, and they likely have limited literacy and will be unable to read and understand the written notice. Oral notice is also necessary to allow class members to ask questions and raise concerns about participating in the available screenings and treatment.

B. *Assessment and Treatment of Custody Subclass*

26. The assessment and treatment of detained class members should be provided in a trauma-informed setting outside of a detention facility, in their native language or a language they speak fluently, and through a non-Government provider. Detained class members will likely fear sharing any personal information or disclosing any harm or trauma caused by the Government if assessment or treatment occurs in a Government building or is provided by a Government employee. Moreover, class members are likely to associate employees or other agents of the Government with the trauma they experienced, and may perceive them as threatening or intimidating. The effectiveness of mental health services depends on ensuring that clients feel safe and secure with their provider and in the place where treatment occurs, and that they have the ability to communicate with their provider in a language in which they are fluent. It is unlikely that class members will be receptive to the offer of services if those services are provided by Government employees or take place in a Government detention facility, especially if they are not provided in languages in which class members are fluent.

27.  If the assessment determines that family therapy would be appropriate, it would also be detrimental to the well-being of class members' children, and undermine the benefits of treatment, to require those children to visit a Government detention facility. It would be critical to identify a child-friendly, trauma-informed environment where both the parents and children felt safe confiding in the provider.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on February 6, 2020.

_____
Kenneth Berrick