```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3                    WESTERN DIVISION

 4      THE HON. JUDGE JOHN A. KRONSTADT, JUDGE PRESIDING

 5

 6   MS. J.P., et al.,                )
                                      )
 7                    Plaintiff,      )
                                      )
 8         vs.                        ) NO. 18-CV-06081-JAK
                                      )
 9   JEFFREY B. SESSIONS, et al.,     )
                                      )
10                    Defendants.     )
     _____)
11

12

13

14          REPORTER'S TRANSCRIPT OF PROCEEDINGS

15              Los Angeles, California

16             Thursday, February 13, 2020

17

18

19

20

21

22

23        LISA M. GONZALEZ, CSR No. 5920, CCRR
              U.S. District Courthouse
24         350 West 1st Street - Suite 4455
             Los Angeles, California 90012
25                 213.894.2979
                 www.lisamariecsr.com
```

```
 1   APPEARANCES:

 2

 3   FOR THE PLAINTIFFS:   PUBLIC COUNSEL
                           BY:  MARK ROSENBAUM, ESQ.
 4                              AMANDA SAVAGE
                           610 S. Ardmore Avenue
 5                         Los Angeles, California  90005
                           (213) 385-2977
 6
                           SIDLEY AUSTIN LLP
 7                         BY:  STEVEN P. KELLY, ESQ.
                                AMY P. LALLY
 8                         19999 Avenue of the Stars
                           17th Floor
 9                         Los Angeles, California  90067
                           (310) 595-9662
10

11   FOR THE DEFENDANTS:   U.S. DEPARTMENT OF JUSTICE
                           CIVIL DIVISION
12                         BY:  NICOLE N. MURPHY
                                LINDSEY VICK
13                         P.O. Box 878
                           Washington, D.C.  20044
14                         (202) 616-0473

15

16

17

18

19

20

21

22

23

24

25
```

```
1        Los Angeles, California; Thursday, February 13, 2020;

2                            1:32 p.m.

3                             -oOo-

4        THE COURT:  Item seven, CV-18-06081, Ms. J.P. v.

5   Sessions.

6        Would you state your appearances, please, starting

7   with plaintiffs' counsel.

8        MR. ROSENBAUM:  Good afternoon, Your Honor.

9   Mark Rosenbaum on behalf of plaintiffs from Public Counsel.

10        THE COURT:  Good afternoon, Mr. Rosenbaum.

11        MR. KELLY:  Good morning, Your Honor.  Steven

12   Patrick Kelly of Sidley Austin for plaintiffs.

13        THE COURT:  Good afternoon, Mr. Kelly.  I think

14   it's afternoon by now.

15        MR. KELLY:  Sorry, Your Honor.

16        MS. LALLY:  Good afternoon, Your Honor.

17   Amy Lally, Sidley Austin for the plaintiffs.

18        THE COURT:  Good afternoon, Ms. Lally.

19        MS. SAVAGE  Good afternoon, Your Honor.

20   Amanda Savage, Public Counsel, also for plaintiff.

21        THE COURT:  Good afternoon, Ms. Savage.

22        For the defendants.

23        MS. MURLEY:  Good afternoon, Your Honor.

24   Nicole Murley for the defendants.

25        MS. VICK:  Good afternoon, Lindsey Vick for the
```

1  defendants.

2          THE COURT:  All right.  Good afternoon, Ms. Murley

3  and Ms. Vick.

4          As a follow-up to your last status conference,

5  I've received your joint report.  I'm aware of the issues

6  that remain.

7          Just a minute.

8          Are there any developments since the filing of the

9  joint report?

10         MS. MURLEY:  No, Your Honor.

11         THE COURT:  The joint report includes a discussion

12  about pending discovery and there's -- I don't think there's

13  anything that I need to do in connection with that at this

14  point.  I recognize to the extent that there are discovery

15  issues that aren't resolved informally, Judge Kim will

16  handle them.  And I know he's already been working with you.

17         I urge you to continue to do what you've done a

18  lot in this matter, which is to work collaboratively and

19  efficiently, but in terms of any substantive discussion or

20  substantive ruling, there's no motion pending.  And I'm not

21  going to undertake to accept an oral motion to skip by the

22  normal process.

23         Yes.

24         MR. KELLY:  Your Honor, there is a motion for

25  protective order pending.

1          THE COURT:  Yes, I'll get to that.  That was a

2   different part of the report.

3          The second issue that's discussed in the report is

4   the Seneca proposal, and I recognize there's certain

5   subsidiary issues as well.  The initial Seneca proposal was

6   made, there was some disclosure about it, some commentary

7   about it, and other further information was requested and

8   another request was made.

9          But my view is that the proposed Seneca as an NGO,

10  this appears to me to be their plan as it's presently

11  formulated and as it may evolve -- I think is sufficient to

12  accomplish the required mission here.  And based on how

13  things evolve or develop, issues may be presented, but I

14  don't see an issue right now that warrants my intervention.

15         Is there something you wanted to add on that?

16  Either side?

17         MS. MURLEY:  No, Your Honor.  No.

18         THE COURT:  Now, there was some commentary as I

19  mentioned with respect to disclosure about the Seneca report

20  before it was finalized.  Do you recall that?

21         MS. MURLEY:  Yes.  So it is still not a finalized

22  proposal or contract.  And so from the Government's

23  perspective, it was a premature disclosure of the

24  Government's procurement plan, so that was the point that we

25  were making.

1          THE COURT:  No, I understand.  And I think, again,

2   work collaboratively, which, as I say, you've done a lot of,

3   so I think you need to continue doing that.

4          One of the issues that is presented with respect

5   to the Seneca report in general is the class notice.  On

6   page eight of the report -- well, the plaintiff is proposing

7   oral notice and affirmative contacts with members of the

8   released subclass.  The Seneca proposal is different.

9          I think that to the extent that the plaintiffs

10  conclude that some supplemental notice or more of a notice

11  or additional efforts to provide notice is appropriate, I

12  think that's something with which you could communicate to

13  Seneca about.  But I don't think that it's -- I don't think

14  I'm persuaded that something other than -- the general

15  description by Seneca of what efforts it will make and

16  undertake to locate and identify and communicate with class

17  members warrants a different order at this time.

18          So again -- I mean, we've got the released

19  subclass and the custody subclass.  And with respect to the

20  custody subclass, again I think what's being proposed is a

21  reasonable effort to provide notice in terms of posting it

22  and communicating it.

23          I'm mindful that the plaintiffs have expressed

24  concern that members of the custody subclass may feel

25  concerned about communicating with those who they think may

1  have been part of the process that led to their being

2  detained and/or separated from their children, but I

3  don't -- I'm just not persuaded that -- first, there's no

4  evidence that it's exactly the same people; but second, I

5  think that the type of notice that is contemplated would be

6  sufficient.

7          And, once again, I don't think there's anything

8  that would preclude the plaintiffs from requesting

9  supplemental written communications or providing it, but I'm

10  not persuaded, at least tentatively, that the general notice

11  process that's described is inadequate.

12          But, once again, if -- and I recognize the

13  timeline here is a relatively long one in light of all the

14  efforts that have been made in connection with this case in

15  general -- if the evidence later shows why this isn't

16  sufficient, I could review it then.

17          Let me just go through these and then we can talk

18  about them.  In terms of services to the custody subclass,

19  again I think that -- I think that there isn't at this point

20  a sufficient basis for me to conclude that the services that

21  would be made available to the custody subclass members are

22  insufficient.

23          Those in custody in various places within

24  different federal systems who need medical treatment are

25  provided with that, and here the provider -- the federal

1  agency with responsibility for managing the care to be

2  provided to the custody subclass should be -- is obligated

3  to do that, but I don't think an order at this point is

4  warranted that requires a particular third party or

5  nonparty, excuse me, provide the services or that the

6  services be provided outside the facility.

7           I think that, as I say, there's a process that

8  applies generally within the federal system to those who

9  need medical attention, and I expect it would be followed

10 here.

11          And again, I'll keep going and I'll hear from you

12 on these issues.

13          There's then been an issue about whether if a

14 separation is determined appropriate -- before a separation

15 of a parent and minor is appropriate whether hearing should

16 be -- is warranted, which is what I stated in the original

17 order.

18          When I -- in terms of separation of a parent and a

19 minor, of course, there's different law that has considered

20 those kinds of issues.  It can be considered in terms of,

21 for example, under the very state laws the termination of

22 parental rights, which is a very significant action, and

23 other issues about potentially separating minors from their

24 parents.  And it was somewhat in that more permanent context

25 that I think that the concept of a hearing was adopted.

```
1            In light of the briefing that's been submitted,
2    I'm presently of the view that it's not -- a hearing would
3    not be required.  I know Judge Sabraw has written about this
4    in a somewhat different context, but again it's a question
5    about whether there's a basis to conclude that a
6    determination that a parent or adult presents a risk to a
7    child if they are together is something that could
8    reasonably be made by those with responsibility for making
9    those decisions.
10           I think what we discussed at the last hearing was
11   whether it would be appropriate to expect that the adult
12   would be given at least a reasonable opportunity to present
13   or provide a response to a decision that's being considered
14   as to whether the parents should be separated from the
15   parent's child.  And I think that's a different thing than a
16   hearing.
17           The concept being that in making a reasonable
18   decision, the person in charge of that decision within the
19   federal agency would be expected to gather -- reasonably
20   gather available information in order to make that decision.
21           And I think potentially crafting that language
22   shouldn't, I don't think, have a material effect on the
23   decision-making process.  In that, I would expect that that
24   decision maker would make reasonable efforts to obtain that
25   input where appropriate.  If you follow me.
```

1           And that doesn't mean a hearing.  Hypothetically,

2   for example, if a decision is being made that it's

3   appropriate to separate a parent from a child based on

4   information that's been provided that the parent has been

5   abusive to the child, could that information -- could the

6   parent be given an opportunity to respond?  Can information

7   from the parent be elicited?

8           MS. MURLEY:  So there's a few points, I'd like to

9   make with regard to this issue.  First, when this issue

10  arose in the first status report in November 26, the

11  question from defendants was whether the Court intentionally

12  included the language "absent a determination and a hearing"

13  because in other places it was sort of --

14          THE COURT:  Slow down.

15          MS. MURLEY:  Sorry.

16          -- in other places in the order, the Court

17  suggested that it was mirroring what had been done in *Ms. L.*

18  So to the extent the Government is just seeking whether the

19  Court meant for that language or did not, because those

20  individuals -- the hearing is not part of the way we

21  identify those individuals, it's a little bit -- it's more

22  burdensome for the Government to have to identify a second

23  set of individuals for this case.  The class here is

24  broader.  So it's -- the question is posed in the context of

25  who gets the preliminary injunctive relief and who does not.

1          With regard to whether or not there's a process in

2    place in CBP, those issues are squarely in front of the

3    *Ms. L* court, and those are issues that are litigated there.

4    The Court's decision on the first-to-file rule made clear

5    that the constitutionality of the separation are not part of

6    this case.

7          I will say, as counsel of record in *Ms. L*, that

8    there is a process in place.  The parent is notified of the

9    basis for the separation and given a tear sheet which has

10   contact information for them if they wish to present

11   evidence contrary to that.

12         The nature of things in border patrol is that it's

13   a short-term processing hold so it's not where the ultimate

14   in custody detention takes place.  So once a border patrol

15   agent identifies that there's a problem, say, with the

16   fitness or sees a fitness or danger or we have this issue of

17   health, the parent then becomes -- there's not a parent

18   present to take care or custody of the child under the

19   Trafficking Victims Protection Reauthorization Act and that

20   child by law becomes an unaccompanied alien child who then

21   goes to ORR custody.

22         And we would say that the Office of Refugee

23   Resettlement, who is given the statutory authority to make

24   determinations about the child, is the agency and the best

25   place to evaluate the parent.

1          So to answer Your Honor's question, I think there

2    is a plan in place.  We would say that there is a plan in

3    place, it's part of another case, and so it's not needed

4    here.  And it would create added confusion to create two

5    standards for what happens at the border.

6          THE COURT:  Let me back up a step.  I'll hear from

7    the plaintiffs.  As I've stated, the concern that I have is

8    what you've been addressing.  And that is whether the parent

9    would have an opportunity to respond.  And you just

10   mentioned in the context of step one, typical step one, the

11   parent would be given notice and would be given a tear sheet

12   which the parent could complete and respond which is exactly

13   the sort of thing I had in mind.

14         You then stated that, to the extent that a child

15   is placed under the supervision of ORR, you said ORR would

16   be in a very good position to make a similar determination.

17   But what I didn't quite hear was if a child is -- will a

18   determination have been made prior to a child being moved to

19   ORR in which the parent had the opportunity to respond?

20         MS. MURLEY:  No, Your Honor.  The opportunity

21   happens when the parent then gets transferred to ICE custody

22   and there's an e-mail and a process to contact ICE because

23   it's a very short process.  CBP agents they process an

24   individual.  When an individual is apprehended, they come

25   into custody and it's determined:  Do we have to detain you?

1    If so, where are you detained?  And then the individuals go

2    to ICE custody.  An adult without a child will go straight

3    to ICE custody.

4            THE COURT:  My question is with respect to members

5    of the subclasses in this case if the term -- are they --

6    are all of them given that same opportunity that you've

7    described at some point in the process to respond to a

8    decision or a potential decision about whether they should

9    remain separated from or will be separated from their child?

10           MS. MURLEY:  Yes, the process is the same.  And

11   before a child is separated, it goes -- there's an internal

12   review that happens in CBP so that the local -- it's my

13   understanding that the local OCC office signs off on it.  So

14   there is a process in place.

15           THE COURT:  Now, are both processes addressed

16   specifically in the *Ms. L* case?

17           MS. MURLEY:  Yes, Your Honor.

18           THE COURT:  In an order?

19           MS. MURLEY:  Yes.  It's the order that's cited

20   to -- the recent order in this case.

21           THE COURT:  Okay.  Is there a reason why the order

22   here couldn't incorporate that or refer to that, so it's

23   clear that the members of the class and the subclass are

24   included within that same relief?

25           In other words, in order to avoid confusion as you

1   mentioned earlier about what the obligations are, could that

2   be adopted in that fashion?

3        MS. MURLEY:  The Court's order in *Ms. L* found --

4   Judge Sabraw found that the Government's process that's in

5   place was sufficient, and he was happy with the process that

6   was in place.  If this Court were to reference that --

7        THE COURT:  Yes.

8        MS. MURLEY:  -- I think we would be okay with it.

9   What we don't want is two separate --

10        THE COURT:  I understand.  My view is that so long

11   as the parents are given an opportunity to provide input on

12   this decision in a reasonable manner, I think that would be

13   sufficient.  And in order to avoid different standards and

14   potential confusion, I think it can be the same standard

15   that's been adopted in *Ms. L.*  But I think we would need

16   some language about that just to make that clear.  I

17   wouldn't expect to be too challenging.

18        MS. MURLEY:  Yes, Your Honor.  We can --

19        THE COURT:  Just a minute.  Is there anything more

20   you had on this specific issue?

21        MS. MURLEY:  No, Your Honor.

22        THE COURT:  Could I hear from you on this, please,

23   the plaintiffs.

24        MR. KELLY:  Yes, Your Honor.  So plaintiffs shared

25   your concern that parents be given an opportunity to object

1   to separation from their children.  And something that we

2   note is that until we receive this JSR even though we'd

3   asked for this information at meet and confer, we'd never

4   heard of this process.  So we'd like some more information

5   about what this process is and whether it actually does do

6   all of the things that have been represented.  We just don't

7   have information.

8           That said, we also note that the process referred

9   to by Judge Sabraw includes meet and confers with the ACLU

10  where the ACLU has the opportunity to challenge whether

11  someone is appropriately removed or appropriately not part

12  of the class.  And so that seems to be a much more

13  collaborative process.  We don't know whether that's

14  happening.  We don't have that here in this case yet.

15          However, plaintiffs would agree that as long as

16  the collaborative process continues in the *Ms. L* case and as

17  long as the Government continues to abide by what is

18  described in Judge Sabraw's order, we don't have an issue

19  with you incorporating that order.  That addresses our

20  concerns.

21          THE COURT:  Thank you, Mr. Kelly.  What about --

22  is that consistent with what you've just told me?

23          MS. MURLEY:  I believe so, Your Honor.  I just

24  want to --

25          THE COURT:  Including the meet and confer issue --

1          MS. MURLEY:  That is all happening in Ms. L.  I

2   want to be really careful that we keep these cases separate

3   so that we're not creating a situation where the

4   constitutionality of the separation that is very much at

5   issue in that case is not brought into this case, which is a

6   much different issue.

7          THE COURT:  I understand.  I think what I'm trying

8   to -- well, I don't want to repeat.  My concern is that the

9   parents have an -- a parent has an opportunity to provide

10  input in connection with the decision being made about

11  whether that parent should be separated from that parent's

12  child.  There's a process like that in place in the Ms. L

13  case.  In order to avoid confusion and potential conflicting

14  processes, I'm just saying adopt here -- I mean, just

15  embrace here what you've done there.

16         MS. MURLEY:  Yes, we could do that.  What I'm

17  concerned about and maybe would like the opportunity to

18  brief is that we don't have dual obligations on the same

19  issue.  Where we wouldn't be reporting here -- we're very

20  much involved with counsel in Ms. L on these issues and we

21  have a process in place there.

22         THE COURT:  No, I'm not looking to do that.  I

23  just want to make sure that the members of the class here

24  have the --

25         MS. MURLEY:  They're the same class.  I mean with

1    the exception of the small caveat, it's the same class.

2    It's the same individuals.  They are treated the same.

3         THE COURT:  I think everybody's really in accord

4    that that works.  Now the issue you've now just raised

5    about -- concerning whether your communications would be

6    limited to counsel for the plaintiffs in Ms. L, I think that

7    was the next question.

8         MR. KELLY:  Your Honor, our concern is just that

9    the plaintiffs who are identified in the Ms. L case also get

10   the relief here.

11        So to the extent that someone is identified as a

12   class member there, they have the opportunity -- there is

13   the -- sorry.  After there's the meet and confer between

14   plaintiffs and defendants in the Ms. L case, if someone is

15   determined to have been wrongfully separated from their

16   child after that opportunity which apparently is what's

17   happening according to Judge Sabraw's order, that that

18   person, once they're included back into the Ms. L class,

19   also be part of this class and receive the relief here.

20        So we want to make sure that somebody is

21   actually -- that it's not just the process but that

22   somebody's looking at this process and making sure that it's

23   being enforced.

24        MS. MURLEY:  If I could, Your Honor.  The reason

25   we brought the question to the court in November in the

1   first place was because we wanted to keep the classes

2   consistent.  And so to the extent that we've identified

3   Ms. J.P. class members, they are coextensive with the Ms. L

4   class.  And we were looking for to keep the class the same

5   and not have a broader class here that didn't comport with

6   there very much for the reasons that plaintiffs' counsel has

7   just identified.

8           One, because it's much easier for the Government

9   to have the same class and identify the same people rather

10  than having a small subset that is different here.  So maybe

11  we can make language that the classes are identical for the

12  purposes of relief in this case -- that the language would

13  be sufficient to say that the classes are identical for the

14  purposes and they're entitled to -- the same individuals are

15  entitled to the relief in the Ms. L class here.

16          THE COURT:  All right.  Just a minute.  One

17  moment.

18          And this may be a broader instruction than I'm

19  going to give it now to you, but what I'd like you to do is

20  to confer and see if you can agree on this language and

21  submit a proposed order -- or stipulation and proposed order

22  if you can agree.

23          If you cannot agree on the language, then what I'd

24  like you to do is have the Government submit -- the parties

25  to submit jointly the Government's proposed language and

1    then showing a red line as to how the plaintiff proposes to

2    modify it.

3            But I think that would be -- I'm optimistic you'll

4    reach an agreement because I don't think you're that far

5    apart, if at all.  And if you are, I'll look at the words.

6    And I think that's the more efficient way to do this.  Do

7    you agree with that?

8            MS. MURLEY:  I do, Your Honor.

9            THE COURT:  Do you think that will be efficient?

10           MR. KELLY:  Yes, Your Honor.  Thank you.

11           THE COURT:  Thanks.

12           With respect to the issue -- you've referred

13   earlier to ORR, and I think that again it's -- I think it's

14   appropriate to defer to the discretion of the ORR to provide

15   the necessary services --

16           Just a moment, please.

17           Just a minute, please.

18           To the extent that there's a child in ORR, the

19   custody of ORR, the care of ORR, and the parent is elsewhere

20   because ORR would be only minors, I think again -- what is

21   appropriate I think -- it's appropriate to leave that within

22   the discretion of ORR, but I don't think that would

23   preclude, for example, ORR from concluding that some form of

24   communication between a minor in its custody, care and the

25   parent or parents of that minor would be appropriate.

1          Now, how that communication might occur again

2     would be something that ORR could consider.  If the parent

3     and the minor are thousands of miles apart, a physical

4     meeting may be challenging.  If they're very close, it may

5     be something that ORR would think would be appropriate.  If

6     not, as opposed to no communications, ORR might conclude

7     that telephonic or video communications if available might

8     be appropriate, but I would leave it within the discretion

9     of ORR, but not preclude it or feel that it's precluded from

10    concluding that some form of these -- one type of this

11    communication might be appropriate.

12          MS. MURLEY:  Your Honor, for all children in ORR

13    care, they have weekly -- I think it's biweekly telephone

14    calls with parents.  A lot of -- just for clarification, the

15    majority of children that come into ORR custody are

16    unaccompanied alien children who enter the United States

17    without a parent or guardian.

18          Oftentimes, those parents or one parent may be in

19    the country of origin and ORR already has processes in place

20    where those children are able to communicate.

21          If there is a sponsor who is identified in the

22    United States who is going to fill out a sponsor application

23    or also facilitates conversations with that individual, one,

24    for the child to have those conversations; but two, to

25    assess as part of the assessment process to make sure the

```
 1   sponsor is a suitable sponsor for the minor who is in ORR's
 2   care.  So that is already in place.
 3          THE COURT:  The question I have -- let me ask you
 4   this question:  I don't think there's going to be -- here's
 5   the question:  ORR's procedures as you just described them
 6   involve communications, the opportunity for communications
 7   between minor and adult.
 8          MS. MURLEY:  Yes.
 9          THE COURT:  If in the course of providing care,
10   the care provider determines that such communications would
11   be appropriate, that seems to be a slightly different point.
12   It's not to say -- if you're with me -- because then the
13   issue is is what is currently going on, which is this type
14   of communication consistent with what's being recommended by
15   the care provider and that can reasonably be provided.
16          So, in other words, just saying that ORR has a
17   standard protocol where there can be communications between
18   parent and -- or adult and child doesn't necessarily mean
19   that ORR is agreeing or being directed to exercise
20   reasonable -- take reasonable steps to implement the
21   recommended treatment by the care provider including
22   potential communications between parent or adult and minor.
23          MS. MURLEY:  One second, Your Honor.
24          ORR would be okay with facilitating that,
25   Your Honor.
```

```
1              THE COURT:  Thank you.

2              MS. MURLEY:  I just wanted to point out, the

3    parties were in agreement that the actual ORR procedures

4    were not part of this case too.

5              THE COURT:  Let me hear from you on this.

6              Mr. Kelly.

7              MR. KELLY:  Your Honor, our understanding was that

8    the Government had agreed that if the mental health care

9    professional offered to the parent said that it was

10   appropriate for the parent and child to receive therapy

11   together under the relief in this case, that ORR would make

12   that happen.  That was our understanding.

13             So I think the only issue -- so that's an

14   agreement, and I think the only thing that was at issue in

15   the joint status report was whether the other children who

16   entered who were not children of class members would be

17   affected by this order.

18             And plaintiffs' position -- I believe the

19   defendants just clarified their position as well -- is that

20   the other children in ORR care who aren't the children of

21   class members aren't affected by Your Honor's order.  And I

22   believe that that is the issue.

23             THE COURT:  What's the disagreement?

24             MR. KELLY:  Initially, the Government had asked

25   for clarification from Your Honor that -- the Government had
```

```
1   asked for clarification from Your Honor that Your Honor's
2   order did not cover children who were not children of class
3   members and that was -- and so they raised that.  And our
4   point was that they weren't covered by the order, but that
5   is an issue that is before another court.
6           THE COURT:  No, I agree with you, they're not.  I
7   agree with you, they're not.  I thought there was some
8   further -- well, I just clarified it.  Maybe I
9   misunderstood.  I thought there was some issue concerning
10  the ORR care that would be provided to children who are
11  children, who are minors, of members of one of the
12  subclasses in terms of communicating with their parents.
13          MR. KELLY:  Our understanding from the
14  Government's statements at the last hearing and the
15  Government's joint status report is that ORR will make those
16  children, to the extent recommended by the mental health
17  care professional, make it possible for there to be joint
18  family sessions.
19          THE COURT:  Do you agree with that?
20          MS. MURLEY:  Yes, Your Honor.  With one caveat,
21  there may be scenarios where it's via telephone or via -- or
22  where there's things that may have to happen where it's not
23  possible.  We may also have a situation where there's
24  children who are not reunited with a parent who may have
25  been released for reasons that is within ORR's statutory
```

1    authority.

2          THE COURT:  I think I referred to that -- the

3    former earlier.  If the two are thousands of miles apart, a

4    physical meeting may not be reasonable.

5          Again, I think it would be helpful if you could

6    submit, as part of the proposed order, do the same thing on

7    this issue.  And, once again, if there's a disagreement,

8    give me the red line.

9          MS. MURLEY:  Yes, Your Honor.

10          MR. KELLY:  Thank you, Your Honor.

11          THE COURT:  Thank you.  If I've misunderstood the

12    issue, you'll tell me.  Not this issue, the next one.

13          Then, there was an issue as to whether certain

14    members of the release subclass are within the transitional

15    period or whether that would exclude individuals who are no

16    longer in removal proceedings, individuals who acknowledge

17    having received the mental health screening and treatment

18    and individuals who acknowledge having had access to mental

19    health screening and treatment whether or not they took

20    advantage of it; and I think there is -- I believe the

21    dispute is about those who are no longer in removal

22    proceedings.  Is that correct?

23          MR. KELLY:  No, Your Honor.

24          THE COURT:  What's the dispute?

25          MR. KELLY:  Sorry, Your Honor.  The dispute,

```
 1    Your Honor, is that these four categories that the
 2    Government has provided are essentially class removal
 3    categories.  They're going to kick people out of relief
 4    before any relief at all has been offered to any of the
 5    subclass members.  I take, for example, request number four
 6    which is individuals who acknowledged having had access to
 7    mental health screening and/or treatment.  The Government
 8    has previously argued that due to the provision of some form
 9    and the possibility of requesting treatment, they've argued
10    that that would include every single one of the class
11    members in their papers.
12            And so what this would do is essentially negate
13    relief to anyone in the class by defining the transitional
14    period so broadly.  Your Honor, on page 46 of your order,
15    said that "transitional treatment shall be provided until
16    those members of the release subclass, through reasonable
17    good faith efforts, and with the assistance of plaintiffs'
18    counsel, are able to locate and enter the care of other
19    adequate health service providers."
20            And so we believe that that is how the
21    transitional period should be defined, and we think that is
22    defined in Seneca's proposal.  We think that the
23    transitional period should be understood to be what is in
24    Seneca's proposal, and that there should not be additional
25    factors grafted on to Your Honor's order to exclude
```

1    significant numbers of people from the class.

2        THE COURT:  Okay.  Let me hear from you on this,

3    please.

4        MS. MURLEY:  Your Honor, we've read the Court's

5    order with regard to the release subclass as being subject

6    to certain limitations.  And defendants, in response to the

7    Court's order proposed limitations.  The Court's order on

8    page 42 says that with regard to the release subclass will

9    necessarily be subject to certain limitations in light of

10   the issues discussed above, and the order goes on to say,

11   "these include but not limited to the length of the

12   transitional period after release, the location and

13   identities of the release subclass, the willingness of the

14   release subclass to participate in Government-sponsored

15   mental healthcare and the appropriate nature, scope and

16   implementation of the relief."

17       So with regard to the transitional period, the

18   Government proposed that the biggest group of individuals

19   would be those removed from the country, and I think the

20   parties are in agreement on that issue.  I think there's one

21   caveat.  And to that end, we had proposed -- there's other

22   language.  We put this forth in our portion of the joint

23   status report where the Court seems to limit the relief to

24   those individuals who are still in some form of removal

25   proceeding, which is the basis for the removed individuals

1  to not be eligible for the relief.

2          So we were suggesting and we proposed limitations.

3  We're not seeking to -- despite plaintiffs' claim, say that

4  everybody that's been released would of had access to mental

5  healthcare, we're not proposing to do something different

6  than what Seneca has proposed but instead in the notice that

7  there would be some questions to ascertain relief

8  eligibility.

9          THE COURT:  Just a minute.  Is it the Government's

10  position that a person who's in the subclass as defined, not

11  in the custody subclass but in the released subclass and who

12  is no longer in removal proceedings -- okay -- but has never

13  received any treatment at all -- never received any

14  treatment, would be ineligible to receive any transitional

15  treatment?

16          MS. MURLEY:  I think that would be our position

17  based on the language in the Court's order.  Those are the

18  final orders of removal.

19          THE COURT:  Excuse me.  You're interpreting --

20  your statement about no longer in removal proceedings,

21  meaning they're in the line to be deported --

22          MS. MURLEY:  Yes.

23          THE COURT:  Just a minute.  Is there something you

24  wanted to add?

25          And, by the way, if you want your clients to sit

1  here, they may.

2           MS. MURLEY:  I think another question is

3  individuals who have -- are in proceeding -- are finished

4  with proceedings and have obtained relief, so they're

5  eligible to remain, I think.  But those are separate

6  questions.  I think individuals with final orders and

7  individuals who have obtained --

8           THE COURT:  Well, an individual who has obtained

9  the relief has obtained the relief that's required by the

10 order.

11          MS. MURLEY:  By "relief," I mean asylum, or they

12 have been granted --

13          THE COURT:  Let me make sure -- let's talk about

14 two things.  One would be that sub group and the other would

15 be the group where the removal proceedings have been

16 completed, but they've not yet been removed from the

17 United States.

18          MS. MURLEY:  Yes.

19          THE COURT:  My question is similar.  Well, let's

20 start with those who are still in custody waiting to be

21 removed, but haven't yet been removed.

22          MS. MURLEY:  Yes.

23          THE COURT:  And that may take an unspecified

24 amount of time.

25          MS. MURLEY:  Correct.

1      THE COURT:  And my question is if a parent is in

2  that queue which hypothetically could be 30 days, 60 days,

3  90 days or more, and it's been recommended that that parent

4  have some opportunity to communicate with the parent's child

5  to facilitate the issues we have here, is it your position

6  that that parent would not be eligible to have that

7  opportunity?

8      MS. MURLEY:  If they had a final order and were

9  slated to be removed?

10     THE COURT:  Correct.

11     MS. MURLEY:  That's how we read the Court's order.

12     THE COURT:  With respect to those who have been

13  granted asylum, so they will be staying?

14     MS. MURLEY:  Yes.

15     THE COURT:  Same question.  If such a person is no

16  longer in any kind of detention, but once again has received

17  no mental health services, is it your position that they

18  would be -- that under the order they wouldn't be eligible

19  to receive them?

20     MS. MURLEY:  The way I read portions of the order

21  is that the relief is tied to being in the duration of the

22  proceedings.

23     THE COURT:  All right.  That's helpful.  Thank

24  you.

25     Mr. Kelly.

1          MR. KELLY:  Your Honor, there were two legal bases

2    for your order as, of course, you know:  The Special

3    Relationship Doctrine and the State-created Danger Doctrine.

4    We believe that the transitional period and the portion of

5    your order related to whether the person is still in removal

6    proceedings entirely stems from the Special Relationship

7    Doctrine and not from the State-created Danger Doctrine.

8          Our reading of the Court's order and of the case

9    law in that area is that relief should be provided to all

10   class members under the State-created Danger Doctrine

11   because the Government caused this harm and should therefore

12   provide the relief necessary to remedy that harm.

13         Also, Your Honor, we would note that these

14   limitations that the Government has proposed would

15   eventually become a self-fulfilling prophecy in that

16   everyone in this class is an asylum seeker, so either they

17   will ultimately be removed from the country or they will

18   ultimately receive asylum.  And at that point, it seems to

19   me the Government's argument that they should not get relief

20   under Your Honor's order.

21         And we're already several years from when the case

22   was filed.  We're 13 months out from the first discovery to

23   which we've gotten one document.  Seneca has not been

24   retained by HSS yet.

25         And so far, no one has gotten any relief under

1    this order, and we don't want to get to the point where the

2    entire class -- where there has been sufficient delay that

3    nobody ever gets any relief.

4          And we're afraid as we keep limiting the class and

5    as we keep shortening the transition period, that's what is

6    happening.

7          First, we don't think the transition period

8    applies because of the State-created Danger Doctrine.  And

9    second, we think that Your Honor's order can't be made a

10   nullity just by waiting it out.

11         THE COURT:  Just a minute.

12         Mr. Kelly, with respect to the time between the

13   issuance of the order and now, if there were a time period

14   when a person had been in the process seeking asylum but

15   hadn't yet received asylum or there was a process pursuant

16   to which a person was in the process of removal but a

17   removal order hadn't yet been issued, would he or she be

18   eligible in your view for treatment?

19         MR. KELLY:  I believe that the person would be

20   eligible for treatment at any time until they're actually on

21   a plane outside of the United States.

22         THE COURT:  Do you agree with that?

23         MS. MURLEY:  Could you repeat the question, Your

24   Honor?

25         THE COURT:  Would you repeat my question please,

1    so I don't state it differently.

2              (Record read.)

3              MS. MURLEY:  Yes.

4              THE COURT:  So you agree on that.  And some of

5    this then turns really on a fact questions, and that is to

6    say are there people in a class -- are there class members

7    in either of these categories who did receive -- have

8    received -- did receive treatment during the time period

9    from the order till now or until and have since, excuse me,

10   not now, but sometime between the order issued and a point

11   when they were either ordered removed or ordered to have

12   asylum, has there been any treatment to those or has no

13   treatment yet been provided to anyone?

14             MS. MURLEY:  No treatment has yet been provided

15   because of the outstanding issues, so there hasn't been an

16   agreement on how that would be done.  I take issue that we

17   have been dilatory.  We've been moving forward with the

18   contracting process.

19             THE COURT:  I'll reflect further on this.  Let me

20   ask you this, Mr. Kelly -- let's just talk about the persons

21   who -- the class members who between the issuance and the

22   order and now have received an order of removal.  It's your

23   position that between now and they actually are removed,

24   they would remain eligible to receive services?

25             MR. KELLY:  Yes, Your Honor.  These are people

1  whose children were taken from them and both they and their

2  child would benefit from mental healthcare.

3          THE COURT:  And with respect to --

4          Do you disagree with that?

5          MS. MURLEY:  Yes.  Because we read the Court's

6  order as placing that limitation.  And one of the reasons

7  for the suggestions and our positions in the JSR is because

8  we read the Court's order as having open questions regarding

9  the transitional period and what is considered a reasonable

10 transition period.

11         THE COURT:  All right.  Just a minute.

12         Do you have an estimate of the number of class

13 members who have received removal orders since the issuance

14 of the order?

15         MS. MURLEY:  I don't, Your Honor.  I don't know --

16 I would say there's a fair number that are still in

17 proceedings and some that have final orders of removal.  We

18 have class members who have been removed and come back.  We

19 know that.

20         THE COURT:  Okay.  Just a minute.

21         I understand.  I'll evaluate this further.  Your

22 comments today have been helpful.  And I take it, just to be

23 clear, about the dispute, to the extent that a member of the

24 class has received an order since the time my order issued,

25 a member of the class has received asylum, the plaintiffs'

34

1    position is that person would remain eligible for these

2    services; correct?

3            MR. KELLY:  Yes, our position is that we think

4    that the plaintiffs would remain eligible, that they need

5    the services.  And we would also point out that for people

6    who are able to receive these services, we don't believe

7    there's any prejudice to the Government in providing them.

8            THE COURT:  I understand.  And do you have any

9    estimate of the numbers?

10           MR. KELLY:  No, Your Honor.

11           THE COURT:  Just to be clear, the Government's

12   position is again different.  You believe that the order

13   would not require the Government to provide these interim

14   services upon a time that a member of the class is granted

15   asylum; is that correct?

16           MS. MURLEY:  Yes.  At the end of the removal

17   proceeding.  Because a person who is applying for asylum is

18   in removal proceedings until the asylum is granted.

19           THE COURT:  Okay.  I understand.  All right.

20           MR. KELLY:  Your Honor, two points.  First is that

21   Your Honor asked several questions about numbers, and I

22   think that those are important, but I don't think we're

23   going to know those numbers until the contract is fulfilled.

24           And there's also a different group of people at

25   issue which are people who have applied for asylum, have had

1    that denied and are not appealing that.  So that's a

2    different group of people as well.

3          MS. MURLEY:  One clarification.  For the purpose

4    of this case, the way we're defining the transitional

5    period, those individuals would still be included in the

6    class.  Even though they would have a final order, it would

7    be on appeal either at the border or at the Ninth Circuit or

8    a different circuit court.

9          THE COURT:  Thank you.  I think the only other

10   area of dispute is the protective order.  Have I overlooked

11   any issue in which you have a dispute?

12         MS. MURLEY:  No, Your Honor.  I think we've

13   addressed them all.

14         THE COURT:  Mr. Kelly, is there any other matter

15   disputed other than the protective order?

16         MR. KELLY:  I don't believe so, Your Honor.

17         THE COURT:  All right.  Thank you.  Here's what

18   would be helpful to me, I've already stated, please submit a

19   proposed order where you disagree.  If you would include in

20   that this last disagreement even though it's not quite the

21   same red lining process because you have fundamentally

22   different views, but just give me your proposed language.

23   So I'm clear what outstanding disputes there are.

24         Can you do that?

25         MS. LALLY:  Your Honor, given some of the issues

1    the parties have had on timing, when would you like this

2    submission, Your Honor?

3             THE COURT:  How long do you think you need?

4             MS. LALLY:  You've asked defense to go first.

5    They can propose a date, and I would propose that we would

6    then respond within three days; and then it would be filed

7    immediately thereafter without further changes.

8             MS. MURLEY:  Tomorrow's a travel day for us, so we

9    won't be able to work on this.  Would seven days be

10   appropriate?

11            MS. LALLY:  So the 21st, or 20th?

12            MS. MURLEY:  Could you give us the 21st?  There's

13   a holiday weekend -- excuse me -- I understand that seems

14   like a long time, but there are four different client

15   entities that have to sign off on anything we do.

16            THE COURT:  Is your proposal, then, that the joint

17   filing would be made one week from tomorrow?

18            MS. MURLEY:  Excuse me, Your Honor, yes.  No,

19   sorry that we would give plaintiffs our submission one week

20   from tomorrow.

21            THE COURT:  I see.

22            MS. LALLY:  So that would be a Friday, so then

23   Tuesday, the 25th, we would add our portion without making

24   any changes to the Government's portion --

25            THE COURT:  Here's what I'd like you to do.  What

1    I'd like you to do is this, just to minimize the possibility

2    or my having to address disputes which aren't disputes, the

3    Government should provide by noon Pacific Time on the 21st

4    its proposed language.  The plaintiffs should by noon

5    Pacific Time on the 25th respond with how you propose to red

6    line the Government's change.

7           The Government should then determine by noon

8    Pacific Time on the 27th whether there's -- having --

9    conferring with counsel to have a final version of what's

10   disputed and then file it on the 28th.

11          Okay.  Can you do that?

12          MS. MURLEY:  Yes, Your Honor.

13          THE COURT:  That would be helpful.

14          MS. LALLY:  Yes, Your Honor.  Thank you.

15          THE COURT:  Are you all right?  Do you need a

16   break?

17          MS. MURLEY:  No, I've just had a lingering cold,

18   Your Honor.

19          THE COURT:  With respect to the protective order

20   issues -- just a moment.

21          The first one concerns paragraph 15, the use of

22   information in the public domain, and I -- my tentative view

23   is I agree with the Government's position that it's

24   appropriate not to provide expressly as to if something's in

25   the public domain or obtained through lawful means that it

1  can immediately be or it's no longer subject to the

2  protective order, because I think that could invite

3  unnecessary litigation.

4          Meaning, if the -- under the protective order,

5  once it's entered, any party can always seek relief.

6  Parties can seek relief to modify the protective order, a

7  party can seek to challenge another party's designation as

8  to what should or shouldn't be protected, a party can raise

9  the issue as to this should no longer be protected because

10 it's now in the public domain; it's been published.

11         I think rather than potentially have a dispute

12 after the fact as to whether or not something fit into this

13 category or it's in the public domain, I think it's a better

14 process for you to not have that in expressly, but obviously

15 it's there.  I mean, it's a matter of law.  If something

16 becomes public, then certain issues are raised as to whether

17 it should any longer be restricted by the protective order.

18 But I don't see this as a major issue.

19         Mr. Kelly.

20         MR. KELLY:  Your Honor, there is one thing that we

21 wanted to clarify, which is the way that we read the

22 provision is our concern is that at the point when

23 defendants began producing documents, we find something or

24 we read an article in the New York Times and we cite that

25 New York Times article to Your Honor and then defendants

1    come into court and say, "You violated the protective order

2    because the subject of that leaked to the New York Times"

3    was something that had somehow been produced under the

4    protective order and marked confidential.  What plaintiffs

5    don't want to have to do is guess everytime we read

6    something in CNN or the New York Times or various public

7    sources about whether somewhere in a massive production

8    there might be something that was allegedly the source of

9    that link.

10            So we're more than happy to follow Your Honor's

11   thoughts, but we do want some protection that if we do read

12   an article and cite it that we're not going to be held to

13   have violated Your Honor's protective order.

14            THE COURT:  I see.  Just a minute.

15            Limited to the issue of something that's been

16   published in a legitimate publication, in other words --

17   let's just talk about that.  If a news article from a

18   legitimate news source is quoted and has information that

19   may -- first, information that the Government also produced

20   in this case under the protective order, would the plaintiff

21   be precluded from presenting that article?

22            MS. MURLEY:  I don't -- I think we're talking

23   maybe about two different things.  There's a fine line

24   between citing a newspaper article that has -- quoting a

25   source or something and a newspaper article as referenced in

1  the case law that we've submitted here that's explicitly

2  references leaked documents that were known to be stolen

3  things or known to be taken from a Government agency.

4  Things that are not properly in the public domain, we cannot

5  agree to their use in this case as evidence.

6        THE COURT:  Again, I think this is something of an

7  academic issue because to the extent that you're going to be

8  -- the plaintiff would hypothetically be citing a news

9  article, which is at least one if not more levels of

10  hearsay, I'm not sure what power that evidence would have.

11        MS. MURLEY:  I agree.  I think the question is the

12  underlying documents.  Like a WikiLeaks scenario, we can't

13  agree to that.

14        THE COURT:  Just a minute.  Is there something you

15  wanted to add?

16        MR. KELLY:  Yes, Your Honor.  In this case,

17  already we have had to cite public news articles because

18  that's the only information we've gotten and Your Honor

19  yourself cited public news article.  And at a certain point,

20  we feel we may well have to do this again, particularly

21  since the newspapers keep coming out with statements -- with

22  articles about how more and more children are separated from

23  their parents.

24        And that's the sort of information that we expect

25  to need to cite in this case going forward; and that's the

```
1   kind of thing that we don't want to come into this courtroom

2   and be told we violated a protective order because CBS has

3   published that more kids have been taken.

4             THE COURT:  Just a minute.

5             Well, my view is this:  I understand your

6   positions, and as I started out with my comments,

7   modifications to a protective order can be made.

8             Further, there's relief available in terms of

9   requesting that if some particular document that's been

10  produced by either side and with the identification as it's

11  being subject to the limitations of the protective order,

12  the receiving party of that document can also seek relief

13  with respect to that document.

14            So I think that the better way to address disputes

15  on this is not to try to craft the language now that might

16  perfectly identify circumstances in which a document that

17  was produced and marked as confidential under the protective

18  order can be used by the receiving party because it's in the

19  public domain, which I think is a different issue than

20  whether a newspaper article or some other reasonable

21  publication can be produced.  I think the right way to do

22  this if it becomes a significant issue, then work with

23  Judge Kim on how promptly to resolve it without having to

24  necessarily bring a motion.

25            So to be clear, I don't think that -- it's one
```

1    thing if a party were to attach to a brief and file it on

2    the public file on the docket a document produced by another

3    party that was designated under the protective order as

4    confidential and did so without any communication with the

5    producing party as to whether there's an objection to having

6    it in the public docket.

7           That's different than you alluded, Mr. Kelly,

8    attaching an article from a recognized news source, quoting

9    the news article.  And that's also different than

10   obtaining -- the same document becomes available through

11   some other means, it's different than again attaching the

12   document that became available through the other means.

13          I think the way to handle this is what I said.  I

14   think it's harder to parse out all the hypotheticals in the

15   protective order by including this language, and I think the

16   better way to do it is what I stated, is to -- recognizing

17   that the protective order can be modified, recognizing that

18   a designation of the document is confidential under the

19   protective order is not a definitive determination by the

20   Court as to whether it should be.  I think these changes are

21   appropriate.

22          Has this issue come up?  Have you actually had a

23   dispute on this?

24          MR. KELLY:  Your Honor, we did not.  We have not

25   received any confidential documents, other than the class

1   list, so no.

2          MS. MURLEY:  No, Your Honor.  The Government

3   cannot agree to use -- we can't consent to the agreement of

4   leaked information in this case, or information that was

5   stolen from the Government.

6          THE COURT:  I understand.  But again, there's a

7   hypothetical there if information were stolen or the

8   Government contends it was stolen and it's now been widely

9   distributed across the world, the question would become:

10  Well, is it still appropriate to restrict it under the

11  protective order?  I can't say.  Without knowing the facts,

12  I can't say.

13          Just a minute.

14          You also have a dispute on paragraph 26 about the

15  use of information subject to the protective order and

16  whether it should be restricted to use in this litigation.

17  It's a similar dispute, frankly.  We could craft language

18  that say, provided, however, this is without prejudice to an

19  application by either party for leave to submit some

20  disclosure for purposes other than this litigation.  But you

21  already have that right.  So it's a similar thing.  I think

22  this is something that's better adjudicated in the context

23  of a particular dispute.

24          Mr. Kelly.

25          MR. KELLY:  I'm sorry, Your Honor.  Seeking

1    clarification on that.  So would your proposal be to include

2    the language and then have the Government -- sorry, there

3    aren't two different versions of this language.  Plaintiffs

4    are requesting the language and the Government is not, and

5    I'm just wondering whether Your Honor is suggesting

6    including the language or not.

7            THE COURT:  Well, what I'm saying is it could be

8    included but the use in this litigation, but it's the same

9    issue that I think we had a minute ago in a different

10   context, meaning it may be appropriate for the information

11   to be used for reasons other than this litigation putting

12   aside Ms. L, for example.  Let's put that over here.  But

13   there may be, and I think that's something that could be

14   determined based on application.

15           MS. MURLEY:  Your Honor, we read the language that

16   plaintiffs have proposed as restricting our statutory

17   function under our obligation to share as law enforcement

18   agencies information that we have obtained, and we cannot

19   ignore those statutory functions.

20           DOJ is a law enforcement agency, DHS is a federal

21   law enforcement agency.  If it comes to light in the

22   litigation, we have reason to be concerned.  ORR has

23   reporting requirements if we find out that there are abuse

24   issues or criminal issues.

25           So those are all things that the Government has

1   secondary or, I would say, primary obligations upon receipt

2   of this information that we cannot ignore.

3          MR. KELLY:  And, Your Honor, plaintiffs would say

4   that in that situation, which we don't expect to arise, the

5   Government should file a motion asking for the document to

6   be marked nonconfidential.  And we think this is a very

7   unlikely event to happen, and the Government can very easily

8   say:  This document, we believe, is a crime or this document

9   is -- they mention terrorism repeatedly in their papers.  I

10  seriously doubt we're going to wind up with terrorism in a

11  case where we're trying to provide mental healthcare to

12  people.  But to the extent that those documents do come up,

13  the Government can very easily apply to Judge Kim who has --

14  they can ask us, and then they can then apply to Judge Kim

15  who has an informal process.  This can be handled very

16  readily, very quickly, through that application.

17         THE COURT:  What about that approach?  Including

18  the possibility of an in camera request to the extent that

19  the Government contends that a particular document's

20  disclosure to anyone would be prejudicial.

21         MS. MURLEY:  We don't think that the Government

22  should be restricted from in a protective order carrying out

23  its statutory functions.  We have obligations.  I would

24  point the Court to the *AOL* litigation, the case that we

25  cited that found similar language unduly restrictive and

1   that the Government could not be bound in a way that is

2   contrary to its statutory functions.

3           MR. KELLY:  Your Honor, we would note that this is

4   a standard provision and the Government has, in multiple

5   cases, agreed to it, including *Ms. L.*  And it's a standard

6   provision in Judge Kim's protective order.  And so the

7   statement that the Government can't bind itself to this is

8   gainsaid by the fact that the Government has bound itself to

9   this in multiple other litigations.  And then when they've

10  tried to change it, the Tenth Circuit has held that they

11  can't.  That's the *SEC v. Merrill* case.

12          So we would submit that the appropriate way

13  forward here is, to the extent there's any documents that

14  arise, the Government should make a motion.

15          THE COURT:  Okay.

16          MS. MURLEY:  I would like to make two points.

17  With regard to the protective order that was entered in

18  *Ms. L*, that was for a different reason.  That case is in a

19  very different procedural posture.  The information

20  exchanged in that case is exclusively for the purposes of

21  carrying out the injunction in that case.  It consists of

22  data.  There has not been a 26(f), there has not been any

23  request for documents.  That protective order was entered

24  into with the idea that we would enter into another

25  protective order when we reached the discovery phase.

```
 1              The second point I'd like to make, and I'd like to
 2    highlight the Otro Lado case where the Court found that it
 3    agreed with the defendants to the extent that the language
 4    proposed by the plaintiffs, which does not allow for any
 5    intra- or intergovernmental sharing of confidentially
 6    designated information, is unduly restrictive when balanced
 7    against defendants' law enforcement-related interests from
 8    particularly the mandatory disclosure requirements of IRTPA.
 9    We can't be bound to not share our own information.
10              MR. KELLY:  Your Honor, first off, the protective
11    order explicitly says that the parties can do whatever they
12    want with their own information.  And, second, plaintiffs
13    are not asking for a permanent ban on this information being
14    used outside the litigation.  They're asking that before
15    information is used outside the litigation that the
16    Government has to come to this court so that we're not
17    winding up in a situation where people are going out trying
18    to offer mental healthcare to someone and that person
19    refuses the healthcare because they're afraid the
20    information will be immediately turned over and used to
21    deport them.
22              We are very concerned that by not at least forcing
23    the Government to move this court to allow this information
24    that we're going to wind up having the very difficult task
25    of reaching these people and offering them this healthcare
```

 1  become an impossible task because people will hide from us

 2  because they're going to be afraid that we're just passing

 3  everything to the Government.

 4            THE COURT:  Just a minute.

 5            If hypothetically a minor is being provided

 6  treatment by a Government through the Government process and

 7  the person who is working with the minor hears from the

 8  minor something that that person under that person's

 9  professional responsibility, obligations, whether by code of

10  responsibility or statute in some states, is obligated to

11  disclose.  Are you with me?

12            MR. KELLY:  Yes, Your Honor.

13            THE COURT:  So under those facts, would that mean

14  that under this order that person couldn't fulfill that

15  person's disclosure obligation?

16            MR. KELLY:  Not at all, Your Honor.  That piece of

17  information would never be produced by plaintiffs.

18  Plaintiffs would never mark that protected material and that

19  is something that the treatment officer would immediately

20  report to their superior.  That would never become a piece

21  of information in this litigation.  The person would follow

22  their professional obligations.

23            What we're talking about is the information that

24  is produced by plaintiffs in this litigation.  This is not

25  that situation at all.

```
1            MS. MURLEY:  Just to clarify, information received
2   by Seneca would be information received from a Government
3   contractor at that point to the Government.  We would not be
4   restricted.  That would not be information that was produced
5   to us by plaintiffs.
6            THE COURT:  Well, again, I think -- I mean, I've
7   looked at -- I'm mindful of the various cases that have been
8   cited here, many of them district court cases.  There's also
9   appellate authority on this.  I think this is one where the
10  more straightforward outcome is to do what I said at the
11  outset, and that is to adopt this language provided;
12  however, this is without prejudice to the application by a
13  party for leave to admit disclosure for purposes other than
14  this litigation, including an application that's made for
15  in camera -- made in camera if justified.
16            Because that way -- just on a practical level,
17  Judge Kim, if this comes up at all and it comes up more than
18  once, I think Judge Kim will then have a good database in
19  which to make a determination as to whether the order should
20  be modified.  It's not a determination that I'm disagreeing
21  with the Government here, it's a determination similar to
22  the one that I made as to the other provision.  I think the
23  better way to resolve this dispute is in the context of
24  something that actually happens.
25            MS. MURLEY:  Yes, Your Honor.  Just one
```

```
 1    clarification.  So this clause, if left in the protective
 2    order, applies solely to information produced to defendants
 3    from plaintiffs?
 4             THE COURT:  Correct.  That's what it says.
 5             MS. MURLEY:  And not information that we could
 6    have obtained from another source or --
 7             MR. KELLY:  With a slight qualification.  It's
 8    information that you -- it doesn't apply to information that
 9    you did obtain from other sources, it would apply to
10    information that you received from plaintiffs but could have
11    gotten from other sources.  But I think that's what you
12    meant.  So information from Seneca would not be covered
13    by --
14             THE COURT:  Again, we can come up with other
15    hypotheticals, but I don't think we need to.  Again, my
16    determination here is a procedural one.  It's how best to
17    resolve the dispute.  I think the best way to do that is in
18    the context of actual disputes.
19             As I've stated, if hypothetically there's a
20    national security interest that warrants an in camera
21    filing, it could be made in that sense and then Judge Kim,
22    if it's challenged, Judge Kim can be asked to make a
23    determination as to whether it should remain in camera.
24             MS. MURLEY:  Yes, Your Honor.
25             MR. ROSENBAUM:  Your Honor, could we get a
```

1  clarification, please.

2         THE COURT:  Could you stand when you speak.

3         MR. ROSENBAUM:  It's not clear to me from the

4  Court's discussion whether or not information that is

5  obtained by Seneca is going to be information that the

6  Government can willy-nilly turn over.  If that is the

7  situation, then that's going to frustrate or make impossible

8  Seneca talking to individuals and saying, you know, this is

9  not going to end up in the Government's lap or be used for

10 removal purposes.

11        MS. MURLEY:  I understood plaintiffs to say that

12 it would not be information that was covered by this

13 paragraph.  I mean, that's what I thought they had just

14 said.  One.  Two, there would be no restriction because we

15 can do what we want with information obtained by our

16 contractors.

17        THE COURT:  Go ahead.

18        MR. ROSENBAUM:  I think that is going to undermine

19 the capacity of any mental health professional to obtain

20 information and provide appropriate therapy, and I think the

21 suggestion that the Court started with, which is let's take

22 this on a case-by-case basis, let's make a determination as

23 to what the need is.

24        But the first question that Seneca is going to be

25 asked is:  If I tell you something, could this be used for a

1  removal purpose, particularly, in light of the earlier

2  discussion today where there are ongoing proceedings.

3  That's the first question that is going to be asked.

4          THE COURT:  Just a minute because I think this is

5  a different dispute.

6          MR. ROSENBAUM:  I just want to get it clarified.

7          THE COURT:  I can't clarify something that isn't

8  part of this dispute.  This dispute concerns information

9  that's produced by one party to the other and how it can be

10 used.  That's different than if a member of a class

11 communicates with a mental healthcare provider, what

12 restrictions are placed, if any, on that mental healthcare

13 provider's ability to share that information.  That's a

14 different issue.

15         MR. ROSENBAUM:  I take Your Honor's point, but I

16 do want to make sure that this is clarified because this

17 could be toxic to the whole process.

18         THE COURT:  I thought you had talked about this

19 issue.

20         MS. MURLEY:  It was my understanding -- what we're

21 talking about right now does not cover Seneca information.

22         THE COURT:  I understand that.  But I thought

23 there had been a discussion about the use of information

24 that might be provided by class members to healthcare

25 providers.

1          MS. MURLEY:  I don't know that the Government --

2     there are reporting requirements built into the contract

3     where information should be shared, and I think -- I don't

4     have it in front of me at this point.

5          Give me one second.

6          MR. ROSENBAUM:  I appreciate the Court taking

7     consideration of this because that's privileged information,

8     and it's the guts of the whole process.

9          MS. MURLEY:  We would be getting not reports of

10    the actual sessions.  It would be statistical reporting

11    requirements:  Names, what individual class members had

12    availed themselves of the relief, who had not.

13         THE COURT:  I think you need to talk more about

14    this one because, as I stated, the issue here is different

15    than that.  What I would request you do is to confer further

16    with respect to what, if any, restrictions would be placed

17    on information provided by a class member to a healthcare

18    provider pursuant to the injunctive order.

19         And again, it may be that it's challenging to

20    identify what limitations there might be.  A healthcare

21    provider receiving certain information may have a statutory

22    or professional obligation to disclose it to someone.  Other

23    information, they may not have that obligation.  I think

24    this is something you need to think through.

25         MS. MURLEY:  We need reporting from the Government

1    contractor to carry out the functions of the contract.

2            THE COURT:  No, I understand that.  I don't think

3    the issue is whether everything that's communicated by a

4    class member to a healthcare provider cannot be disclosed to

5    any other person.

6            I think the concern that's being expressed by the

7    plaintiffs is hypothetically, if a person is being asked --

8    if a member of the class is being asked questions as part of

9    a healthcare process, will that person be open and

10    available -- willing to provide information that would

11    assist hypothetically the healthcare if the person fears

12    that that information would be adverse to that person's

13    interest in connection with some other process and,

14    therefore, would be hesitant to do so because it feels that

15    information might be shared with others, including the

16    Government.  That's a different issue than this one.

17            MR. ROSENBAUM:  I appreciate that, Your Honor.

18    And it may be -- if we're talking about statistics, we don't

19    have a dispute.

20            THE COURT:  Again, maybe this is something --

21    until the care starts being provided, it's not yet at issue

22    exactly.

23            MS. MURLEY:  Your Honor, one point.  With regard

24    to the first issue of the protective order, paragraph 15,

25    it's not clear to defendants what language -- whose language

```
 1   you've adopted.  I think it's defendants, but we're just

 2   seeking --

 3           THE COURT:  Correct.  I would adopt defendants'

 4   language for the reasons I've stated, because I think this

 5   can be tested on a case-by-case basis.

 6           MS. MURLEY:  Thank you.

 7           THE COURT:  You're welcome.

 8           I think the final dispute is about the clawback

 9   provision and the inadvertent disclosure of privileged

10   information.  What I'm inclined to do with respect to this

11   dispute about paragraph 24, I'm inclined to adopt the

12   plaintiffs' version of this because I think the principal

13   difference is whether a receiving party has an obligation to

14   review everything that's produced to it and then make its

15   own determination as to whether there may have been an

16   inadvertent production of privileged information.

17           I'm not persuaded that that's an appropriate or

18   necessary requirement, but at the same time -- because,

19   among other things, I think this could lead to a lot of

20   disputes as to whether the receiving party knew or should

21   have known that this was privileged and did the receiving

22   party then file a brief referring to it in some fashion that

23   is then challenged.  And said, "Well, you must have known

24   about it, yet you didn't fulfill your obligation to us to

25   tell us about it."
```

1          I just find this unusually burdensome.  It's more

2     about process.  If there are thousands of documents

3     produced, my concern is that the receiving party shouldn't

4     have the immediate burden to review everything to see if the

5     producing party made a mistake.  The producing party should

6     do its best not to make a mistake.  If the producing party

7     makes a mistake, there's a remedy under the rules and the

8     producing party would then seek that remedy.

9          MS. MURLEY:  Your Honor, I don't read that

10    provision, paragraph two, that way.  It's my understanding

11    this provision just details what happens if they come across

12    information that they believe is privileged.  If they come

13    across attorney-client information, that they have an

14    obligation to alert us.

15         And then it sets out -- in a case like this where

16    we expect voluminous electronically stored information that

17    having a clawback agreement that is more robust, that

18    explicitly details what the parties are to do and sets out a

19    mechanism for dispute and correction -- actually eases the

20    burden on the Government for producing because we have so

21    many governmental privileges that are at stake in this case.

22    Where instead of one to two levels of review, if there's not

23    an obligation to tell us if you see information that you

24    think is privileged that it could slow down the process.

25         We've also had cases where we're talking -- where

1    we have such large volume of information, particularly in

2    this case, about five different governmental entities that

3    we're currently pulling in and searching, that the -- that

4    turning over large swaths of information that may be

5    privileged, to have a more robust clawback agreement in

6    place protects that process and protects the Government's

7    ability to identify those privileges and get that material

8    back.

9         I will also add that plaintiffs raised the issue

10   that we would -- it's like gotcha, where we've turned over

11   information, we're about to use it, and then we claim

12   privilege over that.  We would not be turning over

13   information that's privileged on purpose.  It would be

14   purely accidental or oversight or a screwup at the lab,

15   which has happened.  We think that the way the clawback

16   order is written, the one we've drafted actually reduces the

17   litigation because it is more clear, it sets out more

18   standards for the parties to follow with regard to this

19   information.  And the focus is on flexibility under 502(d).

20        THE COURT:  Mr. Kelly.

21        MR. KELLY:  Yes, Your Honor.  I would just point

22   Your Honor to the comment, to 502(b), which is when it was

23   adopted, they said:  "The rule opts for the middle ground:

24   Inadvertent disclosure of protected communications or

25   information in connection with a federal proceeding.  It

58

1  does not constitute waiver if the holder took reasonable

2  steps to prevent disclosure and promptly took reasonable

3  steps to rectify the error.  And this position is in accord

4  with a majority view on whether an inadvertent disclosure is

5  a waiver."

6         Here, our real point is we don't know all of the

7  various governmental privileges that the Government may or

8  may not assert, and we can't go through a giant production

9  and try and guess what they'll call subject to whatever

10  privilege and then have to raise it to them saying:  Maybe

11  you might have meant this.  We don't want to get into a

12  situation where we cite something and it becomes:  "Oh,

13  wait, no, that was privileged."  And under a privilege that

14  we have not even had raised to us yet.

15         THE COURT:  Let me ask you this question.  If --

16         Just a minute.

17         Suppose that a document is produced that's

18  received and reviewed and at the top it says

19  "attorney-client communication privileged and confidential."

20  If the plaintiffs' form of the order were adopted, there's

21  no expressed obligation of the plaintiffs -- the plaintiffs

22  or either party -- to do anything upon reviewing such a

23  document.

24         Now, to be sure such a document, although it may

25  appear to be privileged may not be.  The party producing it

```
1    may have concluded that it isn't and so therefore produced

2    it.  But if there's something that is unsubtle and if the

3    plaintiffs' proposed version of this provision is adopted,

4    does that -- does the party that receives such a document

5    have any obligation?

6              MR. KELLY:  I believe we do under the rules of

7    professional conduct, Your Honor.  That's covered.

8              So if I see something that's attorney-client

9    privileged or I think it is, then I'm obliged to segregate

10   it and point it out to defendants.

11             But if I see something that may be some kind of

12   deliberative process privilege that I've never even heard of

13   before, I'm not going to know that.

14             MS. MURLEY:  And I agree the opposing party is not

15   going to know every Governmental privilege or which

16   document, but I think that the way -- what this does is if

17   even under the obligation under the rules, if that document

18   is identified, this provides a procedure for which the

19   parties are to follow.

20             THE COURT:  What I'd be inclined to do is to add a

21   section to plaintiffs' proposed paragraph 24 which refers

22   specifically to the obligation that each side has under the

23   rules of professional responsibility to notify the producing

24   party if the receiving party under those rules has reason to

25   conclude that a document was inadvertently produced
```

1  notwithstanding its privilege.

2          And, once again, my view is this -- I think that

3  this is another one of those issues as you develop some

4  experience with what's happened, it may warrant

5  modification.

6          MS. MURLEY:  I will add that the more robust 502

7  agreement is based on our office's experience with the

8  inadvertent disclosure of privileged information which

9  unfortunately happens a lot more than we would like.  And we

10 have adopted sort of as a policy a push for more robust

11 because the way that has been written in the past has not

12 been sufficient and has led to needless litigation between

13 the parties.

14         I would ask that with the adoption of the Court's

15 paragraph if that were to replace the obligation that the

16 procedures in place for identifying that information, that

17 we keep those because I think it makes sense to say if you

18 dispute -- if plaintiff counsel identifies such information,

19 what do we do then, how many days, when do we go to the

20 court if they dispute the Government --

21         THE COURT:  You're saying if in the exercise of

22 fulfilling one's professional responsibility one receives a

23 document that he or she thinks may have been inadvertently

24 produced and you would have a time schedule for when that

25 information should be transmitted to the producing party?

```
1              Any objection to that?

2              MS. MURLEY:  And disputes over that information.

3    That way, I think that actually reduces litigation over the

4    issue.

5              MR. KELLY:  Any objection to a time period after

6    we identify it, Your Honor?

7              THE COURT:  Just a process.  In other words, it

8    would say:  Fulfill your obligations that you already have

9    under the rules of professional responsibility to notify the

10   producing party of a potential inadvertent disclosure and it

11   can go on and say when that happens.  If the producing party

12   contends, yes, this was inadvertently produced and the

13   receiving party disputes that, there's a method for

14   resolving that expressly stated.  I don't think that adds --

15   I think that would work.

16             MR. KELLY:  That works for plaintiffs, Your Honor.

17             MS. MURLEY:  That works for us too.

18             THE COURT:  Fine.  In light of what I've said

19   today, put together a new version of the protective order,

20   put it into that same queue, where you're going to talk

21   about red lining in case you get to a dispute about

22   particular language and then submit to me -- not necessarily

23   agreed upon, but an order that you agree is consistent with

24   my rulings.  And then if there's a dispute about some

25   particular language, show me a red line.
```

 1          MS. MURLEY:  Yes, Your Honor.

 2          THE COURT:  And can you do that on the same

 3   schedule as the other submission?

 4          MS. MURLEY:  Yes, Your Honor.

 5          MR. KELLY:  We can, and we will endeavor to do

 6   more quickly.

 7          THE COURT:  Thanks.  I think those are the issues

 8   that we needed to address.

 9          Did I miss anything?

10          MS. MURLEY:  Not to my knowledge.

11          MS. LALLY:   No, Your Honor.

12          THE COURT:  Thank you for your help.  I know

13   you've said having a neutral assisting with any future

14   disputes is not necessary.  That's fine.  If the parties at

15   any point going forward believe that some further

16   facilitative discussions about trying to resolve the entire

17   dispute would be productive, then let me know.  And we can

18   see what bench officer might be available.  Judge Otero is

19   leaving the bench, but others might be available.  So let me

20   know.

21          MS. LALLY:  Thank you, Your Honor.

22          MS. MURLEY:  Thank you.

23          THE COURT:  Thanks for your help today.  Safe

24   travels.  I hope your cough gets better.

25          MS. MURLEY:  Thank you.

1          *(Thereupon, at 3:12 p.m., proceedings adjourned.)*

2

3                              -oOo-

4

5                            CERTIFICATE

6

7          I hereby certify that pursuant to Section 753,

8     Title 28, United States Code, the foregoing is a true and

9     correct transcript of the stenographically reported

10    proceedings held in the above-entitled matter and that the

11    transcript format is in conformance with the regulations of

12    the Judicial Conference of the United States.

13

14    Date:  February 19, 2020

15

16                              /s/ Lisa M. Gonzalez

17                              _____
                                Lisa M. Gonzalez, U.S. Court Reporter
18                              CSR No. 5920

19

20

21

22

23

24

25